JUDGE NATHAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



———————————————————— x
LILI SCHAD, Individually and on Behalf of  :
All Others Similarly Situated,             :
                                           :
          Plaintiff,                       :     Civil Action No. _____
                                           :
     vs.                                   :
                                           :
HARBINGER CAPITAL PARTNERS LLC,            :     **CLASS ACTION COMPLAINT**
HARBINGER HOLDINGS, LLC and PHILIP         :
A. FALCONE,                                :
                                           :
          Defendants.                      :     JURY TRIAL DEMANDED
                                           :
———————————————————— 



| ZAMANSKY & ASSOCIATES LLC | GIRARD GIBBS LLP |
|---|---|
| *Co-counsel for Plaintiff* | *Co-counsel for Plaintiff* |
| JACOB H. ZAMANSKY | DANIEL C. GIRARD |
| EDWARD H. GLENN, Jr. | AMANDA M. STEINER |
| KEVIN D. GALBRAITH | LESLEY VITTETOE |
| 50 Broadway, 32nd Floor | 601 California Street, 14th Floor |
| New York, NY 10004 | San Francisco, CA 94611 |
| Tel.: (212) 742-1414 | Telephone: (415) 981-4800 |
| Fax: (212) 742-1177 | Facsimile: (415) 981-4846 |
| jake@zamansky.com | dcg@girardgibbs.com |

## INTRODUCTION

1.     Plaintiff Lili Schad, by and through her undersigned counsel, brings this action individually and on behalf of all persons and entities who purchased or otherwise acquired limited partnership interests in Harbinger Capital Partners Fund I, L.P. (the "Fund" or "Harbinger"), pursuant to the October 2007 Confidential Offering Memorandum, as amended from time to time (the "Offering Materials"), and held their interests as of December 31, 2011("Class Members" or "Limited Partners"). She brings this action against the general partner, Harbinger Capital Partners, LLC, the managing member of the general partner, Harbinger Holdings LLC, and Philip A. Falcone.   She sues Defendants for breaching contractual and fiduciary duties to the Limited Partners and making deceptive and misleading statements in the course of soliciting investments in the Fund and communicating with the Limited Partners.

2.     Plaintiff and the other Class Members are limited partners of the Fund.   They invested in the Fund after receiving the Offering Materials and signing a subscription agreement. The Offering Materials stated that the Fund would pursue an investment strategy designed to "achieve superior absolute returns by participating in investments primarily involving distressed/high yield debt securities, special situation equities, and private loans and notes."   The Offering Materials stating that the Fund "focuses primarily on turnarounds, restructurings, liquidations, event driven situations and capital structure arbitrage," and "seeks to achieve its investment objectives by employing a disciplined value investing approach based on intensive credit research."

3.     Plaintiff and the other Limited Partners were required, as part of their subscription agreement, to warrant and represent that they each "solely relied" on the Offering Materials in connection with their investments.   The representations in the Offering Materials concerning

investment strategy were the only source of information available to investors in the Fund in connection with their investment. Defendants reportedly raised as much as $20 billion through the sale of interests in the Fund by means of the Offering Materials.

4.     Defendants implemented a very different investment strategy, which bore little or no resemblance to the investment strategy described in the Offering Materials. That strategy involved concentrating a substantial percentage of the Fund's resources to acquire and operate LightSquared (originally SkyTerra), a development-stage wireless telecommunications company. Defendants had no relevant expertise or experience in telecommunications, in operating a wireless network, or in managing the regulatory issues associated with wireless technologies. Defendants did not advise Class Members of their plan to concentrate the Fund's resources in LightSquared, the extent to which the Fund's resources had actually become concentrated in LightSquared, or the impending regulatory challenges facing LightSquared until after media reports and Falcone's entanglement in a series of media controversies and regulatory inquiries brought the extent of the Fund's problems to light.

5.     Defendants have reportedly invested at least 60% of the Fund into LightSquared. LightSquared's commercial viability depends on a license granted it by the Federal Communications Commission ("FCC") to operate and broadcast on the L-squared broadband spectrum, which is adjacent to the spectrum used by satellites. The FCC conditioned the license on LightSquared's ability to resolve interference problems between its proposed network and global positioning systems ("GPS") employed by the military, airlines, and transportation companies. On February 15, 2012, the FCC announced that its conditional approval granted to LightSquared was indefinitely suspended because of the GPS interference. Most industry

commentators believe that LightSquared's proposed network is no longer viable. As a result, the Limited Partners stand to lose substantially all of the value of their investments.

6.      Defendants first advised Plaintiff and the other Limited Partners that LightSquared's technology interfered with GPS systems on or about August 19, 2011. Nothing in the Offering Materials or any subsequent reports or communications from Defendants to investors prior gave any indication that Harbinger's investment in LightSquared might be in jeopardy, and Defendants have yet to advise investors of the impact LightSquared's failure will have on their investments. Defendants knew from the outset, or were reckless in failing to know, that LightSquared's technology interfered with GPS systems. Falcone's attorney wrote Senator Charles Grassley on October 19, 2011 and acknowledged that LightSquared's predecessor had attempted to address GPS interference problems as early as 2002.

7.      By "going all in" on LightSquared, Defendants materially deviated from the Offering Material's representations that the Fund would seek to achieve attractive returns by investing in distressed debt, special situation equities, and private loans and notes. The risks, rewards and time horizon implicit in the LightSquared investment were not those attendant upon an investment in a hedge fund with the objectives and investment strategy described in Harbinger's Offering Materials. The Offering Materials stated that Defendants would "monitor portfolio volatility and risk," but the risks associated with Defendants' concentration of the Fund's resources on LightSquared could not be controlled or managed through customary credit risk management techniques employed to manage portfolio risk and volatility.

8.      Had Plaintiff known that Defendants would concentrate the Fund's investments in LightSquared or known of the regulatory obstacles the company faced, she would have refrained from investing in the Fund or immediately sought to withdraw her investment from the Fund.

Yet Defendants failed to provide Plaintiff and the other Limited Partners with the information they needed in order to determine if an investment in the Fund met their objectives. Defendants also failed to provide Fund investors with candid information concerning the status of the Fund's investment in LightSquared, depriving them of the ability to determine if they wished to maintain their investments in the Fund.

9.      At the same time, Defendants have allowed certain favored investors to redeem their investments at times and on terms unavailable to Plaintiff and other Limited Partners. For example, in 2009, at a time when other limited partners were precluded from withdrawing their investments from the Fund, Defendants allowed Goldman Sachs to redeem a $50-million interest in the Fund. By allowing Goldman Sachs to withdraw its investment, Defendants further concentrated the remaining limited partners' assets interest in the Fund's impaired investment in LightSquared. In December 2011, the SEC formally notified Falcone that it was considering enforcement action against him in connection with the redemption of Goldman Sachs's interest in the Fund.

10.      Defendants' actions violate the rights of, and have damaged, Plaintiff and Class Members. By inducing Plaintiff's investment through the Offering Materials, then concentrating the Fund's assets in LightSquared and failing to notify Plaintiff of the extent of the Fund's concentration and regulatory challenges LightSquared faced, Defendants have deprived her and other similarly situated limited partners of information they required to exercise their rights as limited partners. Plaintiff asserts claims for breach of fiduciary duty, gross negligence, breach of contract, equitable fraud and fraudulent misrepresentation and/or omission. She seeks damages according to proof.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331-1332.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367.  The aggregate amount in controversy exceeds $5,000,000, and less than two-thirds of all Class members reside in the State of New York.

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) and (b).

## RELEVANT NON-PARTIES

13.     Harbinger Capital Partners Fund I, L.P. (the "Fund" or "Harbinger") is a limited partnership organized under the laws of the State of Delaware.  The Fund has a principal office c/o Harbinger Capital Partners LLC, 450 Park Avenue, 30th Floor, New York, New York 10022.

14.     Harbinger Capital Partners Master Fund I, L.P. (the "Master Fund") is a company organized in the Cayman Islands. Upon information and belief, the Master Fund and Fund are managed under a master-feeder structure so that the Fund is allocated a portion of the holdings of the Master Fund.  The Master Fund has a principal office c/o Harbinger Capital Partners LLC, 450 Park Avenue, 30th Floor, New York, New York 10022.

## PARTIES

15.     Plaintiff Lili Schad resides in Walkill, New York.  She invested $4 million in Harbinger and suffered damages as a result of Defendants' misconduct described herein.

16.     Defendant Harbinger Capital Partners, LLC ("HCP") is a limited liability company organized under the laws of the State of Delaware.  HCP is the general partner of the Fund and the Master Fund and has a principal office at 450 Park Avenue, 30thFloor, New York, New York 10022.   HCP is also the investment manager and/or general partner of the Fund, the Master Fund and other affiliated funds.

17.    Defendant Harbinger Holdings LLC ("Holdings") is a limited liability company organized under the laws of the State of Delaware. Holdings is the managing member of HCP, and has a principal office at 450 Park Avenue, 30th Floor, New York, New York 10022.

18.    Defendant Philip A. Falcone is the co-founder and Chief Investment Officer of HCP.

19.    Falcone controls HCP and Holdings, which, in turn, control the Fund. Harbinger is an instrumentality and alter ego of Defendants. Among other things, they have a common address and common financial interests and principals.

## FACTUAL ALLEGATIONS

### A.    The Harbinger Fund

20.    In 2001, the Harbinger hedge fund was co-founded by Falcone, its CEO. Beginning in late 2006, Falcone invested heavily in credit default swaps on mortgage-backed securities that held pools of subprime mortgages. These investments were essentially "bets" on the collapse of the subprime mortgage market that would profit if the securities defaulted. When the subprime market collapsed in 2007, Falcone's hedge funds recorded multi-billion dollar gains.

21.    The Offering Materials for Harbinger consisted of a Confidential Offering Memorandum dated October 2007, and its amendments and/or supplements, dated June 2008, October 2008, December 2008 and March 2009.

22.    In the Offering Materials, Harbinger stated that its investment strategy would focus "primarily on turnarounds, restructurings, liquidations, event driven situations and capital structure arbitrage." These investment strategies involved committing partnership capital for limited time periods and short- or medium-term exit strategies or options for the Fund to

capitalize on its investment or unlock value.   While the general partner's investment authority was described as broad and flexible, the Offering Memorandum states:

### SUMMARY

The Partnership seeks to achieve superior absolute returns by participating in investments primarily involving distressed/high yield debt securities, special situation equities, and private loans and notes. The Partnership focuses primarily on turnarounds, restructurings, liquidations, event driven situations and capital structure arbitrage, with characteristics that are consistent with the Partnership's underlying investment strategy, building a portfolio including long and short positions of highly leveraged and Financially distressed companies.

It is anticipated that most traditional distressed investments by the Partnership will be made through the Master Fund while investments that are more active in nature (e.g., revolvers and active loans) or involve other tax, regulatory, foreign ownership or special considerations may be made through one or more Special Purpose Funds. The use of the Special Purpose Funds is intended to allow the Partnership to receive the desired economic benefits while insulating it from such considerations. Ultimately, however, allocations between the Master Fund and the Special Purpose Funds will be made in the sole discretion of the Investment Adviser.

### Investment Strategy

The Partnership seeks to achieve its investment objective by employing a disciplined value investing approach based on intensive credit research. When selecting individual investments, the Harbinger Capital Partners investment team typically analyzes the issuing company's business, competitive position and financial condition to assess whether the security is expected to fit the Partnership's parameters. The Partnership expects to monitor diversification within the portfolio, with investments in anyone company or anyone industry being compared to general concentration guidelines, as measured at the time of investment. These guidelines may change from time to time, are not strict limits, and may be exceeded.

When evaluating potential long positions, the Partnership's research focus will be tailored to the specific investment opportunities. In the case of current or anticipated restructuring or bankruptcy investments the Partnership typically will seek to purchase securities at a price, which when considered with the claims of other securities holders, will allow the Partnership to "create" the underlying investment at an attractive valuation compared to private market, public market or merger comparables. The anticipated time to complete the restructuring or bankruptcy may also be an important factor in the determination of the attractiveness of these situations. For example, bonds issued by companies in the process of a turn-around can be attractive due to their depressed prices in relation to the interest coupon payments. In these situations the Partnership's research may focus on available cash flow, liquid assets and the availability of credit to meet these payments,

- 7 -

together with an evaluation of management's plans to reposition the business and reduce debt. The securities of companies in liquidation may be attractive when they can be purchased at a price that is materially below the Partnership's assessment of the asset values upon which the securities have senior claims. The Partnership may frequently receive equity in a newly reorganized company in exchange for securities held prior to the reorganization. The Partnership may in certain instances seek to further increase its equity ownership through other means, including the participation in or backstop of a rights offering or negotiated direct investments. The analysis of event driven investments generally revolves around the Partnership's evaluation of both the value of the underlying securities and the timing and probability of a specific event such as an exchange offer, emergence from or announcement of bankruptcy, earnings announcement, outcome of creditor negotiations, etc. Depending on the specific type of event anticipated, the Partnership may be long, short, or both long and short the securities of the same issuer.

23.     The Offering Materials also said that Harbinger had risk management guidelines and procedures in place, and that it monitored volatility and risk.  The Offering Memorandum states:

### Risk Management

Investment in the securities or debt of distressed issuers involves a high degree of risk. Such investments are generally not listed on major securities exchanges and the ability to buy or sell securities and their prices may fluctuate widely depending on conditions specific to the issuer or general market and economic circumstances. Consequently, the Partnership intends to employ a range of risk management guidelines and procedures, from time to time, in its efforts to monitor portfolio volatility and risk. The Partnership's current risk management guidelines, which are subject to change without notice, include investment guidelines providing for the monitoring of the proportion of the Partnership's net asset value invested in anyone issuer or anyone industry or sector. These guidelines may change from time to time, are not strict limits, and may be exceeded.

24.     Investors were required to sign a subscription agreement that, among other things, stated that they would rely only on information provided in the Offering Memorandum.  The agreement stated (with emphasis added):

**THIRD**: The New Limited Partner further represents, warrants, acknowledges and agrees that:
(a)     He (or his Purchaser Representative, if any, who has been designated by him) is entering into this Agreement **relying solely on the facts, terms and disclosures set forth in this Agreement, the Partnership's Confidential Offering Memorandum**, as amended from time to time and the Limited Partnership Agreement, he had received copies of all such documents and the General Partner had not made any representations of

- 8 -

any kind or nature to induce the New Limited Partner to enter into this Agreement except as specifically set forth in such documents; …

25.     Investors therefore relied on the representations and descriptions in the Offering Materials concerning the Fund's intended strategies, style and risk management.   Harbinger raised over $20 billion in funds from investors.

### B.     Harbinger Acquires LightSquared

26.     In 2007, Harbinger began to invest in SkyTerra, a public company that changed its name to "LightSquared" in mid-2010. LightSquared is a development-stage wireless broadband company that seeks to build a wholesale, nationwide network to provide 4G wireless access to end users.

27.     At first, Harbinger acquired a minority shareholder interest in LightSquared. Over the next few years, however, Harbinger increased its investment in LightSquared until, by March 2010, Harbinger had acquired full control of the company.

28.     On December 15, 2007, Harbinger entered into a securities purchase agreement to purchase $150 million of SkyTerra's 16.5% senior unsecured notes due 2013 and ten-year warrants to purchase 9,144,038 shares of SkyTerra's capital stock, with an exercise price of $10.00 per share.

29.     On February 4, 2008, Harbinger purchased 14,407,343 shares of non-voting common stock of SkyTerra from another company. As a result of Harbinger's purchase, SkyTerra was required to offer to repurchase its senior secured notes due to a "change in control," and the majority of note holders agreed to a waiver of this provision.

30.     On April 7, 2008, Harbinger purchased 10,224,532 shares of SkyTerra common stock and 6,173,597 shares of non-voting common stock for, in the aggregate, approximately $164 million ($10 per share) from a third party. In connection with this stock purchase,

Harbinger filed an application with the FCC to acquire control over SkyTerra and 442,825 shares were placed in escrow pending FCC consent.  Harbinger also proposed two directors who were appointed to the SkyTerra board of directors.

31.     On April 10, 2008, Harbinger approached SkyTerra management with a proposal for a business combination between SkyTerra and Inmarsat, a competitor in which Harbinger owned a 28% interest. SkyTerra's board of directors approved a transaction for its acquisition of all of the stock of Inmarsat not owned by Harbinger, which was to be funded by Harbinger.  As part of the deal, Harbinger would exchange Inmarsat stock for shares of SkyTerra stock at $10 per share.  Harbinger also agreed to provide $500 million of debt financing to fund SkyTerra's business plan through the third quarter of 2010.

32.     On August 22, 2008, SkyTerra's board approved the Inmarsat deal, and changed the terms so that SkyTerra agreed to issue 10.3 million additional shares of common stock to Harbinger if the business combination with Inmarsat was consummated.

33.     On September 12, 2008, SkyTerra entered into several agreements with another company for the sale of its SkyTerra holdings to Harbinger.  This company sold 23,626,074 shares of non–voting common stock to Harbinger (of which 7,906,737 shares were placed in escrow pending the receipt of the FCC Consent for $4.15 per share). Following the sale, SkyTerra agreed to exchange non-voting stock for voting common stock, and Harbinger exchanged 6,353,915 shares for voting common stock.

34.     During January and February 2009, Harbinger purchased 1,634,708 shares of common stock in open market transactions at purchase prices ranging from $1.43 to $4.69 per share.

35.     On September 23, 2009, Harbinger entered into an agreement and plan of merger with SkyTerra to acquire 100% of the company.  At the time, Harbinger held approximately 69% of the company.  In connection with its acquisition, Harbinger also took SkyTerra private so that it no longer filed public reports.

36.     With the completion of the merger on March 29, 2010, Defendants took full control of SkyTerra and began to transform it into LightSquared.  The acquisition gave Defendants full responsibility for the management of the company, and managerial execution of its business plans.  Defendants replaced nearly all of LightSquared's officers and directors.  As the owner of LightSquared, rather than an investor in the company, the Fund's options for exiting its position in the company were greatly reduced.

37.     By the end of 2011, Harbinger had assets of $5.7 billion, and had invested about $3 billion in the LightSquared venture.

**C.     The GPS Interference Problem**

38.     LightSquared's high-speed network is designed to operate on an "L-band satellite spectrum."  If deployed, the base stations of the LightSquared network would use radio band adjacent to GPS frequencies.  Although each has its own network, the spectrums are so close that GPS systems would likely pick up the stronger LightSquared signal.

39.     LightSquared must obtain FCC approval to operate its network.  In 2005, the FCC granted LightSquared authority to build out its network in the L-band spectrum.

40.     On January 26, 2011, the FCC gave LightSquared approval to expand its existing initial satellite bandwidth license—but conditioned the approval on the resolution of interference problems with GPS operators. The FCC directed LightSquared to participate in an interference working group, and to submit monthly reports and a final report by June 2011.  The FCC also

directed the National Telecommunications and Information Administration ("NTIA") to conduct a study into the interference concerns.

41.    The GPS community has objected to FCC approval of LightSquared's expanded network.   Opposition has come from GPS equipment makers, the Pentagon and military industries, and companies like John Deere, whose farm equipment uses GPS systems.

42.    In July 2011, the Federal Aviation Administration issued a report that said it would take ten years for the aviation industry to design, develop, certify and install modified GPS equipment in commercial and private jets.

43.    On September 8, 2011 the FCC issued a request for NTIA to conduct additional testing into LightSquared's GPS interference.

44.    Independent of the NTIA study, the National Space-Based PNT Systems Engineering Forum conducted its own study of the potential for interference with military and civilian GPS applications.  On December 9, 2011, according to Bloomberg, "laboratory testing was performed for the National Space-Based Positioning, Navigation, and Timing (PNT) Systems Engineering Forum, an executive branch body that helps advise policy makers on issues around GPS" and "found that 69 of 92, or 75 percent, of receivers tested 'experienced harmful interference' at the equivalent of 100 meters (109 yards) from a LightSquared base station."

45.    On February 14, 2012, NTIA reported to the FCC that government tests showed that LightSquared's network would interfere with navigation equipment used by airlines.  NTIA concluded that "there is no practical way to mitigate the potential interference at this time."

46.    On February 15, 2012, the FCC revoked its conditional approval because of the GPS interference problem. Tammy Sun, an FCC spokesperson, said in an e-mailed statement that the agency is preparing to withdraw the preliminary approval it granted last year for the company

to build a high-speed network. Sun said, "[t]he commission clearly stated from the outset that harmful interference to GPS would not be permitted," and that "[t]he commission will not lift the prohibition on LightSquared."

### D. Defendants' Reporting to the Limited Partners

47.     Falcone has known that the GPS interference has been an issue since 2002 and he has said in interviews that LightSquared has been working with the GPS industry to remedy the problem since it first became known. By October 2007, Falcone knew that a resolution of the GPS issue was required to receive the final FCC approval needed to deploy LightSquared's technology. But Defendants have provided the Limited Partners with only positive, general reporting on Harbinger's investment in LightSquared.

48.     Defendants periodically advised the investors and provided them with analysis of the market environment and updates on the Fund's investments. Prior to the Fund's acquisition of SkyTerra and the name change to LightSquared, the Fund only generally referenced SkyTerra.

49.     Defendants provided additional information about SkyTerra in connection with the acquisition of the company. Investors were advised of Defendants' bid to take SkyTerra private and their belief that they would be able to capitalize on the need for spectrum bandwidth. Defendants were advised about "exciting news" in the FCC's approval for Harbinger to acquire SkyTerra. Defendants advised the Investors that the FCC had granted approvals that would allow the company's spectrum licenses to be developed commercially. Despite Defendants' knowledge of the GPS interference issue dating to the Fund's first investment in 2006, they always described SkyTerra in highly favorable terms and made no reference of any kind to the interference issue.

50.     Defendants also issued monthly performance summaries describing the Fund's asset allocations.  These reports did not give any information specific to the investments in LightSquared or SkyTerra and did not offer information sufficient to determine the degree to which investors' money was concentrated in a single investment.

51.     Defendants advised Investors about the GPS interference issue on or about August 19, 2011, in mild terms that did not fully capture the depth of the problem and its risks. Defendants only advised Investors that users of GPS had claimed that LightSquared's network would interfere with satellite signals sent to GPS devices.  Defendants reassured investors that LightSquared had, for years, been diligently working with the GPS industry on the issue and had found a comprehensive solution that would allow LightSquared's plans to proceed.  Defendants never disclosed that ultimate FCC approval was contingent on LightSquared finding a solution for the GPS issue.

52.     In November 2011, Harbinger reported to its Limited Partners that the Fund was down that month by 3.44%, and 13.49% year-to-date.  By then, Harbinger's assets were dominated by its at least 60% holdings of LightSquared, with no offsetting short or hedge.

53.     Harbinger was responsible for valuing LightSquared's privately held stock.  In December 2011, Harbinger reportedly marked down the LightSquared position by approximately 50%.

54.     In early December 2011, Defendants closed the Fund to withdrawals.

E.      **Congressional and Regulatory Investigations**

55.     After the January 26, 2011 FCC waiver, Falcone and LightSquared became the subject of a Congressional investigation into whether the FCC's approval was tainted by political

contributions. Falcone was a substantial Democratic contributor, and the FCC's approval was alleged to have been obtained through improper political influence by the White House.

56.     Senator Charles Grassley is taking part in the investigation of the FCC's waiver. He has demanded copies of correspondence between Falcone and the FCC Chairman, and has inquired about contacts that LightSquared, Harbinger and GPS companies have had with the FCC and the White House. In an October 5, 2011 email, Falcone said that approval of LightSquared's network could be made a "win" for the Senator and that "the last thing I want to do is make this more political than it already is."

57.     On January 23, 2012, Senator Grassley sent Falcone a letter regarding attempts to influence his investigation. The Senator said that a member of his staff received a phone call on January 6, 2012 from Todd Ruelle, a telecommunications executive, who said that a call center might be placed in Iowa if the FCC approves LightSquared's network, and that Ruelle "only gets paid if this deal goes through." The Senator said that Ruelle's call was an "unseemly invitation to discuss a quid pro quo," and that the call, in combination with Falcone's October 5 email, "implied an invitation to pull punches in my investigation."

58.     In September 2011, General William Shelton—a four-star Air Force general who oversees Air Force Space Command—reported that he was pressured by the White House to change his congressional testimony after he revealed his concerns with LightSquared's GPS interference. Representative Mike Turner, chairman of the House Armed Services subcommittee that oversees the General's space command and GPS issues, said that "[t]here was an attempt to influence the text of the testimony and to engage LightSquared in the process in order to bias his testimony. The only people who were involved in the process in preparation for the hearing included the Department of Defense, the White House, and the Office Management and Budget."

59.     On December 8, 2011, the SEC issued a Wells Notice to Harbinger and Falcone concerning whether Harbinger engaged in "market manipulation" in certain mortgage-related securities traded during 2006 to 2008.

60.     Both Falcone and Harbinger's president, Omar Asali, are targets of an SEC investigation concerning $50 million that Goldman Sachs withdrew from the Fund in 2009. Harbinger had suspended cash redemptions, but, in 2009, allowed Goldman Sachs to withdraw $50 million from the Fund at par value.  By redeeming Goldman's investment for $50 million, Falcone further concentrated the interests of the remaining investors in the Fund's investments in LightSquared. Before joining Harbinger in 2009, Asali was co-head of the Goldman Sachs hedge fund strategy group.  While at Goldman Sachs, Asali reportedly helped oversee its decision to invest in Harbinger.

61.     The SEC is reportedly also investigating a $113 million loan that Falcone took from another of his hedge funds in October 2009 without obtaining permission from its investors.

**F.     LightSquared Is Facing Insolvency**

62.     In January 2012, a number of industry analysts reported that LightSquared will exhaust its available cash in the near future, by many reports as early as the second quarter of 2012.

63.     On January 31, 2012, LightSquared's network partner, Sprint Nextel, gave Harbinger a mid-March deadline for obtaining the FCC's unconditional approval.  LightSquared and Sprint Nextel have a 15-year contract for sharing the spectrum and the costs of equipment and building the network.

64.     On February 14, 2012, Tim Farrar, an independent satellite-industry analyst, said that "[w]ith LightSquared set to run out of money in the near future, it must now consider whether to file for bankruptcy and preserve its resources for the inevitable litigation fights, or continue pretending that all of its problems can be overcome while its cash drains away."

## TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION

65.     Plaintiffs, on behalf of the Class Members, did not discover the facts constituting Defendants' violations until a date within the limitations period governing this action, and promptly exercised due diligence by filing this class action complaint.  Class members could not reasonably have discovered Defendants' conduct before the date of the filing of this case, and therefore, their claims accrued on that date, and any applicable statutes of limitations were tolled until that date.

## CLASS ACTION ALLEGATIONS

66.     This is a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class of all persons and entities who purchased or otherwise acquired limited partnership interests in Harbinger Capital Partners Fund I, L.P. pursuant to the October 2007 Confidential Offering Memorandum, as amended from time to time, and held their interests as of December 31, 2011.  Excluded from the Class are Defendants and their respective officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest or is a parent.

67.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time and can only be obtained through appropriate discovery, Plaintiff believes that the number of Class Members exceeds 40 and joinder would be impracticable.  Record owners and other members of

the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

68.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class include (1) whether Defendants deviated from the investment strategies described in the Offering Materials; (2) whether Defendants omitted and/or misrepresented material facts about risks associated with their intended investment strategies; (3) whether Defendants knew or recklessly disregarded that their statements were false or misleading; (4) whether Defendants breached fiduciary duties to Class Members; and (5) the extent to which members of the Class have sustained damages and the proper measure of any such damages.

69.     Plaintiff's claims are typical of the claims of other Class Members, as all members of the Class were similarly affected by Defendants' wrongful conduct.

70.     Plaintiff will fairly and adequately protect the interests of Class Members and has retained counsel that is competent and experienced in class and securities litigation. Plaintiff has no interest that is in conflict with, or otherwise antagonistic to the interests of the other Class members.

71.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. There will be no difficulty in management of this action as a class action.

## COUNT I

### (Breach of Fiduciary Duty)

89.     Plaintiff incorporates by reference each and every allegation set forth above as though fully set forth herein.

90.     Defendants owed Plaintiff and the Class fiduciary duties of loyalty and care as the result of taking custody of Class Members' funds and undertaking to invest the money on their behalf.   As the general partner and its controllers, Defendants owe fiduciary duties to the Harbinger partnership and the Limited Partners.

91.     Defendants breached their fiduciary duties by making numerous false and misleading misrepresentations about Harbinger to Plaintiffs and Class Members about the Fund's investment strategy, the experience of its managers, the risks associated with the Fund's investments and the risk management strategies that would be employed, and the prospects for the underlying Fund investments.

92.     Defendants further breached their duties by failing to preserve Fund property and failing to adhere to the standard of care owed by a fiduciary to investors.

93.     As a direct and proximate result of these breaches, Plaintiff and Class Members have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## COUNT II

### (Gross Negligence)

93.     Plaintiff incorporates by reference each and every allegation set forth above as though fully set forth herein.

94.     Defendants owed Plaintiff and the Class duties of ordinary and reasonable care that arose from their relationships with Harbinger and the Limited Partners, Harbinger's position and status as issuer of the limited partnership interests in the Fund, and as investment advisors and managers of the Fund.  Defendants owed duties of ordinary and reasonable care applicable to any similar hedge fund, private equity firm or other investment advisor.

95.     Defendants made numerous false and misleading misrepresentations about Harbinger to Plaintiff and Class Members concerning the Fund's investment strategy, the experience of its managers, the risks associated with the Fund's investments and the risk management strategies that would be employed, and the prospects for the underlying Fund investments.

96.     Defendants were grossly negligent in the breach of their duties to exercise reasonable care.  Defendants' conduct was an extreme departure from the ordinary standard of care and more than ordinary inadvertence or inattention.

97.     Plaintiff and the Class justifiably relied on the statements made by Harbinger in its sales of limited partnership interests to them. Plaintiff and the Class also justifiably relied on the ongoing statements made by Harbinger in their decisions to continue holding and not redeem.

98.     As a result of Defendants' conduct, Plaintiff and the members of the Class have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## COUNT III

### (Breach of Contract)

99.     Plaintiff incorporates by reference each and every allegation set forth above as though fully set forth herein.

100.   The subscription and limited partnership agreements between Plaintiff and the Class and Defendants are valid and enforceable contracts. The subscription agreements incorporate the Offering Materials.

101.   Defendants have contractual duties to comply with the terms and representations of the agreements and Offering Materials.

102.   Plaintiff and Class Members fully performed their obligations under the agreements and Offering Materials.

103.   Defendants breached the agreements with Plaintiff and the Class by making numerous false and misleading misrepresentations about Harbinger to the Plaintiff and the Class concerning the investment strategy of the Fund, the experience of its managers, the risks associated with the Fund's investments and the risk-management strategies that would be employed, and the prospects for the underlying Fund investments.

104.   Defendants also breached the agreements with Plaintiff and the Class by exceeding the scope of power and authority the agreements granted to them. The agreements limit Defendants' powers to buying, selling and holding securities, and other typical activities of an investment manager.

105.   As a direct and proximate result of the contractual breaches, Plaintiff and the members of the Class have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## COUNT IV

### (Equitable Fraud Under Delaware Common Law)

106.   Plaintiff incorporates by reference each and every allegation set forth above as though fully set forth herein.

107.    The Fund is a limited partnership organized under Delaware law, and its general partner, defendant HCP, is a limited liability company organized under Delaware law.

108.    Delaware law is incorporated into the contracts that govern the rights of Plaintiff and Class members and, as a result, Defendants are subject to liability under Delaware law for equitable fraud.

109.    Defendants made numerous false representations to Plaintiff and Class Members negligently, with reckless indifference to the truth, or with knowledge or belief that the representation was false, or Defendants deliberately concealed some material fact, or Defendants were silent in the face of a duty to provide disclosure to Plaintiff and Class Members.

110.    Defendants' false representations, concealment or silence induced Plaintiffs to invest in the Fund and/or forbear from redeeming their investments in the Fund.

111.    Plaintiff and Class members justifiably relied upon Defendants' false representations, concealment or silence, which induced them to invest in the Fund and/or forbear from redeeming their investments in the Fund.

112.    As a direct and proximate result of such reliance, Plaintiff and the members of the Class have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## COUNT V

### (Fraudulent Misrepresentation and Omission)

113.    Plaintiff incorporates by reference each and every allegation set forth above as though fully set forth herein.

114.    In the Offering Materials and subsequent communications to Plaintiff and the Class Members, Defendants made false and misleading representations to Plaintiff and Class

Members with reckless indifference to the truth, or with knowledge or belief that the representation was false.  Defendants also concealed material facts and were silent in the face of a duty to provide disclosure to Plaintiffs and Class Members.

115.    Defendants' false representations, omissions and silence induced Plaintiff and Class Members to invest in the Fund and/or forbear from redeeming their investments in the Fund.

116.    Plaintiff and Class Members justifiably relied upon Defendants' false representations, omissions or silence.

117.    As a direct and proximate result of their reliance, Plaintiff and the members of the Class have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and Class members pray for a judgment in their favor:

(1)    for an order certifying the Class as defined herein and appointing Plaintiff as class representative and Plaintiff's counsel as class counsel;

(2)    for compensatory, special and general damages according to proof;

(3)    for prejudgment interest;

(4)    for appropriate equitable relief;

(5)    for reasonable attorneys' fees and costs of investigation and litigation; and

(6)    for such other and further relief as the interests of law or equity may require.

## JURY DEMAND

Plaintiffs demand trial by a jury on all triable issues.

Dated:   February 17, 2012

**ZAMANSKY & ASSOCIATES LLC**

By: _____

Jacob H. Zamansky
Edward H. Glenn, Jr.
Kevin D. Galbraith
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177

**GIRARD GIBBS LLP**
Jonathan K. Levine
711 Third Avenue, 20th Floor
New York, NY 10017-4036
Telephone: (212) 867-1721
Facsimile: (212) 867-1767
         -and-
Daniel C. Girard
Amanda Steiner
601 California Street, 14th Floor
San Francisco, CA 94611
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— x

LILI SCHAD, Individually and on Behalf of  :
All Others Similarly Situated,              :
                                            :
                Plaintiff,                  :
                                            :     Civil Action No. _____
        vs.                                 :
                                            :
HARBINGER CAPITAL PARTNERS LLC,             :
HARBINGER HOLDINGS, LLC and PHILIP          :     **CLASS ACTION COMPLAINT**
A. FALCONE,                                 :
                                            :
                Defendants.                 :
                                            :     <u>JURY TRIAL DEMANDED</u>
                                            :
                                            :
———————————————————————— x


**ZAMANSKY & ASSOCIATES LLC**
*Co-counsel for Plaintiff*

JACOB H. ZAMANSKY
EDWARD H. GLENN, Jr.
KEVIN D. GALBRAITH
50 Broadway, 32nd Floor
New York, NY 10004
Tel.: (212) 742-1414
Fax: (212) 742-1177
jake@zamansky.com

**GIRARD GIBBS LLP**
*Co-counsel for Plaintiff*

DANIEL C. GIRARD
AMANDA M. STEINER
LESLEY VITTETOE
601 California Street, 14th Floor
San Francisco, CA 94611
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dcg@girardgibbs.com