**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
———————————————————————

|  |  |
|---|---|
| | ) |
| | ) |
| | ) |
| | )   Case No. 12-CV-1244-AJN |
| In re HARBINGER CAPITAL PARTNERS | ) |
| FUNDS INVESTOR LITIGATION | )   ECF CASE |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| ——————————————————————— | ) |

**HARBERT DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS**

**GREGORY P. JOSEPH LAW OFFICES LLC**
485 Lexington Avenue, 30th Floor
New York, New York 10017
Tel. (212) 407-1200
Fax (212) 407-1280

*Attorneys for Harbert Management Corporation
and Harbert Fund Advisors, Inc.*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................1

    I.    No Claims Against Harbert Can Lie After March 4, 2009 .........................................2

    II.    No Standing to Assert Claims Relating to Three of Six Funds ...................................3

    III.    No Investment Concentration Claim Against Harbert ...............................................4

        A.  No Alleged Concentration Limit Exceeded Before Harbert Buyout ................4

        B.  No Percentage Limit on Investment Concentration ..........................................4

            1.  August 2004 Fund I OM ........................................................................5

            2.  December 2006 SSOF OM .....................................................................6

            3.  October 2007 DDQ ................................................................................6

            4.  First Quarter 2010 DDQ ........................................................................8

    IV.    No Misstatements Concerning Investment Strategy or Risk Management .................8

        A.  Disclosure of Investment Strategy ...................................................................9

        B.  Disclosure That Investment Strategy Was Subject to Change..........................13

        C.  Disclosure Concerning Risk Management.........................................................13

        D.  Forward-Looking Statements............................................................................15

    V.    Harbert Uninvolved in Alleged Plan to Concentrate Fund Assets in LightSquared....16

    VI.    No Factual Allegation that Harbert Knew About GPS Issues ....................................17

    VII.    No Alleged Statements by Harbert Concerning LightSquared...................................20

    VIII.    No Factual Allegations Supporting Holder Claim Against Harbert ...........................20

    IX.    Breach of Contract Claims Are Factually and Legally Defective ..............................21

      A.  No Contract with Harbert.........................................................................................21

      B.  No Identification of Breached Terms ...................................................................22

      C.  No Breach of Implied Warranty of Good Faith and Fair Dealing ........................23

X.      Plaintiffs Have No Unjust Enrichment Claim ............................................................23

XI.     No Factual Allegations Supporting Scienter................................................................24

XII.    Claims of Armfield and Lang Are Time-Barred.........................................................25

CONCLUSION.........................................................................................................................25

# TABLE OF AUTHORITIES

Page

**Cases**

*380544 Can., Inc. v. Aspen Tech., Inc.*,
  No. 07 Civ. 1204 (JFK), 2011 WL 4089876 (S.D.N.Y. Sept. 14, 2011)...................17 n.27

*Abbad v. Amman*,
  285 F. Supp. 2d 411 (S.D.N.Y. 2003)........................................................... 1-2

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................17 n.27

*Bay Harbour Mgmt. LLC v. Carothers*,
  282 F. App'x 71 (2d Cir. 2008) ...............................................................16 n.26

*Bd. of Trs. ex rel. Gen. Retirement Sys. of Detroit v. BNY Mellon*, N.A,
  No. 11 Civ. 6345 (RJS), 2012 WL 3930112 (S.D.N.Y. Sept. 10, 2012)...................23 n.36

*Crigger v. Fahnestock & Co.*,
  443 F.3d 230 (2d Cir. 2006)........................................................................8 n.9

*Denny v. Barber*,
  576 F.2d 465 (2d Cir. 1978)....................................................................16 n.26

*Druck Corp. v. Macro Fund Ltd.*,
  290 F. App'x 441 (2d Cir. 2008) ..............................................................24 n.39

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)....................................................................14 n.23

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
  375 F.3d 168 (2d Cir. 2004)....................................................................16 n.26

*Gulf & W. Corp. v N.Y. Times Co.*,
  81 A.D.2d 772 (1st Dep't 1981) ..............................................................22 n.34

*Harborview Value Masterfund, L.P. v. Freeline Sports, Inc.*,
  No. 11 Civ. 1638 (CM), 2012 WL 612358 (S.D.N.Y. Feb. 23, 2012) .....................20 n.29

*Hoffman v. UBS-AG*,
  591 F. Supp. 2d 522 (S.D.N.Y. 2008)........................................................3 n.5

*In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*,
 No. 08 Civ. 11278 (DLC), 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009)...............14 n.23

*In re Merkin*,
 817 F. Supp. 2d 346 (S.D.N.Y. 2011).........................................................................8 n.10

*In re Merrill Lynch Auction Rate Sec. Litig.*,
 No. 09 MD 2030 (LAP), 2012 WL 3297732 (S.D.N.Y. Aug. 13, 2012) ........4 n.6, 17 n.27

*In re Merrill Lynch Auction Rate Sec. Litig.*,
 851 F. Supp. 2d 512 (S.D.N.Y. 2012) ....................................................................12 n.19

*In re WorldCom, Inc. Sec. Litig.*,
 382 F. Supp. 2d 549 (S.D.N.Y. 2005).....................................................................20 n.30

*Iowa Pub. Emps.' Retirement Sys. v. MF Global, Ltd.*,
 620 F.3d 137 (2d Cir 2010)....................................................................................16 n.25

*Kelter v. Apex Equity Options Fund, LP*,
 No. 08 Civ. 2911 (NRB), 2009 WL 2599607 (S.D.N.Y. Aug. 24, 2009) .......2 n.3, 13 n.20

*Landesbank Baden-Wurttemberg v. Goldman Sachs & Co.*,
 No. 11-4443, 2012 WL 1352590 (2d Cir. Apr. 19, 2012) ........................................20 n.29

*Lipson v. Cassels Brock & Blackwell LLP*,
 [2011] ONSC 6724 (Can. Ont. Super. Ct.) ............................................................25 n.45

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
 98 F.3d 2 (2d Cir. 1996)..........................................................................................16 n.26

*Pricaspian Dev. Corp. (Tex.) v. Royal Dutch Shell, PLC*,
 382 F. App'x 100 (2d Cir. 2010) ............................................................................25 n.44

*Prickett v. N.Y. Life Ins. Co.*, No. 09 Civ. 3137,
 2012 WL 4053810 (S.D.N.Y. Sept. 12, 2012)................... 23 n.37, 24 nn.38 & 41, 25 n.43

*Rapoport v. Asia Elecs. Holding Co.*,
 88 F. Supp. 2d 179 (S.D.N.Y. 2000)..............................................................................2 n.3

*San Diego Cnty. Emps. Retirement Ass'n v. Maounis*,
 749 F. Supp. 2d 104 (S.D.N.Y. 2010).................................................................... *passim*

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
 547 F.3d 406 (2d Cir. 2008)....................................................................................12 n.19

iv

*Stratton v. Royal Bank of Can.*,
   No. 07 CVS 15079, 2010 WL 445605 (N.C. Super. Ct. Feb. 5, 2010),
   *aff'd*, 712 S.E.2d 221 (N.C. Ct. App. Apr. 19, 2011) ............................................... 25 n.45

*Welch v. TD Ameritrade Holding Corp.*,
   No. 07 Civ 6904 (RJS), 2009 WL 2356131 (S.D.N.Y. July 27, 2009) ........................8 n.9

## Rules & Statutes

FED. R. CIV. P. 8 ........................................................................................................17 n.27

FED. R. CIV. P. 9(b) ...................................................................................................... *passim*

FED. R. CIV. P. 12(b)(6)..................................................................................................1

Limitations Act, S.O. 2002, c. 24, Sched. B (Can.) ....................................................25

N.C. Gen. Stat. § 1-52 (2011) ......................................................................................25

N.Y. C.P.L.R. § 202 (McKinney 2011)........................................................................25

Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. § 78bb (2010).................24 n.40

## PRELIMINARY STATEMENT

Defendants Harbert Management Corporation ("HMC") and Harbert Fund Advisors, Inc. ("HFA") (together, the "Harbert Defendants" or "Harbert") submit this brief in support of their motion to dismiss Plaintiffs' Third Amended Complaint ("TAC") pursuant to FED. R. CIV. P. 12(b)(6) and 9(b).[1]  The crux of the TAC is that, beginning in 2006, all Defendants embarked on a plan to invest a majority of the assets of a group of hedge funds ("Harbinger Funds" or "Funds") in a wireless telecommunication company — originally called "SkyTerra," and later "LightSquared" — which they knew from the outset was doomed to fail.[2]  *See* ¶9 (alleging that it was "*known* by ... Defendants" that LightSquared's technology was "materially flawed due to an *insurmountable* obstacle," in that it "*fatally* interfered with existing global positioning systems").  LightSquared is the only investment challenged by the TAC as inappropriate in any way.  The TAC does not claim that any other investment deviated from the Funds' disclosed investment strategies or reflected any inadequacy in risk management.

Nowhere does the TAC explain why the Harbert Defendants would knowingly squander billions of dollars of assets on which their own success and financial well-being depended.  But even if the TAC had a plausible theoretical basis, it would fail to state a claim for relief against Harbert.  This case "fits squarely into the legion of cases wherein investor plaintiffs, disappointed in the outcome of their investment, conclude that somewhere, sometime in the past, a plan was hatched without their knowledge and that subsequent events and statements were all

---

[1]    All "¶" references are to the TAC.  Emphasis is added to, and citations, footnotes, brackets and internal quotation marks are omitted from, quotations herein, except as indicated.

[2]    The Harbinger Funds are Harbinger Capital Partners Fund I, L.P. ("Fund I"), Harbinger Capital Partners Offshore Fund I, L.P. ("Offshore Fund I"), Harbinger Capital Partners Fund II, L.P. ("Fund II"), Harbinger Capital Partners Offshore Fund II, L.P. ("Offshore Fund II"), Harbinger Capital Partners Special Situations Fund L.P. ("SSF"), and Harbinger Capital Partners Special Situations Offshore Fund, L.P. ("SSOF") (¶2).  The Defendants other than Harbert are Philip A. Falcone ("Falcone"), Harbinger Capital Partners LLC ("HCP"), Harbinger Capital Partners G.P. L.L.C. ("Harbinger GP"), Harbinger Holdings, LLC, Harbinger Capital Partners Special Situations GP, L.L.C. ("SSF GP"), and Harbinger Capital Partners Special Situations Offshore GP, L.L.C. (collectively, the "Harbinger Defendants" or "Harbinger") (¶¶31-38).

fraudulent attempts to keep the plaintiffs from uncovering the secret plan." *Abbad v. Amman*, 285 F. Supp. 2d 411, 420-21 (S.D.N.Y. 2003).

## I.    No Claims Against Harbert Can Lie After March 4, 2009

The TAC asserts that Harbert is liable for statements and actions with respect to the Funds until March 2009, when Harbinger bought out Harbert (the exact date was March 4, 2009). *See* ¶195; *see also* ¶¶31, 33, 44, 48. Accordingly, the claims of wrongful conduct after March 4, 2009 involve only Harbinger. For example, the TAC sections on "Falcone's Attempt to Improperly Influence the Government" (¶¶76-85) and "The Senate Investigation" (¶¶86-88) describe activities of Falcone and LightSquared from September 2009 to October 2011. TAC ¶¶152-93, headed "Post-Purchase False and Misleading Communications to Investors," identify only communications by Harbinger in 2010 and 2011. The allegedly wrongful settlement of litigation involving NACCO Industries, Inc. was in February 2011 (¶123).

The TAC relies heavily on an irrelevant Securities and Exchange Commission ("SEC") complaint against Falcone, HCP and an HCP officer, alleging that in October 2009, Falcone improperly borrowed $113.2 million from SSF. *See* ¶¶13-15, 18, 22, 101-105, 134, 136-37, 259, 276, 292; *SEC v. Harbinger Capital Partners LLC*, No. 12-CIV-5028 (S.D.N.Y.) ("SEC Complaint 12-5028") (Ex. C to ECF # 47 in this action) ¶¶2, 16-59. TAC ¶259 conclusorily asserts that all Defendants approved the $113.2 million loan, but this is unsupported by any factual allegation concerning Harbert. It is also contradicted by SEC Complaint 12-5028, which alleges that the loan was made after March 2009 and does not allege any Harbert involvement in the loan — indeed, it does not mention Harbert at all. Thus, ¶259 need not be accepted as true.[3]

SEC Complaint 12-5028 is also the source of allegations concerning a preferential redemption scheme initiated after March 2009. *See* ¶¶13-15, 18, 22, 101-102, 106-109, 260,

---

[3]    On this motion, the Court may consider documents which are exhibits to, incorporated by reference in, or integral to the TAC. *See Kelter v. Apex Equity Options Fund, LP*, No. 08 Civ. 2911 (NRB), 2009 WL 2599607, at *3 (S.D.N.Y. Aug. 24, 2009). If those documents contradict the allegations of the TAC, they control and the Court need not accept the allegations as true. *See Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

276, 287; SEC Complaint 12-5028 ¶¶3, 60-87.  The SEC alleges that both the $113.2 million

loan and the preferential redemption scheme were conceived and carried out by Falcone and

others, not Harbert.  SEC Complaint 12-5028 ¶¶11-13.  The TAC also relies on an irrelevant

SEC administrative order settling charges that HCP settled short-sold stock during a restricted

period and then, between April and June 2009, purchased the stock in an initial public offering.

*See* ¶¶14, 17, 18, 101, 102, 114; Exchange Act Release No. 67278, 2012 WL 2411463, at *2-3

(June 27, 2012) (Ex. F to ECF # 47).  The SEC's findings do not mention Harbert.[4]

Thus, the TAC's allegations of wrongful conduct after March 2009 fall into two

categories:  (1) those relating to the Funds' investment in LightSquared and (2) those relating to

the activities described in the SEC proceedings and the NACCO settlement.  The allegations in

the first category do not involve Harbert.  Those in the second category involve neither the

LightSquared investment nor Harbert, and are pled solely in support of breach of fiduciary duty

claims against the Harbinger Defendants.  *See* ¶¶22, 117, 134-40, 276, 281, 287, 292.

## II.   No Standing to Assert Claims Relating to Three of Six Funds

The named Plaintiffs invested in only three of the six Funds:  (1) Fund I (Schad); (2)

Offshore Fund I (Lang, Armfield and Bhardwaj); and (3) SSOF (Armfield).  *See* ¶¶27-30.  There

is no named Plaintiff who invested in the other Funds, so the TAC states no claim as to them.[5]

---

[4]       TAC ¶¶16, 110-13, 116, 134 and 137 point to a second SEC complaint arising from a "short squeeze" in high-yield bonds in 2006-08 executed by Falcone, SSF GP and another Harbinger entity.  *SEC v. Falcone*, No. 12-CIV-5027 (S.D.N.Y.) ("SEC Complaint 12-5027") (Ex. B to ECF #47).  The short squeeze allegations have nothing to do with LightSquared, and are alleged solely in support of fiduciary duty claims asserted against Harbinger.  *See* ¶¶22, 281, 287, 292.  As the TAC alleges (¶¶16, 113, 116), HMC recently settled SEC charges relating to the alleged short squeeze.  *See SEC v. Harbert Mgmt. Corp. et al.,* No. 12-CIV-5029 (S.D.N.Y filed June 27, 2012) ("SEC Complaint 12-5029") and Final Judgment (filed July 3, 2012) (Exs. D and E, respectively, to ECF #47).  SEC Complaint 12-5029 charged HMC with a single count of control person liability under the federal securities laws — HMC was not charged with direct involvement in the alleged short squeeze.  HMC did not admit or deny the substantive allegations in SEC Complaint 12-5029.  Ex. E to ECF #47 ¶2.

[5]       *See, e.g.*, *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 530-32 (S.D.N.Y. 2008).

## III.   No Investment Concentration Claim Against Harbert

TAC ¶¶146, 150, 158 and 195 assert that the Funds had percentage limits on investment concentration that were exceeded in the course of the Funds' investment in LightSquared.  The documents relied on by the TAC show that there were no such limits, but even if there were, the TAC does not allege that they were exceeded before the March 2009 buyout of Harbert.  Thus, there is no factual basis for the claim that Harbert made incorrect statements about percentage limits on investment concentration, let alone that Harbert knew such statements to be false.[6]

### A.   No Alleged Concentration Limit Exceeded Before Harbert Buyout

The TAC claims wrongful concentration of the Funds' assets in LightSquared but fails to say when this occurred.  TAC ¶195 refers to "Falcone's decision to invest the Funds over 60% in LightSquared," but does not say when this 60% threshold was reached.  TAC ¶7 asserts that the Funds "ultimately concentrat[ed] more than half of the Funds' resources" in LightSquared, and ¶9 puts the amount invested at "approximately two-thirds," but both are silent as to time.  TAC ¶¶281, 287 and 292 allege that Defendants "invest[ed] a majority of the Funds' assets in a single, high-risk equity investment," but do not say when the majority line was crossed.  TAC ¶203 asserts that "[a]t their peak, the Harbinger Funds managed more than $26 billion" and that, "[o]f this amount, approximately $3 billion was invested in LightSquared."  This $3 billion is about 11.5 % of the total $26 billion, but the TAC does not fix this in time and does not allege that an 11.5% investment level, or any other quantum, was reached before Harbert's exit in March 2009. Since the TAC does not allege the proportion of the Funds' assets in LightSquared as of March 2009, it cannot claim that the investment concentration disclosures at that time were untrue.

### B.   No Percentage Limit on Investment Concentration

Even if the TAC alleged that a high proportion of the Funds' assets was in LightSquared

---

[6]     "Where a complaint alleges a false statement, the complaint must state with particularity the specific facts in support of plaintiffs' belief that defendants' statements were false when made."  *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 MD 2030 (LAP), 2012 WL 3297732, at *2 (S.D.N.Y. Aug. 13, 2012).

as of March 2009, the investment concentration claim would still fail, because the TAC contains no factual support for the existence of percentage limits.  The TAC points to four statements mentioning percentage limits:  (1) one which last appeared in a Fund I offering memorandum ("OM") in August 2004; (2) one, from the December 2006 OM for SSOF, which is inapplicable on its face; (3) one in an October 2007 Due Diligence Questionnaire ("DDQ"), which is taken wholly out of context and was not relied on by any named Plaintiff; and (4) one in a 2010 DDQ for which Harbert can have no responsibility.  Each of these is discussed below.

(1) **August 2004 Fund I OM.**  TAC ¶195 disingenuously asserts that "[i]n one Fund I [OM] ... Harbinger stated that it established limits of 7.5% invested in any one company, and 25% invested in one industry."  The TAC omits that the last time any Fund I OM referred to such percentages was in August 2004, and even then, the OM was clear that the statements were forward-looking references to general guidelines that were subject to change.  Thus, the August 2004 Fund I OM (Cherington Dec. Ex. 1) states at 6 that "[t]he General Partner expects to maintain a diversified portfolio, with investments in any one company generally limited to 7.5% of the portfolio and with investments in any one industry generally limited to 25% of the total portfolio, both measured at the time of investment."  The OM at 7 refers to these 7.5% and 25% guidelines and states that they are "*subject to change*" and "*subject to change without notice*," and that there "can be *no assurances* that the [Fund] will remain in compliance with these parameters, or that they will protect investors from losses."

By February 2005, the references to percentages were gone.  The February 2005 Fund I OM (Cherington Dec. Ex. 2) describes "general concentration guidelines" which are "*subject to change*."  *Id.* at 6-7.  It capitalizes the warnings that the risk management policies are "SUBJECT TO CHANGE WITHOUT NOTICE" and "THERE CAN BE NO ASSURANCES THAT THE [FUND] WILL REMAIN IN COMPLIANCE WITH THESE PARAMETERS, OR THAT THEY WILL PROTECT INVESTORS FROM LOSSES."  *Id.* at 7.

The March 2007 Fund I OM (Cherington Dec. Ex. 3) provides even greater latitude, stating that the Fund "expects to monitor diversification" by comparing investments with

"general concentration guidelines" which "*may change from time to time, are not strict limits, and may be exceeded.*" *Id.* at 10; *see id.* at 14 (compliance is not assured, guidelines may not prevent losses, and fund "MAY HAVE A CONCENTRATED PORTFOLIO ... COMPRISED OF A LIMITED NUMBER OF ISSUERS," such that "A LOSS OF CAPITAL MAY OCCUR").

**(2) December 2006 SSOF OM.** TAC ¶146 asserts with respect to SSOF that "Defendants ... represented that they would ... limit [the Fund's] ... 'Special Investments' to only 20% of its net assets." TAC ¶146 does not identify which OM it is relying on, but it appears to be the December 2006 version (Cherington Dec. Ex. 5). This OM (*id.* at 2-3) states that "the General Partner may, in its sole discretion, designate certain ... investments as side pocket investments ('*Special Investments*') [which are] *generally* ... not *expected* to comprise more than 20% of the net assets of any Investor's individual Interest(s)."

The TAC nowhere alleges that LightSquared was designated as a Special Investment or side pocket investment, so this language is inapplicable on its face. Furthermore, even if this general expectation applied to LightSquared, it is not a "limit" as ¶146 claims. The risk management section of this OM (*id.* at 33-34) contains no percentage limits. It warns that risk management guidelines "may change from time to time, are not strict limits, and may be exceeded." *Id.* at 33. It further warns that there is no assurance that guidelines will be complied with or that they will protect investors from loss. *Id.* at 34. Under the heading "Lack of Diversification," the OM warns that SSOF's portfolio "generally will be highly concentrated," that SSOF "may hold large positions in a relatively limited number of investments," that it "may be concentrated in as few as 10 to 15 issuers at any given time,"[7] and that it "could be subject to significant losses if [it] holds a relatively large position in a single issuer." *Id.* at 51.

**(3) October 2007 DDQ.** TAC ¶150 claims that an October 2007 DDQ for Fund I and

---

[7]     TAC ¶146 characterizes this as a "represent[ation]" that SSOF would be diversified across 10-15 investments. Even if this were a fair characterization, it would be irrelevant because the TAC never alleges that SSOF had fewer than 10-15 investments. TAC ¶146 also claims that SSOF said it would exit investments within 36 months. This seems to refer to the April 2007 SSOF OM (Cherington Dec. Ex. 6 at 3), which states that SSOF "typically expects" to exit within 36 months, but "may hold investments for significant[ly] longer periods of time."

Offshore Fund I misled investors by stating that "any core investment could constitute 3-5% of the Funds." TAC ¶150 acknowledges that "these numbers were followed by the parenthetical 'or more'" — but then omits the rest of the paragraph, which underscores that there are no fixed percentage limits. The entire paragraph (Cherington Dec. Ex. 4 at 10) states:

> The market value of a core position *may represent 3% to 5% (or more)* of the Fund's gross market value. The final determination on position size generally depends, among other factors, on the company fundamentals, size of the issue, and current technicals. *Ultimately it may depend on how comfortable the Senior Managing Director [Falcone] is with the risk associated with the issue.*

It is clear from the DDQ, but ignored by the TAC, that this is a "forward-looking statement ... made as of June 1, 2007" and is subject to change without notice. *Id.* at 1; *see id.* at 9, 12-13. In addition, the DDQ expressly contemplates that any risk management guidelines may be exceeded, explaining that "if a guideline is exceeded," the position will be discussed with the Fund's Senior Managing Director [*i.e.*, Falcone], after which "a determination will be made whether the position is acceptable under the circumstances." *Id.* at 13.

According to TAC ¶52, as of June 2007, the Funds had only once purchased LightSquared securities: $60 million worth of senior secured notes. The TAC does not allege that this came anywhere near 3%, 5% or any other percentage of the Funds' assets, so it states no factual basis for claiming that the DDQ's reference to percentages was false. Further, Plaintiffs do not claim that they relied on the DDQ in making their investments. The TAC does not allege that any named Plaintiff who invested in Fund I or Offshore Fund I ever saw this DDQ.[8] Even if

---

[8]  Armfield invested in Offshore Fund I in March 2007, before this DDQ existed. Lang made one of his three investments in Offshore Fund I even earlier, in January 2007. Lang later invested in Offshore Fund I in May 2008, and his subscription agreement states that he received and reviewed the September 2007 version of the Offshore Fund I OM, not any DDQ. (Lang's first investment in Offshore Fund I was in 2003, but the TAC does not assert any claim with respect to it, and any such claim would be time-barred.) Schad and Bhardwaj did not invest until well after the issuance of this DDQ. Schad invested in Fund I in February 2008; Bhardwaj, according to Plaintiffs' counsel, invested in Offshore Fund I in June 2008 but did not sign a subscription agreement. Copies of the subscription agreements for Schad, Lang and Armfield are annexed to the Cherington Dec. as Exs. 11 - 16. The OMs in effect when the named Plaintiffs invested are:  (1) for Schad, October 2007 Fund I OM (*id.* Ex. 4); (2) for Lang, October 2006 and September 2007 Offshore Fund I OMs (*id.* Exs. 7 and 9); (3) for Armfield, December

they saw it before they invested, they expressly disclaimed any reliance on it. *See*, *e.g.*, ¶144. Nor could they have reasonably relied on it as representing that investments would be kept within fixed percentage limits because it clearly warns that any percentages are only monitoring guidelines that may be exceeded or changed.

**(4) First Quarter 2010 DDQ.** TAC ¶¶158-59, the only other allegations of percentage limits, concern a DDQ issued by Harbinger for the first quarter of 2010, long after Harbert's exit.

## IV.   No Misstatements Concerning Investment Strategy or Risk Management

The premise of the TAC's fraud and negligent misrepresentation claims is that the OMs did not adequately disclose (1) the Funds' investment strategy — in particular the possibility of a substantial, long-term equity investment that might involve the acquisition and exercise of control over a company, or (2) the potential risks of such an investment.[9]  By means of selective quotation and distorted paraphrasing, the TAC seeks to create the illusion that compliance with the Funds' disclosures would have precluded the LightSquared investment.  But "[p]laintiffs cannot be permitted to cherry-pick language from the offering memoranda."[10]

As demonstrated above, there were no percentage limits on investment concentration. Investors were warned that (1) the guidelines relating to investment concentration were subject to change without notice and could be exceeded, (2) there was no assurance that the Funds would comply with the guidelines or that the guidelines would protect investors from loss, and (3) the

---

2006 OM for SSOF and March 2007 OM for Offshore Fund I (*id.* Exs. 5 and 8); and (4) for Bhardwaj, September 2007 Offshore Fund I OM (*id.* Ex. 9).

[9]     On this motion, except as to the issue of derivative standing, we assume the claims arise under New York law.  That assumption is made for purposes of, and is limited to, this motion only.  The elements of fraud under New York law are:  "(1) a material misrepresentation or omission of fact (2) made by a defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006).  "Negligent misrepresentation involves most of the same elements as fraud, with a negligence standard substituted for the scienter requirement."  *Welch v. TD Ameritrade Holding Corp.*, No. 07 Civ. 6904 (RJS), 2009 WL 2356131, at *44 (S.D.N.Y. July 27, 2009).

[10]     *In re Merkin*, 817 F. Supp. 2d 346, 355 (S.D.N.Y. 2011).

Funds may have concentrated portfolios that could result in a loss of capital.[11]

Thus, the only remaining question is whether, in some other way, the OMs represented that the Funds would not make any large or controlling equity investment from which there may not be a short-term exit.  They did not.  The OMs unequivocally warn of the possibility of such investments and of their risks.  And even assuming, *arguendo*, that the LightSquared investment did not fall within the strategies disclosed in the OMs, there would still be no factual basis for the fraud and negligent misrepresentation claims because (1) the OMs disclose that the Funds may follow investment strategies other than those described in the OMs, and (2) the OMs' investment strategy disclosures are protected by the "bespeaks caution" doctrine.

A.    **Disclosure of Investment Strategy**

TAC ¶145 principally relies on an OM for Fund I, quoting four paragraphs which state that Fund I:  (1) "seeks to achieve superior absolute returns by participating in investments primarily involving distressed/high yield securities, special situation equities, and private loans and notes," (2) "focuses primarily on turnarounds, restructurings, liquidations, event driven situations and capital structure arbitrage," and (3) "seeks to achieve its investment objective by employing a disciplined value investing approach based on intensive credit research."[12]  Notably,

---

[11]    In addition to the OMs discussed above, *see also, e.g.*:  (1) October 2007 Fund I OM (in effect when Schad made her February 2008 investment) (Cherington Dec. Ex. 4) at 11, 15; (2) October 2006 Offshore Fund I OM (in effect when Lang made his January 2007 investment) (*id.* Ex. 7) at 10, 14; (3) March 2007 Offshore Fund I OM (in effect when Armfield made its April 2007 investment) (*id.* Ex. 8) at 10, 14; (4) September 2007 Offshore Fund I OM (in effect when made Lang made his May 2008 investment and Bhardwaj purportedly made his June 2008 investment) (*id.* Ex. 9) at 10, 14.  The relevant portions of the December 2006 SSOF OM, in effect when Armfield invested in SSOF in March 2007, are discussed in Point III.B.2.

[12]    The TAC does not identify which Fund I OM is quoted in ¶145, but the language appears in the October 2007 version, which was in effect when Schad invested.  *See* Cherington Dec. Ex. 4 at 11-12.  Because the TAC focuses primarily on the October 2007 Fund I OM, this brief does too, but we also cite to parallel disclosures in the relevant OMs for Offshore Fund I and SSOF, in which the other named Plaintiffs invested.  *See* n.11, *supra*.  TAC ¶5 attempts to gloss over the TAC's failure to specify supposedly false statements for each named Plaintiff from each OM by conclusorily alleging that the "Offering Materials" for the Funds were "[s]imilar" and made "nearly identical representations or emphasized that the focus was on distressed investments identified through rigorous credit analysis."  This is grossly inadequate under Rule 9(b).

the TAC does not allege that the Funds' investment in LightSquared did not involve "distressed/high yield securities [or] special situation equities," or that it was not an "event-driven situation[]."[13]   Moreover, read in isolation, the language quoted in ¶145 does not fairly reflect the overall content and import of the OMs' disclosures.  The TAC's purported summaries of this language (¶¶4-5, 7, 10, 20, 146) further distort what the OMs actually say.

For example, ¶20 alleges that investors were unaware of the possibility of an investment such as LightSquared because the Funds were sold as "diversified, risk-controlled funds primarily focused on *distressed debt* and *credit-driven* investments."  This is contradicted by the OMs themselves in multiple ways.  A "primar[y]" Fund I investment category was "special situation equities," and that category included both "distressed *and non-distressed* companies."  *See* October 2007 Fund I OM (Cherington Dec. Ex. 4) at 13.  In addition, these special situation positions could be not just credit-driven but also, for example, "*event-driven*, where the [Fund] expects the securities to appreciate if an expected 'event' occurs."  *Id.* ("Such events include spin-offs, recapitalizations, bankruptcies or reorganizations, liquidations, management changes, fundamental industry changes, balance sheet restructurings and company restructurings.").  Such positions, which may involve a "significant ownership percentage of the issuer," could also be driven by the "prospect of capital appreciation resulting from an operational turnaround."  *Id.*[14]

Investments could also be made in order to take "Control Positions" or pursue an "Activist Strategy."  *Id.* at 44-45.  A "Control Position" could involve the Fund taking "a controlling stake in or [becoming] deemed an affiliate of a particular company."  *Id.* at 45.  As to "Activist Strategy," the OM (*id.* at 44) states:

> The [Fund's] investment strategy may involve *aggressive shareholder activism...*, and there exists the *risk that the intended strategy for a particular company will be unsuccessful*.  Further, when securities are purchased in anticipation of

---

[13]     Indeed, ¶52 describes the Funds' first investment in LightSquared as "appropriate for a fund marketed primarily as a distressed-debt fund."

[14]     *See also, e.g.,* October 2006 Offshore Fund I OM at 12, March 2007 Offshore Fund I OM at 12, September 2007 Offshore Fund I OM at 12, December 2006 SSOF OM at 27; Cherington Dec. Exs. 7, 8, 9, 5, respectively.

*influencing the future direction* of a company, a *substantial period of time may elapse between the [Fund's] purchase of the securities and the anticipated results.... [I]f the anticipated results do not in fact occur, the [Fund] may be required to sell its investment at a loss....*[T]here exists a *potential risk of loss by the [Fund] of its entire investment in such companies.*[15]

The OM explains that control and activist positions may have limited liquidity and may be adversely affected by developments in the relevant industry. *Id.* at 37-38. The OM also warns that investment positions may be concentrated, leading to risk of loss. *Id*. at 15 ("THE [FUND] MAY HAVE A CONCENTRATED PORTFOLIO THAT MAY BE COMPRISED OF A LIMITED NUMBER OF ISSUERS. CONSEQUENTLY, ... A LOSS OF CAPITAL MAY OCCUR."). *See also id.* at 47 ("lack of diversification" may subject fund to "significant losses"). The OM stresses the "long-term illiquid" nature of the portfolio and its "high degree of risk," including "the risk that the entire amount invested may be lost." *Id.* at 10 (fund is for "SOPHISTICATED PERSONS THAT CAN BEAR THE ECONOMIC RISK OF THE LOSS OF THEIR INVESTMENT ... [AND] ARE IN A POSITION TO PARTICIPATE IN A LONG-TERM ILLIQUID INVESTMENT PORTFOLIO"); *see also id.* at 37.[16]

Yet ¶10 claims that the Funds represented that they "would not assume operational risk," as if to suggest that the operations of investee companies would somehow have no effect on the Funds' profitability. This claim is belied by the fact that, as set forth above, investors were clearly warned that the Funds were free to take control positions, use activist strategies and buy special situation equities for capital appreciation resulting from operational turnaround.

The only statement cited by the TAC purportedly in support of this claim is in ¶146, which alleges that SSOF represented that it "will not have 'direct operational involvement.'" TAC ¶146 does not identify the source of the phrase "direct operational involvement," but

---

[15]    *See also, e.g.,* October 2006 Offshore Fund I OM at 40-41, March 2007 Offshore Fund I OM at 41, September 2007 Offshore Fund I OM at 43, December 2006 SSOF OM at 51-52; Cherington Dec. Exs. 7, 8, 9, 5, respectively.

[16]    *See, e.g.,* October 2006 Offshore Fund I OM at ii, 9, 12, 14, 34-35, 43-44, 47-48, March 2007 Offshore Fund I OM at ii, 9, 12, 14, 34-35, 43-44, 47-48, September 2007 Offshore Fund I OM at ii, 9, 12, 14, 36-37, 45-46, 50, December 2006 SSOF OM at 24, 25, 33-34, 47-48, 51; Cherington Dec. Exs. 7, 8, 9, 5, respectively.

appears in the April 2007 version of the SSOF OM (Cherington Dec. Ex. 6 at 2). This irrelevant OM[17] in fact makes it plain that the fund is exposed to operational risk. It describes a strategy that is "typically biased toward long positions," and those are generally expected to have one or more of the following attributes: "(i) an anticipated investment horizon of one year or longer; (ii) a position to effect board or voting control over an entity or otherwise influence the entity's management or restructuring process; and/or (iii) limited trading liquidity based on restrictions arising from ... access to non-public information, significant ownership of an issuer, or ... other considerations." *Id.* Such investments include "special situation equities," which "offer the prospect of capital appreciation resulting from an operational turnaround." *Id.* at 2, 29.

The OM refers to "*direct* operational involvement" — something SSOF "seeks," but does not promise, to avoid — in the context of exercising influence or control over those who manage the investee company. *Id.* at 2 ("Shareholder activism, including control activism or activism based on an influential position, may be employed.... The [Fund] seeks to ... (iii) maintain liquidity ... but establish influential relationships with management; and (iv) help guide overall corporate strategy without direct operational involvement."). Thus, whether operational involvement was "direct" or otherwise, the operations of investee companies would inevitably affect SSOF's results, so there would necessarily be "operational risk."[18]

In sum, the TAC alleges that as of March 2009, when Harbinger bought out Harbert, the Funds had made a substantial, long-term equity investment in LightSquared, which included the possibility of taking control of the company and involved various risks, such as illiquidity and possibly adverse business developments. The OMs plainly contemplated investments of this kind and warned of their risks.[19]

---

[17]   Armfield, the only named Plaintiff to invest in SSOF, made its investment in March 2007, before this OM was issued. The phrase "direct operational involvement" does not appear in the December 2006 SSOF OM, which was in effect when Armfield invested.

[18]   There is, in any event, no claim of operational involvement in LightSquared until March of 2010, when Harbinger is alleged to have appointed new management. *See* ¶64.

[19]   The TAC's conclusory allegations of reasonable reliance on the OMs (¶¶ 143, 207-09) ignore not only the disclosures in the OMs but also the widely available media reports about the Funds' investment activities (*see, e.g.*, Cherington Dec. Exs. 23 and 24), which are judicially

### B. Disclosure That Investment Strategy Was Subject to Change

Courts consistently dismiss claims alleging failure to disclose a change in investment strategy where, as here, the OM discloses that investment strategy may change.[20]  The October 2007 Fund I OM discloses:

> The descriptions of specific strategies that may be engaged in by the [Fund] described in this [OM] should not be understood as in any way limiting the [Fund's] investment activities.  The [Fund] may engage in investment strategies not described herein that the General Partner considers appropriate.  The [Fund's] investment objective is speculative and entails substantial risks, and there can be no assurance that the Partnership's investment program will be achieved.

Cherington Dec. Ex. 4 at 5.  Under the heading "Flexibility," the OM further states (at 14) that while it is "anticipated" that the Fund will invest primarily in distressed/high yield debt securities, special situation equities and private loans and notes, it "has broad and flexible investment authority."  If that investment strategy or anything else in the OM changes, Harbert has "*no duty to update* any such information for subsequent changes of any kind."  *Id*. at ii.[21] There is no basis for any fraud or misrepresentation claim because the possibility of a change of investment strategy (assuming, *arguendo*, that there was a change) was disclosed.

### C. Disclosure Concerning Risk Management

The TAC alleges that the Funds' risk management systems were represented to be "adequate" (¶4), "credible" (¶149), "robust" (¶149) and "state-of-the-art" (¶194).  But the OMs say nothing of the kind — indeed, they prominently disclaim any such representation.

The TAC's sole quote from an OM about risk management, in ¶148, is an expression of intent coupled with an explicit warning:

---

noticeable as part of the total mix of information available to investors.  *See In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 526 n.4, 536-37 (S.D.N.Y. 2012) (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

[20]   *See, e.g., San Diego Cnty. Emps. Retirement Ass'n v. Maounis*, 749 F. Supp. 2d 104, 122 (S.D.N.Y. 2010); *Kelter*, 2009 WL 2599607, at *5.

[21]   *See, e.g.,* October 2006 Offshore Fund I OM at iii, 5, 13, March 2007 Offshore Fund I OM at iii, 5, 13, September 2007 Offshore Fund I OM at iii, 5, 13, December 2006 SSOF OM at ii, 7, 30; Cherington Dec. Exs. 7, 8, 9, 5, respectively.

> [T]the Partnership [*i.e.*, Fund I] <u>intends</u> to employ a range of risk management guidelines and procedures, from time to time, in its efforts to monitor portfolio volatility and risk.  <u>The Partnership's current risk management guidelines, which are subject to change without notice,</u> include investment guidelines providing for the monitoring of the proportion of the Partnership's net asset value invested in anyone *[sic]* issuer or anyone *[sic]* industry or sector.  These guidelines <u>may change from time to time, are not strict limits, and may be exceeded</u>.

Tellingly, the TAC omits the prominent warning on the same page of the OM:  "THERE CAN BE NO ASSURANCES THAT ... THE RISK MANAGEMENT GUIDELINES WILL PROTECT INVESTORS FROM LOSSES."  October 2007 Fund I OM (Cherington Dec. Ex. 4) at 15; *see also id.* at 11.[22]

    In the absence of any identifiable misrepresentation, the TAC resorts to vague wishful thinking.  TAC ¶197 claims the Funds lacked kind of the "automated" risk management "investors would expect" — not that they lacked the kind of risk management investors were actually told about.  TAC ¶195 sweepingly claims that Falcone's decision to overinvest in LightSquared violated "all responsible guidelines or limits for concentration."  But nothing in the TAC provides factual support for the claim that risk management was represented to be "adequate," let alone "state-of-the-art."  The TAC does not, because it cannot, quote a single statement in any OM making a qualitative statement about the effectiveness of the Funds' risk management.  Even if the Funds had made qualitative statement of the kind conclusorily alleged in the TAC, they would not be actionable.[23]  The risk management claims constitute fraud-by-hindsight pleading, contending that because the LightSquared investment has not been successful, the Funds' risk management systems must have been misrepresented.  The TAC does not allege — nor could it allege — that portfolio concentration was not monitored as contemplated by the OMs.  Consequently, it fails to plead a false statement by Harbert.

---

[22]     *See also, e.g.,* October 2006 Offshore Fund I OM at 10, 14, March 2007 Offshore Fund I OM at 10, 14, September 2007 Offshore Fund I OM at 10, 14, December 2006 SSOF OM at 33-34; Cherington Dec. Exs. 7, 8, 9, 5, respectively.

[23]     *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 205–06 (2d Cir. 2009); *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, No. 08 Civ. 11278 (DLC), 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009).

### D.      **Forward-Looking Statements**

The October 2007 Fund I OM (Cherington Dec. Ex. 4 at ii) warns that its forward-looking statements are inherently uncertain:

> **Forward-Looking Statements.**  This [OM] contains forward-looking statements. These forward-looking statements are based on the current expectations and genuinely held beliefs of the management of the Investment Adviser and the General Partner and the reasonable assumptions made by such management. Words such as "seeks", "will", "expects", "believes", "anticipates", "intends", "plans", "contemplates", "should", "could", "may", "will", variations of such words and similar expressions are intended to identify such forward-looking statements.  These statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions which are difficult to predict. Therefore, actual outcomes and results may differ significantly from what is expressed or anticipated in such-forward-looking statements.[24]

As the principal support for the claim that investment strategy was misrepresented, ¶145 relies on a four-paragraph excerpt from this OM.  The excerpt is replete with forward-looking formulations — *e.g.*, "seeks to achieve," "[i]t is anticipated," "may be made," "is intended to allow," "expects to monitor," "may change," "may be exceeded," "will be tailored," "typically will seek," "will allow," "anticipated time," "may also be an important factor," "may focus," "may be attractive," "may frequently receive," "may in certain instances seek," "may be long, short, or both." As the principal support for the claim that risk management was misrepresented, ¶148 quotes a paragraph from the OM stating that the Fund "intends" to employ a range of guidelines and procedures to monitor risk, and that the guidelines "may change from time to time, are not strict limits, and may be exceeded."

As set forth in Points III.B and IV.A through C above, these forward-looking statements are accompanied by ample cautionary language warning investors of precisely the risks the TAC claims were undisclosed, including that:  (1) investment positions, particularly control and activist positions, may be long-term, illiquid and unsuccessful; (2) the portfolio could be concentrated in a limited number of issuers; (3) investment strategies and risk management

---

[24]     *See, e.g.,* October 2006 Offshore Fund I OM at ii, March 2007 Offshore Fund I OM at ii, September 2007 Offshore Fund I OM at ii, December 2006 SSOF OM at ii, Cherington Dec. Exs. 7, 8, 9, 5, respectively.

guidelines could change without notice; (4) risk management guidelines might not be complied

with and may be ineffective; and (5) the entire value of an investment position or an investor's

entire investment may be lost.  The OMs' forward-looking statements concerning investment

strategies and risk management are non-actionable under the "bespeaks caution" doctrine,

because no reasonable investor could have been misled by them into believing that the risks of

which the TAC complains did not exist.[25]

## V.   Harbert Uninvolved in Alleged Plan to Concentrate Fund Assets in LightSquared

On this motion, we must assume the truth of the claim that the Funds ultimately came to

have over half their assets invested in LightSquared.  But it cannot be inferred from this that a

plan to invest Fund assets in this way existed years earlier, in 2006 — let alone that Harbert was

party to such a plan.  To contend that because something happened, it must have been planned

years earlier, is the kind of hindsight pleading the Second Circuit has consistently rejected.[26]  In

all events, as set forth in Point IV.A above, the possibility of the Funds taking control positions

was explicitly disclosed to investors from the outset.

The TAC pleads no facts linking Harbert to the alleged plan to squander Fund assets on

LightSquared.  The TAC alleges that the Funds' investment in LightSquared was a "gamble" by

Falcone, whose "personal 'vision'" was to be "the founder of a next-generation 4G satellite-

terrestrial wireless broadband company."  ¶¶10, 20; *see also* ¶¶98, 117, 130-32, 141, 147, 183.

Only once does the TAC attempt to impute Falcone's supposed vision to all Defendants.  TAC

---

[25]      Under the bespeaks-caution doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading.... In such circumstances, it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency."  *Iowa Pub. Emps.' Retirement Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir 2010).  The bespeaks caution doctrine applies to common law as well as federal securities law fraud claims.  *See, e.g.*, *San Diego Cnty.*, 749 F. Supp. 2d at 123.

[26]      *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 8 (2d Cir. 1996); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978); *Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71, 75 (2d Cir. 2008).

¶130 conclusorily alleges that "Defendants ... decided to use the Funds as their own personal piggy bank to pursue a wildly complex 'vision' of building a competitor to existing wireless companies from the ground up."  But as to Harbert, the TAC pleads no supporting facts — not a single act or statement.  The particularity requirements of Rule 9(b) are not satisfied where, as here, the complaint vaguely attributes alleged fraudulent conduct to defendants collectively.[27]

Although it does not refer to Falcone's alleged "vision," ¶7 alleges that, beginning in 2006, "Defendants started to implement [an] ... investment strategy with risks which bore little-or-no resemblance to the investment strategy and risks described to investors" — a strategy that "involved ultimately concentrating more than half of the Funds' resources to acquire and operate a single, high-risk company called LightSquared."  *See* ¶8 ("plan to ... concentrate a majority of the Funds' resources" in LightSquared).  Once again, no concrete facts are pled.

TAC ¶63 alleges that by September 2009, the Funds held "approximately 69%" of LightSquared's predecessor.  But this says nothing about the proportion of the Funds' assets invested in LightSquared, so it is unavailing.  The allegedly undisclosed plan on which the TAC is based is *not* a plan to acquire a majority of LightSquared — it is a plan to spend a majority of the *Funds' assets* on LightSquared.  *See* ¶¶7-8, 195.  The TAC alleges no act or statement by Harbert that could support a claim that Harbert was party to such a plan.

## VI.    No Factual Allegation that Harbert Knew About GPS Issues

The TAC's fraud and negligent misrepresentation claims are premised on the notion that, starting in 2006, Defendants knew or recklessly disregarded that GPS (global positioning system) issues made it impossible for LightSquared to succeed.  TAC ¶¶9, 11, 152 and 154 conclusorily assert this as to all Defendants collectively.  The TAC contains no factual allegation that could support an inference that Harbert had any knowledge of GPS issues at LightSquared, let alone that Harbert knew such issues would be fatal.

---

[27]    *See, e.g.*, *380544 Can., Inc. v. Aspen Tech., Inc.*, No. 07 Civ. 1204 (JFK), 2011 WL 4089876, at *6 (S.D.N.Y. Sept. 14, 2011); *In re Merrill Lynch Auction Rate Sec. Litig.*, 2012 WL 3297732, at *2.  Even under Rule 8, "a complaint [will not] suffice if it tenders naked assertions devoid of further factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The TAC points to alleged "acknowledge[ments]" by Harbinger in October and November 2011 that "LightSquared's predecessor" was aware of the company's GPS interference problems as early as 2002 (¶¶11, 152 & p. 48 n.3). But the TAC does not allege that LightSquared's predecessor shared any of what it supposedly knew with Harbert, let alone when or by what means. The TAC does not allege that Harbert ever had any communication with LightSquared's predecessor, or LightSquared itself, at any time on any subject. Even assuming *arguendo* that Plaintiffs have some factual basis for believing that information about GPS issues was shared with Harbert, there would still be no reason to accept the conjecture that awareness of such issues as a general matter equates to actual knowledge — before March 2009 — that those issues were insurmountable.

The TAC's description of the actions of the Federal Communications Commission ("FCC") contradicts the notion that anyone could have known — before 2011 at the earliest — that LightSquared would be unable to solve the alleged GPS issues:

**FCC February 2005 Order.** TAC ¶66 alleges that in 2005, the FCC authorized LightSquared to start to build out its network. This hardly suggests that the FCC saw LightSquared's technology as a lost cause. The grant of authority referred to in ¶66 is contained in a February 10, 2005 FCC Opinion and Order (Cherington Dec. Ex. 19). This order (at 27) declined to act on a GPS industry petition to impose stricter limits on "out-of-band emissions," observing that while it is "essential to ensure that GPS does not suffer harmful interference, it is also important to ensure that new technologies are not unnecessarily constrained."

**FCC March 2010 Order.** The next FCC action relied on (¶¶167, 171(d)) is an order issued five years later, on March 26, 2010 (Cherington Dec. Ex. 20). This order gave conditional approval for SkyTerra to "increase the power of its base station transmissions" (¶167). In granting the approval, the FCC intended "to give SkyTerra flexibility to attempt to coordinate and resolve the interference issues," and accordingly required SkyTerra to "regularly report to the FCC on its progress." *Id.* That this approval was "conditional" (*id.*) in no way supports the TAC's speculation that LightSquared was doomed to fail. Nowhere does the TAC explain how

Harbert could have known, before March 4, 2009, that LightSquared was doomed when the FCC evidently had no such knowledge in March 2010.

**FCC January 2011 Order.**  TAC ¶67 relies on a further FCC order granting conditional approval to LightSquared on January 26, 2011 to "expand its existing initial satellite bandwidth license" (Cherington Dec. Ex. 21).  This order, as described in ¶¶67-68, shows that efforts to resolve GPS issues were ongoing.  The FCC directed LightSquared to "participate in an interference working group, and to submit monthly reports and a final report by June 2011" (¶67).  The FCC also directed the National Telecommunications and Information Administration ("NTIA") to conduct a study (*id.*).  As part of its investigation, NTIA solicited reports from other government agencies (¶68).  Not until July 2011 did these agencies complete their reports (*id.*).  TAC ¶68 alleges that "the[] findings [in these reports] were devastating," citing, *inter alia*, NASA's statement that "it is ***conclusive*** that LightSquared's implementation on the upper 10-MHz is not feasible in the near or long-term" (emphasis in TAC).  Even so, ¶74 alleges that it was not until February 14, 2012 that NTIA

> reported to the FCC that multiple government tests all reached the same inescapable conclusion:  LightSquared's network would interfere with navigation equipment used by ... vehicles that depend on GPS....  NTIA concluded that "there is no practical way to mitigate the potential interference at this time."

The next day, February 15, 2012, the FCC "revoked its conditional approval because of the GPS interference problem" and "prepar[ed] to withdraw the preliminary approval it granted last year for [LightSquared] to build a high-speed network." ¶75.[28]

The TAC does not allege that Harbert had contemporaneous knowledge of the FCC's actions, but even if it did, Harbert would have had no reason to see the GPS issues as fatal.  Even if "industry insiders" foresaw that the GPS issues would be "insurmountable" (¶¶9, 19, 76), the TAC is bereft of any factual allegation that Harbert had any awareness of this.

---

[28]   The FCC's February 15, 2012 Public Notice (Cherington Dec. Ex. 22 at 1-3; *see* ¶75) recounts the emergence of the GPS issues, noting (at 3) that "*late in 2010, ... the GPS community ... raised for the first time* concerns that LightSquared's terrestrial base stations (that is, its cell towers) would cause widespread overload interference to GPS receivers and other GPS devices."

## VII.   No Alleged Statements by Harbert Concerning LightSquared

The TAC does not identify a single statement by Harbert about LightSquared.  TAC ¶152 conclusorily alleges that "Defendants provided ... positive, anodyne general reporting on ... LightSquared that functioned more as sales pitches than true, honest reports."  Additionally, TAC ¶153 states that, "[p]rior to the Funds' acquisition of SkyTerra and the name change to LightSquared" in March 2010 (see ¶64), the Funds "only generally referenced SkyTerra." "[M]ore robust information" was later provided, but before then there were only "vague references" (¶154).  These allegations provide none of the particularity required by Rule 9(b), and are therefore insufficient to state a claim of fraud or misrepresentation against Harbert.[29]  As discussed below, the balance of the TAC's section on "Post-Purchase False and Misleading Communications to Investors" (¶¶154-93) points only to post-Harbert statements by Harbinger.

## VIII.   No Factual Allegations Supporting Holder Claim Against Harbert

New York recognizes "holder" claims by investors, but there must be a "sufficiently direct communication from the defendant to the plaintiff to support a claim that the fraud induced inaction."[30]  As against Harbert, the TAC's claim that Plaintiffs continued to hold their investments in the Funds because of misrepresentations by "Defendants" (see ¶¶152-93) is patently inadequate.  This claim identifies only statements made by Harbinger after Harbert's exit, commencing with a 2010 DDQ (¶¶158-59) and ending with an August 2011 portfolio update (¶¶186-90).  The fatal infirmity of TAC ¶¶152-53 is addressed in Point VII above. TAC ¶¶154-57 assert equally non-specific misrepresentations "during and subsequent to the acquisition of SkyTerra" (¶154), but these are all post-March 2009 and therefore post-Harbert. TAC ¶210 alleges that Plaintiffs relied on net asset value ("NAV") reports in deciding whether to

---

[29]   *See Harborview Value Masterfund, L.P. v. Freeline Sports, Inc.*, No. 11 Civ. 1638 (CM), 2012 WL 612358, at *12 (S.D.N.Y. Feb. 23, 2012) (negligent misrepresentation claims subject to Rule 9(b)).  Whether the TAC seeks to plead misstatement by commission or omission, it must satisfy the particularity requirements of Rule 9(b).  *See, e.g., Landesbank Baden-Wurttemberg v. Goldman Sachs & Co.*, No. 11-4443, 2012 WL 1352590, at *1 (2d Cir. Apr. 19, 2012).

[30]   *In re WorldCom, Inc. Sec. Litig.*, 382 F. Supp. 2d 549, 559 (S.D.N.Y. 2005).

hold their investments, but the period during which NAV reports are alleged to be incorrect is "[f]rom March 2010 through the beginning of 2012" (¶193). *See* ¶192 (LightSquared stock held by the Funds first "became Level III assets" subject to FASB 157 "[a]fter March 2010"). Thus, none of the alleged post-purchase misrepresentations can be attributed to Harbert.[31]

## IX.   Breach of Contract Claims Are Factually and Legally Defective

### A.   No Contract with Harbert

The breach of contract claims (¶¶252-61) fail because they do not identify any contract with Harbert. TAC ¶253 alleges that the contracts were the named Plaintiffs' subscription agreements ("SAs"), each of which allegedly "incorporated by reference" (1) the applicable fund's OM and (2) either the fund's limited partnership agreement ("LPA") (in the case of Schad's investment in Fund I and Armfield's investment in SSOF) or its Articles of Association (in the case of the Offshore Fund I investments of Lang, Armfield and Bhardwaj). Harbert is not a party to any of these SAs.

The Fund I SA signed by Schad on February 20, 2008 is an agreement between Schad and Fund I. Cherington Dec. Ex. 11 at 1. It is signed on behalf of Fund I by its general partner, Harbinger GP. *Id.* at 13. HMC-New York, Inc. ("HMC-NY"), a subsidiary of HMC,[32] signed not as a party but only in its capacity as the managing member of Harbinger GP. *Id.* Neither HMC nor HFA signed the Schad's SA, and HMC-NY signed only in a representative capacity. Similarly, neither Harbert Defendant is a party to Lang's Offshore Fund I SAs. Lang's first SA, signed by him on June 27, 2003, is with "Harbert Distressed Investment Offshore Fund, Ltd.,"

---

[31]    As to Offshore Fund I, it is in any event doubtful that Armfield would have a holder claim. The TAC claims (¶29) that Armfield "continues to hold shares" but does not say in which fund, perhaps to avoid disclosing that Armfield has fully redeemed its Offshore Fund I investment.

[32]    *See* October 2007 Fund I OM (Cherington Dec. Ex. 4) at 4. HMC-NY also signed the LPAs for Fund I and SSOF, but did so solely in a representative capacity, as managing member of the general partners of these funds. *See* Cherington Dec. Ex. 17 (Schad February 20, 2008 Fund I LPA) at 15 and Ex. 18 (SSOF LPA as in effect at time of Armfield investment) at 26. The only parties to these LPAs are the limited and general partners of the partnerships. *Id.*

which was the name of Offshore Fund I until 2006.  Lang's second and third SAs, signed by him

on January 22, 2007 and May 21, 2008, respectively (*id.* Exs. 13 and 14), are agreements with

Offshore Fund I.  Neither Harbert Defendant signed Lang's SAs as a party.  HFA signed the May

2008 SA in a representative capacity, on behalf of Offshore Fund I.  *Id.* Ex. 14.  Neither Harbert

Defendant is a party to the SAs signed by Armfield.  Armfield's March 22, 2007 SA is an

agreement with SSOF, and its April 1, 2007 SA is an agreement with Offshore Fund I.  *Id.* Ex.

16 at I-1, VI-1 and Ex. 15 at 15. There is no SA signed by Bhardwaj.

Thus, the only SA signed by either Harbert Defendant is the third (May 2008) Lang SA.

It was signed by HFA solely in a representative capacity, so as a matter of New York law, HFA

has no liability thereunder.[33]  TAC ¶238 tries to circumvent this by positing that relationships

between the Defendants render each of them a party to contracts signed by any one of them.  But

even assuming *arguendo* the existence of control or affiliate relationships as alleged in ¶238,

there would be no claim under New York law, because such relationships, without more, do not

make entities liable for each other's contractual undertakings.[34]

###    B.    No Identification of Breached Terms

The TAC includes a hodgepodge of claims about supposed breaches of contract but never

identifies specific terms of specific contracts allegedly breached.  TAC ¶256 claims that "the

Contracts ... limit Defendants' powers to buying, selling and holding securities, and other typical

activities of an investment manager," but does not point to any provision of any agreement

containing such a limitation.  Nor does the TAC identify contract terms requiring calculation and

reporting of NAV in accordance with GAAP (¶258).  Given that, as set forth above, the OMs

disclose that the Funds may, without notice, change their investment strategies and risk

management guidelines, it is not surprising that the TAC provides no contractual source for the

obligation to "only act in conformity with the [OMs'] investment objectives and representations"

---

[33]    *See, e.g.*, *San Diego Cnty*, 749 F. Supp. 2d at 128-29.

[34]    *See, e.g.*, *Gulf & W. Corp. v N.Y. Times Co.*, 81 A.D.2d 772, 773 (1st Dep't 1981).

(¶255) and to "engage in the risk management strategies that [Defendants] represented would be employed" (¶257).  The TAC is equally silent as to what contractual term was breached by the approval of a $113 million personal loan to Falcone (¶259) or by preferential redemption of certain investors (¶260) (in any event these were post-Harbert).  Because the TAC fails identify any breached contract term, it fails to state a claim against Harbert.[35]

### C.     No Breach of Implied Warranty of Good Faith and Fair Dealing

TAC ¶255 alleges that "Defendants breached their contractual duties and implied warranty of good faith and fair dealing because they made numerous false and misleading misrepresentations about the Funds."  Thus, on its face, the implied warranty claim is not supported by any allegations distinct from the breach of contract allegations, and it must therefore be dismissed.[36]

### X.     Plaintiffs Have No Unjust Enrichment Claim

The unjust enrichment claim (¶¶267-72) is premised on the Funds' alleged overpayment of management fees and performance allocations.  Had such overpayments occurred, they would have injured the Funds, not investors directly, so the claim is derivative.  However, the TAC pleads unjust enrichment as a direct claim, which Plaintiffs lack standing to bring.

Standing is governed by the law of the jurisdiction in which each fund was organized.[37]  Thus, whether Schad, rather than Fund I, has standing to sue for unjust enrichment is determined by Delaware law, because Fund I is a Delaware limited partnership.  Whether Lang, Armfield and Bhardwaj, rather than Offshore Fund I, have standing is determined by the law of the Cayman Islands because Offshore Fund I is a Cayman company.  Whether Armfield, rather than SSOF, has standing is likewise determined by Cayman law, because SSOF is a Cayman limited

---

[35]     *See, e.g.*, *San Diego Cnty.*, 749 F. Supp. 2d at 129 n.7.

[36]     *See, e.g.*, *Bd. of Trs. ex rel. Gen. Retirement Sys. of Detroit v. BNY Mellon*, *N.A*, No. 11 Civ. 6345 (RJS), 2012 WL 3930112, at *5 (S.D.N.Y. Sept. 10, 2012).

[37]     *See, e.g.*, *Prickett v. N.Y. Life Ins. Co.,* No. 09 Civ. 3137, 2012 WL 4053810, at *9 (S.D.N.Y. Sept. 12, 2012).

partnership.  *See* Cherington Dec. Exs. 5-6, 18.

Under Delaware law, a hedge fund's overpayment of fees gives rise only to a direct claim by the fund or a derivative claim by investors on the fund's behalf — not a direct claim by investors — because it is the fund that has suffered the harm.[38]  Under Cayman law, only the entity that allegedly overpaid the fees has standing to sue for their recovery.[39]  Since the TAC pleads unjust enrichment solely as a direct claim, the claim must be dismissed.[40]

Moreover, unjust enrichment is a quasi-contractual remedy.  It is generally unavailable where, as here, there is a written contract governing the same subject matter, even if the plaintiff is not party to the contract.[41]  Here, the amount of fees payable to Harbert is governed by various written contracts, including (1) for Fund I, the LPAs with investors, and (2) for Offshore Fund I and SSOF, the advisory services agreements with HFA, referred to in the OMs.[42]  Accordingly, even if Plaintiffs had standing, the unjust enrichment claim would fail as a matter of law.

## XI.    No Factual Allegations Supporting Scienter

The TAC contains no factual support for its claims that Harbert made false statements concerning, *inter alia*, percentage limits on investment concentration, investment strategies and

---

[38]     *See, e.g.*, *Prickett*, 2012 WL 4053810, at *9.

[39]     *See* Declaration of Hector G. Robinson at ¶¶54-57, submitted by Harbinger in connection with its motion to dismiss the TAC, setting forth the applicable Cayman law; *see also Druck Corp. v. Macro Fund Ltd.*, 290 F. App'x 441, 444 (2d Cir. 2008).

[40]     The fraud and negligent misrepresentation claims are likewise derivative, because they seek damages for harm to the Funds, *i.e.*, the $3 billion allegedly misspent on LightSquared, in which Plaintiffs would share solely in proportion to their investments in the Funds.  *See* TAC ¶¶203, 205, 206.  This provides an additional, independent basis for dismissing the fraud and negligent misrepresentation claims.  *See, e.g.*, *San Diego Cnty.*, 749 F. Supp. 2d at 127.  In addition, to the extent the Court may determine that Harbinger's arguments for preclusion of the TAC's claims under the Securities Litigation Uniform Standards Act of 1998 (15 U.S.C. § 78bb(f)(1)(A)-(B) (2010)) apply to Harbert, Harbert adopts such arguments.

[41]     *See, e.g.*, *Prickett*, 2012 WL 4053810, at *10.

[42]     *See, e.g.*, Schad February 20, 2008 Fund I LPA (Cherington Dec. Ex. 17) at § 4.03; October 2006 Offshore Fund I OM (*id.* Ex. 7) at 23-24; March 2007 Offshore Fund I OM (*id.* Ex. 8) at 24-25; September 2007 Offshore Fund I OM (*id.* Ex. 9) at 25-26; December 2006 SSOF OM (*id.* Ex. 5) at 31.

risk management, GPS issues at LightSquared or LightSquared generally.  But even if the TAC adequately pled false statements by Harbert — which it demonstrably does not — it contains no factual support for the assertion that Harbert knowingly or recklessly made such statements. Fraudulent intent, or scienter, is a required element of a common law fraud claim under New York law, and it is not satisfied by conclusory allegations of knowing or reckless falsity.[43]

## XII.   Claims of Armfield and Lang Are Time-Barred

Under New York's borrowing statute, N.Y. C.P.L.R. § 202 (McKinney 2011), North Carolina's three-year statute of limitations, N.C. Gen. Stat. § 1-52 (1), (9) (2011), governs Armfield's claims because this is a diversity action, Armfield is incorporated and has its offices in North Carolina (Cherington Dec. Ex. 16 at II-13, III-1) and its economic injuries are deemed to have occurred there.[44]  Ontario's two-year statute of limitations, S.O. 2002, c. 24, Sched. B, §§ 4-5 (Can.), likewise governs Lang's claims because he resides there (Cherington Dec. Ex. 12 at 10).  The Harbert Defendants were first named as parties in Plaintiffs' First Amended Complaint on May 3, 2012 (*see* ECF ## 30, 33).  Since at least 2008, there has been widespread media coverage of the Funds' efforts to acquire SkyTerra and other satellite communication companies (*see, e.g.*, *id.* Ex. 23), as well as the Funds' numerous other activist and control-oriented investments (*see, e.g.*, *id.* Ex. 24).  Armfield and Lang were thus on notice of their claims more than four years before they sued Harbert, rendering those claims time-barred as a matter of law.[45]

## CONCLUSION

For the foregoing reasons, the Harbert Defendants respectfully request that the TAC be dismissed in its entirety and with prejudice.

---

[43]     *See, e.g.*, *Prickett*, 2012 WL 4053810, at *7.

[44]     *See Pricaspian Dev. Corp. (Tex.) v. Royal Dutch Shell, PLC,* 382 F. App'x 100, 102-03 (2d Cir. 2010).

[45]     *See, e.g., Stratton v. Royal Bank of Can.*, No. 07 CVS 15079, 2010 WL 445605, at *9 (N.C. Super. Ct. Feb. 5, 2010), *aff'd*, 712 S.E.2d 221 (N.C. Ct. App. Apr. 19, 2011); *Lipson v. Cassels Brock & Blackwell LLP*, [2011] ONSC 6724 ¶ 136 (Can. Ont. Super. Ct.) (Cherington Dec. Ex. 25).

Dated:  October 25, 2012
        New York, New York

**GREGORY P. JOSEPH LAW OFFICES LLC**


By:          *s/ Gregory P. Joseph*
            _____
            Gregory P. Joseph (GJ-1210)
            (gjoseph@josephnyc.com)
            Pamela Jarvis (PJ-1250)
            (pjarvis@josephnyc.com)
            Rachel M. Cherington (RC-3673)
            (rcherington@josephnyc.com)

485 Lexington Avenue, 30th Floor
New York, New York 10017
Tel:        (212) 407-1200
Fax:        (212) 407-1280

*Attorneys for Harbert Management Corporation and*
*Harbert Fund Advisors, Inc.*

720979