# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| | Case No. 1:12-cv-01244-AJN |
| In re HARBINGER CAPITAL PARTNERS FUNDS INVESTOR LITIGATION | **FOURTH VERIFIED AMENDED CLASS ACTION AND DERIVATIVE COMPLAINT** |
| | JURY TRIAL DEMANDED |

RECEIVED 2012 DEC -5 P 1:11 U S DISTRICT COURT SDNY

6401-1

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    SUBJECT MATTER JURISDICTION AND VENUE .................................................... 10

III.   PARTIES ........................................................................................................ 10

       A.   Plaintiffs ................................................................................................ 10

       B.   Defendants ............................................................................................. 11

       C.   Nominal Defendants ............................................................................... 13

IV.    FACTUAL ALLEGATIONS ................................................................................. 18

       A.   The History of Harbinger and the Funds ............................................... 18

       B.   Harbinger Acquires LightSquared With Money from the Funds ......................... 19

       C.   The GPS Interference Problem and the Conditional Waiver from the FCC ......... 22

       D.   Falcone's Attempt to Improperly Influence the Government .............................. 25

       E.   The Senate Investigation ........................................................................ 28

       F.   LightSquared Filed for Bankruptcy ....................................................... 29

       G.   The SEC Investigation, Civil Actions And Settlements ....................................... 33

       H.   The September 2012 Hearings in the House of Representatives ........................... 38

V.     DEFENDANTS' BREACHES OF FIDUCIARY DUTIES TO THE FUNDS ............... 38

       A.   The LightSquared Gamble ..................................................................... 39

       B.   The SEC Investigation And Civil Fraud Actions .................................................. 41

       C.   Attempt to Improperly Influence the FCC and a Congressional Investigation ..... 42

VI.    FALSE AND MISLEADING STATEMENTS TO THE INVESTORS ......................... 43

       A.   The Offering Documents ........................................................................ 43

       B.   Post-Purchase False and Misleading Communications to Investors .................... 48

i

1.  General Background of Repeated False and Misleading Statements and Omissions Regarding the Viability and Risk of the LightSquared Venture .................................................................. 48

2.  The 1Q 2010 Due Diligence Questionnaire for Fund I, Fund II, Offshore Fund I, and Offshore Fund II ..................................... 50

3.  The April 28, 2010 Investor Conference Call .......................................... 51

4.  The June 3, and June 4, 2010 Commentaries ........................................... 52

5.  The June 2010 Investor Presentation ...................................... 53

6.  The July 20, 2010 Press Release .............................................. 56

7.  The November 11, 2010 Commentary ...................................... 57

8.  The June 17, 2011 Announcement .......................................... 57

9.  The August 5, 2011 Commentary ........................................... 58

10. The August 19, 2011 Commentary – First Reference to GPS Interference Issues ..................................................................... 60

11. The Monthly Statements and Performance Summaries Reporting NAV and AUM ........................................................................... 61

VII.   RISK MANAGEMENT .................................................................................. 62

VIII.  DAMAGES AND LOSS CAUSATION ...................................................... 64

IX.    RELIANCE ..................................................................................................... 65

X.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ..................... 66

    A.  With Respect to Offshore Fund I, Offshore Fund II, the Special Situations Offshore Fund and the Master Fund ..................................... 66

    B.  With Respect to Fund I, Fund II and the Special Situations Fund ....................... 68

XI.    SPECIAL RELATIONSHIP BETWEEN DEFENDANTS AND INVESTORS ............. 70

XII.   TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATIONS ........................ 71

XIII.  CLASS ACTION ALLEGATIONS .................................................................. 72

ii

6401-1

XIV.    COUNTS ........................................................................................................... 73

XV.     JURY DEMAND ............................................................................................. 82

XVI.    PRAYER FOR RELIEF ................................................................................... 82

6401-1

## I.   INTRODUCTION

> *"Today's charges read like the final exam in a graduate school*
> *course in how to operate a hedge fund unlawfully"*
>
> *–Robert Khuzami, Director of the SEC's Division of Enforcement*
> *in a June 27, 2012 News Release announcing multiple civil fraud*
> *charges against Defendants Falcone, Harbinger and Harbert*

1.      This is a class and derivative action on behalf of the Harbinger family of hedge funds and their investors and seeks to recover approximately $3 billion of losses sustained as a direct result of Defendants' fraudulent and/or grossly negligent misrepresentations to investors and knowing, reckless and/or grossly negligent breaches of fiduciary duties owed to the funds and to the investors.

2.      Plaintiffs Lili Schad ("Schad"), Anil Bhardwaj ("Bhardwaj"), The Edward M. Armfield Sr. Foundation Inc. (the "Foundation"), Dr. Randall Lang ("Lang"), and the Klein Family Partnership LP ("Klein") (together, the "Plaintiffs"), by and through their undersigned counsel, bring this action individually and on behalf of all persons and entities who purchased or otherwise acquired limited partnership interests in Harbinger Capital Partners Fund I, L.P. ("Fund I"), limited partnership interests in Harbinger Capital Partners Fund II, L.P. ("Fund II"), limited partnership interests in Harbinger Capital Partners Special Situations Fund L.P. (the "Special Situations Fund"), limited partnership interests in Harbinger Capital Partners Special Situations Offshore Fund L.P. (the "Special Situations Offshore Fund"), shares in Harbinger Capital Partners Offshore Fund I, Ltd. ("Offshore Fund I") and/or shares in Harbinger Capital Partners Offshore Fund II, Ltd. ("Offshore Fund II") (collectively, the "Funds" or the "Harbinger Funds") and purchased their interests prior to December 31, 2011 ("Class Members"). Plaintiffs bring this action against various entities that control the Funds, including Harbinger Capital Partners LLC ("HCP"), Harbinger Holdings, LLC, Harbinger Capital

Partners GP, L.L.C., Harbinger Capital Partners Special Situations GP, L.L.C., and Harbinger Capital Partners Special Situations Offshore GP, L.L.C., as well as individual Philip A. Falcone, for common law fraud and negligent misrepresentation.  Plaintiffs also bring this action against Harbert Management Corporation, the former owner of the entities that control the Funds ("Harbert").

3.      Plaintiffs also assert derivative claims (or double-derivative claims) on behalf of the Funds and Harbinger Capital Partners Master Fund I, Ltd. (the "Master Fund"), which were operated under common control of the Defendants and as a unified enterprise, arising from Defendants' breaches of their fiduciary duties owed to the Funds.  Plaintiffs also assert claims against Falcone for breaching his fiduciary duty to his fellow partners in the Delaware Funds, and against Harbert for aiding and abetting the other defendants' breaches of fiduciary duty.

4.      The Harbinger Funds, founded and controlled by famed billionaire hedge-fund manager Defendant Philip A. Falcone, were marketed to Plaintiffs and other similarly situated investors as primarily distressed-debt funds. The Defendants offered limited partnership interests and shares in a number of funds and represented that they would seek superior absolute returns by continuing to invest primarily in a portfolio of high-yield debt issued by distressed companies.  In addition, the Defendants represented that the Funds had adequate risk-control measures in place to ensure that exposure to any single company or industry was contained and investments were properly diversified.

5.      For example, offering documents (discussed in more detail below, and collectively referred to as the "Offering Materials") related to Fund I stated that the Fund would pursue an investment strategy designed to "achieve superior absolute returns by participating in investments primarily involving distressed/high yield debt securities, special situation equities,

2

and private loans and notes." The Offering Materials further state that Fund I "focuses primarily on turnarounds, restructurings, liquidations, event driven situations and capital structure arbitrage," and "seeks to achieve its investment objectives by employing a disciplined value investing approach based on intensive credit research." Similar Offering Materials related to the other Harbinger Funds made nearly identical representations or emphasized that the focus was on distressed investments identified through rigorous credit analysis.

6.      Plaintiffs were required, as part of their subscription agreement, to warrant and represent that they each "solely relied" on the Offering Materials in connection with their investments. The representations in the Offering Materials concerning investment strategy were the only source of information available to investors in the Funds in connection with the investments, and were the only information that the investors were contractually permitted to rely upon. Defendants reportedly raised as much as $20 billion through the sale of interests in the Funds by means of the Offering Materials, and at their peak, the Harbinger Funds had more than $26 billion under management.

7.      In 2006, despite marketing the Funds as primarily distressed-debt and credit-driven funds, and despite reassuring investors that the Funds had sufficient risk-control mechanisms in place to protect investors, Defendants started to implement a very different investment strategy with risks that bore little-or-no resemblance to the investment strategy and risks described to investors. That strategy, which amounted to a material deviation from the Funds' investment objective and investment program, involved ultimately concentrating more than half of the Funds' resources to acquire and operate a single, high-risk company called LightSquared (originally SkyTerra). LightSquared was a development-stage wireless telecommunications company with no profits and its success (if such was ever possible) was

dependent on overcoming massive technological and regulatory hurdles. Defendants also made a further substantial investment in a competing company Inmarsat, plc, intended to augment the LightSquared project.

8.     Defendants had no relevant expertise or experience in the telecommunications field, either in operating or building out a multi-billion dollar wireless network that used complex cutting-edge technology or in managing the regulatory issues associated with such unproven wireless technologies.   Defendants did not advise Class Members of their plan to deviate from the investment objectives and concentrate a majority of the Funds' resources in a single LightSquared/Inmarsat venture, nor did they disclose the nearly impossible technical and regulatory obstacles facing the venture until _after_ media reports and Falcone's entanglement in a series of media controversies and regulatory inquiries brought the extent of the Funds' problems to light.

9.     Defendants invested approximately two-thirds of the Funds into LightSquared, a company that had a singular focus.   LightSquared sought to use a portion of the L-band spectrum reserved for satellite communications to build out a hybrid terrestrial and satellite communications network. Undisclosed to investors, but known by industry insiders and Defendants, LightSquared's plan was materially flawed due to an insurmountable obstacle: the proposed hybrid network it planned to build fatally interfered with existing global positioning systems ("GPS") employed by the military, airlines, and transportation companies. Commercial viability for LightSquared's plan depended on resolving the technical interference issues and convincing the Federal Communications Commission ("FCC") that the GPS interference problem could be resolved.  The FCC had reservations but granted LightSquared a ___conditional___ ___waiver___, giving it the opportunity to prove that it could resolve GPS interference problems.

4

Thus, LightSquared was required by the FCC to spend several billion dollars before it could even prove that its technology was viable. Defendant Falcone, who controlled the Funds, committed billions of dollars of the Funds to a venture-stage project with possibly unworkable technology.

10. In essence, Defendant Falcone impermissibly used the Funds to gamble on his "vision" of being the founder of a next-generation 4G satellite-terrestrial wireless broadband company. By "going all in" on LightSquared, Defendants materially deviated from the Offering Materials' representations that the Funds would seek to achieve attractive returns by investing in a credit-driven, risk-controlled, diverse portfolio of distressed debt, special situation equities, and private loans and notes, and that it would not assume operational risk. The risks, rewards and time horizon implicit in the LightSquared investment were not those attendant upon an investment in a hedge fund with the objectives and investment strategy described in Harbinger's Offering Materials. The Offering Materials stated that Defendants would "monitor portfolio volatility and risk," but the risks associated with Defendants' concentration of the Funds' resources on LightSquared could not be controlled or managed through customary credit risk management techniques employed to manage portfolio risk and volatility.

11. Worse, Defendants misled investors about their strategy and its risks. On or about August 19, 2011, years after Defendants already had poured billions of dollars of investors' money into the LightSquared venture, Defendants finally advised Plaintiffs and the other investors that LightSquared's technology interfered with GPS systems, and that it was fatally flawed. Nothing in the Offering Materials or any reports or communications from Defendants to investors before August 19, 2011 gave any indication that the Funds' investment in LightSquared might be in jeopardy, had material risks or was unlikely to succeed due to GPS

5

interference or related regulatory issues. Defendants knew from the outset, or were reckless in failing to know, that LightSquared's technology interfered with GPS systems. Indeed, Falcone's attorney wrote Senator Charles Grassley on October 19, 2011 and acknowledged that LightSquared's predecessor had attempted to address GPS interference problems as early as 2002. Notwithstanding this knowledge, Defendants led investors in the Funds to believe that they owned extremely valuable "spectrum assets" in LightSquared, that its business plans and viability were approved by the FCC and that LightSquared was signing contracts with customers and close to commercial operation.

12.     Had Plaintiffs known that Defendants would concentrate the Funds' assets in a single, high-risk venture like LightSquared, assumed operational control of a company without the appropriate expertise to run it, or known of the regulatory and technical obstacles that LightSquared faced, they would have refrained from investing in the Funds or immediately sought to withdraw their investments from the Funds.   Yet, Defendants failed to provide Plaintiffs and  other investors with the information they needed about these risks and hurdles in order to determine if an investment in the Funds met their objectives.   Defendants also failed to provide investors with candid information concerning the status of the Funds' investment in LightSquared or its risks of failure, depriving them of the ability to determine if they wished to maintain their investments in the Funds.

13.     At the same time, Defendants were engaged in other conduct that constituted gross mismanagement of the Funds and, among other things, violated their fiduciary duties of loyalty and care.   Specifically, according to the SEC, Falcone unlawfully caused the Special Situations Fund to pay him $113.2 million in the form of a low interest rate "personal loan" that was not disclosed to investors until months later.   Additionally, Defendants, as *quid pro quo* for

approval of more stringent redemption restrictions, allowed certain favored institutional investors to redeem their investments at times and on terms unavailable to Plaintiffs and other investors.  Through an undisclosed "side letter" arrangement one institutional investor redeemed $65 million on terms not available to other investors.  Though the SEC has not named the investor, the press has reported that this investor was Goldman Sachs, one of the Funds' prime brokers.

14.    On June 27, 2012, the SEC formally charged Defendants including Falcone personally, in three civil fraud complaints[1] and one administrative proceeding[2] with multiple violations of the securities laws, including the Securities Act of 1933, the Exchange Act of 1934 and the Investment Advisors Act of 1940, and regulations thereunder.

15.    First, HCP and Falcone were charged with scheming to misappropriate $113.2 million from the Special Situations Fund as a low interest rate personal loan to pay taxes owed (and avoid curtailing his lavish spending), failing to obtain investor approval for this loan, misleading outside legal counsel to obtain advice on how to proceed with the loan, and violating the legal advice he received.  HCP and Falcone were also charged with scheming to grant large investors favorable redemption and liquidity terms as a *quid pro quo* for their vote to approve increased redemption restrictions, and hiding this scheme from the directors who had the sole authority to grant preferences.

---

[1] *Securities and Exchange Commission v. Harbinger Capital Partners LLC; Philip A. Falcone; and Peter A. Jenson*, 12 Civ. 5028 (PAC); *Securities and Exchange Commission v. Philip A. Falcone, Harbinger Capital Partners Offshore Manager L.L.C. and Harbinger Capital Partners Special Situations GP, L.L.C.*, 12 Civ. 5027 (PAC); *Securities and Exchange Commission v. Harbert Management Corporation, HMC-New York Inc. and HMC Investors LLC*, 12 Civ. 5029 (PAC).

[2] *In the Matter of Harbinger Capital Partners LLC*, SEC Administrative Proceeding, File No. 3-14928.

6401-1

16.     Second, Falcone, HCP Offshore Manager L.L.C. and HCP Special Situations GP, L.L.C. were charged with manipulating a "short squeeze" in high-yield bonds owned by the Funds to force settlement at inflated prices.   Harbert Management Corporation was also separately charged in connection with the illegal "short squeeze" and subsequently settled for a monetary penalty of $1 million.

17.     Third, the SEC charged HCP in an administrative proceeding with multiple violations of Rule 105 of Regulation M of the Exchange Act by short selling securities during a restricted period and then purchasing the securities in an initial public offering.  HCP settled the administrative proceeding and agreed to accept censure, pay disgorgement of $857,950 representing its profits on the trades, prejudgment interest of $91,838.00, and pay an additional monetary penalty of $428,975.

18.     These civil fraud charges led to SEC Director Khuzami's above quotation in the News Release announcing the SEC actions.  Director Khuzami further stated:

> **Clients and market participants alike were victimized as Falcone unscrupulously used fund assets to pay his personal taxes, manipulated the market for certain bonds, favored some clients at the expense of others, and violated trading rules intended to prohibit manipulative short sales.** (Emphasis added)

19.     Finally, on February 14, 2012, as predicted by industry insiders, the FCC announced that its conditional waiver granted to LightSquared was indefinitely suspended because Harbinger and LightSquared were unable to resolve the GPS interference problem.  Most industry experts believe that LightSquared's proposed network is no longer viable.  As a result, on May 14, 2012, Defendant Falcone caused LightSquared to file for bankruptcy, resulting in even greater losses for Class Members.  In contrast to the investors who trusted him with their money, however, Falcone has reassured the public that the failure of his quixotic

8

venture will not similarly impact him; in an interview with the *Daily Beast* on April 16, 2012, Falcone said, "If LightSquared went to zero, no, my lifestyle would not change . . . I have enough capital in other assets and in other areas where my lifestyle is not going to change." Falcone even stated to *Bloomberg News* on April 5, "LightSquared, if I have to, I'll put it into bankruptcy, ***I don't care.***"  (Emphasis added).

20.     Defendants' actions have damaged Plaintiffs, Class Members and the Funds. Defendants sold Plaintiffs and other investors diversified, risk-controlled funds primarily focused on distressed debt and credit-driven investments, while intending to use the Funds to pursue Falcone's personal "vision" by investing in a single, controlling equity position in a single high-technology company which in turn was pursuing a single, high-risk multi-billion-dollar gamble on an unproven and ultimately unworkable technology.

21.     Defendants also falsely represented these actions in communications to investors after the investments, and falsely represented the true value of the LightSquared investment to the Class Members.

22.     Defendants also breached their fiduciary duties to the Funds by pursuing their own interests above the interests of the Funds, including pursuing the LightSquared strategy; permitting Defendant Falcone to give himself a low interest loan for $113.2 million, which violated the Funds' governing documents; giving preferential treatment to Goldman Sachs and other institutions at a time when other investors were barred from withdrawing their investments; subjecting the management and general partners of the Funds to the SEC's censure, penalties and civil fraud actions; and unjustly enriching themselves at the expense of the Funds.

6401-1

## II.    SUBJECT MATTER JURISDICTION AND VENUE

23.    This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because at least one member of the class is a citizen of a state different from at least one defendant, the aggregate amount in controversy exceeds $5,000,000.00, the Class contains more than 100 members, and less than two-thirds of all Class members reside in the State of New York. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the Defendants' conduct giving rise to the causes of actions occurred within this District.

## III.    PARTIES

### A.    Plaintiffs

25.    Plaintiff Lili Schad ("Schad") is an adult domiciled in the State of New York. She purchased limited partnership interests in Nominal Defendant Harbinger Capital Partners Fund I, L.P. ("Fund I") and suffered damages as a result of Defendants' misconduct described herein. Plaintiff Schad continues to hold her limited partnership interests.

26.    Plaintiff Anil Bhardwaj ("Bhardwaj") is an adult domiciled in Dubai, United Arab Emirates. He purchased Class A shares issued by Nominal Defendant Harbinger Capital Partners Offshore Fund I, Ltd. (the "Offshore Fund") and suffered damages as a result of Defendants' misconduct described herein. Plaintiff Bhardwaj continues to hold his shares.

27.    Plaintiff The Edward M. Armfield Sr. Foundation Inc. ("Foundation") is a non-profit corporation domiciled in Greensboro, North Carolina. In April 2007, the Foundation invested in Class A shares issued by Nominal Defendant Harbinger Capital Partners Offshore

10

Fund I, Ltd. (the "Offshore Fund") and invested in limited partnership interested in Nominal Defendant Harbinger Capital Partners Special Situations Offshore Fund L.P. (the "Special Situations Offshore Fund"). The Foundation continues to hold shares.

28.     Plaintiff Dr. Randall Lang ("Lang") is an adult domiciled in Ontario, Canada. Since 2003, has invested in Class A shares issued by Nominal Defendant Offshore Fund and suffered damages as a result of Defendants' misconduct described herein. Plaintiff Lang continues to hold shares.

29.     Plaintiff Klein Family Partnership L.P. ("Klein") is a partnership domiciled in Harrison, New York. Klein purchased limited partnership interests in Nominal Defendant Special Situations Fund in June 2007 and suffered damages as a result of Defendants' misconduct described herein. Klein continues to hold limited partnership interests. In addition, Klein purchased limited partnership interests in Fund I in November 2006 and suffered damages as a result of Defendants' misconduct described herein. Klein continues to hold limited partnership interests in Fund I.

**B.     Defendants**

30.     Defendant Harbinger Capital Partners LLC ("HCP") is a limited liability company organized under the laws of the State of Delaware. HCP is the managing member of Defendant Harbinger Capital Partners GP, L.L.C. ("Harbinger GP"), which in turn is the general partner of Nominal Defendants Fund I and Fund II. HCP has served as the investment manager and investment advisor to Nominal Defendants Offshore Fund I and Offshore Fund II and non-party Master Fund since March 2009, and as investment advisor to Nominal Defendants Fund I, Fund II and Special Situations Fund. HCP received management fees in connection with these duties based on the supposed value of total fund assets, as detailed below. HCP has its

11

principal office at 450 Park Avenue, 30th Floor, New York, New York 10022.   HCP is controlled by Defendants Falcone and Harbinger Holdings, LLC.

31.      Defendant Harbinger Holdings, LLC ("Holdings") is a limited liability company organized under the laws of the State of Delaware.  Holdings is the managing member of HCP, the managing member of Defendant Harbinger Capital Partners GP, L.L.C. ("Harbinger GP"), and the managing member of Defendant Harbinger Capital Partners Special Situations GP, L.L.C. ("Special Situations GP") and has a principal office at 450 Park Avenue, 30th Floor, New York, New York 10022.  Holdings is controlled by its managing member, Defendant Falcone.

32.      Defendant Harbert Management Corporation ("Harbert") is an Alabama corporation headquartered at 2100 Third Avenue North, Suite 600, Birmingham, AL 35203. Harbert maintains an office in this District at 555 Madison Avenue, 16th Floor, New York, NY 10022.  Harbert financed the launch of the Harbinger funds in 2000, and with Defendant Falcone controlled the Funds until 2009.

33.      Defendant Harbinger Capital Partners GP, L.L.C. ("Harbinger GP") is a limited liability company organized under the laws of Delaware and headquartered at 450 Park Avenue, 30th Floor, New York, New York 10022.  Harbinger GP is the general partner of Nominal Defendants Fund I and Fund II, and is controlled by Defendants Holdings and Falcone. Harbinger GP paid itself an "incentive allocation" of 20% of the purported "excess profits" of Fund I and Fund II as discussed in more detail below.

34.      Defendant Harbinger Capital Partners Special Situations GP, L.L.C. ("Special Situations GP") is a limited liability company organized under the laws of Delaware and headquartered at 450 Park Avenue, 30th Floor, New York, New York 10022. Special Situations GP is the general partner of the Special Situations Fund, and is controlled by Defendants

6401-1

Holdings and Falcone.  Special Situations GP paid itself an "incentive allocation" of 20% of the purported "excess profits" of the Special Situations Fund as discussed in more detail below and invests in the Fund.

35.     Defendant Harbinger Capital Partners Special Situations Offshore GP, L.L.C. ("Special Situations Offshore GP") is a limited liability company organized under the laws of Delaware and headquartered at 450 Park Avenue, 30th Floor, New York, New York 10022. Special Situations Offshore GP is the general partner of the Special Situations Offshore Fund, and is controlled by Defendants Holdings and Falcone.  Special Situations Offshore GP paid itself an "incentive allocation" of 20% of the purported "excess profits" of the Special Situations Offshore Fund as discussed in more detail below and invests in the Fund.

36.     Defendant Philip A. Falcone ("Falcone") is an adult domiciled in the State of New York.  He is the co-founder, Chief Investment Officer and managing member of Holdings which in turn is the managing member of HCP.  Defendant Falcone controls HCP and Holdings, and has ultimate control and dispositive power over assets held by the Master Fund, Fund I, the Offshore Fund, the Special Situations Fund and the Special Situations Offshore Fund.  Falcone also invests in the Funds.

37.     Defendants Falcone, HCP, Special Situations GP, Special Situations Offshore GP, Harbinger GP and Holdings are sometimes referred to as "Harbinger" or the "Harbinger Entities" in this Complaint.

**C.     Nominal Defendants**

38.     Harbinger Capital Partners Fund I, L.P. ("Fund I") is a limited partnership organized under the laws of the State of Delaware.  Fund I is controlled by Defendants Falcone and Holdings, and has its principal office at 450 Park Avenue, 30th Floor, New York, New York

13

10022.  In a 1Q2010 due diligence questionnaire, Defendant HCP disclosed that all activities and functions of Fund I, including trading, research, portfolio management and operations activities, take place in New York.  Fund I is a feeder fund and invests solely in the Master Fund.

39.     Harbinger Capital Partners Offshore Fund I, Ltd. ("Offshore Fund I") is an exempted company organized under the laws of the Cayman Islands. Offshore Fund I is controlled by Defendants Falcone and Holdings, and has its principal office address at 450 Park Avenue, 30th Floor, New York, NY 10022.  Its custodian (and Cayman counsel) is Ogier Fiduciary Services (Cayman), 89 Nexus Way, Camana Bay, Grand Cayman, Cayman Islands, KY1-9007.  In a 1Q2010 due diligence questionnaire, Defendant HCP disclosed that all activities and functions of the Fund, including trading, research, portfolio management and operations activities, take place in New York.  Offshore Fund I is a feeder fund and invests solely in the Master Fund.

40.     Harbinger Capital Partners Special Situations Fund L.P. (the "Special Situations Fund") is a limited partnership organized under the laws of the State of Delaware.  The Special Situations Fund is controlled by Defendants Falcone and Holdings, and has its principal office at 450 Park Avenue, 30th Floor, New York, New York 10022.

41.     Harbinger Capital Partners Special Situations Offshore Fund L.P. (the "Special Situations Offshore Fund") is an exempted company organized under the laws of the Cayman Islands. The Special Situations Offshore Fund is controlled by Defendants Falcone and Holdings, and has its principal office at 450 Park Avenue, 30th Floor, New York, New York 10022.  The Special Situations Fund and the Special Situations Offshore Fund are organized and managed under a master-feeder structure so that the Special Situations Offshore Fund

14

invests solely in the Special Situations Fund and is a majority limited partner of the Special Situations Fund.

42.     Harbinger Capital Partners Fund II, L.P. ("Fund II") is a limited partnership organized under the laws of the State of Delaware. Fund I is controlled by Defendants Falcone and Holdings, and has its principal office at 450 Park Avenue, 30th Floor, New York, New York 10022. In a 1Q2010 due diligence questionnaire, Defendant HCP disclosed that all activities and functions of the Fund, including trading, research, portfolio management and operations activities, take place in New York. Fund II is a feeder fund and invests solely in the Master Fund.

43.     Harbinger Capital Partners Offshore Fund II, Ltd. ("Offshore Fund II") is an exempted company organized under the laws of the Cayman Islands. Offshore Fund II is controlled by Defendants Falcone and Holdings, and has its principal office address at 450 Park Avenue, 30th Floor, New York, NY 10022. Its custodian (and Cayman counsel) is Ogier Fiduciary Services (Cayman), 89 Nexus Way, Camana Bay, Grand Cayman, Cayman Islands, KY1-9007. In a 1Q2010 due diligence questionnaire, Defendant HCP disclosed that all activities and functions of the Fund, including trading, research, portfolio management and operations activities, take place in New York. Offshore Fund II is a feeder fund and invests solely in the Master Fund.

44.     Harbinger Capital Partners Master Fund I, Ltd. (the "Master Fund") is an exempted company organized under the laws of the Cayman Islands. The Master Fund is controlled by Defendants Falcone, HCP and Holdings, and has its principal office address at 450 Park Avenue, 30th Floor, New York, New York 10022. Its custodian is International Fund Services (Ireland) Limited (a State Street Company), 78 Sir John Rogerson's Quay, Dublin 2,

15

Ireland.  The Master Fund, Nominal Defendant Harbinger Capital Partners Fund I, L.P. ("Fund I"), Nominal Defendant Harbinger Capital Partners Fund II, L.P. ("Fund II"), Nominal Defendant Harbinger Capital Partners Offshore Fund I, Ltd. ("Offshore Fund I") and Nominal Defendant Harbinger Capital Partners Offshore Fund II, Ltd. ( "Offshore Fund II") are managed under a master-feeder structure so that the Funds (among other funds) are each allocated a portion of the holdings of the Master Fund.

45.     Fund I, Fund II, Offshore Fund I, Offshore Fund II, the Special Situations Fund, the Special Situations Offshore Fund and the Master Fund are sometimes referred to as the "Harbinger Funds" or just the "Funds" in this Complaint.   Where appropriate, the term "Harbinger" is used to mean the Harbinger Defendants and the Harbinger Funds collectively in this Complaint.

46.     The relationship among the Special Situations Fund, Special Situations Offshore Fund and Defendants HCP, Holdings, Falcone, Special Situations GP and Special Situations Offshore GP, is illustrated below:

16



SPECIAL SITUATIONS FUND OWNERSHIP DIAGRAM[1]

Note:   All equity percentages are calculated as of January 31, 2012 as provided by Defendant HCP to the Federal Communications Commission.  Footnotes omitted.

47.     The relationship among Fund I, Fund II, Offshore Fund I, Offshore Fund II, the Master Fund and Defendants HCP, Holdings, Falcone and Harbinger GP is illustrated below.

48.     As the chart illustrates, all of the Funds ultimately were controlled by Falcone.

17

MASTER FUND OWNERSHIP DIAGRAM[1]



Note:  All equity percentages are calculated as of January 31, 2012 as provided by Defendant HCP to the Federal Communications Commission.  Footnotes omitted.

## IV.    FACTUAL ALLEGATIONS

### A.    The History of Harbinger and the Funds

49.    Defendant Falcone founded New York based Defendant HCP in 2001 with the assistance of Defendant Harbert, an alternative-investment manager based in Birmingham, Alabama.  Harbert held a majority stake and provided $25 million of seed money for HCP's first hedge fund in 2001.  Falcone bought out Harbert in 2009 for an undisclosed sum, but Harbert's eponymous owner, non-party Raymond Harbert, is still a substantial investor in various Harbinger funds.  Falcone continues to hold a majority interest in HCP and a 100%

18

interest in Defendant Holdings today, and controls all of the Nominal Defendants and Relevant Non-Parties.

50.     Falcone came to national prominence in 2007 when five hedge fund managers (including George Soros, Jim Simons, John Paulson, Ken Griffin and Defendant Phil Falcone), paid themselves $12.6 billion in a single year after profiting from the collapse of the credit markets. Falcone paid himself $1.7 billion in 2007 after his two main funds returned 114% and 176% that year. From 2005-2007, the funds invested heavily in credit default swaps that offered protection on specific layers of the capital structure of various synthetic CDOs and other less-esoteric mortgage-backed securities that held pools of subprime mortgages. When the financial markets collapsed in 2007, the swaps paid out handsomely and Falcone's two primary funds recorded multi-billion dollar gains.

**B.     Harbinger Acquires LightSquared With Money from the Funds**

51.     In 2006, the Harbinger funds began to invest in SkyTerra Communications, Inc. ("SkyTerra"), a public Delaware corporation based in Virginia that is now known as LightSquared Inc. ("LightSquared"). LightSquared and SkyTerra are used interchangeably in this Complaint where appropriate.

52.     LightSquared is a development-stage wireless broadband company that seeks to build a wholesale, nationwide network to provide 4G wireless access integrated with satellite coverage to end users.

53.     At first, Harbinger invested in SkyTerra's debt, as would be appropriate for a fund marketed primarily as a distressed-debt fund, and small amounts of equity. For example, the Master Fund purchased $60 million of Senior Secured Notes in a $750 million bond offering in March 2006.

54.     On December 15, 2007, Harbinger entered into a securities purchase agreement to purchase $150 million of SkyTerra's 16.5% senior unsecured notes due 2013.  Harbinger also ramped up its equity exposure to SkyTerra by acquiring ten-year warrants to purchase 9,144,038 shares of SkyTerra's capital stock, with an exercise price of $10.00 per share.

55.     On February 4, 2008, Harbinger purchased 14,407,343 shares of non-voting common stock of SkyTerra from another company.  As a result of Harbinger's purchase, SkyTerra was required to offer to repurchase its senior secured notes due to a "change in control," and the majority of note holders agreed to a waiver of this provision on April 2, 2008.

56.     On April 7, 2008, Harbinger purchased 10,224,532 shares of SkyTerra common stock and 6,173,597 shares of non-voting common stock for, in the aggregate, approximately $164 million ($10 per share) from Apollo Funds.  In connection with this stock purchase, Harbinger filed an application with the FCC to acquire control over SkyTerra and 442,825 shares were placed in escrow pending FCC consent.  Harbinger also proposed two directors who were appointed to the SkyTerra board of directors.

57.     Three days later, on April 10, 2008, Harbinger approached SkyTerra management with a proposal for a business combination between SkyTerra and Inmarsat plc, a London-based competitor in which Harbinger already owned a 28% interest. SkyTerra's board of directors approved a transaction for its acquisition of all of the stock of Inmarsat not owned by Harbinger, which was to be funded by Harbinger.  As part of the deal, Harbinger would exchange Inmarsat stock for shares of SkyTerra stock at $10 per share.  Harbinger also agreed to provide $500 million of debt financing to fund SkyTerra's business plan through the third quarter of 2010.

6401-1

58.     On August 22, 2008, SkyTerra's board approved the Inmarsat deal, and changed the terms so that SkyTerra agreed to issue 10.3 million additional shares of common stock to Harbinger if the business combination with Inmarsat was consummated.  On the same date, SkyTerra filed with the FCC for a change of control to Harbinger.

59.     On September 12, 2008, SkyTerra entered into several agreements with another company for the sale of its SkyTerra holdings to Harbinger.  This company sold 23,626,074 shares of non-voting common stock to Harbinger (of which 7,906,737 shares were placed in escrow pending the receipt of the FCC consent for $4.15 per share).  Following the sale, SkyTerra agreed to exchange non-voting stock for voting common stock, and Harbinger exchanged 6,353,915 shares for voting common stock.

60.     During January and February 2009, Harbinger purchased 1,634,708 shares of common stock in open market transactions at purchase prices ranging from $1.43 to $4.69 per share.

61.     In early 2009, SkyTerra's management team was made aware of the increasing uncertainty that the acquisition of Inmarsat could be financed before SkyTerra ran out of money.  Thus, SkyTerra authorized a special committee to work with management, Morgan Stanley and outside counsel to analyze funding and restructuring alternatives.

62.     On June 9, 2009, Morgan Stanley advised that SkyTerra may only have sufficient capital to fund business operations through the third quarter of 2010.  Morgan Stanley also advised that SkyTerra would find it challenging to find a strategic investor.  Harbinger had appointed two members to the SkyTerra board and was thus aware the company was facing severe financial problems.

6401-1

63.     SkyTerra and Harbinger filed a CFIUS ("Committee on Foreign Investment in the United States") notice in connection with a change in control to the Master Fund (a Cayman Islands entity).  The Committee approved the change in control on August 21, 2009.

64.     On September 23, 2009, Harbinger entered into an agreement and plan of merger with SkyTerra to acquire 100% of the company.   At the time, Harbinger already held approximately 69% of the company.  In connection with its acquisition, Harbinger also took SkyTerra private so that it no longer had to file public reports.

65.     With the completion of the merger on March 29, 2010, Defendants took full control of SkyTerra and began to transform it into LightSquared.   The acquisition gave Defendants full responsibility for the management of the company, and managerial execution of its business plans.  Defendants replaced nearly all of LightSquared's officers and directors.  As the owner of LightSquared, rather than an investor in the company, the Funds' options for exiting their position in the company were greatly reduced.

C.     The GPS Interference Problem and the Conditional Waiver from the FCC

66.     LightSquared's high-speed network is designed to operate on an "L-band satellite spectrum."  If deployed, the base stations of the LightSquared network would use radio band adjacent to GPS frequencies.  Although each has its own network, the spectrums are so close that GPS systems would likely pick up the stronger LightSquared signal.

67.     LightSquared must obtain FCC approval to operate its proposed network.   In 2005, the FCC granted LightSquared authority to start to build out – but not operate – its network in the L-band spectrum.

68.     On January 26, 2011, the FCC gave LightSquared approval to expand its existing initial satellite bandwidth license, but conditioned the approval on the resolution of interference

22

problems with GPS operators. The GPS community has objected to FCC approval of LightSquared's expanded network. Opposition has come from GPS equipment makers, the Pentagon and military industries, and companies like John Deere, whose farm equipment uses GPS systems. It is now widely understood – but was only known by insiders like SkyTerra at the time – that the industry was aware of the potential for massive GPS interference should the LightSquared network actually deploy and become functional. The FCC thus directed LightSquared to participate in an interference working group, and to submit monthly reports and a final report by June 2011. The FCC also directed the National Telecommunications and Information Administration ("NTIA") to conduct a study into the interference concerns.

69.     As a part of its investigation, the NTIA solicited reports from several government agencies, including NASA, the Department of Transportation (which includes the FAA), and the Department of the Interior. Each submitted reports in July 2011, and their findings were devastating. For example, Badri A. Younes, Deputy Associate Administrator for Space Communications & Navigation at NASA concluded in a July 20, 2011 report that:

> NASA feels that due to the severity of the operational impacts, to both government and commercial users, it is **conclusive** that LightSquared's implementation on the upper 10-MHz is not feasible in the near or long-term (emphasis added).

70.     NASA was also concerned because LightSquared had proposed to the FCC that it would only use the lower half of its spectrum to avoid the upper-end interference, but was told "that the upper 10-MHz is needed to provide a viable 4G LTE service."

71.     Joel Szabat, the Deputy Assistant Secretary for Transportation Policy at the U.S. Department of Transportation ("DOT"), wrote to the NTIA the next day and echoed NASA's concern in much stronger language. DOT concluded that LightSquared's proposed network would interfere with GPS to such a degree and interfere with Aviation, Maritime, Rail and Road

23

systems so pervasively that the LightSquared network "likely would result in the loss of life and an economic [impact] to transportation applications of over $100 billion."

72.     DOT's primary concern was with aviation.  In the July 21, 2011 report, DOT concluded:

> The effects of LightSquared deployment would be far-reaching and potentially devastating to aviation.  If LightSquared deploys as planned, all current GPS efficiency and safety benefits would be lost, or at least severely reduced, until all aircraft operating in US airspace could be retrofitted over a period of 10 and possibly up to 15 years.

73.     On September 8, 2011, the FCC issued a request for NTIA to conduct additional testing into LightSquared's GPS interference.

74.     Independent of the NTIA study, the National Space-Based PNT Systems Engineering Forum conducted its own study of the potential for interference with military and civilian GPS applications.  On December 9, 2011, according to Bloomberg, "laboratory testing was performed for the National Space-Based Positioning, Navigation, and Timing (PNT) Systems Engineering Forum, an executive branch body that helps advise policy makers on issues around GPS" and "found that 69 of 92, or 75 percent, of receivers tested 'experienced harmful interference' at the equivalent of 100 meters (109 yards) from a LightSquared base station."

75.     On February 14, 2012, NTIA reported to the FCC that multiple government tests all reached the same inescapable conclusion: LightSquared's network would interfere with navigation equipment used by airlines, trains, boats and other vehicles that depend on GPS navigation tools.  NTIA concluded that "there is no practical way to mitigate the potential interference at this time."

76.     On February 15, 2012, the FCC revoked its conditional approval because of the GPS interference problem. Tammy Sun, an FCC spokesperson, said in an e-mailed statement

24

that the agency was preparing to withdraw the preliminary approval it granted last year for the company to build a high-speed network.  Sun said, "[t]he commission clearly stated from the outset that harmful interference to GPS would not be permitted," and that "[t]he commission will not lift the prohibition on LightSquared."

### D.    Falcone's Attempt to Improperly Influence the Government

77.    The fact that the FCC finally relented and was forced to revoke the conditional waiver surprised no one in the industry.  Instead, industry insiders had been scratching their heads wondering why the conditional waiver was granted in the first place, and why the FCC and others in the government appeared to treat LightSquared with suspicious favoritism.

78.    It has since come to light in media reports that Defendant Falcone and other executives at Harbinger may have improperly tried to gain favors from the government.

79.    For example, at a time when the FCC was reviewing LightSquared's proposed network, James Kohlenberger, chief of staff for the White House Office of Science and Technology Policy, met with Falcone and LightSquared CEO Sanjiv Ahuja on September 29, 2009; one week after the meeting, Falcone donated $30,400 to the Democratic Senatorial Campaign Committee. These circumstances were reported by the Center for Public Integrity in a September 14, 2011 article titled, "Emails Show Wireless Firm's Communications with White House as Campaign Donations Were Made" ("CPI Report").

80.    According to the CPI Report, the following year, on September 23, 2010, LightSquared's representative Dave Kumar emailed Aneesh Chopra, the President's Chief Technology Officer, asking for a meeting, and mentioned that he would be at a Presidential fundraiser the following week.  On the same day (September 23, 2010), Henry Goldberg, a LightSquared lawyer, wrote to Kohlenberger also asking for a meeting with Chopra, and also

noted that he would be at the fundraiser the following week. According to the CPI Report, Ahuja donated another $30,400 to the DSCC *on the exact same day both emails were sent asking for a meeting with Chopra*.

81.     Other connections also implicate LightSquared's conduct. For example, as reported by the *Daily Caller* on February 21, 2012, according to White House visitor logs, FCC Chairman Julius Genachowski – a friend and classmate of the President, and the man with authority to grant or deny LightSquared's waiver – met with White House Personnel Director Don Gips on February 18, 2009. At the time, Gips held between $250,000 and $500,000 of LightSquared stock options. It is unclear what was said at the meeting at the White House, but immediately thereafter, two members of the President's transition team were given jobs at LightSquared – Jeff Carlyle was named LightSquared's VP of regulatory affairs, and Gary Epstein was named executive vice president. Epstein also worked for a few months at the FCC between leaving the transition team and starting at LightSquared.

82.     According to the February 21, 2012 *Daily Caller* article, these various attempts to gain influence were followed by multiple instances of government officials trying to assist LightSquared. For example, on July 24, 2009, LightSquared asked the FCC to allow it to delay the launch of a new satellite; the FCC granted the request even though it denied the exact same request by a competitor. Several other decisions by the FCC favored LightSquared over the same competitor, according to the article.

83.     There have also been reports that the White House attempted to tamper with testimony before a House Armed Services Subcommittee hearing on September 15, 2011. This incident was reported in a September 15, 2011 *Daily Beast* article by Eli Lake titled, "White House Pressure for Donor?" According to the article, General William Shelton, Commander of

26

Air Force Space Command testified that the LightSquared network "poses significant challenges for almost all GPS users." However, in a classified briefing prior to the hearing, General Shelton said the White House intervened and tried to pressure him to change his testimony to make it more favorable to the company. Then, according to the article, the White House leaked the General's prepared testimony to LightSquared prior to the hearing. General Shelton reportedly "chafed at the intervention."

84.     As reported in the September 15, 2011 *Daily Beast* article, U.S. Representative Mike Turner, chairman of the House Armed Services subcommittee that oversees General Shelton's space command and GPS issues, said that "[t]here was an attempt to influence the text of the testimony and to engage LightSquared in the process in order to bias his testimony. The only people who were involved in the process in preparation for the hearing included the Department of Defense, the White House, and the Office of Management and Budget."

85.     After the press reported the attempt to pressure General Shelton, several members of the House Committee on Space, Science and Technology, including the Chairperson, wrote on September 20, 2011 to the Director of the Office of Management and Budget demanding copies of all communications between Falcone, LightSquared or Harbinger and any OMB employee. The Committee members' letter also referred to White House efforts to pressure General Shelton as "tampering with testimony."

86.     According to a September 19, 2011 *Daily Beast* article titled, "White House's Testimony 'Guidance,'" after the reports concerning General Shelton, a second witness at the Armed Services Subcommittee hearing admitted that he received "guidance" from the White House prior to his testimony. Anthony Russo, director of the National Coordination Office for Space-Based Positioning, Navigation and Timing, admitted that OMB requested that he testify

27

that GPS interference testing could be done in 90 days. This was the timeframe favored by LightSquared. According to the *Daily Beast* article, Russo rejected the "guidance" and said he was aware that other witnesses received identical "guidance."

### E.       The Senate Investigation

87.     After the January 26, 2011 FCC conditional waiver, Falcone and LightSquared became the subject of a Senate Judiciary Committee investigation into whether the FCC's approval was tainted by political contributions. On April 27, 2011, Senator Grassley wrote to the FCC to demand documents related to all communications with Harbinger and LightSquared. In his letter, Senator Grassley pointed to the ongoing SEC investigation of possible securities fraud by Falcone as one of the reasons for concern that the FCC was moving with such haste.

88.     The Senate investigation has become increasingly contentious as the FCC has refused to comply with various requests, or complied but with substantial delays. After news broke in September 2011 of the details of the various connections among the FCC, the White House and LightSquared, the Senate investigation intensified. Immediately thereafter, according to a January 23, 2011 letter from Senator Grassley to Falcone, Falcone personally intervened. According to Senator Grassley's letter, on October 5, 2011, Falcone sent an email to Senator Grassley saying that approval of LightSquared's network could be made a "win" for the Senator since the matter was already in the "political arena" and that "the last thing I want to do is make this more political than it already is."

89.     According to Senator Grassley's letter, Falcone's email was followed up by an email from Todd Ruelle, a consultant for LightSquared, who said that if LightSquared were approved, Grassley's home state of Iowa could get a "call center." Grassley's office advised Ruelle not to contact the office again and called the Senate Ethics Committee regarding the

6401-1

contact.  Senator Grassley's letter demanded that Falcone explain the "questionable contact" and said that the two emails, when read together, "intimated benefits for Grassley if he softened his inquiry of government approval of the project."

**F.      LightSquared Filed for Bankruptcy**

90.      The February 14, 2012 revocation of the conditional waiver was a financial blow from which LightSquared was not able to recover, and resulted in its bankruptcy.  Even prior to the FCC's decision, a number of industry analysts concluded that LightSquared would exhaust its available cash in the near future, perhaps prior to the end of the second quarter of 2012.

91.      Without any plan to generate revenues and increasingly dim hopes of convincing the FCC to reconsider, LightSquared's business began to unravel.  Forty-five percent of the company's staff was laid off, and on February 28, 2012, LightSquared CEO Sanjiv Ahuja stepped down, replaced temporarily by co-COOs Doug Smith and Marc Montagner.  On the same day, the Harbinger Funds (which are controlled by Falcone) named Falcone to the Board. Following the announcement, Tim Farrar at TMF Associates told Bloomberg News: "Ahuja lost his credibility by continually stating his absolute confidence that this will get resolved. . . . As this moves forward, the focus will be more toward litigation and away from building a network."

92.      In addition, customers terminated contracts before service even started.  For example, in June 2011, LightSquared entered into a 15-year, $9 billion spectrum-hosting agreement with Sprint Nextel to deploy and operate the planned 4G network capable of utilizing LightSquared's 1.6GHz spectrum.  LightSquared made $350 million in prepayments to cover costs of the deployment.  On March 16, 2012, Sprint terminated the agreement because LightSquared had not satisfied its conditions related to the GPS interference.  Although

Earlier, on February 15, FreedomPop (a startup backed by Skype co-founder Niklas Zennstrom) terminated its agreement with LightSquared and instead signed a wholesale agreement with Clearwire Corp.

93.     In addition to burning through cash with no actual profits in sight, loans and other financial obligations were coming due that LightSquared was increasingly desperate to meet.  For example, despite receiving a $190 million loan from Jeffries Group Inc. on January 30, 2012 – a loan with an effective rate of 24%, more than four times what the riskiest corporate borrowers pay – LightSquared missed a $56.25 million payment due to London-based Inmarsat plc on February 20, 2012.  LightSquared also missed a second payment of $29.6 million at the end of March.

94.     The $190 million Jeffries loan was used (in part) to pay off the remainder of a $400 million loan from Zurich-based UBS AG.  The deadline was January 30, 2012 at 1 pm; the money from Jeffries was wired six minutes before the deadline after lawyers worked through the night hammering out the deal.

95.     On April 20, 2012, LightSquared reached an agreement with Inmarsat to pay the $56.25 million missed payment in exchange for suspending payments and all other terms of the contract for two years to give LightSquared time to figure out what to do.

96.     Following the FCC's decision to revoke the conditional waiver, Tim Farrar, an independent satellite-industry analyst, said that "[w]ith LightSquared set to run out of money in the near future, it must now consider whether to file for bankruptcy and preserve its resources for the inevitable litigation fights, or continue pretending that all of its problems can be overcome while its cash drains away."

97.     The next day, an unnamed holder of LightSquared's debt echoed Mr. Farrar's sentiment and told Reuters that a "bankruptcy Chapter 11 filing seems inevitable." Defendant Falcone, however, flatly ruled it out, telling investors that bankruptcy "is clearly not on our table." He said there was a plan for dealing with the situation, but declined to offer any details.

98.     On April 5, 2012, Falcone told Reuters and Bloomberg that he was in fact considering putting LightSquared into bankruptcy. Because most of the Funds' investment in LightSquared is in the form of equity, not debt, bankruptcy would further injure Plaintiffs and the Class Members, as the bondholders might convert some of their holdings into equity and possibly even wipe out the equity completely. Falcone and the LightSquared bondholders then negotiated a deal to extend bankruptcy negotiations until May 7, 2012, with the condition that Falcone resign from the Board.

99.     Falcone, however, stated that he did not care. Instead, he stated that "we" would be better off in bankruptcy, apparently forgetting the investors in his Harbinger funds that he is supposed to protect, and despite pretending to be aligned with their interests. He told the press on April 5, and investors on April 9, that the goal is to "complete the vision"; there was no mention of protecting the Funds or his investors, to whom Falcone admitted he owed fiduciary duties (going so far as to call himself "your fiduciary" in correspondence to investors), and no mention of the fact that he barred all redemptions, trapping investors in his venture whether they want to stay in or not. Instead, all that mattered to Falcone was pursuing his vision of making LightSquared work, even if it wiped his investors out. Shockingly, Falcone even admitted this to Bloomberg News on April 5, saying, "LightSquared, if I have to, I'll put it into bankruptcy, *I don't care*" (emphasis added), adding that he would still personally maintain control over the company even if it were to be reorganized. And as noted above, Falcone reassured the press

31

that even if LightSquared were to go bankrupt and his investors were to lose the majority of their investment, he will still live well: "If LightSquared went to zero, no, my lifestyle would not change . . . I have enough capital in other assets and in other areas where my lifestyle is not going to change."

100.   On May 14, 2012, Defendant Falcone finally put LightSquared into bankruptcy as LightSquared and all of its related subsidiaries filed a Voluntary Chapter 11 Petition.  In its filings, the Funds are identified as owning 96% of the equity, and LightSquared listed "assets" of $4.48 billion and debt of $2.29 billion as of February 29, 2012.  Thomas Lauria, a lawyer for an ad hoc group of lenders who own a portion of the debt stated in court that "[t]oday it isn't really a business.  There's a vision of a business."  In filings, the ad hoc group of lenders has also described LightSquared's plan as the "mere hope of a positive outcome of FCC discussions or litigation," and stated that it does not believe that there is sufficient cash flow to support LightSquared's existing debt.

101.   Defendant Falcone also told the Wall Street Journal on or about May 4, 2012, that the board of LightSquared needs "telecom and industry veterans, not hedge-fund[] managers" and yet placed himself – a hedge fund manager with no prior experience in the telecom industry – on the board in February, 2012.  This put Falcone in the curious situation of having fiduciary duties to the single largest creditor of a company in bankruptcy to which he had also had fiduciary duties.

102.   On June 13, 2012, counsel for LightSquared told the bankruptcy court that LightSquared reached an agreement to use lenders' cash collateral, giving the company money to fund operations until September, 2013.  As a part of the deal, LightSquared agreed to pay the lenders $6.25 million a month and let them return to court to file a motion for the use of the

32

6401-1

cash collateral, and LightSquared must also pay the lenders' legal fees, further draining assets from the company. It was also reported that the lenders are exploring whether they can pursue claims for damages against Defendant Falcone and Harbinger, either directly or derivatively on behalf of the company.

103.    Currently, LightSquared's efforts are focused on trying to modify its ATC authorization from the FCC, seeking approval to use just the upper 10 MHz end of its spectrum, hoping that giving up the lower end provides a buffer to interference. LightSquared appears to be asking to be subject to the same original conditions of working out issues and testing, which further risks what little value the spectrum has to LightSquared.

### G.    The SEC Investigation, Civil Actions And Settlements

104.    On June 27, 2012, after many months of investigation, the SEC formally charged Defendants Falcone, HCP, Harbinger Capital Partners Offshore Managers, Harbinger Capital Partners Special Situations GP, and Harbert, in three civil fraud complaints and one administrative proceeding, with multiple violations of the securities laws, including the Securities Act of 1933, the Exchange Act of 1934 and the Investment Advisors Act of 1940, and regulations thereunder.

105.    The Release by the SEC announcing the filings contained the following statement:

> Today's charges read like the final exam in a graduate school course in how to operate a hedge fund unlawfully," said Robert Khuzami, Director of the SEC's Division of Enforcement. "Clients and market participants alike were victimized as Falcone unscrupulously used fund assets to pay his personal taxes, manipulated the market for certain bonds, favored some clients at the expense of others, and violated trading rules intended to prohibit manipulative short sales.

106.    The SEC charged Falcone and HCP with fraudulently scheming to misappropriate $113.2 million from the Funds, and putting their own interests above those of the Funds.  Falcone arranged for a personal low interest rate loan in order to pay taxes he owed, rather than sell assets so as to avoid curtailing his lavish spending and lifestyle.  The SEC claims that Falcone arranged for this loan at a time when investors could not redeem, that he failed to obtain investor approval for the related party loan and concealed the loan from investors for five months.

107.    The SEC also claims that to give the appearance of legality to the loan, Falcone and HCP engaged an outside law firm to advise on the transaction but failed to disclose material information to the law firm, and failed to act on the law firm's advice.  Falcone ignored the law firm's requirement that the portfolio manager determine that the lender had no need for the cash and that such a loan would have no adverse effect on the lender.  The Loan Agreement provided that Falcone was supposed to pay the higher of either the Applicable Federal Rate (at the time 2.66 percent) plus 1 percent, or 1 percent more than the lender's cost of funds (at the time 7 percent).  Falcone's loan was at an interest rate 3.66 percent instead of the 8 percent interest rate he should have paid – a benefit to him at investors' expense.  Falcone even ignored an email from the general counsel of the Funds' third-party service provider who advised against it.

108.    Further, the SEC claims that Falcone and HCP failed to disclose the loan to investors in the Special Situations Fund.  Falcone's loan was never listed as an "asset" of the Fund, despite the fact that it would have been one of its largest holdings.  Falcone also allegedly sent an email to investors misrepresenting the loan had been "vetted extensively" with outside counsel, as well as other misleading emails. In addition, after the loan was revealed in March 2010, Falcone and HCP misled investors by telling them that Falcone's tax liability was

34

unexpected. This was untrue as Falcone and HCP knew at least six months before the loan was taken that he would have a large tax obligation due October 2009, and Falcone had inquired about a bank loan but declined one.

109.   The same SEC fraud action charges HCP and Falcone with scheming to grant large investors favorable redemption and liquidity terms as a *quid pro quo* for their vote to approve increased redemption restrictions at a time when the Funds were losing assets, and hiding this scheme from the directors who were the only ones authorized to grant preferences. In Fall 2008, the Funds experienced a sharp decline in assets due to investor redemptions. In response, Falcone sought to change the redemption restrictions in Fund I from a limit on the total redemptions received by investors of 20%, to a more restrictive 25% limit on each investor's redemption. Effectively, he sought to change from a fund-level "gate" to an investor-level "gate."

110.   This change required investor consent. To secure consent, Falcone and HCP made side deals with some of their largest investors giving them preferential liquidity as *quid pro quo* for their affirmative vote for the change. One of these large investors was reportedly Goldman Sachs. In making these arrangements, Falcone and HCP failed to disclose these material terms to the directors and other investors, and failed to honor "most favored nation" provisions with certain other investors.

111.   Falcone entered into two side letter agreements with one institutional investor to approve $65 million in preferential redemptions. Another institution obtained a side letter permitting it to treat its affiliated accounts as a single account for purposes of calculating the investor-level "gate" or the 25% redemption limit. Another institution received a waiver of prior notice provisions for its customers' redemptions of investments in Harbinger Funds.

35

112.   Despite these side letters, in March 2010, the directors for Fund I were notified that there were no side letters.  HCP also failed to honor agreements with other investors that required them to be notified and offered any more favorable terms offered in side letters to other investors. Harbinger again failed to disclose the preferences it had granted in response to annual investor questionnaires.

113.   In the second fraud action, the SEC charged Falcone, and HCP Offshore Manager L.L.C. and HCP Special Situations GP, L.L.C. with manipulating a "short squeeze" in a $170 million of high yield bonds issued by a Canadian company called MAAX Holdings Inc. (now called "MAAX Corp."). During 2006 to 2008, Harbinger learned that a prime broker it used was shorting MAAX bonds in which it had a position.  In retaliation, Harbinger purchased more than the available supply of these bonds (and more than even had been issued), then transferred the MAAX Corp. bonds away from the prime broker to a custodial bank account so that they could not be used to deliver on short positions.  Harbinger also demanded the return of any MAAX Corp. bonds that were borrowed.

114.   When the firm could find no bids in the market and sought to purchase MAAX Corp. bonds from Harbinger, Harbinger offered the bonds at par, or at a price of $100, although they were selling at a steep discount and were carried on its books at $65.  Harbinger continued to try to induce the firm to buy-in at inflated prices, and even engaged in a trade with a long-time trading partner of Falcone to make it appear as though Harbinger did not own all of the MAAX Corp. bonds.  Falcone continued to try to induce the firm to purchase the MAAX Corp. bonds at a price of $60 or more, even after he had written the position off as worthless.

115.   The SEC also separately charged Defendant Harbert in connection with the illegal "short squeeze" as control persons responsible and liable for Falcone's actions.  During

36

the time period in which the illegal short squeeze occurred, Falcone was a Harbert employee and under its supervision.   Harbert was also responsible for the legal, compliance and supervision of Falcone and his Funds during this time.

116.   On July 3, 2012, Harbert settled with the SEC and agreed to pay a penalty of $1 million.

117.   The SEC also charged HCP in an administrative proceeding with multiple violations of Rule 105 of Regulation M of the Exchange Act by short selling securities during a restricted period and then purchasing the securities in an initial public offering.   HCP settled the administrative proceeding and agreed to accept censure, pay disgorgement of $857,950, representing its profits on the trades, and pay a penalty of $428,975.

118.   Although the SEC investigation that resulted in these actions apparently began in 2008, it was not disclosed to investors until April 29, 2011.   By that time, Harbinger management had already produced documents and witnesses to regulators.

119.   From April 2011 until early December 2011, Falcone and the SEC attempted to negotiate a settlement.   According to the *Wall Street Journal*, the two sides appear divided on two crucial questions: the amount of financial sanctions, and whether as a part of the settlement Falcone would be banned (temporarily) from working in the securities industry or acting as a director of a public company.   According to the *Journal*, the SEC views a ban as particularly important when the charges stem from an intentional fraud like the charge against Falcone. Although Harbert settled the claims against it, the two more serious SEC civil fraud actions – those against HCP and Falcone – are still pending.

120.   Now that the SEC has made public its findings and formally charged Falcone and HCP, it is clear that the Defendants put personal interests ahead of all others, running the

37

Funds with little regard for the well-being of the majority of investors or the iron-clad rules governing appropriate fiduciary conduct. The conduct and actions described in the SEC complaints are also consistent with Falcone's *modus operandi* concerning LightSquared – gambling investor funds on his ego-driven vision of a satellite-terrestrial wireless company and "breaking rules" to achieve it.

**H.     The September 2012 Hearings in the House of Representatives**

121.   On September 21, 2012, the House Energy and Commerce Committee held hearings into the FCC's handling of the LightSquared situation.  Two officials from the FCC were called to testify, Ms. Mindel De La Torre (Chief of the International Bureau) and Mr. Julius Knapp (Chief of the Office of Engineering and Technology).

122.   Although the Hearings did not officially assign blame for the fiasco, the Committee clearly noted that as early as 2001, the industry knew that GPS interference was a substantial problem to be overcome should LightSquared's predecessor be granted its requested L-band license.

123.   Indeed, in response to public comments in 2001 in response to LightSquared's predecessor's (Motient's) application for a license, Motient acknowledged the potential GPS interference problem.  In the FCC's August 17, 2001 Notice of Proposed Rulemaking, the FCC noted, "unwanted emissions from terrestrial stations in the MSS would have to be carefully controlled in order to avoid interfering with GPS receivers."

**V.     DEFENDANTS' BREACHES OF FIDUCIARY DUTIES TO THE FUNDS**

124.   Defendants HCP, Harbert, Holdings and Falcone controlled Offshore Fund I, and thus owed the fund fiduciary duties under Cayman Islands law to act in good faith, to act with proper purpose, and to avoid conflict of interest.

125.    Defendants Harbinger GP, Harbert, Holdings and Falcone controlled Fund I and Fund II and as such owed Fund I and Fund II fiduciary duties of loyalty and care under Delaware law.

126.    Defendants Harbinger Special Situations GP, Harbert, Holdings and Falcone controlled the Special Situations Fund and as such owed the Special Situations Fund fiduciary duties of loyalty and care under Delaware law.

127.    Defendants Harbinger Special Situations Offshore GP, Harbert, Holdings and Falcone controlled the Special Situations Offshore Fund and as such owed the Special Situations Offshore Fund fiduciary duties of loyalty and care under Cayman Islands law.

A.      **The LightSquared Gamble**

128.    The Defendants directed that Fund I, Fund II, Offshore Fund I and Offshore Fund II invest solely in the Master Fund.  Fund I, Fund II, Offshore Fund I and Offshore Fund II are ultimately controlled by HCP and Falcone to the exact same extent as HCP and Falcone control the Master Fund.  By investing the assets of these Funds solely in the Master Fund, any actions taken on behalf of the Master Fund that constitute a breach of fiduciary duty therefore must constitute a breach of fiduciary duty owed to Fund I, Fund II, Offshore Fund I and Offshore Fund II.

129.    The Defendants directed that Special Situations Offshore Fund invest solely in the Special Situations Fund.  Special Situations Fund and Special Situations Offshore Fund are ultimately controlled by HCP and Falcone to the exact same extent as HCP and Falcone control the Special Situations Fund.  By investing the assets of the Special Situations Offshore Fund solely in the Special Situations Fund, any actions taken on behalf of the Special Situations Fund

6401-1

that constitute a breach of fiduciary duty therefore must constitute a breach of fiduciary duty owed to the Special Situations Offshore Fund.

130.    Falcone's decision to pursue his "vision" of building a satellite-terrestrial wireless 4G network created an impermissible conflict of interest between the Defendants and the Funds.  The Defendants had fiduciary duties to maximize returns for investors consistent with the investment objectives, which should have targeted a diversified portfolio focused primarily on distressed debt and proper risk management.  Defendants, however, materially deviated from this objective and decided to use and/or facilitate Falcone's use of the Funds to pursue a wildly complex "vision" of building a competitor to existing wireless companies from the ground up that used unproven technologies the Defendants knew were interfering with the GPS system.

131.    Falcone's pursuit of his vision with the knowledge and substantial assistance of the other Defendants put his own interests ahead of his investors.  Before LightSquared filed for bankruptcy, Falcone repeatedly told the press that he did not care if it went bankrupt, so long as he maintained control of the company, though this meant of course that his investors' equity position would shrink substantially or be wiped out.  Falcone even continued to pursue his personal vision after investor redemptions were restricted and suspended, and forced his investors to stay in the Funds whether they wanted to or not.

132.    In addition to the conflict of interest and self-dealing inherent in Falcone's strategy, Defendants breached their duties to the Funds by concentrating such a large portion of the Funds in a single, high-risk venture (made worse by the parallel investment in rival Inmarsat used to augment Falcone's "vision"), by failing to employ adequate internal risk controls, and

6401-1

by taking control of a company when no executive at Harbinger had sufficient experience in running a complex high-technology wireless telecommunications company.

133.    Summing up the consensus in the investor community after the FCC's February 14, 2012 decision, Artemis Wealth Advisors LLC's Peter Rup said, "[t]this has been nothing but a complete mismanagement of the fund."  He further added, "[t]here should have been constraints on risk and concentration of the investments."

**B.      The SEC Investigation And Civil Fraud Actions**

134.    Since apparently 2008, the SEC has been investigating Harbinger and Falcone, which led to the civil fraud charges over possible manipulation of the market for MAAX bonds violations of Rule 105, improper loans that Falcone made to himself that he did not disclose to his investors for months (and made at a time when other investors faced restrictions from withdrawing from the Funds), and other improprieties.

135.    It was because of the SEC investigation of these possible instances of securities fraud that the Senate Judiciary Committee launched its investigation in the first place.  In an April 27, 2011 letter from the Committee to Chairman Genachowski, Senator Grassley called the FCC's actions following the announcement of the SEC investigation a "curious set of circumstances" and ordered the FCC to provide documents related to communications with Falcone and the other defendants.

136.    Had it not been for the market manipulations, personal loans, and other violations being investigated by the SEC, Falcone would have likely avoided the Senate investigation and would have had at least a fighting chance in Washington to find a last-minute political solution.  Because LightSquared is now viewed as politically toxic, it no longer has the

41

ability to find a political solution, and thus the personal loan constituted a breach of fiduciary duty to the Funds.

137.    In addition, even without the SEC investigation, Falcone's $113.2 million personal loan taken from the Funds constituted a breach of fiduciary duty because the Funds at that time had suspended redemptions, which by definition meant that the Funds lacked the liquidity to pay cash redemptions to investors.  By taking $113.2 million out of the Funds at the time that liquidity problems were so severe, the Defendants breached their fiduciary duties.

138.    Finally, the special treatment given to Goldman Sachs and other institutions was a breach of Defendants' fiduciary duties to the Funds because the Defendants allowed Goldman to withdraw $65 million from the Funds at a time when the Funds were experiencing liquidity problems.  Other investors were restricted from redeeming at the time under the same terms.

**C.       Attempt to Improperly Influence the FCC and a Congressional Investigation**

139.    Because LightSquared and Harbinger have been unable to resolve the problems of the L-band GPS interference problem, the only possible way for Falcone's "vision" to work would be to convince the government to swap spectrum with the company.  However, the Defendants' attempts to improperly influence the FCC and Senator Grassley have made LightSquared a "political hot potato" according to more than one commentator.  The *Wall Street Journal* confirmed on April 27, 2012 that LightSquared's lenders "believe Mr. Falcone has become a lightning rod that has made dealing with Washington regulators too difficult and threatens to upend the company's chances of success."

140.    So just when LightSquared "needed friends" in Washington D.C. to help it with a spectrum swap, the Defendants have made the company toxic, thus making a political resolution impossible. Before filing for bankruptcy, LightSquared recognized that its situation

on the political front was desperate, and tripled its lobbying budget in a single quarter, increasing it from $350,000 in the fourth quarter of 2011 to $1 million in the first quarter of 2012, according to the U.S. Senate's Lobbying Disclosure Act database.

## VI.    FALSE AND MISLEADING STATEMENTS TO THE INVESTORS

### A.    The Offering Materials

141.    Investors in each of the Defendant hedge funds received and relied upon Confidential Offering Memorandums ("OMs") that were identical in many, if not all material respects.  These OMs contained numerous statements that were false when made (or omitted to provide information necessary to make the other statements not misleading), and were made knowingly or with reckless disregard for their falsity.

142.    Investors in all Funds were required, as a condition of their investment, to represent that they relied solely on the OMs in deciding whether to invest.  For example, Plaintiff Schad and other Class Members who invested in Fund I were required to sign a subscription agreement that, among other things, stated that they would rely only on information provided in the Offering Memorandum and the Limited Partnership Agreement. The agreement stated (with emphasis added):

> **THIRD**: The New Limited Partner further represents, warrants, acknowledges and agrees that:
>
> (a) He (or his Purchaser Representative, if any, who has been designated by him) is entering into this Agreement relying <u>solely</u> on the facts, terms and disclosures set forth in this Agreement, the Partnership's Confidential Offering Memorandum, as amended from time to time and the Limited Partnership Agreement, he had received copies of all such documents and the General Partner had not made any representations of any kind or nature to induce the New Limited Partner to enter into this Agreement except as specifically set forth in such documents; …

43

143.   In the Offering Materials for Fund I and Offshore Fund I, for example, Harbinger stated that its investment strategy would focus "primarily on turnarounds, restructurings, liquidations, event driven situations and capital structure arbitrage." These investment strategies involved committing partnership capital for limited time periods and short- or medium-term exit strategies or options for the Funds to capitalize on their investment or unlock value. While the general partner's investment authority was described as broad and flexible, the Offering Memorandum states:

SUMMARY

The Partnership seeks to achieve superior absolute returns by participating in investments primarily involving distressed/high yield debt securities, special situation equities, and private loans and notes. The Partnership focuses primarily on turnarounds, restructurings, liquidations, event driven situations and capital structure arbitrage, with characteristics that are consistent with the Partnership's underlying investment strategy, building a portfolio including long and short positions of highly leveraged and financially distressed companies.

It is anticipated that most traditional distressed investments by the Partnership will be made through the Master Fund while investments that are more active in nature (e.g., revolvers and active loans) or involve other tax, regulatory, foreign ownership or special considerations may be made through one or more Special Purpose Funds. The use of the Special Purpose Funds is intended to allow the Partnership to receive the desired economic benefits while insulating it from such considerations. Ultimately, however, allocations between the Master Fund and the Special Purpose Funds will be made in the sole discretion of the Investment Adviser.

**Investment Strategy**

The Partnership seeks to achieve its investment objective by employing a disciplined value investing approach based on intensive credit research. When selecting individual investments, the Harbinger Capital Partners investment team typically analyzes the issuing company's business, competitive position and financial condition to assess whether the security is expected to fit the Partnership's parameters. The Partnership expects to monitor diversification within the portfolio, with investments in anyone company or anyone industry being compared to general concentration guidelines, as measured at the time of investment. These guidelines may change from time to time, are not strict limits, and may be exceeded.

6401-1

When evaluating potential long positions, the Partnership's research focus will be tailored to the specific investment opportunities. In the case of current or anticipated restructuring or bankruptcy investments the Partnership typically will seek to purchase securities at a price, which when considered with the claims of other securities holders, will allow the Partnership to "create" the underlying investment at an attractive valuation compared to private market, public market or merger comparables. The anticipated time to complete the restructuring or bankruptcy may also be an important factor in the determination of the attractiveness of these situations. For example, bonds issued by companies in the process of a turn-around can be attractive due to their depressed prices in relation to the interest coupon payments. In these situations the Partnership's research may focus on available cash flow, liquid assets and the availability of credit to meet these payments, together with an evaluation of management's plans to reposition the business and reduce debt. The securities of companies in liquidation may be attractive when they can be purchased at a price that is materially below the Partnership's assessment of the asset values upon which the securities have senior claims. The Partnership may frequently receive equity in a newly reorganized company in exchange for securities held prior to the reorganization. The Partnership may in certain instances seek to further increase its equity ownership through other means, including the participation in or backstop of a rights offering or negotiated direct investments. The analysis of event driven investments generally revolves around the Partnership's evaluation of both the value of the underlying securities and the timing and probability of a specific event such as an exchange offer, emergence from or announcement of bankruptcy, earnings announcement, outcome of creditor negotiations, etc. Depending on the specific type of event anticipated, the Partnership may be long, short, or both long and short the securities of the same issuer.

144.    The Offering Materials for the Special Situations Fund and Special Situations Offshore Fund also described a credit-driven investment strategy in distressed investments, and not a venture capital strategy with operational risk.  The Defendants stated they would invest the Fund's assets in medium- to long-term-investments but that prior to investment, they examined possible exit scenarios.  The Defendants also represented that they would diversify the Fund across 10-15 investments, and limit its "Special Investments" to only 20% of its net assets.  The Offering Materials also represent that "[s]hareholder activism, including control activism or activism based on an influential position, may be employed in an effort to create value," but the Funds will not have "direct operational involvement" in terms of running the companies in which the Funds invested. Additionally, while "event-driven" strategies were permitted, there was no disclosure that the Funds would invest in long-term illiquid, development stage ventures

45

6401-1

with no near-term exit.  Instead, the Funds stated that it would make "toe hold" or exploratory investments, build a position, then exit within 36 months.

145.    These representations in the Offering Materials for the Funds were materially false and misleading at the time they were made, because it is now clear, but was not known to investors at the time of their investment, that Falcone's vision all along was to acquire SkyTerra (and rival Inmarsat) for the sole purpose of using their spectrum to create a 4G network.  This goal could only be accomplished if Defendants diverged from the investment strategy disclosed to investors and used a majority of the Funds' assets to purchase SkyTerra in its entirety, devote substantial resources to overcoming its regulatory hurdles, raising billions of dollars in capital for the build out of the 4G network, and resolving all technical issues, including the GPS interference problem – all of which required years of operating risk to the Funds.  Thus, the Defendants materially misrepresented the investment objectives of the Fund.

146.    In addition, the Offering Materials also stated that the Funds had risk management guidelines and procedures in place, and that they monitored volatility and risk. The Offering Memorandum for Fund I, for example, states:

### Risk Management

Investment in the securities or debt of distressed issuers involves a high degree of risk. Such investments are generally not listed on major securities exchanges and the ability to buy or sell securities and their prices may fluctuate widely depending on conditions specific to the issuer or general market and economic circumstances. Consequently, the Partnership intends to employ a range of risk management guidelines and procedures, from time to time, in its efforts to monitor portfolio volatility and risk. The Partnership's current risk management guidelines, which are subject to change without notice, include investment guidelines providing for the monitoring of the proportion of the Partnership's net asset value invested in anyone issuer or anyone industry or sector. These guidelines may change from time to time, are not strict limits, and may be exceeded.

These risk management guidelines are monitored by Harbinger Capital Partner's Senior Managing Director [Falcone] and by HMC's risk management personnel.

The Offering Memoranda for each respective Fund contains substantially similar or identical risk management disclosures.

147.   This statement was false and misleading when made because it is now known, but was not known to Class Members at the time of their investments, that the Funds lacked any credible risk management systems, and certainly not those as robust as described above, because Falcone controlled all investment decisions with absolutely no check on his authority.

148.   In addition, in Due Diligence Questionnaires ("DDQs") given to investors, the Defendants gave the impression that the Funds would maintain a diversified portfolio of dozens of investments with no single position constituting a dominant exposure.  For example, in an October 2007 DDQ provided with respect to Fund I and Offshore Fund I, Defendant Harbert stated that the market position of any core investment could constitute 3-5% of the Funds. Although these numbers were followed by the parenthetical "or more," in the context of the DDQ the 3-5% disclosure clearly does not contemplate a core position anywhere near 50%, let alone more than half the Funds.  However, at the time Harbert issued the DDQ, the decision had already been made to pursue the LightSquared strategy.

149.   The materially false and misleading statements above were made knowingly and/or with reckless indifference for the purpose of inducing investors to invest in the Funds.

6401-1

**B.      Post-Purchase False and Misleading Communications to Investors**

**1.      General Background of Repeated False and Misleading Statements and Omissions Regarding the Viability and Risk of the LightSquared Venture**

150.     LightSquared's predecessor knew since 2002[3] that the GPS interference with its spectrum would be fatal to any plans to build a hybrid terrestrial-satellite wireless network, and Falcone has recently admitted in interviews that LightSquared (or its predecessor company) has been working with the GPS industry to remedy the problem since it first became known.  By October 2007, still long before Harbinger finished its acquisition of the company, Defendants knew that a resolution of the GPS issue was required to receive the final FCC approval needed to deploy LightSquared's technology, and knew that the entire venture depended on this one critical issue.  Despite knowing of these enormous risks and hurdles, Defendants provided the Plaintiffs and Class Members with positive, anodyne general reporting on Harbinger's investment in LightSquared that functioned more as sales pitches than true, honest reports from fiduciary to investor.  No mention was ever made of any GPS interference issue, let alone the full extent of the risk, until well after Harbinger had completed purchasing 100% of the company, and part of a competing company, Inmarsat.

151.     For example, Defendants periodically advised the investors and provided them with analysis of the market environment and updates on the Funds' investments.  Prior to the Funds' acquisition of SkyTerra and the name change to LightSquared, the Funds only generally referenced SkyTerra.

---

[3]   In a November 4, 2011 letter to Senator Charles E. Grassley, Harbinger acknowledged that LightSquared's predecessor company knew of the GPS problem for almost 10 years, since 2002. This letter was subsequently shared with investors and that was the first time investors learned that the company they owned had been struggling with the issue for so long.

152.    Defendants started to provide more robust information during and subsequent to the acquisition of SkyTerra, but these statements were actually worse than the vague references offered before, because they warped the truth beyond recognition.  Investors were advised of Defendants' bid to take SkyTerra private and their confidence that they would be able to capitalize on the need for spectrum bandwidth.  Investors were also advised about "exciting news" in the FCC's approval for Harbinger to acquire SkyTerra.  Defendants advised the Investors that the FCC had granted approvals that would allow the company's spectrum licenses to be developed commercially.  Despite Defendants' knowledge of the GPS interference issue dating to the Funds' first investment in 2006, they always described SkyTerra in highly favorable terms and made no reference of any kind to the GPS interference issue.

153.    Defendants also issued monthly performance summaries describing the Funds' asset allocations.  These reports did not give any information specific to the investments in LightSquared or SkyTerra and did not offer information sufficient to determine the degree to which investors' money was concentrated in a single investment, a concentration made far worse when one considers the massive parallel investment in Inmarsat.

154.    In fact, despite numerous references to the LightSquared investment over the years, Defendant never even mentioned the single most important risk factor in the venture – the ultimately fatal GPS interference issue – until August 19, 2011, more than a year after Harbinger had already purchased 100% of the company.  Even then, when Harbinger did finally admit that GPS interference was an issue, the risk was described in only mild terms that did not accurately reflect the depth of the problem.  Defendants only advised investors that users of GPS had claimed that LightSquared's network would interfere with satellite signals sent to GPS devices.  Defendants reassured investors that LightSquared had, for years, been diligently

49

6401-1

working with the GPS industry on the issue and had found a comprehensive solution that would allow LightSquared's plans to proceed. Defendants never disclosed that ultimate FCC approval was contingent on LightSquared finding a solution for the GPS issue until after redemptions were formally suspended – again – at the end of 2011. These material false and misleading statements are provided in detail below.

155. Harbinger's misrepresentation and disclosure failures relating to GPS interference issues exacerbated its failures to disclose risks associated with its investment strategies, i.e., its overconcentration into a single investment in LightSquared, its abandonment of a credit-driven strategy for a venture capital strategy, and its adoption of a long-term strategy to execute on business plans rather than an event-driven strategy. Harbinger changed the fundamental nature of its investment strategy when it acquired LightSquared and it never disclosed this fact or the material related risks to investors.

## 2. The 1Q 2010 Due Diligence Questionnaire for Fund I, Fund II, Offshore Fund I, and Offshore Fund II

156. The 1Q 2010 DDQ repeated the false statements in earlier DDQs that the Funds' portfolio would be diversified and not exposed to any one position. In past DDQs, Defendants represented that the target weight for core positions would be 3-5% of the portfolio; in the 1Q 2010 DDQ "objective of the Fund" section, the upper end was moved out slightly, so that the Defendants now told investors that the portfolio targeted 25-35 core positions between 3-8%. The DDQ further assured investors that the portfolio would be diversified by issuer, sector and geography; the guideline for sector maximum was 30%.

157. These statements were false when made because the Master Fund, in which the Funds described in the DDQ exclusively invested, had already committed to purchasing all of

SkyTerra and was attempting to merge it with Inmarsat, and had accumulated a long position in the telecom-wireless sector of 56.7% by the middle of the first quarter of 2010.

### 3.     The April 28, 2010 Investor Conference Call

158.    On April 28, 2010, Harbinger hosted an investor conference call for the Fund I investors.   Defendant Falcone told investors that the Funds were equally exposed to long and short positions "to hedge risk."

159.    This statement was false and misleading because the Funds had just acquired 100% of the equity of LightSquared (a particularly risky long position) and had other long positions that far outweighed the shorts.  This gave investors a false sense of security that risk in the portfolio was mitigated when the truth was exactly the opposite.

160.    HCP CEO Ahuja told investors that "we own 50 MHz of spectrum worth $15 billion."

161.    This statement was false and misleading because Harbinger did not "own" spectrum, it merely held licenses that had less legal protection than true "ownership."   More importantly, this spectrum is and was worth nowhere near $15 billion, a number that is so inflated as to strongly suggest that the value was arrived at and communicated to investors with fraudulent intent.  Indeed, such a valuation is not reflected in any audited balance sheet or NAV or AUM calculation.

162.    Ahuja further stated on the call that "while there is execution risk [related to the build-out of LightSquared], it's low.  Technology is proven.  We own the spectrum, so there is base value even without any added value."

163.    These statements were false and misleading because the execution risk was extreme, not low, and this was known to Defendants.  Also, the technology was unproven by

51

any definition.  At the time of this call, Defendants knew that substantial tests would be required to prove the viability of the technology, and that such testing would be expensive.  And finally the statement that "we own the spectrum" is false and misleading because Harbinger merely held licenses, it did not "own the spectrum."

### 4.     The June 3 and June 4, 2010 Commentaries

164.    On June 3, 2010, Harbinger provided investors in Fund I, Fund II, Offshore Fund I and Offshore Fund II with a portfolio update, and on June 4, 2010, Harbinger provided investors in the Special Situations Fund and Special Situations Offshore Fund with a portfolio update, which commented on the market environment and the Funds' holdings.  Harbinger reported to investors in the Funds that:

> On March 27, the FCC approved two critical items.  The first was approval for the transfer of control of Skyterra to Harbinger.  As a result, we were able to acquire Skyterra on March 30 which places us in the driver's seat on this significant spectrum wireless asset.  **In addition, and perhaps more significantly, the FCC approved Skyterra's application for a modification of certain terms of the ancillary terrestrial component ("ATC") authorization. This approval enables Skyterra's spectrum licenses to be made commercial for a terrestrial mobile broadband network**. Both of these approvals are the culmination of several months of work with the FCC and provided us with a solid framework on which we can proceed.  With these regulatory hurdles behind us, we announced two other milestones during April.  We launched [Lightsquared], a new entity that will house our spectrum wireless business, and we announced the hiring of Sanjiv Ahuja as CEO of [Lightsquared]…..In summary because of the time that our investors have allowed us to devote to our spectrum wireless thesis, within the last 60 days, **we have: 1) achieved regulatory support**; 2) created a valuable spectrum asset at a low cost; and 3) hired a credible management team. (Emphasis added).

165.    Harbinger's representations about the FCC approval and its impact were materially false and/or materially misleading, because on March 26, 2010, the FCC issued only a **conditional** approval requested by SkyTerra for the ATC modification. The FCC's Order and

Authorization permitted SkyTerra to increase the power of its base station transmissions, but subjected its approval to numerous conditions to address the interference and degradation issues. The FCC's conditional approval did not confer commercial viability to any aspect of its business, and the FCC stated that it likely agreed with NTIA that SkyTerra would need to make a "hardware demonstration." The FCC's grant was intended only to give SkyTerra flexibility to attempt to coordinate and resolve the interference issues, and SkyTerra was required to regularly report to the FCC on its progress.

166.    Furthermore, Harbinger's statement above was materially false and misleading because Harbinger also knew that the venture required significant and expensive additional FCC approvals including further ATC modification (for example, to make handsets available for terrestrial-only service) for its business to come close to being commercially viable.

### 5.    The June 2010 Investor Presentation

167.    On June 11, 2010, Harbinger provided a confidential investor presentation on its website.  In the commentary sent to investors in Fund I, Fund II, Offshore Fund I and Offshore Fund II, Harbinger directed Class Members to this presentation which was "aimed to address investors' questions and thoroughly walk through our investment thesis and valuations for [LightSquared]."   The presentation contained numerous materially false and misleading statements.

168.    Harbinger stated that it was an early investor in L-band spectrum and that it spent the last four years working with the FCC on modifying the spectrum for consumer broadband usage.  Despite its long history as an L-band spectrum investor, and years of working with the FCC, Harbinger failed to even mention to investors the risks presented from GPS interference – the single largest risk to LightSquared's commercial viability.

53

169.     Instead, Harbinger focused on its thesis – that exploding demand for wireless service provides LightSquared with the opportunity to capitalize on the value of the spectrum it accumulated through investments in several companies. Harbinger compared the value of its assets, the low cost of its acquisition of the assets, and discussed the enormous potential for its operation of a network. However, in doing so, Harbinger made numerous false and misleading statements about LightSquared's progress to date, the true value of its assets, the hurdles ahead, the downside risks associated with its plan, and its prospect for success, as follows:

(a)    **"We believe [LightSquared] has more usable spectrum available for deployment of a next generation network than AT&T and Verizon."** This statement was false and misleading because Verizon's and AT&T's legacy networks (to which spectrum must be allocated) are a huge advantage for them in terms of existing customers and revenue streams, and they have a huge operational head start.

(b)    **"In March 2010, the Harbinger Funds were granted important modifications to their spectrum licenses that enable them to unroll a commercially viable, terrestrial network."** This statement was false and misleading because the ATC modifications granted by the FCC were only conditional and subject to numerous conditions including resolution of interference issues before LightSquared's network could ever achieve commercial viability. LightSquared also had several regulatory hurdles ahead including additional ATC modifications needed from the FCC before it could ever reach commercial viability for a terrestrial network.

(c)    **"…even with minimal additional build out of a broadband network, [LightSquared] has 59 MHz of spectrum that, based on recent auction metrics, could be worth multiples."** This statement was materially false and misleading because LightSquared's entire 59 MHz of spectrum is not likely commercially usable based on its location on the spectrum proximately adjacent to GPS signals. In fact, LightSquared would later have only 10-20 MHz of usable spectrum. Because of the interference issues, and the conditional nature of FCC approvals, LightSquared's L-band spectrum also cannot compare on a valuation basis to the spectrums sold at recent auctions, and should be discounted far more severely than the aggressive valuations given in the presentation.

(d)    **"The expected demand growth is driving the FCC to identify other sources of existing spectrum and modify various rules around these spectrum licenses in order to encourage usage in mobile broadband**

54

networks." This statement was materially false and misleading because the FCC approval for ATC modification granted on March 26, 2010 to LightSquared was plainly conditional, with requirements that LightSquared address and resolve interference issues. This FCC gave no indication that it would modify rules in a way that would allow LightSquared to circumvent the interference issues.

(e)    **"The FCC also approved our business plan for a competitive broadband network, which they view as enhanced by commitments to limit capacity sales to AT&T and Verizon Wireless."** This statement was materially false and misleading because the FCC did not approve either Harbinger's or LightSquared's "business plan" as this term is commonly understood and interpreted by investors, and did not give any "view" on its plans. The FCC simply issued a conditional grant of a request. Moreover, LightSquared's decision to limit its wholesales to just Verizon and AT&T, or 40% of its potential market, eliminating the other 60% of its potential market, should not have been presented as a positive to investors, and the FCC did not comment on the business aspect of this decision.

(f)    **"Upon completion of the proposed capital raise, the Company would be capitalized by approximately $5,000MM to $6,000MM."** This statement was materially false and misleading because this amount represents approximately three-to-four times less capital than would reasonably be needed to develop and build the terrestrial network which LightSquared stated was its goal. The presentation failed to disclose the full extent of the capital needed or that this capital raise would be largely insufficient for the realization of LightSquared's plans. Harbinger also misleadingly suggested that the additional capital would come from strategic investors, vendor financing and financial investors, not just the Funds.

170.    The June 2010 presentation by Harbinger did not provide its investors with a balanced discussion of its investment thesis or views, and no discussion at all of the associated investment risks. Harbinger did not describe or discuss the investment risks associated with its investment in spectrum "assets," nor the risks associated with the "assets." Harbinger also did not describe or discuss the investment risks associated with its large concentration of the Funds' assets into LightSquared (and parallel investment in Inmarsat), including the lack of any reliable hedge that could be employed to manage risk.

171.   Finally, Harbinger's presentation also failed to address the specific and unique material risks to the Funds associated with assuming a *de facto* management and business execution strategy in the highly-regulated telecommunications field.  The Funds' success as an investment became dependent on Harbinger's ability to manage a development-stage telecommunications business, and not simply conduct credit analysis on an investment. Investors were not given clear disclosure of these risks, nor of the effect the risks had on their investments in the Funds.

### 6.   The July 20, 2010 Press Release

172.   On July 20, 2010, LightSquared issued a Press Release announcing a launch of LightSquared entitled "INTRODUCING LIGHTSQUARED: Revolutionizing the U.S. Wireless Industry". Falcone is credited as the "driving force behind LightSquared," and quoted in the Press Release as saying that the launch is a "milestone" for Harbinger.

173.   The Press Release touted LightSquared as the "[f]irst-ever wholesale nationwide 4G-LTE wireless broadband network integrated with satellite coverage [that] allows partners to offer terrestrial-only, satellite-only or integrated satellite-terrestrial services to their end users."

174.   This statement was materially false and misleading because LightSquared had not yet built its broadband network, and the FCC had not yet granted LightSquared an ATC modification permitting it to provide "terrestrial-only" service (and did not until January 2011).

175.   The Press Release also stated that "LightSquared controls valuable high quality spectrum assets of 59 MHz of nationwide spectrum in an advantageous frequency position" and that "[t]he nationwide LightSquared network, consisting of approximately 40,000 cellular base stations, will cover 92 percent of the U.S. population by 2015."   These statements were both materially false and misleading because LightSquared's frequency had significant drawbacks

and limitations on its potential usability that made it highly disadvantageous compared to other spectrum, and LightSquared's forecast of the size of its network lacked a basis in reality as it had not yet received approval to even operate its network prior to commencing a multi-billion-dollar deployment.

### 7.    The November 11, 2010 Commentary

176.    On November 11, 2010, Harbinger provided investors in Fund I, Fund II, Offshore Fund I and Offshore Fund II with a confidential portfolio update.  The commentary stated that LightSquared had "secured significant financing to fund its initial capex requirements."  Harbinger went on to state that:

> The response to both the debt and equity raise was tremendous and, we believe, underscores the appetite for spectrum assets in the market. As further validation for not just the asset, but also the business plan, Lightsquared signed definitive documents with its first wholesale network customers and continues to actively negotiate with a pipeline of additional customers.

177.    This commentary was materially false and misleading because it reaffirmed Harbinger's prior false statements about its assets and business plans, while omitting any disclosure of risks or qualifications about the worth of the assets or limitations on the plans. Harbinger also failed to disclose specifics on its capital needs, cash burn-rate, and cash position – material information to any investor in a development-stage company.

### 8.    The June 17, 2011 Announcement

178.    On June 17, 2011, Harbinger provided investors in Fund I, Fund II, Offshore Fund I, Offshore Fund II, Special Situations Fund and Special Situations Offshore Fund with a letter announcing that LightSquared had reached a definitive agreement with Sprint Nextel Corporation, and cautioned them about the confidentiality of this "inside" communication. The letter stated:

6401-1

> The agreement establishes a 15-year strategic partnership between
> Lightsquared and Sprint that we believe will be transformative for
> Lightsquared. Under the agreement, Lightsquared and Sprint will jointly
> develop, deploy and operate Lightsquared's 4GLTE network;
> Lightsquared will obtain 3G network roaming capacity from Sprint; and
> Sprint will become a significant customer of Lightsquared's 4G LTE
> network.

179.    This description of the agreement with Sprint was materially false and

misleading. LightSquared failed to disclose that it would pay Sprint $9 billion in cash and $4.5

billion in credits, so that there was significant consideration to be provided.  Additionally, and

more importantly, LightSquared's "15-year strategic partner" Sprint had the right to cancel the

agreement before the end of the year if LightSquared was unable to resolve the interference

issues with the FCC, and the agreement had other contingencies and conditions on resolving

interference issues. Sprint's right to cancel, and the other conditions, based on interference

issues, were not disclosed to Harbinger's investors.

### 9.       The August 5, 2011 Commentary

180.    On August 5, 2011, Harbinger provided investors in Fund I, Fund II, Offshore

Fund I and Offshore Fund II with a portfolio update that commented on the market environment

and the Funds' holdings.  Harbinger reported:

> Lightsquared is an investment that truly emphasizes our ability to be novel
> and unique in our approach and active in opportunities where we can be
> the driver of returns.  Reflecting on the past year, Lightsquared has
> achieved a number of significant milestones since Harbinger fully
> acquired Skyterra on March 27, 2010. Coinciding with this acquisition,
> LightSquared **received approval from the Federal Communications
> Commission (the "FCC") to** <u>pursue Lightsquared's business plan</u> **and**
> to modify certain terms of the ancillary terrestrial component
> authorization, which <u>enhanced the commercial attractiveness</u> of the terms
> under which Lightsquared's spectrum licenses may be used to operate the
> terrestrial portion of Lightsquared's mobile broadband network.  **Early
> this year, the FCC issued an order further** <u>**enhancing this commercial
> attractiveness by endorsing Lightsquared's plans**</u> **for integrating the
> satellite and terrestrial portions of its network.** (Emphasis added)

181.   These statements to investors were materially false and misleading because Harbinger, again, misled investors into believing that the FCC approved its "business plan" when in fact the FCC merely allowed LightSquared to spend several billions of dollars to attempt to get approval for its business plan.   Likewise, the statement materially misled investors into believing that the ATC modification "enhanced the commercial attractiveness" of LightSquared when in fact the FCC's approval was a conditional approval which placed numerous significant conditions that had to be met, particularly resolution of interference issues, before LightSquared's spectrum could be commercially viable.   The FCC's waiver was in effect permission to burn through $3 billion, which cannot be said to be an order "enhancing" the "commercial attractiveness" of Falcone's vision.

182.   Harbinger also misrepresented the significance of the January 2011 Order from the FCC which, again, did not "endorse" LightSquared's plans.   Even while the FCC granted LightSquared a waiver, it noted the GPS-related interference concerns raised by the NTIA and U.S. GPS Industry Council. In fact, the FCC established a working group on GPS interference issues, and required LightSquared to participate in the working group and report on the progress.   The FCC also emphasized that this waiver did not change the prior conditions relating to interference placed in the March 2010 ATC modification it granted.   The FCC Order was not an endorsement or comment on the commercial attractiveness or viability of LightSquared's business plans.

183.   Despite referencing LightSquared's progress, Harbinger failed to disclose to investors the GPS interference issues related to its proposed plans, or the conditional nature of

59

6401-1

the FCC approvals. Harbinger's discussion of the FCC approvals without reference to the conditions is a materially false and misleading statement.

10. **The August 19, 2011 Commentary – First Reference to GPS Interference Issues**

184.    On August 19, 2011, Harbinger provided investors in Fund I, Fund II, Offshore Fund I and Offshore Fund II with a portfolio update that, among other things, commented for the first time on the GPS interference issues. Yet Harbinger misrepresented the seriousness of the interference issue, and the likelihood of LightSquared ever achieving commercial viability. LightSquared's statement also demonstrated its long-standing knowledge of the GPS interference issues.

185.    Harbinger reported as follows:

Additionally, LightSquared management continues to work diligently with the FCC, NTIA and GPS community on a modified spectrum plan that will serve as a foundation for the construction of their wireless broadband network. Users of GPS receivers have claimed that LightSquared's transmissions will overpower the satellite signals sent to their devices. It is critical to note that the reason for this interference is not because LightSquared would improperly transmit in the GPS band. Results from recent GPS device tests confirm that the interference is a result of the GPS device manufacturer's decision over the past eight years to design products that depend on using spectrum assigned to other FCC licensees. **For years, LightSquared (and/or its predecessor companies) has participated in open, public proceedings to determine its network's technical parameters and has worked with the GPS Industry throughout the process.** Despite LightSquared's continuous efforts to cooperate in order to find solutions to the interference issues, the GPS community has recently launched a rather loud and contentious public relations and lobbying effort outside the scope of the proceedings, which fails to acknowledge any responsibility for having created this situation. (emphasis added)

* * *

In a report filed with the FCC on June 30th, LightSquared outlined a comprehensive solution that allows the company to move forward with its business plan and lay the foundation for future co-existence with the GPS community. LightSquared is committed to working with the FCC, NTIA and others to find solutions that mitigate the interference issues and we look forward to keeping you informed on any developments.

60

186.   Harbinger's bare identification of the GPS interference issue was a materially false and misleading characterization of the overwhelmingly difficult task ahead for the company.   On June 30, 2011 – *several weeks prior to this statement above* – the FCC's Technical Working Group issued a report of its findings from its extensive study and testing of potential GPS interference.   The TWC concluded that LightSquared's terrestrial broadband network would cause harmful interference to nearly all 500 million GPS receivers and GPS-dependent applications. Separately, the FAA and National Public Safety Telecommunications Council reached similar conclusions *prior to the August 2011 disclosure to investors*. Thus, Harbinger still failed to disclose the full depth and degree of the seriousness of the fatal GPS interference problems to its investors, as any reasonable possibility of LightSquared's terrestrial use of the L-band spectrum for its network was effectively ended by the TWC's test results. The TWC further found that filters or other technology that would solve the interference problem did not exist.

187.   In reaction to the TWC's report, Harbinger submitted a 318-page proposal to the FCC in a last-ditch effort to "save" LightSquared's business.   Among its proposals were for LightSquared to operate at reduced power and to utilize only its lowest 10 MHz band (out of its total 59 MHz) for its terrestrial network. Harbinger's commentary to investors failed to disclose these proposed radically scaled-back options, or that it even had been forced to make such proposals.   Harbinger's disclosure to investors was thus grossly false and misleading, as investors were never informed that LightSquared was teetering on the edge of a cliff.

188.   Upon information and belief, Harbinger made the same or substantially similar misrepresentations and/or material omissions to investors in all Funds.

### 11.   The Monthly Statements and Performance Summaries Reporting NAV and AUM

189.    The Defendants follow GAAP in the maintenance and reporting of the Funds' accounts in the calculation of Assets Under Management and each investor's account balance.

190.    After March 2010, the LightSquared stock held by the Funds became Level III assets (or assets whose value cannot be determined by observable measures), and the Funds including the Master Fund adopted the framework set forth in Financial Accounting Standards Board Statement No. 157 ("FASB 157") to calculate "fair value" of assets that do not trade on an active market and lack significant observable inputs.

191.    FASB 157 requires valuation of the Funds' assets "based on the best information available."  From March 2010 through the beginning of 2012, Defendants knew that they had wildly overvalued the LightSquared stock because their valuation did not make appropriate assumptions about risk, and did not include the best information available, including the fact that the business wholly depended on resolving a technical issue that could not be resolved.  In 2011, the Defendants wrote down the LightSquared value by half, but this mark-down should have been done far earlier.  The refusal to provide proper valuations for an asset that constituted the bulk of the Funds' assets resulted in inappropriately reassuring performance figures and thus misrepresented the health of the Funds each month to investors.

## VII.    RISK MANAGEMENT

192.    In the Offering Materials for all Funds, Harbinger represented to investors that its investments involved a "high degree of risk," so it intended to "employ a range of risk management guidelines and procedures from time to time, in its efforts to monitor portfolio volatility and risk."  In its regular updates, Harbinger further advised investors when new risk personnel were hired or new risk systems added.  Investors are presumed to have relied upon the statements that Harbinger – which managed multiple billions of dollars of investor funds –

62

had state-of-the-art risk management procedures and processes for the protection of their investments.

193.    Unbeknownst to investors, Harbinger had no effective risk control or management system, and its representations were false and misleading.  In truth, the Funds' investments were entirely at the whim and discretion of Falcone, the manager.  After March 2009, Harbinger left Harbert and undertook its own operations, accounting and risk management functions.  This removed any last check on Falcone's authority.  Falcone's decision to invest the Funds over 60% in LightSquared and additional significant portions of the Funds in a parallel investment in rival Inmarsat violated all responsible guidelines or limits for concentration. In one Fund I offering memorandum, for example, Harbinger stated that it established limits of 7.5% invested in any one company, and 25% invested in one industry. These limits represent typical guidelines expected by investors in a blind pool fund. Harbinger's concentration in LightSquared grossly exceeded these or any other rational positions limits expected for investment managers acting as fiduciaries.

194.    Amazingly, it was not until November 2009 that Harbinger implemented an internal risk management tool, Risk Manager, from Risk Metrics. Previously, as Harbinger acknowledged in an update to investors in the Funds advising them about Risk Metrics, "our trading acumen and risk management judgment has always been and will continue to be critical to our portfolio construction."  Harbinger further stated that "we will utilize Risk Manager as an analytical tool that will complement our existing skill set and will help us identify, and quantify, the various risks in our portfolio"; and "we will also use the tool to construct various stress tests, scenario analysis and to help us tweak certain hedging strategies."

6401-1

195.    Harbinger failed to disclose to investors from the start that the Funds had no risk control or management system protecting investors.   Instead, the Funds relied entirely on Falcone's instinct and guesswork.   The Funds also appeared to lack an automated risk management system and tools that investors would expect that a billion-dollar investment fund manager would have.

## VIII.   DAMAGES AND LOSS CAUSATION

196.    At their peak, the Harbinger Funds managed more than $26 billion.  Of this amount, approximately $3 billion was invested in LightSquared.  Due in part to redemptions, but also due in part to drops in asset values, the Funds now have less than $4 billion under management. Such a drop in only four years constitutes the biggest loss by any family of hedge funds in history.   The $3 billion investment in now-bankrupt LightSquared is now almost completely gone.

197.    The Defendants falsely represented their intentions with respect to the Funds' investment objectives and used the Funds as their personal piggy bank to finance a quixotic venture to build out a nationwide 4G network using risky, unproven technology.   The Defendants concealed the risk inherent in this strategy, and when the risk materialized, the Defendants closed the gate and refused to let investors out.

198.    Defendants used assets in the Funds to finance LightSquared. All told, more than $3 billion was diverted from the Funds to LightSquared, which is now bankrupt with only a "vision of a business" left.

199.    In addition, the Defendants' knowing, reckless and/or grossly negligent breaches of their fiduciary duties to the Funds caused substantial harm to the Funds and investors therein, including direct harm as outlined in the SEC cases, and indirect harm because of Defendants'

64

inability to salve a political solution for the LightSquared GPS interference problem. Because Falcone and the other Defendants put their interests above the Harbinger investors, and because they committed multiple counts of securities fraud, they have become toxic in Washington and substantially diminished their ability to solve the GPS problem.

200.   In addition, Defendant Falcone's knowing, reckless and/or grossly negligent breaches of his fiduciary duties to his fellow partners in the Delaware Funds caused substantial harm to the partners.

201.   As a direct result of the Defendants' fraudulent and/or grossly negligent misrepresentations of the investment objectives of the Funds, and of the risks inherent in the LightSquared folly that materialized, investors and the Funds have lost almost all of the $3 billion.

IX.   **RELIANCE**

202.   Plaintiffs Schad and Klein, like all limited partners in Fund I and Fund II, justifiably relied on the representations in the onshore Offering Materials in making their purchase. In fact, the Defendants required all limited partners in these Funds to "represent, warrant and acknowledge" that they were relying **_solely_** on the facts, terms and disclosures set forth in the onshore Offering Materials, and thus reliance was by definition justifiable.

203.   Plaintiffs Bhardwaj, Foundation and Lang, like all shareholders in Offshore Fund I and Offshore Fund II, justifiably relied on the representations in the offshore Offering Materials. In fact, the Defendants required all shareholders to "represent, warrant and acknowledge" that they were relying solely on the facts, terms and disclosures set forth in the offshore Offering Materials, and thus reliance was by definition justifiable.

6401-1

204.     Plaintiff Foundation, like all limited partners in Special Situations Fund and Special Situations Offshore Fund, justifiably relied on the representations in the Offering Materials.   In fact, the Defendants required all shareholders to "represent, warrant and acknowledge" that they were relying solely on the facts, terms and disclosures set forth in the Offering Materials, and thus reliance was by definition justifiable.

205.     Plaintiffs actually relied on communications from the Defendants related to the Funds after the date of purchase of their interests, including the reported net asset values ("NAVs"), in deciding whether to continue to hold their investments.   Because the Funds are not publicly traded companies, reliance on such communications as the Plaintiffs' primary source of information on the Funds is justifiable.

206.     Class Members are also presumed to have relied on communications from the Defendants related to the Funds after the date of purchase of their interests, including the reported net asset values ("NAVs"), in deciding whether to continue to hold their investments. Because the Funds are not publicly traded companies, reliance on such communications as the Class Members' primary source of information on the Funds is justifiable.

## X.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

### A.     With Respect to Offshore Fund I, Offshore Fund II, the Special Situations Offshore Fund and the Master Fund

207.     Offshore Fund I, Offshore Fund II, the Master Fund and Special Situations Offshore Fund are organized under Cayman Islands law.

208.     Plaintiffs Bhardwaj, Foundation and Lang bring Count V of this action derivatively and/or double-derivatively for the benefit of these funds, to redress injuries suffered and injuries that continue to be suffered by these funds as a direct result of the misconduct alleged herein.   Plaintiffs Schad and Klein bring derivative or double-derivative claims on

66

behalf of the Master Fund.   These funds are named as nominal defendants only and are not defendants in this action.   There is therefore no conflict in asserting claims derivatively on behalf of them.

209.   Offshore Fund I, Offshore Fund II, Fund I, Fund II and the Master Fund are designed to function as a single enterprise under a master-feeder structure controlled by the same person with the same investment objectives.   Offshore Fund I, Offshore Fund II Fund I, and Fund II invested solely in the Master Fund which, in turn, invested in the underlying assets which are reported to the investors in Offshore Fund I, Offshore Fund II Fund I, and Fund II. For example, in the 1Q 2010 due diligence questionnaire provided by Defendant HCP to investors, the funds were described as a "Fund" in the singular, and the investment objectives for the "Fund" did not make any distinctions among the Funds.   The Defendants exercise *de facto* and *de jure* control over the Offshore Funds and as such owe fiduciary duties to the Offshore Funds under Cayman Islands law.   These duties include the duty of good faith to act *bona fide* in the interests of the company, the duty to act only with proper purpose, and the duty to avoid conflict of interest.

210.   The Cayman Islands follows the laws of England with respect to derivative suits and will allow such suits consistent with any one of the exceptions to the Rule in *Foss v. Harbottle*.[4]

211.   The actions of Defendants described herein amount to multiple breaches of their fiduciary duties to the Offshore Fund, Special Situations Offshore Fund and the Master Fund.

---

[4] *Foss v. Harbottle*, [1843] 2 Hare 461, adopted as the law of the Cayman Islands by the Cayman Islands Court of Appeal in *Schultz v. Reynolds*, [1992-1993] C.I.L.R. 50.

6401-1

212.    Because the Defendants control the funds, their breaches constitute a fraud on the minority, thus giving Plaintiffs standing to pursue this claim.

213.    The actions of the Defendants described herein are *ultra vires* acts, thus giving Plaintiffs standing to pursue this claim.

214.    Plaintiffs will fairly and adequately represent the interests of the funds and their investors in enforcing and prosecuting the funds' rights under all relevant laws.

215.    This derivative action is not being used by Plaintiffs to gain any personal advantage over any other investor, nor do Plaintiffs maintain any personal agenda other than seeking to remedy the wrong that has been done to the Funds.

**B.    With Respect to Fund I, Fund II and the Special Situations Fund**

216.    Fund I, Fund II and the Special Situations Fund (the "Partnerships") are organized under Delaware law.

217.    Plaintiffs Schad and the Klein Foundation incorporate by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

218.    Plaintiffs bring Counts VII and VIII derivatively or double-derivatively for the benefit of the Partnerships to redress injuries suffered and injuries that continue to be suffered by the Partnerships as a direct result of the misconduct alleged herein. The Partnerships are named as nominal defendants solely in a derivative capacity, and not as named defendants, and thus there is no conflict in asserting these derivative claims.

219.    Plaintiffs Schad and Klein brings the derivative claim on behalf of Fund I which is managed as a single unified enterprise in a master-feeder structure along with Fund II, Offshore Fund I, Offshore Fund II and the Master Fund, to purse a common goal and thus effectively function as a single entity. Defendants invested the entirety of Fund I, Fund II,

Offshore Fund I and Offshore Fund II into the Master Fund, which invested in and held the assets which were reported to the investors in Fund I, Fund II, Offshore Fund I and Offshore Fund II.

220.    Plaintiffs Foundation and Klein brings a derivative or double-derivative claim on behalf of the Special Situations Fund and the Special Situations Offshore Fund which, in turn, is a majority limited partner in the Special Situations Fund. The Special Situations Fund and Special Situations Offshore Fund are partnerships which are managed as a single unified enterprise under a master-feeder structure to purse a common goal and thus effectively function as a single entity. The Special Situations Offshore Fund invested solely in the Special Situations Fund which invested in and holds the assets reported to investors in the Special Situations Offshore Fund. Both Funds are under common control.

221.    Plaintiffs will fairly and adequately represent the interests of the respective Partnerships and their limited partners in enforcing and prosecuting their rights.

222.    Plaintiffs have made substantial investments in the Partnerships. Plaintiffs have owned their respective limited partnership interests continuously throughout the period in which Defendants' wrongful acts occurred, and continue to own their limited partnership interests, thus giving them standing to pursue Counts VII and VIII pursuant to 6 DEL. C. § 17-1002.

223.    This action is not being used by the Plaintiffs to gain any personal advantage, nor do Plaintiffs maintain any personal agenda other than seeking to remedy the wrong that has been done to the Partnerships.

224.    Plaintiffs did not make a demand on the General Partners of the Partnership to take remedial action on behalf of the Partnerships against the Defendants because such a demand would have been a futile, wasteful, and useless act.  The General Partners themselves

6401-1

participated in, approved, and/or permitted the wrongs alleged herein and concealed or disguised those wrongs, and are therefore not disinterested parties and lack sufficient independence to exercise business judgment as alleged herein.

225.    In addition, as established above and by Falcone's own admissions, the General Partners of the Partnerships are ultimately controlled by Falcone and the related Harbinger entities named as Defendants in this action. It would be futile to make a demand on the General Partners to sue the very people who control and make the decisions for the General Partners. As such, demand is excused under Delaware law.

## XI.    SPECIAL RELATIONSHIP BETWEEN DEFENDANTS AND INVESTORS

226.    The Defendants had a special relationship with Plaintiffs and Class Members that gave rise to legally recognized duties of care and fiduciary duties.

227.    Defendants communicated directly and confidentially with each investor prior to the investment.   Confidential offering documents were provided or made available to each investor, and each investor was instructed to rely solely on the information contained therein when deciding whether to invest.

228.    The shares and limited partnership interests are restricted securities, not traded on any public exchange, and can only be purchased by certain qualified investors.  Almost all information provided by the Defendants to the investors is required to be kept confidential.

229.    The Defendants provided monthly performance summaries directly to the investors that were not permitted to be made public.

230.    Defendant Falcone wrote letters directly to his investors and hosted conference calls to discuss recent events and answer questions investors might have.

6401-1

231.    In the Offering Materials for each fund, Defendants held themselves out as experts in their field.  For example, the Confidential Offering Memorandum for Fund I touted the "extensive expertise" of the investment team which enabled them to "develop a broad network within the restructuring community."  Biographies for no fewer than 18 key employees at Harbinger and 5 at Harbert were provided in the OM to give comfort to investors that the Funds would be well-managed.

232.    The Defendants were aware that the Plaintiffs and Class Members would use information provided by the Defendants for the special purpose of deciding whether to invest and/or redeem.  Not only was the information confidential but Defendants were frequently the only conduit for information to get to the investors, and the Defendants required that each investor represent and warrant that he or she would only rely on information supplied by Defendants in deciding whether to invest.

233.    The Plaintiffs and each and every member of the class are in privity of contract, or in a relationship approaching privity of contract, with the Defendants, because investments can only be made through a subscription agreement executed by at least one Defendant (all of whom are ultimately controlled by or affiliated with Defendant Falcone) and the investor.  No limited partnership agreements or shares can be acquired on the open market without a contract signed by at least one Defendant.

## XII.    TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATIONS

234.    Plaintiffs, on behalf of the Class Members and derivatively on behalf of the Funds, did not discover the facts constituting Defendants' violations until a date within the limitations periods governing this action, and promptly exercised due diligence by filing the original class action complaint and subsequent amended class action and derivative complaint in

6401-1

this action.  Plaintiffs and Class Members could not reasonably have discovered Defendants'
conduct before 2011, and therefore any applicable statutes of limitations were tolled until at
least the beginning of 2011.

### XIII.   CLASS ACTION ALLEGATIONS

235.     Counts I through IX of this action assert class claims pursuant to Rules 23(a) and
(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who
purchased or otherwise acquired limited partnership interests in Fund I, Fund II, the Special
Situations Fund, the Special Situations Offshore Fund, Offshore Fund I and Offshore Fund II
prior to December 31, 2011.  Excluded from the Class are Defendants and their respective
officers, directors, employees, affiliates, legal representatives, predecessors, successors and
assigns, and any entity in which any of them have a controlling interest or is a parent.

236.     The members of the Class are so numerous that joinder of all members is
impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time
and can only be obtained through appropriate discovery, Plaintiffs believe that the number of
Class Members exceeds 40 and joinder would be impracticable.  Record owners and other
members of the Class may be identified from records maintained by Defendants and may be
notified of the pendency of this action by mail, using a form of notice similar to that customarily
used in securities class actions.

237.     Common questions of law and fact exist as to all members of the Class and
predominate over any questions affecting solely individual members of the Class.  The
questions of law and fact common to the Class include (1) whether Defendants deviated from
the investment strategies described in the Offering Materials; (2) whether Defendants omitted
and/or misrepresented material facts in communications with investors about risks associated

with their intended investment strategies; (3) whether Defendants knew or recklessly disregarded that their statements were false or misleading; (4) whether Defendants breached fiduciary duties to the Class Members; and (5) the extent to which members of the Class have sustained damages and the proper measure of any such damages.

238.   Plaintiffs' claims are typical of the claims of other Class Members, as all members of the Class were similarly affected by Defendants' wrongful conduct.

239.   Plaintiffs are substantial investors who will fairly and adequately protect the interests of Class Members and have retained counsel that is competent and experienced in class and securities litigation.   Plaintiffs have no interests that are in conflict with, or otherwise antagonistic to the interests of the other Class Members.

240.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. There will be no difficulty in management of this action as a class action.

## XIV.   COUNTS

### COUNT I

### Negligent Misrepresentation Asserted Against All Defendants

241.   Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein, except for those averring fraud.

242.   Defendants had a special duty of care to investors that arose out of a special relationship.  Defendants, as a result of their special relationship with investors in the Funds, owed Plaintiffs and the Class duties of ordinary and reasonable care that arose from their relationships with the Harbinger entities and the investors, their position and status as issuer of the limited partnership interests in the Funds, and as investment advisors and managers of the

73

6401-1

Funds. Defendants owed duties of ordinary and reasonable care applicable to any similar hedge fund, private equity firm or other investment advisor.

243.    Defendants made numerous false and misleading representations about the Funds to Plaintiffs and Class Members concerning, among other things, the Funds' investment strategy, the risk management strategies that would be employed, and the prospects for the Funds' underlying investments.

244.    Defendants were grossly negligent in their failure to exercise reasonable care. Defendants' conduct was an extreme departure from the ordinary standard of care and more than ordinary inadvertence or inattention.

245.    Plaintiffs and the Class justifiably relied on the statements Defendants made in selling limited partnership interests and shares. Plaintiffs and the Class also justifiably relied on the ongoing statements Defendants made in deciding to continue holding and not redeem.

246.    As a result of Defendants' conduct, Plaintiffs and the members of the Class have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## COUNT II

### Common Law Fraud Asserted Against All Defendants

247.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

248.    Defendants made numerous false representations to Plaintiffs and Class Members with reckless indifference to the truth, and/or with knowledge or belief that the representation was false, or Defendants deliberately concealed some material fact, or

6401-1

Defendants were silent in the face of a duty to provide disclosure to Plaintiffs and Class Members.

249.    Defendants' false representations, concealment or silence induced Plaintiffs to invest in the Funds and/or forbear from redeeming their investments in the Funds.

250.    Plaintiffs and Class members justifiably relied upon Defendants' false representations, concealment or silence, which induced them to invest in the Funds and/or forbear from redeeming their investments in the Funds.

251.    As a direct and proximate result of such reliance, Plaintiffs and the members of the Class have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## COUNT III

### Unjust Enrichment Asserted Against Defendants Falcone, Holdings, HCP, Harbinger GP, Harbinger Special Situations GP and Harbinger Offshore Special Situations GP

252.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

253.    Defendants paid themselves management fees on a quarterly basis that were calculated as a percentage of assets under management.

254.    Defendants allocated a portion of profits to themselves (performance allocations) that were based on the increase in value of the assets under management.

255.    Defendants knowingly provided grossly inflated asset values to the investors in all three Funds and calculated management fees and performance allocations based on the inflated assets values.

256.    Defendants thus were able to extract larger management fees and performance allocations than they otherwise would have been entitled to.  For example, in calendar year 2008, the Defendants caused Fund I to pay management fees of $25,229,647, a number which represented 1% of the assets under management as calculated by Defendants. Had AUM been calculated pursuant to GAAP (including FASB 157) as required, AUM would have been lower and the management fee would have been far less. Fees for Fund I in 2009, 2010 and 2011, and for the other Nominal Defendant Funds in 2008-2011 similarly would have been far less than actually paid had AUM been calculated in accordance with GAAP and FASB 157.

257.    As a direct and proximate result of their own malfeasance, Defendants were unjustifiably enriched at the expense of the investors.

## COUNT IV

### Breach of Fiduciary Duty Asserted Against Defendants Falcone, Harbinger GP, Harbinger Special Situations GP and Harbinger Special Situations Offshore GP

258.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein, except for those averring fraud.

259.    Defendants Falcone, Harbinger GP, Harbinger Special Situations GP and Harbinger Special Situations Offshore GP, in addition to fiduciary duties owed to the Funds, owed direct fiduciary duties to the Plaintiffs and Class Members.  Defendant Falcone admitted in communications with investors that he is their fiduciary.

260.    Specifically, these Defendants owed duties of candor and truthful disclosures as well as the duty to avoid disparate treatment of the investors.

261.    Defendants knowingly and/or grossly negligently made false statements in communications with the investors with respect to the value of the LightSquared gamble and the

risks inherent therein (which should have been reflected in the NAV reported each month), which was a breach of their fiduciary duties. Defendants also failed to disclose to investors that Falcone received a low-interest, personal loan for $113.2 million from the Funds at a time when other investors faced redemption restrictions, making his loan one of the largest investments for the Special Situations Fund. Defendants further failed to disclose to investors that the Fund reached side agreements with large institutional investors to receive preferential treatment of redemption requests.

262.    Defendants' actions constituted breaches of fiduciary duties owed directly to the investors.

263.    These breaches induced Plaintiffs and Class Members to forbear from redeeming their investments in the Fund and as a result they incurred damages.

## COUNT V

### Breach of Fiduciary Duty Against Defendants HCP, Holdings and Falcone Derivatively On Behalf of Offshore Fund I, the Master Fund, and Special Situations Offshore Fund Under Cayman Islands Law

264.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein except for those averring fraud.

265.    Defendants HCP, Holdings and Falcone controlled the Offshore Fund I, the Master Fund, and Special Situations Offshore Fund and thus owed these funds fiduciary duties under Cayman Islands law to act in good faith, to act with proper purpose, and to avoid conflict of interest.

266.    Defendants breached their fiduciary duties by, *inter alia*, violating the investment objectives of the Funds, investing a majority of the Funds' assets in a single, high-risk equity investment, subjecting the Funds to SEC civil fraud actions, in reporting inflated asset values

77

thus resulting in inappropriately high fees being paid to Defendants, and otherwise acting in their own interests and not in the best interests of the Funds.

267.    Defendants' actions functioned as a fraud on minority investors.

268.    Defendants' actions were *ultra vires*.

269.    As a direct and proximate result of these breaches, the Special Situations Offshore Fund, Offshore Fund I and the Master Fund have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## COUNT VI

### Breach of Fiduciary Duty Against Defendants Harbinger GP, Holdings and Falcone Derivatively On Behalf of Fund I and Fund II Under Delaware Law

270.    Plaintiffs incorporate by reference each and every allegation set forth above, except for those averring fraud, as though fully set forth herein.

271.    Defendants Harbinger GP, Holdings and Falcone controlled Fund I and as such owed the Fund fiduciary duties of loyalty and care under Delaware law.

272.    Defendants breached their fiduciary duties by, *inter alia*, violating the investment objectives of the Fund and investing a majority of the Fund's assets in a single, high-risk equity investment, subjecting the Fund to SEC civil fraud actions, granting preferential treatment in side agreements with large institutional investors, reporting inflated asset values thus resulting in inappropriately high fees being paid to Defendants, and otherwise acting in their own interests and not in the best interests of the Funds.

273.    Plaintiffs did not make demand on the Funds because such demand would be futile.  The general partner of the Fund and those in control of the general partner and the Funds are the primary wrongdoers that engaged in the breaches of fiduciary duty.

6401-1

274.    As a direct and proximate result of these breaches, the Funds have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## COUNT VII

### Breach of Fiduciary Duty Against Defendants Holdings, Harbinger Special Situations GP, and Falcone Derivatively On Behalf of the Special Situations Fund

275.    Plaintiffs incorporate by reference each and every allegation set forth above, except for those averring fraud, as though fully set forth herein.

276.    Defendants Harbinger Special Situations GP, Holdings and Falcone controlled the Special Situations Fund and as such owed the Fund fiduciary duties of loyalty and care under Delaware law.

277.    Defendants breached their fiduciary duties by, inter alia, violating the investment objectives of the Fund and investing a majority of the Fund's assets in a single, high-risk equity investment, making a personal $113.2 million loan to Defendant Falcone, subjecting the Fund to SEC civil fraud actions, reporting inflated asset values thus resulting in inappropriately high fees being paid to Defendants, and otherwise acting in their own interests and not in the best interests of the Fund.

278.    Plaintiffs did not make demand on the Fund because such demand would be futile. The general partner of the Fund and those in control of the general partner and the Fund are the primary wrongdoers that engaged in the breaches of fiduciary duty.

279.    As a direct and proximate result of these breaches, the Fund has suffered and continues to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

79

6401-1

## COUNT VIII

### Aiding and Abetting Breach of Fiduciary Duty Against Defendant Harbert

280.   Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein, except for those averring fraud.

281.   Defendants Falcone, Harbinger GP, Harbinger Special Situations GP and Harbinger Special Situations Offshore GP owed direct fiduciary duties to the Plaintiffs and Class Members in addition to the duties owed to the Funds.

282.   Specifically, these Defendants owed duties of candor and truthful disclosures as well as the duty to avoid disparate treatment of the investors.

283.   These Defendants breached those duties for the reasons stated herein, by, *inter alia*, violating the investment objectives of the Fund, investing a majority of the Fund's assets in a single, high-risk equity investment, subjecting the Fund to SEC civil fraud actions, granting preferential treatment in side agreements with large institutional investors, reporting inflated asset values thus resulting in inappropriately high fees being paid to Defendants, and otherwise acting in their own interests and not in the best interests of the Funds.

284.   Defendant Harbert knew that Falcone, Harbinger GP, Harbinger Special Situations GP and Harbinger Special Situations Offshore GP owed Plaintiffs and Class Members a direct fiduciary duty.

285.   Defendant Harbert knowingly participated and substantially assisted in these breaches by causing Falcone, Harbinger GP, Harbinger Special Situations GP and Harbinger Special Situations Offshore GP to make false statements to investors and to fail to disclose the $113.2 million loan to Falcone and the selective redemptions of certain investors.

6401-1

286.    These breaches induced Plaintiffs and Class Members to forbear from redeeming their investments in the Funds and as a result they incurred damages.

## COUNT IX

### Aiding and Abetting Breach of Fiduciary Duty Against Defendants Falcone and Holdings

287.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

288.    Plaintiffs assert this claim in the alternative against Defendant Falcone.

289.    Defendants Harbinger GP, Harbinger Special Situations GP and Harbinger Special Situations Offshore GP owed direct fiduciary duties to the Plaintiffs and Class Members in addition to the duties they owed to the Funds.

290.    Specifically, these Defendants owed duties of candor and truthful disclosures as well as the duty to avoid disparate treatment of the investors.

291.    These Defendants breached those duties for the reasons stated herein, by, *inter alia*, violating the investment objectives of the Fund, investing a majority of the Fund's assets in a single, high-risk equity investment, subjecting the Fund to SEC civil fraud actions, granting preferential treatment in side agreements with large institutional investors, reporting inflated asset values thus resulting in inappropriately high fees being paid to Defendants, and otherwise acting in their own interests and not in the best interests of the Funds.

292.    Defendants Falcone and Holdings knew that Harbinger GP, Harbinger Special Situations GP and Harbinger Special Situations Offshore GP owed Plaintiffs and Class Members a direct fiduciary duty.

293.    Defendants Falcone and Holdings knowingly participated and substantially assisted in these breaches by causing Harbinger GP, Harbinger Special Situations GP and

81

6401-1

Harbinger Special Situations Offshore GP to make false statements to investors and to fail to disclose the $113.2 million loan to Falcone and the selective redemptions of certain investors.

294.   These breaches induced Plaintiffs and Class Members to forbear from redeeming their investments in the Funds and as a result they incurred damages.

## XV.   JURY DEMAND

Plaintiffs demand trial by a jury on all triable issues.

## XVI.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and Class members pray for a judgment in their favor:

(1)   for an order determining that Counts I through IX of this action constitute a proper class action, and certifying the Class as defined herein and appointing Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

(2)   for compensatory, special and general damages according to proof;

(3)   for prejudgment interest;

(4)   for appropriate equitable relief;

(5)   for disgorgement of all management and performance fees paid by the Funds directly or indirectly to any Defendant;

(6)   for an accounting of all damages caused by Defendants to the funds and class members;

(7)   for reasonable attorneys' fees and costs of investigation and litigation; and

(8)   for such other and further relief as the interests of law or equity may require.

6401-1

Dated:   December 5, 2012        Respectfully submitted,

**ZAMANSKY & ASSOCIATES LLC**

By: _____
Jacob H. Zamansky
Edward H. Glenn, Jr.
Kevin D. Galbraith
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
*jake@zamansky.com*

*Interim Class Counsel*

**STEWARTS LAW US LLP**
David A. Straite
Ralph N. Sianni
Michele S. Carino
Lydia E. York
535 Fifth Avenue, 4th Floor
New York, NY  10017
Tel.: (212) 897-3731
Fax: (212) 897-3733
*dstraite@stewartslaw.com*

**GIRARD GIBBS LLP**
Daniel C. Girard
Amanda M. Steiner
Dena C. Sharp
Ian P. Samson
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
*dcg@girardgibbs.com*

*Additional Counsel for Plaintiffs*

6401-1

### RULE 23.1 VERIFICATION OF EDWARD H. GLENN JR., Esq.

### ON BEHALF OF PLAINTIFF THE EWARD N. ARMFIELD SR. FOUNDATION

1. I am Edward H. Glenn Jr., counsel for plaintiff The Edward M. Armfield Sr. Foundation (the "Foundation).

2. I am authorized to make this verification on behalf of the Foundation.

3. I have provided a copy of the fourth amended complaint to Foundation which has confirmed that it knows the contents thereof and that, based upon personal knowledge and information provided to me, the facts provided therein are true and correct to the best of my information and belief.

4. Plaintiff Foundation is located in another state and obtaining a Rule 23.1 verification at this time would prove to be impractical.

_____

Edward H. Glenn Jr. as agent for The Edward
M. Armfield Sr. Foundation

**RULE 23.1 VERIFICATION OF JACOB H. ZAMANSKY, Esq.**

**ON BEHALF OF PLAINTIFF LILI SCHAD**

1. I am Jacob H. Zamansky, counsel for plaintiff Lili Schad ("Schad").

2. I am authorized to make this verification on behalf of Schad.

3. I have provided a copy of the fourth amended complaint to Schad and she confirms that knows the contents thereof and that, based upon personal knowledge and information provided to me, the facts provided therein are true and correct to the best of my information and belief.

4. Plaintiff Schad is out of town and getting her to execute a Rule 23.1 verification at this time would prove to be impractical.


Jacob H. Zamansky as agent for Lili Schad

## **VERIFICATION**

I, Milton Klein, herby declare as follows:

1.      I am authorized to make this verification on behalf of the Klein Family Partnership LP, a plaintiff in the foregoing action.

2.      I verify that I have reviewed the foregoing Fourth Amended Class Action and Derivative Complaint, know the contents thereof and that, based upon personal knowledge and information provided to me, the facts provided therein are true and correct to the best of my information and belief.

Executed this _5_ day of _Dec_ 2012

Milton Klein, on behalf of the
Klein Family Partnership LP

**RULE 23.1 VERIFICATION OF JACOB H. ZAMANSKY, Esq.**

**ON BEHALF OF PLAINTIFF ANIL BHARDWAJ**

1. I am Jacob H. Zamansky, counsel for plaintiff Bhardwaj ("Bhardwaj").

2. I am authorized to make this verification on behalf of Bhardwaj.

3. I independently verified Bhardwaj's holdings in Offshore Fund I after communication with his bank, HSBC, and confirm that Bhardwaj held shares in Offshore Fund I prior to the date the derivative claims ripened, and can confirm that Bhardwaj still holds shares.

4. I have provided a copy of the fourth amended complaint to Bhardwaj and he confirms that his standing was not obtained by collusive methods.

5. Plaintiff Bhardwaj is domiciled in Dubai and getting him to execute a Rule 23.1 verification would prove to be impractical.


Jacob H. Zamansky as agent for Anil Bhardwaj

## RULE 23.1 VERIFICATION OF JACOB H. ZAMANSKY, Esq.

### ON BEHALF OF PLAINTIFF RANDY LANG

1.  I am Jacob H. Zamansky, counsel for plaintiff Randy Lang ("Lang").

2.  I am authorized to make this verification on behalf of Lang.

3.  I independently verified Lang's holdings in Offshore Fund I, and confirm that Lang held shares in Offshore Fund I prior to the date the derivative claims ripened, and can confirm that Lang still holds shares.

4.  I have provided a copy of the fourth amended complaint to Lang and he confirms that his standing was not obtained by collusive methods.

5.  Plaintiff Lang is domiciled in Ontario, Canada and getting him to execute a Rule 23.1 verification would prove to be impractical.


_____

Jacob H. Zamansky as agent for Randy Lang

## CERTIFICATE OF SERVICE

I, David A. Straite,  hereby certify that on December 5, 2012, I caused a true and correct copy of the foregoing document to be served upon the following counsel via email and ECF:

Daniel J. Leffell
Leslie G. Fagen
Steven C. Herzog
**PAUL, WEISS, RIFKIND, WHARTON &**
**GARRISON LLP (NY)**
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3218
Fax: (212)492-0218
dleffell@paulweiss.com
lfagen@paulweiss.com
sherzog@paulweiss.com
*Attorneys for Defendants Philip A. Falcone,*
*Harbinger Capital Partners GP, L.L.C.,*
*Harbinger Capital Partners LLC, Harbinger*
*Capital Partners Special Situations GP,*
*L.L.C., Harbinger Holdings, LLC*

Gregory P. Joseph
Pamela H. Jarvis
Rachel M. Cherington
**GREGORY P. JOSEPH LAW OFFICE LLC**
485 Lexington Ave
New York, NY 10017
(212) 407-1210
Fax: (212)-407-1280
gjoseph@josephnyc.com
pjarvis@josephnyc.com
rcherington@josephnyc.com
*Attorneys for Defendants Harbert Management*
*Corp. and Harbert Fund Advisors, Inc.*

Gregory A. Clarick
Isaac B. Zaur
Nicole L. Gueron
**CLARICK GUERON REISBAUM LLP**
40 West 25th Street
NEW YORK, NY 10010
(212) 633-4313
Fax: 646-478-9484
gclarick@cgr-law.com
izaur@cgr-law.com
ngueron@cgr-law.com
*Attorneys for Nominal Defendants Harbinger*
*Capital Partners Fund I, L.P., Harbinger*
*Capital Partners Special Situation Fund L.P.*
*and Harbinger Capital Partners Special*
*Situations Offshore Fund LP*

Nina M. Beattie
Jessica R. Holloway
**BRUNE & RICHARD LLP**
One Battery Park Plaza
New York, NY 10004
(212) 668-1900
Fax: 212-668-0315
nbeattie@bruneandrichard.com
jholloway@bruneandrichard.com
*Attorneys for Nominal Defendants Harbinger*
*Capital Partners Offshore Fund I, Ltd. and*
*Harbinger Capital Partners Master Fund I,*
*Ltd.*

_____*/s/ David A. Straite*_____
David A. Straite
Counsel for Plaintiffs

6403-1