UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

IN RE HARBINGER CAPITAL PARTNERS FUNDS
INVESTOR LITIGATION

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 3 0 2013

12 Civ. 1244 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

This case arises from Plaintiffs' investments in a family of hedge funds (the "Funds")
managed by entities affiliated with Defendants Philip A. Falcone and Harbinger Capital Partners,
LLC ("HCP"). Plaintiffs bring direct claims on behalf of a putative class comprising individuals
and entities who invested in the Funds prior to December 31, 2011, as well as derivative claims
on behalf of several of the Funds themselves. (The Court will sometimes refer to these Funds as
the "Nominal Defendants.") Plaintiffs' claims, both direct and derivative, variously allege
common law fraud, negligent misrepresentation, breach of fiduciary duty, and aiding and
abetting breach of fiduciary duty, and they primarily, although not exclusively, center on
Defendants' purchase of a wireless broadband company called SkyTerra Communications, Inc.
("SkyTerra"), later LightSquared Inc. ("LightSquared"). At core, Plaintiffs allege that
Defendants marketed the Funds as diversified, distressed-debt and credit-driven hedge funds, but
in fact used the Funds to take a large ownership interest in LightSquared without adequately
disclosing this shift in strategy or its attendant risks.

Currently before the Court are four motions to dismiss Plaintiffs' Fourth Verified Amended Class Action and Derivative Complaint (the "4AC"), filed by two groups of Defendants and two groups of Nominal Defendants. For the following reasons, the motions are granted in part and denied in part.

## I.    BACKGROUND

Unless noted otherwise, the following facts are drawn from allegations in the 4AC and, for purposes of addressing this motion, are assumed to be true. *See Kassner v. 2d Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

### A.  The Parties

Plaintiffs in this action are Lili Schad, Anil Bhardwaj, the Edward M. Armfield Sr. Foundation Inc. ("Armfield"), Dr. Randall Lang, and the Klein Family Partnership LP ("Klein"). These individuals and entities invested in four of the Funds at issue in this case: Schad purchased limited partnership interests in Harbinger Capital Partners Fund I, L.P. ("Fund I"); Bhardwaj and Lang purchased shares in Harbinger Capital Partners Offshore Fund I, Ltd. ("Offshore Fund I"); Armfield purchased shares in Offshore Fund I, as well as limited partnership interests in Harbinger Capital Partners Special Situations Offshore Fund L.P. (the "Special Situations Offshore Fund"); and Klein purchased limited partnership interests in Harbinger Capital Partners Special Situations Fund, L.P. (the "Special Situations Fund"). All of the Plaintiffs continue to hold these investments. 4AC ¶¶ 25–29.

Plaintiffs purport to bring class claims on behalf of "all persons and entities" who "purchased or otherwise acquired" limited partnership interests or shares in the four Funds in which Plaintiffs invested, as well as investors in two other Funds in which Plaintiffs did not invest—Harbinger Capital Partners Fund II, L.P. ("Fund II"), and Harbinger Capital Partners

Offshore Fund II, Ltd. ("Offshore Fund II").  This putative class is limited to persons and entities who acquired their interests in the six Funds prior to December 31, 2011.  4AC ¶ 2.

In addition, Plaintiffs bring derivative claims on behalf of the six Nominal Defendants in this case: Fund I, Fund II, the Special Situations Fund, Offshore Fund I, the Special Situations Offshore Fund, and Harbinger Capital Partners Master Fund I, Ltd. (the "Master Fund").

Four of the Funds—Fund I, Fund II, Offshore Fund I, and Offshore Fund II—are so-called "feeder funds" that invest solely in the Master Fund, which accepts investments only from feeder funds and has no individual investors.  4AC ¶¶ 38, 39, 42, 43.  Under this master-feeder structure, each feeder fund is allocated a portion of the holdings of the Master Fund.  Similarly, the Special Situations Offshore Fund is a feeder fund for the Special Situations Fund, but it is only a majority limited partner and the Special Situations fund has other investors, including members of the public.  4AC ¶¶ 41, 46.  Fund I, Fund II, and the Special Situations Fund are Delaware limited partnerships; Offshore Fund I, Offshore Fund II, and the Master Fund are Cayman Islands exempted companies; and the Special Situations Offshore Fund is a Cayman Islands limited partnership.  4AC ¶¶ 38–46.

Defendants manage these Funds' investments.  Falcone founded New York–based HCP in 2001 with the assistance of Defendant Harbert Management Corporation ("Harbert"), an alternative-investment manager based in Birmingham, Alabama.  4AC ¶ 49.  Falcone bought out Harbert in 2009.  *Id.*  Today, Falcone is Chief Investment Officer and 100% managing member of Defendant Harbinger Holdings, LLC ("Holdings"); together, Falcone and Holdings own 100% of HCP, Defendant Harbinger Capital Partners GP ("Harbinger GP"), and Defendant Harbinger Capital Partners Special Situations GP ("Special Situations GP").  They also own a majority of, and a 100% voting interest in, Harbinger Capital Partners Special Situations Offshore GP

3

("Special Situations Offshore GP").[1]  4AC ¶¶ 36, 46, 48.  (Harbinger GP, Special Situations GP, and Special Situations Offshore GP are called the "General Partners.")

In turn, HCP and the General Partners manage the investments of the Funds: HCP is the investment manager and investment advisor for Offshore Fund I, Offshore Fund II, and the Master Fund, and is the investment manager for Fund I, Fund II, and the Special Situations Fund. 4AC ¶ 30.  Harbinger GP is the general partner of Fund I and Fund II, and collects management fees based on a percentage of those Funds' assets; similarly, Harbinger Special Situations GP is the general partner of the Special Situations Fund and Special Situations Offshore GP is the general partner of the Special Situations Offshore Fund.  4AC ¶¶ 33–35.  As discussed in more detail later in this opinion, Falcone thus controls all of the Funds' investments and (between himself and Holdings) owns a 100% voting interest in all three General Partners, but he is not a majority limited partner or majority shareholder in any of the Funds.  Instead, the Funds' ownership is for the most part widely dispersed among the investing public.

**B. The LightSquared Investment**

Plaintiffs were provided with confidential offering memoranda ("OMs") that described the Funds' investment strategies.  The OMs for Fund I and Offshore Fund I stated that those Funds would focus "primarily on turnarounds, restructurings, liquidations, event driven situations and capital structure arbitrage."  4AC ¶ 143.  The OMs for the Special Situations Fund and Special Situations Offshore Fund "also described a credit-driven investment strategy in distressed investments," and disclaimed any "operational involvement" with the companies in

---

[1] Special Situations Offshore GP is named in Counts III and IV of the 4AC, but it has not entered an appearance in this case or joined any of the four motions to dismiss.  Accordingly, references to the term "Defendants" in this opinion exclude Special Situations Offshore GP.

which the Funds would invest. 4AC ¶ 144. Plaintiffs were also provided with due diligence questionnaires, which stated that the Funds' positions in individual companies would generally be limited to 3–5% of the Funds' assets. 4AC ¶¶ 148, 156. Other disclosure documents stated investment limits of 7.5% per company and 20% per industry. 4AC ¶ 193.

In 2006, using money from the Funds, Defendants began to invest in SkyTerra, which was a public wireless broadband company organized under Delaware law and based in Virginia. Between 2006 and 2008, the amount of SkyTerra debt and equity owned by the Funds increased considerably as a result of both open-market transactions and negotiated transactions with other companies. In 2009, following earlier negotiations with SkyTerra management, Defendants arranged for the Funds to acquire 100% of the company in a "take-private" transaction, after which Defendants changed its name to LightSquared and replaced nearly all of its officers and directors. 4AC ¶¶ 51–65. Eventually, over 60% of the Funds' assets were invested in LightSquared. 4AC ¶ 193.

Once the company became private, the LightSquared investment was a "Level III asset" whose value cannot be measured by observable inputs. As a result, the value of the investment was reported to investors at Defendants' own assessment of "fair value." 4AC ¶¶ 189–191.

Both leading up to and following Defendants' acquisition of LightSquared, the company's business model faced technological problems. The company operates a wireless broadband network by sending information over the so-called "L-band" satellite spectrum. That band of spectrum is adjacent to the band on which Global Positioning System ("GPS") devices operate, and LightSquared's signal is sufficiently strong that it interferes with those devices. In early 2011, the FCC gave LightSquared a conditional license to operate its network contingent on resolving GPS interference problems, and commissioned a study to look into interference

concerns.  That study concluded that LightSquared's network would cause massive interference with important transportation infrastructure, and the FCC revoked the company's conditional license on February 15, 2012.  4AC ¶¶ 66–76.  Meanwhile, the fact that LightSquared's technology had become a political issue led to a number of efforts by Defendants to gain influence in Washington, eventually prompting a Senate investigation.  4AC ¶¶ 77–86.

In 2011, Defendants wrote down the value of the LightSquared investment by half, 4AC ¶ 191, and eventually, unable to operate its network, the company filed for bankruptcy on May 14, 2012.  4AC ¶ 100.  The Funds' investment in LightSquared is now "almost completely gone."  4AC ¶ 196.  This ill-fated investment coincided with a steep drop in the Harbinger Funds' assets under management.  At their peak, the Funds managed more than $26 billion in investor assets.  But as of the date of the 4AC, due to investor redemptions and declining asset values, that total was less than $4 billion.  4AC ¶ 196.

SkyTerra had known about the GPS interference problem since 2002.  4AC ¶ 150 & n.3. Despite receiving periodic updates about the Funds' investments in SkyTerra and LightSquared, investors in the Funds were never told by Defendants about the risk of GPS interference until August 19, 2011.  Even then, they were not informed that LightSquared's network required an FCC license that was conditional on resolving the issue.  4AC ¶¶ 150–154, 158–188.  According to Plaintiffs, these investor communications by Defendants were substantially the same across all of the Funds.  4AC ¶ 188.

### C. The SEC Actions

In addition to the LightSquared investment, the Funds were involved in other controversies.  On June 27, 2012, the Securities and Exchange Commission ("SEC") brought three civil complaints and one administrative proceeding against Falcone, HCP, Harbert, Special

6

Situations GP, and another affiliate.  4AC ¶¶ 105–120.  Those actions involved several sets of allegations relevant here.

First, Falcone allegedly arranged to receive a personal loan of $113.2 million from the Special Situations Fund at a time when other investors were prevented from redeeming their investments; failed to obtain the required investor approval for the loan; and concealed the loan from investors for five months, despite the fact that it would have been one of the Special Situations Fund's largest individual holdings.  The loan allegedly carried an inappropriately low interest rate of 3.66%; under the loan agreement, Falcone should have paid 8%.  Additionally, the SEC alleged that Falcone ignored the advice of an outside law firm that the Fund's portfolio manager had to determine that it had no need for the cash before Falcone could receive the loan. 4AC ¶¶ 105–108.  Falcone allegedly used the proceeds from the loan to pay taxes, "rather than sell assets so as to avoid curtailing his lavish spending and lifestyle."  4AC ¶ 106.

Second, the SEC charged Falcone with granting certain large institutional investors favorable redemption and liquidity terms as a *quid pro quo* for their vote to approve increased redemption restrictions for other investors, and with hiding this scheme from the Funds' directors, who were the only ones authorized to grant such preferences.  The heightened redemption restrictions were necessary to keep the Funds from hemorrhaging more money during a period, in 2008, in which the Funds' asset values were declining sharply.  These arrangements were allegedly accomplished through "side letters" with the large investors. Nonetheless, Falcone allegedly told Fund I's directors in March 2010 that there were no such side letters.  4AC ¶¶ 109–112.

Third, the SEC charged Falcone, Harbert, Special Situations GP, and another affiliate with market manipulation in connection with the short sale of certain securities, including high

yield bonds issued by a Canadian company called MAAX Holdings Inc.  4AC ¶¶ 113–118.  The SEC investigation began in 2008, but it was not disclosed to investors until April 29, 2011, by which time the Funds' management had already produced documents and witnesses to the regulators.  4AC ¶ 118.

### D.  Procedural History

Schad originally brought this putative class action on February 17, 2012, and the original complaint was initially amended twice to add additional Plaintiffs and derivative claims.  Dkt. Nos. 1, 33, 51.  Defendants and Nominal Defendants then moved, in four groups, to dismiss the Third Amended Complaint.  Dkt. Nos. 62, 65, 70, 77.  In response, Plaintiffs amended their complaint an additional time, and the 4AC was filed on December 5, 2012.  The 4AC contains the following counts, 4AC at 73–81:

- Count I: Negligent misrepresentation, asserted against all Defendants.

- Count II: Common law fraud, asserted against all Defendants.

- Count III: Unjust enrichment, asserted against Falcone, Holdings, HCP, Harbinger GP, Special Situations GP, and Special Situations Offshore GP.

- Count IV: Breach of fiduciary duty asserted against Falcone, Harbinger GP, Special Situations GP and Special Situations Offshore GP.

- Count V: Breach of fiduciary duty asserted against HCP, Holdings, and Falcone derivatively on behalf of Offshore Fund I, the Master Fund, and the Special Situations Offshore Fund.

- Count VI: Breach of fiduciary duty asserted against Harbinger GP, Holdings, and Falcone derivatively on behalf of Fund I and Fund II.

- Count VII: Breach of fiduciary duty asserted against Holdings, Special Situations GP, and Falcone derivatively on behalf of the Special Situations Fund.

- Count VIII: Aiding and abetting breach of fiduciary duty asserted against Defendant Harbert.

8

- Count IX: Aiding and abetting breach of fiduciary duty asserted against Defendants Falcone and Holdings.

Defendants and Nominal Defendants again moved to dismiss in four groups. Those groups, respectively, comprise (1) Falcone, HCP, Holdings, Harbinger GP, and Harbinger Special Situations GP (the "Harbinger Defendants"); (2) Harbert; (3) Fund I, Fund II, the Special Situations Fund, and the Special Situations Offshore Fund (the "LP Nominal Defendants"); and (4) Offshore Fund I, Offshore Fund II, and the Master Fund (the "LTD Nominal Defendants"). Dkt. Nos. 90, 95, 98, 101. Those motions are now before the Court. Defendants argue, *inter alia*, that Plaintiffs' class claims must be dismissed because they may be brought only as derivative claims; are precluded by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. § 78bb(f); and are inadequately pled. Nominal Defendants primarily challenge Plaintiffs' standing to bring derivative claims on their behalf.

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

At the motion to dismiss stage, plaintiffs must simply plead factual allegations in a manner that "raise[s] a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The task of the court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (quoting *Levitt*

*v. Bear Stearns & Co.*, 340 F.3d 94, 101 (2d Cir. 2003)) (internal quotation mark omitted).

Furthermore, the court must accept all well-pleaded factual allegations in the complaint as true,

and draw all reasonable inferences in the plaintiff's favor. *See Chambers v. Time Warner*, 282

F.3d 147, 152 (2d Cir. 2002).

## III.   DISCUSSION

Plaintiffs bring both direct claims, or claims on behalf of themselves and the other

members of their putative class, and derivative claims, or claims on behalf of the Funds in which

they and members of their putative class invested.  The Court considers Plaintiffs' direct claims

first.

### A.  Plaintiffs' Direct Claims

The Court begins by addressing two preliminary issues raised by Defendants that pertain

to some of the direct claims.  First, Defendants argue that because no Plaintiff invested in Fund II

or Offshore Fund II, Plaintiffs should not be able to bring direct claims on behalf of investors in

those Funds.  Harbert Br. at 4.  Second, they argue that some of Plaintiffs' claims should be

dismissed because they may only be asserted derivatively on behalf of the Funds, not by

individual investors.  Harbinger Br. at 20–21; Harbert Br. at 25 & n.38.  The Court rejects the

first argument and agrees, in part, with the second.

#### 1.   Plaintiffs Have Standing to Bring Direct Claims on Behalf of Investors in Funds in Which They Did Not Invest

Defendants are incorrect that Plaintiffs may not assert claims on behalf of investors in

Fund II and Offshore Fund II.  Article III of the Constitution requires every federal plaintiff to

have suffered an injury giving her a personal stake in the outcome of her case. *See Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (requiring an injury in fact, fairly traceable

to defendants' actions, that is redressable by the requested relief). In general, this requirement means that a plaintiff alleging wrongdoing in connection with an investment in a security must have actually invested in that security. However, the Second Circuit has recently held that in the context of putative class actions, class representatives—who purport to bring claims on behalf of themselves and other class members—need not have suffered the same injury as every member of their putative class. *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 693 F.3d 145, 162–65 (2d Cir. 2012). Instead, *NECA* explains, "a plaintiff has class standing if he plausibly alleges (1) that he 'personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant,' and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class." *Id.* at 162 (citations omitted) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982); and *Gratz v. Bollinger*, 539 U.S. 244, 267 (2003)). As discussed below, under the *NECA* standard, Plaintiffs' claims on behalf of investors in Fund II and Offshore Fund II are properly before the Court.

The facts in *NECA* are analogous to this case. In *NECA*, the plaintiff and putative class representative had purchased certain mortgage-backed securities ("MBS"), and it sought to bring claims on behalf of investors who had purchased different MBS sold as part of the same "series." The plaintiff's claims were premised on misstatements in the securities' offering documents regarding the underwriting standards of the underlying mortgage loans, but those statements varied from MBS to MBS, depending on which mortgage lenders had originated the loans. Nonetheless, the Second Circuit held that the named plaintiff had standing to bring claims on behalf of investors who purchased MBS "backed by loans originated by originators common to those backing" the named plaintiff's MBS. *NECA*, 693 F.3d at 164. Because the plaintiff's claims and the other investors' all turned on whether the originators had abandoned their stated

11

underwriting guidelines, the plaintiff's "claims raise[d] a sufficiently similar set of concerns to permit it to purport to represent" the other investors. *Id.*; *see also N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 128 (2d Cir. 2013) (discussing *NECA*).

Comparably, in the instant case, Plaintiffs allege that Fund I and Offshore Fund I were "feeder funds" for the Master Fund, which Fund II and Offshore Fund II also fed into.  4AC ¶¶ 38–44.  Plaintiffs' claims are premised largely on the investments that Defendants made in LightSquared using funds from the Master Fund, and any injuries associated with that investment would have affected all of the feeder funds—and their investors—in the same way.  And as in *NECA*, regardless of whether Plaintiffs and the investors in the other Funds received precisely the same disclosures, the misrepresentations on which Defendants' liability will turn were allegedly made to those other investors as well.  *Cf. Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*, — F.R.D. — , 2013 WL 2369674, at *11 (S.D.N.Y. May 31, 2013) ("It is sufficient that the plaintiff has pleaded that the defendant breached the same obligations in the same way in connection with the trusts in which the plaintiff invested and the trusts in which putative class members invested, that those trusts were substantially similar, and that those breaches by the defendant caused injury to the plaintiff and to the putative class in the same way.").  Indeed, Defendants do not even try to distinguish *NECA*, pointing instead to a single district court case from 2008.  *See* Harbert Br. at 4 n.5 (citing *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 530–32 (S.D.N.Y. 2008)).  Accordingly, Plaintiffs have standing to bring direct claims on behalf of investors in Fund II and Offshore Fund II.

### 2.  Some of Plaintiffs' Purportedly Direct Claims Are Derivative

As a second preliminary matter, Defendants argue that many of Plaintiffs' claims may be asserted only as derivative claims, not as direct claims.  *See* Harbinger Br. at 20 (breach of

fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment); Harbert Br. at 25 & n.38 (aiding and abetting breach of fiduciary duty, fraud, and negligent misrepresentation). Whether Plaintiffs' claims are derivative or direct is a question of state law, *see Seidl v. Am. Century Cos.*, 713 F. Supp. 2d 249, 255 (S.D.N.Y. 2010), and the parties agree that Cayman law and Delaware law are substantially the same on this issue, *see ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1332 (S.D.N.Y. 1997); Pl. Opp. at 25; Harbinger Br. at 21.  The governing standard involves two questions: "Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy?"  *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004); *see also* Robinson Decl. ¶¶ 75–78 (under Caymans law, duty breached must be owed to shareholder, and shareholder must suffer injury separate from injury to corporation (citing *Johnson v. Gore Wood & Co.*, [2002] 2 A.C. (H.L.) 1, 35)).  In *Tooley*, the Delaware Supreme Court explicitly discarded a requirement that direct claims must allege a "special injury . . . separate and distinct from that suffered by other shareholders."  845 A.2d at 1035; *see also id.* at 1037 ("[A] direct, individual claim of stockholders that does not depend on harm to the corporation can . . . fall on all stockholders equally, without the claim thereby becoming a derivative claim.").  Thus, the relevant question is not whether all stockholders were harmed equally, but whether "the duty breached was owed to the stockholder and [whether] he or she can prevail without showing an injury to the corporation."  *Id.* at 1039.  While it is true that injuries to a corporation often affect all investors equally, the mere fact that all investors are affected equally is insufficient to show that the corporation, not the investor, was the one injured.

The same analysis applies to limited partnerships. *See Saltz v. First Frontier, L.P.*, 782 F. Supp. 2d 61, 78 (S.D.N.Y. 2010) (Sand, J.).  Plaintiffs spend several pages of their brief arguing

that a more "flexible" standard should apply to limited partnerships, but the cases on which they base that argument, *In re Cencom Cable Income Partners, L.P.*, No. Civ. A. 14634, 2000 WL 130629 (Del. Ch. Jan. 27, 2000), and *Anglo American Securities Fund, L.P. v. S.R. Global International Fund, L.P.*, 829 A.2d 143 (Del. Ch. 2003), predate *Tooley* and have been effectively limited to their facts by later cases—they do not stand for a general principle that courts should disregard *Tooley* in the limited partnership context. *See Saltz*, 782 F. Supp. 2d at 78 n.15; *Metro. Life Ins. Co. v. Tremont Grp. Holdings, Inc.*, No. Civ. A. 7092-VCP, 2012 WL 6632681, at *10–11 (Del. Ch. Dec. 20, 2012); *Agostino v. Hicks*, 845 A.2d 1110, 1125 (Del. Ch. 2004).   Additionally, those two cases are readily distinguishable. *Cencom* involved a dissolving partnership: "the partnership's business [was] complete, the liquidation sale [was] over, and the only two parties to the partnership [were] now clearly adversaries." 2000 WL 130629, at *4. Those factors made both of the justifications for requiring partners to bring derivative claims— the consolidation of lawsuits and a preference for intra-partnership dispute resolution— inapplicable. *Id.* at *5.  None of those factors is present here.  In *Anglo American*, the court was concerned that channeling recoveries to the fund itself would unfairly reward new partners and deny relief to the partners who were actually harmed, some of whom had left the fund. 829 A.2d at 152–53; *see Saltz*, 782 F. Supp. 2d at 78 n.15 (distinguishing *Anglo American* on that basis). In this case, by contrast, Plaintiffs remain invested and have not alleged the existence of any new partners who would receive a windfall if the Funds were to recover.  In light of these distinctions, the Court sees no reason to deviate from *Tooley*'s formulation of the governing standard.

Under that standard, Plaintiffs' unjust enrichment claims are derivative.  Those claims revolve around the allegation that Defendants' management and performance fees were

artificially high because they were calculated as a percentage of the Funds' asset values, which were "grossly inflated" by Defendants. 4AC ¶ 255. However, Plaintiffs themselves allege that these management fees were paid directly from the Funds, not from investors, 4AC ¶ 256, meaning that the Funds themselves were injured and any recovery would flow to them. These are prototypical derivative claims. *Cf. Feldman v. Cutaia*, 956 A.2d 644, 656 & n.36 (Del. 2007) (claims premised on "the excessive issuance of stock options and payment of fees to executives [are] derivative" (citing *Kramer v. W. Pac. Indus.*, 546 A.2d 348 (Del. 1988))).

Defendants argue that Plaintiffs' fiduciary duty claims should be classified as derivative for similar reasons. But Defendants mischaracterize those claims when they state, in conclusory fashion, that "any injury necessarily would have been suffered by the Funds through the depletion of their assets." Harbinger Br. at 20–21. In fact, the purportedly direct fiduciary duty claims in Count IV of the 4AC rest on the assertion that Defendants owed Plaintiffs, as limited partners, a fiduciary duty of disclosure independent of the duties that Defendants owed the Funds. (Defendants never contest that they owed Plaintiffs such a duty.) Plaintiffs argue that Defendants breached that duty by making "numerous false statements and omissions about the risk associated with the LightSquared venture, the personal loan to Falcone, and the side agreements with large institutional investors to receive preferential treatment of redemption requests." Pl. Opp. at 27; *see* 4AC ¶¶ 258–63. As a result of Defendants' alleged breaches, Plaintiffs claim, they "were lulled into remaining invested and then were unable to redeem and leave the Fund." Pl. Opp. at 27.

Delaware law is clear that fiduciary duty claims alleging fund mismanagement are derivative. *See, e.g.*, *Saltz*, 782 F. Supp. 2d at 79 ("A claim for deficient management or administration of a fund is 'a paradigmatic derivative claim.'" (quoting *Albert v. Alexander*

15

*Brown Mgmt. Servs., Inc.*, Nos. Civ. A. 762-N, Civ. A. 763-N, 2005 WL 2130607, at *12–13
(Del. Ch. Aug. 26, 2005))); *San Diego Cnty. Emps. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104,
127 (S.D.N.Y. 2010) (Batts, J.) ("The first allegation—that Defendants broke fiduciary duties to
[Plaintiff] by failing to manage properly the Fund—is . . . a classic claim of fund
mismanagement that belongs to the Fund, and is therefore derivative.").  For this reason, to the
extent that Plaintiffs' fiduciary duty claims arise from either the LightSquared investment itself
or the personal loan made to Falcone by the Special Situations Fund, their claims are derivative.[2]
The ill-fated investment hurt the Funds by depleting their assets, an injury that the limited
partners experienced only indirectly by virtue of their investment in the Funds.  *See In re
Goldman Sachs Mut. Funds*, No. 04 Civ. 2567 (NRB), 2006 WL 126772, at *6 (S.D.N.Y. Jan.
17, 2006); *cf. Saltz*, 782 F. Supp. 2d at 79 ("The diminution in the value of partnership interests
clearly is not a direct injury, because '[t]he diminution in the value of [the] interests flows from
the damage inflicted directly on the Partnership.'" (first alteration in original) (quoting *Litman v.
Prudential-Bache Props., Inc.*, 611 A.2d 12, 16 (Del. Ch. 1992))).  Likewise, the personal loan to
Falcone was allegedly made at a below-market interest rate, meaning that the Special Situations
Fund was insufficiently compensated for the risk it took.  4AC ¶ 107.  The loan therefore injured
the Fund directly, and the Fund's limited partners only indirectly.

---

[2] The language in the 4AC's direct fiduciary duty count (Count IV) focuses on the false statements and omissions
allegedly made by Defendants.  4AC ¶¶ 259–63.  However, as with the other counts in the 4AC, Count IV
"incorporate[s] by reference each and every allegation set forth above as though fully set forth herein, except for
those averring fraud."  4AC ¶ 258.  Many of those allegations concern improper conduct—such as the LightSquared
strategy, the personal loan to Falcone, the preferential redemption agreements, and market manipulation—not just
misrepresentations and omissions.  With respect to market manipulation, Defendants never actually allege any
injury, to either themselves or the Funds, independent of the injuries caused by the LightSquared investment: their
theory is that the market manipulation made Defendants, and thus LightSquared, less politically palatable, which
helped lead to the FCC's eventual revoking of LightSquared's conditional license.  4AC ¶ 136.

On the other hand, to the extent that Plaintiffs' claims involve the nondisclosure of information (and nondisclosure appears to be the gravamen of Count IV), Delaware cases establish that these so-called "holding" claims are direct. In *Albert v. Alexander Brown Management Services*, an investor brought fiduciary duty claims against a fund manager for not disclosing to investors that its funds had unhedged positions and liquidity problems, and had defaulted on credit agreements. *See* 2005 WL 2130607, at *2–3. The Delaware Court of Chancery held that those claims were direct: "Generally, non-disclosure claims are direct claims," and under *Tooley*'s first prong, "[a]ny harm was to the [investors], who either lost their opportunity to request a withdrawal from the Funds from the Managers, or to bring suit to force the Managers to redeem their interests." *Id.* at *12. Additionally, under *Tooley*'s second prong, "the [investors] would receive any recovery, not the Funds." *Id.* at *13. "While the best remedy for a disclosure violation is to force the partnership to disclose the information, . . . the court may find it appropriate to grant monetary damages," which would be paid to the investors. *Id.* Some district courts have relied on *Albert* in holding that fiduciary duty claims alleging nondisclosure are direct, not derivative, *see Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 401 n.9 (S.D.N.Y. 2010) (Marrero, J.); *In re Parkcentral Global Litig.*, 2010 WL 3119403, at *5–6 (N.D. Tex. Aug. 5, 2010), and the Delaware Court of Chancery has approvingly cited *Albert* (although in dicta) for the proposition that "non-disclosure claims are direct claims where a defendant has 'failed to disclose material information when they had a duty to disclose it,'" *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1181 n.54 (Del. Ch. 2006) (quoting *Albert*, 2005 WL 2130607, at *12)).[3]

---

[3] *Manzo v. Rite Aid Corp.*, No. Civ. A. 18451-NC, 2002 WL 31926606, at *6 (Del. Ch. Dec. 19, 2002), which Defendants cite in a different context, Harbinger Br. at 21 n.31, reaches a contrary conclusion. However, *Manzo*

Although some other courts have held that "holding" claims are derivative because any nondisclosure affects all investors equally, *see, e.g.*, *Smith v. Waste Mgmt. Inc.*, 407 F.3d 381, 384–85 (5th Cir. 2005); *Maounis*, 749 F. Supp. 2d at 127; *Broyles v. Cantor Fitzgerald & Co.*, Nos. 10-864-JJB, 10-857-JJB, 2013 WL 1681150, at *9 (M.D. La., Apr. 17, 2013), that logic implicitly adopts the "special injury" requirement that *Tooley* rejected.[4] Defendants' fiduciary duty of disclosure flows to limited partners, not to the Funds, and *Albert* persuasively explains why Plaintiffs' injuries arising from Defendants' alleged misrepresentations and omissions do not depend on an injury to the Funds. Accordingly, the Court concludes that Plaintiffs' breach of fiduciary duty claims are direct insofar as they involve those misrepresentations and omissions.

For similar reasons, Harbert's argument that Plaintiffs' negligent misrepresentation and fraud claims are derivative also fails. Harbert Br. at 25 n.38; Harbert Reply at 8–9. Those claims primarily involve misrepresentations and omissions that Defendants allegedly made in connection with the LightSquared investment, which induced Plaintiffs to invest in the Funds and, once they had invested, caused them to forbear from redeeming their investments. 4AC ¶¶ 241–51. Insofar as those claims arise from Defendants' actions while Plaintiffs were already invested in the Funds, they are subject to the same analysis as the "holding" claims discussed above, and therefore may be brought directly. And to the extent that Plaintiffs' negligent misrepresentation and fraud claims involve their initial decision to invest, courts consider such

---

predated *Tooley*, and it appears to rest on the "special injury" requirement that *Tooley* rejected. *See Manzo*, 2002 WL 31926606, at *6 ("To state a direct claim on [the basis of nondisclosure], plaintiff must identify some resultant injury that either affects some shareholders disproportionately to their *pro rata* stock ownership, or affects those rights of shareholders that are traditionally regarded as 'incidents' of stock ownership.").

[4] In a non-binding decision, *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 621 (2d Cir. 2012), the Second Circuit summarily affirmed a district court's holding that the plaintiff lacked standing to assert a holding claim, but it did not squarely address the rejection of the "special injury" requirement in *Tooley*.

"inducement" claims to be direct as well.  *See, e.g., Saltz*, 782 F. Supp. 2d at 79 ("[R]ecovery on

a claim based solely on inducement would only flow to those individuals, such as [Plaintiffs],

who were so induced." (alterations in original) (quoting *Stephenson v. Citco Grp., Inc.*, 700 F.

Supp. 2d 599, 612 (S.D.N.Y. 2010)) (internal quotation marks omitted)).  Thus, Plaintiffs may

bring their fraud and negligent misrepresentation claims directly.

Plaintiffs also argue that Defendants owed them a fiduciary duty to treat all of the Funds'

investors equally, 4AC ¶ 260, a duty that Defendants allegedly breached by signing "side letters"

granting large investors preferential redemption rights in exchange for approving restrictions on

other investors' redemption rights, 4AC ¶¶ 109–111.  Plaintiffs' injury in connection with these

allegations does not depend on an injury to the Funds; in fact, the Funds were seeking to benefit

at Plaintiffs' expense by locking up their money while the Funds' assets were declining—in part

because of the large investors' redemptions.  4AC ¶ 138.  None of the authority cited by the

parties is directly on point, but allegations involving the enrichment of majority investors at the

expense of the minority have been held to state direct claims.  *See, e.g., Gentile v. Rossette*, 906

A.2d 91, 99–103 (Del. 2006) (holding that minority stockholders had a direct claim where

controlling stockholder caused company to issue excessive shares in exchange for the

stockholder's own assets, thereby "increas[ing] the controlling stockholder's percentage of stock

ownership at the expense of the minority"); *In re Tristar Pictures, Inc.*, 634 A.2d 319, 332–33

(Del. 1993) (same); *see also Feldman*, 956 A.2d at 655–59; *Carsanaro v. Bloodhound Techs.,

Inc.*, 65 A.3d 618, 658–59 (Del. Ch. 2013).  Similarly, Defendants in this case were allegedly

conferring an "exclusive benefit," *Feldman*, 956 A.2d at 657, on a subset of investors in

exchange for votes intended to injure other investors.  To the extent that Plaintiffs' breach of

fiduciary duty claims rest on those allegations, they are direct, not derivative.

19

Courts are not always clear about whether purportedly direct claims that are actually derivative must be dismissed on that basis, or instead can survive if the plaintiff making the claim has adequately alleged derivative standing. *Compare, e.g.*, *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, — F. Supp. 2d. — , 2013 WL 1285453, at *7–8 (S.D.N.Y. Mar. 29, 2013) (Seibel, J) (dismissing claims outright upon finding that they were derivative), *and VEC Corp. of Del. v. Hilliard*, No. 10 Civ. 2542 (VB), 2011 WL 7101236, at *5 (S.D.N.Y. Dec. 13, 2011) (same), *with NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, No. 10 Civ. 5762 (PAE), 2013 WL 489020, at *10 (S.D.N.Y. Feb. 8, 2013) (finding that some claims were derivative and then asking whether plaintiff had derivative standing). In this case, Plaintiffs have explicitly brought similar claims both directly and derivatively, and they have had the chance to amend their Complaint in light of Defendants' arguments. The Court therefore concludes that dismissal is appropriate. *Cf. Newman v. Family Mgmt. Corp.*, 748 F. Supp. 2d 299, 316 & n.13 (S.D.N.Y. 2010) (Sand, J.) (dismissing purportedly direct claims upon finding that they were derivative and citing the fact that "Plaintiffs do in fact bring substantively identical claims against [certain] Defendants derivatively" as "further support for dismissal"), *aff'd*, No. 11-622-cv, 2013 WL 3712404 (2d Cir. July 16, 2013).

To summarize, Plaintiffs' unjust enrichment claims may be brought only as derivative claims, if at all, and therefore must be dismissed. However, Plaintiffs' fraud, negligent misrepresentation, and breach of fiduciary duty claims are direct to the extent that they rest on Defendants' alleged misrepresentations and omissions and the preferential redemption status granted to certain large investors. Turning finally to Plaintiffs' claims for aiding and abetting breach of fiduciary duty, Defendants are correct that to the extent that the underlying breach of fiduciary duty claims are dismissed as derivative, the attendant aiding and abetting claims must

20

also be dismissed. *See Manzo v. Rite Aid Corp.*, No. Civ. A. 18451-NC, 2002 WL 31926606, at

*6 (Del. Ch. Dec. 19, 2002).  As a corollary, there is no basis for dismissing Plaintiffs' aiding

and abetting claims with respect to the surviving underlying claims.

### 3.  SLUSA Precludes Plaintiffs' Remaining Direct Claims to the Extent That They Relate to the Purchase of SkyTerra

Having addressed these preliminary matters, the Court turns now to a basis for dismissal

that Defendants argue affects all of Plaintiffs remaining direct claims.  Defendants argue that all

of Plaintiffs' direct claims are precluded by SLUSA because "the alleged misrepresentations and

manipulations are in connection with the purchase or sale of a covered security."  Harbinger Br.

at 12.[5]  With respect to certain of Plaintiffs' direct claims, the Court agrees.

As the Second Circuit has recently noted, SLUSA was passed by Congress in furtherance

of its "desire to have class actions affecting the national securities markets be more completely

governed by federal securities laws."  *In re Herald, Primeo, and Thema*, No. 12 Civ. 156, slip

op. at 13 (2d Cir. Sept. 16, 2013).  The "broadly worded" language of SLUSA provides that no

action seeking damages on behalf of fifty prospective class members "based upon the statutory

or common law of any State or subdivision thereof may be maintained in any State or Federal

---

[5] In fact, Defendants assert that all of Plaintiffs' "class claims" are precluded by SLUSA, Harbinger Br. 11, and Plaintiffs actually describe all of their claims as class claims, 4AC ¶ 235.  In any event, SLUSA explicitly does not preclude "exclusively derivative" actions brought by plaintiffs on behalf of a corporate entity.  15 U.S.C. § 78bb(f)(5)(C) ("[T]he term 'covered class action' does not include an exclusively derivative action brought by one or more shareholders on behalf of a corporation.").  Because the Second Circuit requires courts to conduct a claim-by-claim analysis under SLUSA, *see Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 47 (2d Cir. 2005), *rev'd on other grounds*, 547 U.S. 71 (2006); *In re Merkin*, 817 F. Supp. 346, 359 (S.D.N.Y. 2011), Plaintiffs' claims that are "exclusively derivative" are not precluded, even if some of their direct claims are.  *See also Newman*, 748 F. Supp. 2d at 311–18 (assessing plaintiffs' direct claims under SLUSA while assessing plaintiffs' derivative claims under separate grounds for dismissal).  Defendants do not argue that the asserted derivative claims are somehow not "exclusively derivative," so the Court assumes that their preclusion arguments are aimed at Plaintiffs' direct claims.

court by any private party alleging . . . a misrepresentation or omission of a material fact in
connection with the purchase or sale of a covered security." *Id.* (citing 15 U.S.C. § 78bb(f)(1)).

Thus, to be precluded by SLUSA, "(1) the suit must be a 'covered class action'; (2) the
action must be based on state or local law; (3) the action must concern a 'covered security'; and
(4) the defendant must have misrepresented or omitted a material fact or employed a
manipulative device or contrivance 'in connection with the purchase or sale' of that security."
*Newman*, 748 F. Supp. 2d at 311–12.  A "covered class action" is one that seeks damages on
behalf of a class of 50 or more people and in which common questions of law or fact
predominate over questions affecting only individual members of the class.  15 U.S.C.
§ 78bb(f)(5)(B).  A "covered security" includes any security that is listed or authorized for listing
on the New York Stock Exchange or another national exchange, as well as securities issued by
investment companies registered with the SEC.  *Newman*, 748 F. Supp. 2d at 312 (citing 15
U.S.C. § 77r(b)).

"Any claim may trigger SLUSA preemption if the basis of that claim sounds in fraud or
relies on alleged misstatements or omissions."  *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp.
2d 458, 480 (S.D.N.Y. 2012) (citing *In re Merkin,* 817 F.Supp.2d 346, 359 (S.D.N.Y. 2011)),
*aff'd*, No. 12-3859, 2013 WL 1982534 (2d Cir. May 15, 2013).  Thus, SLUSA is triggered not
only when a complaint alleges either "an explicit claim of fraud or misrepresentation (e.g.,
common law fraud, negligent misrepresentations, or fraudulent inducement)," but also when a
complaint alleges "other garden-variety state law claims that sound in fraud."  *In re Kingate
Mgmt. Ltd. Litig.,* No. 09 Civ. 5386 (DAB), 2011 WL 1362106, at *6 (S.D.N.Y. Mar. 30, 2011)
(quoting *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.,* 341 F. Supp. 2d 258,
261 (S.D.N.Y. 2004)) (internal quotation marks omitted).  A "garden-variety state law claim"

22

sounds in fraud when, "although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim." *Id.*

Because plaintiffs may seek to avoid SLUSA preclusion through "artful pleading," courts are also required to "look beyond the face of the complaint to analyze the substance of the allegations made." *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 34 (2d Cir. 2005) ("*Dabit I*"), *rev'd on other grounds,* 547 U.S. 71 (2006) ("*Dabit II*"); *see, e.g.*, *McCullagh v. Merrill Lynch & Co.,* No. 01 Civ. 7322 (DAB), 2002 WL 362774 (S.D.N.Y. 2002) (dismissing as SLUSA-precluded plaintiffs' breach of fiduciary duty and unjust enrichment claims against a securities broker that allegedly failed to provide customers with objective research and advisory services because the substance of the allegations made were connected with the purchase or sale of covered securities); *In re Livent, Inc. Noteholders Securities Litigation,* 151 F. Supp. 2d 371, 442–43 (S.D.N.Y. 2001) (Marrero, J.) (dismissing as SLUSA-precluded plaintiffs' state law fraud, negligence, and negligent misrepresentation claims arising from company's manipulations of its books because the substance of the allegations was connected with the purchase or sale of covered securities).

The parties agree that the present action meets three of the four elements required to trigger SLUSA preclusion: it (1) involves a covered class action (2) brought under state law (3) that alleges the Defendants made material misrepresentations. Pl. Opp. at 17–18. The only disputed issue for purposes of determining SLUSA preclusion, as the parties acknowledge, is whether the Defendants' alleged misrepresentations were in connection with the purchase or sale of a covered security. *Id.*

Plaintiffs concede that a large portion of their claims involve the Funds' purchase of one particular covered security—"publicly-traded SkyTerra stock"—before "Defendants took

[SkyTerra] private in 2009." Pl. Opp. at 18.  In fact, of the approximately five pages of briefing Plaintiffs devote to their discussion of SLUSA preclusion, four focus on whether the purchase of SkyTerra securities by Defendants meets SLUSA's "in connection with" requirement, with the final page devoted to a discussion that Plaintiffs themselves describe as concerning the remaining "misrepresentations and breached fiduciary duties that *do not relate in any way* to covered securities," *e.g.*, those involving the personal loan to Falcone and the preferential redemption agreements.  *Id.* at 21 (emphasis added).

Although Plaintiffs thus recognize that their claims involving Defendants' purchase of publicly traded SkyTerra stock "relate . . . to covered securities," they nonetheless argue that the misrepresentations they allege do not meet SLUSA's "in connection with" requirement because "plaintiffs purchased shares in hedge funds, rather than covered securities."  Pl. Opp. at 18 (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Bank of Am. Sec., LLC.*, 750 F. Supp. 2d 450, 453–54 (S.D.N.Y. 2010)).  This argument, however, was recently rejected by the Second Circuit in a case involving plaintiffs who invested into "feeder funds" that ultimately invested in Bernard L. Madoff Investment Securities ("BMIS"), which engaged in "a giant Ponzi scheme" based on the purported purchase and sale of covered securities.  *Herald*, slip op. at 7.  In *Herald*, the Circuit affirmed the District Court's holding that "since Madoff's purported trading strategy utilized indisputably covered securities, and since all the claims of misconduct . . . arose 'in connection with' Madoff Securities' securities fraud, SLUSA applied."  *Id.* at 13–14; *see also Dabit II*, 547 U.S. at 85 (holding that the "in connection with" standard is met when "the fraud alleged 'coincide[s] with a securities transaction—whether by plaintiff or by someone else" and rejecting the idea that SLUSA preclusion applies merely in those instances when "the plaintiff himself was defrauded into purchasing or selling particular securities").

24

In *Herald*, the Second Circuit explicitly rejected the plaintiffs' attempt to evade SLUSA preclusion by drawing a distinction between their investments in "feeder funds" and "Madoff's 'downstream' transactions in covered securities." *Herald*, slip op. at 14. Instead, the Circuit found, SLUSA preclusion applied because the defendants' liability was "predicated on . . . [their] relationship with, and alleged assistance to, Madoff Securities' Ponzi scheme, which indisputably engaged in purported investments in covered securities on U.S. exchanges." *Id.*

Because *Herald* was decided after briefing on the current motions was complete, the parties submitted letters addressing the case. In their letter to the Court, Plaintiffs argue that *Herald* is distinguishable because in this case, "the allegations of material omissions and misrepresentations are directly predicated on [Plaintiffs'] purchase and sale of 'noncovered' securities"—specifically, their investment into the feeder fund—while in *Herald*, the allegations centered on the defendants' knowledge and assistance with the "Madoff [Securities'] Ponzi scheme, which indisputably engaged in purported investments in covered securities on U.S. exchanges." Pl. Letter at 2. For several reasons, that analysis is unpersuasive.

Though the defendants in *Herald* were the "banks at which Madoff Securities' accounts were held" and Defendants are the individuals and entities responsible for investing the money supplied by the feeder funds in which Plaintiffs invested, the cases are closely analogous. Plaintiffs invested in hedge funds, which are not covered securities, but their claims revolve around Defendants' role in an allegedly improper "strategy" to take control of SkyTerra (later LightSquared), Pl. Opp. at 21, a strategy that—by Plaintiffs' own admission—involved purchases of covered SkyTerra securities. Similarly, the plaintiffs in *Herald* did not themselves purchase covered securities, but their claims centered on the defendants' role in Madoff's Ponzi scheme, which involved purported investments in covered securities. Thus, to the extent that

25

Plaintiffs' claims are predicated on Defendants' role in a scheme involving covered securities, they are precluded. *See Herald*, slip op. at 14 ("[T]he liability of JP Morgan and BNY is predicated . . . on the banks' relationship with, and alleged assistance to, Madoff Securities' Ponzi scheme, which indisputably engaged in purported investments in covered securities.").

Moreover, the fact that Plaintiffs style their claims as state-law tort claims and not securities fraud claims is not sufficient to prevent SLUSA preclusion.  As the Circuit noted in *Herald*, "even though the complaints do not style their claims against JPMorgan and BNY as securities fraud claims, the complaints' allegations nonetheless are precluded by SLUSA" because "the fact that plaintiffs allege claims sounding in negligence . . . and the like does not preclude preclusion under SLUSA where, as here, it is obvious that the banks' liability, under any claim, is premised on their participation in, knowledge of, or a minimum, cognizable disregard of Madoff Securities' securities fraud." *Herald*, slip op. at 15, 16 n.7.

Indeed, putting the intricacies of *Herald* to the side, a majority of district courts in this Circuit have determined that SLUSA precludes state law claims against "feeder funds" when the actual purchase and sale of covered securities was conducted by third party funds into which the feeder funder ultimately invested plaintiffs' money. *See, e.g.*, *Kingate*, 2011 WL 1362106, at *9 (dismissing investors claims against defendants associated with two "feeder funds" that channeled investments into BMIS under SLUSA); *In re J.P. Jeanneret Assoc's, Inc.*, 769 F. Supp. 2d 340, 378–79 (S.D.N.Y. Jan. 31, 2011) (McMahon, J.) (state law claims against defendants associated with investment firm which invested with BMIS barred by SLUSA); *Newman.*, 748 F. Supp. 2d at 311–13 (dismissing investors' state law claims against a "sub-feeder fund" that invested in "feeder funds" that in turn invested in BMIS under SLUSA); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 429–31 (S.D.N.Y. Oct. 5, 2010) (Sand, J.)

26

(dismissing investors' state law claims against investment advisors, feeder fund, asset management consultant, and individuals associated with investment firm and fund arising out of investments in BMIS under SLUSA); *Barron v. Igolnikov*, No. 09 Civ. 4471 (TPG), 2010 WL 882890, at *3–5 (S.D.N.Y. Mar. 10, 2010) (state law claims against defendants associated with feeder fund that channeled investments into Madoff-operated funds under SLUSA); *Backus v. Conn. Cmty. Bank, N.A.*, No. 3:09–CV–1256, 2009 WL 5184360, at *5–10 (D. Conn. Dec. 23, 2009) (dismissing investors' state law claims against bank managing retirement funds pursuant to custodial agreements that ultimately invested in BMIS under SLUSA). The Court agrees with those courts' analysis and therefore rejects Plaintiffs' contention that because plaintiffs purchased shares in hedge funds, rather than covered securities, Pl. Opp. at 18, SLUSA does not preclude their claims.

With the exception of certain allegations discussed below that Plaintiffs argue "do not relate in any way to covered securities," Pl. Opp. at 21, Plaintiffs' chief argument against preclusion is the one that the Court has just rejected, *i.e.*, that their allegations do not meet SLUSA's "in connection with" requirement. In other words, Plaintiffs do not, for the most part, dispute that their allegations related to the purchase of SkyTerra involve "covered securities." Nonetheless, the Court has considered that question, in part because Defendants themselves call attention to a purchase of SkyTerra stock in September of 2008 that occurred not through an open-market purchase, but rather through a negotiated acquisition of privately issued, non-voting SkyTerra shares from a company called TerreStar.[6] Harbinger Br. at 12–13; *see* 4AC ¶ 59. With

---

[6] Plaintiffs never mention TerreStar by name. However, while it is well-settled that a court may not consider documents outside the pleadings on a Rule 12(b)(6) motion, the Court is authorized to consider documents that are "integral to the complaint." *Bill Diodato Photography LLC v. Avon Products, Inc.*, No. 12 Civ. 847 (RWS), 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012). To be "integral to a complaint, the plaintiff must have (1) actual

respect to that transaction, Defendants proffer that the relevant "purchase or sale of a covered security" was the Funds' predicate acquisition of approximately 49% of TerreStar's NASDAQ-listed common stock; they argue that Plaintiffs' claims concerning the Funds' purchase of SkyTerra securities are therefore connected with "the Funds' investment in covered securities issued by TerreStar." Harbinger Br. at 12–13, 6–7.

Plaintiffs do not dispute this argument or attempt to separate the investment in TerreStar from the open-market purchases of SkyTerra stock. Indeed, they describe Defendants' "LightSquared strategy," Pl. Opp. at 21, as a singular effort in which Defendants "poured billions of dollars of investors' money into the LightSquared venture" in order to fulfill Defendant Falcone's "'vision' of being the founder of a next-generation 4G satellite-terrestrial wireless broadband company." 4AC ¶¶ 11,10. Given that Plaintiffs themselves have categorized claims arising from Defendants' "conceal[ing] the LightSquared strategy" as distinct from claims that "do not relate in any way to covered securities," Pl. Opp. at 21, the Court concludes that all of Plaintiffs' claims predicated upon Defendants' purchase of SkyTerra are precluded under SLUSA.

Plaintiffs do argue that some of their allegations are not predicated upon Defendants' acquisition of SkyTerra. In particular, Plaintiffs point to the "below-market loan" to Falcone from the Special Situations Fund and Defendants' "undisclosed, preferential redemption

---

notice of the extraneous information and (2) relied upon the documents in framing the complaint." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp.2d 54, 60 (S.D.N.Y. 2010) (citations and internal quotation marks omitted). In this case, the information regarding the Defendants' purchase of SkyTerra securities from TerreStar was based on publicly filed SEC documents of which Plaintiffs presumptively had notice. Furthermore, these documents were necessarily relied upon to frame the 4AC because they form the basis for any factual pleadings based on that sale of SkyTerra securities to Defendants. Therefore, the Court has considered the documents underpinning the purchase of SkyTerra securities in September of 2008 called to the Court's attention by Defendants.

agreements" with large institutional investors.  4AC ¶¶ 106-12.  Plaintiffs also argue that claims

arising from alleged misstatements and omissions connected to SkyTerra after it was taken

private and renamed LightSquared do not involve any "covered securit[ies]" for purposes of

SLUSA preclusion.  Pl. Opp. at 22.

      While those arguments may have merit, each of the 4AC's counts—alleging fraud,

negligent misrepresentation, breach of fiduciary duty, and aiding and abetting breach of fiduciary

duty—begins by "incorporat[ing] by reference each and every allegation set forth above as

though fully set forth herein."  4AC ¶¶ 241, 247, 258, 280.  And many of the allegations

throughout the 4AC rely on omissions or misstatements regarding SkyTerra.  Plaintiffs

themselves argue that their fraud claim is premised on the fact that "Defendants made materially

false and misleading statements about the Funds' investment strategies and risk control

measures," as well as "material omissions about the LightSquared investment."  Pl. Opp. at 28

(citing 4AC ¶¶ 143–191, 8, 11, 12, 145, 150, 152, 154,155, 168, 170, 171, 177, 179, 183, 186,

187, 195).  While Plaintiffs describe these alleged fraudulent statements and omissions as about

"LightSquared," a closer look at the cited paragraphs reveals that many of the statements and

omissions center on the acquisition of SkyTerra.  Similarly, in defending their negligent

misrepresentation claim, Plaintiffs point to Defendants' alleged misrepresentations in OMs

regarding the motivation to purchase SkyTerra securities; investor conference calls which

misrepresented the Funds' risk profile, given the SkyTerra investment; and due diligence

questionnaires that misrepresented the Funds' diversification strategy, given the concentration of

the Funds' assets in SkyTerra.  Pl. Opp. at 46 (citing 4AC ¶¶ 142, 149, 232–233, 158).

Plaintiffs' fiduciary duty and aiding and abetting claims rely on the same misrepresentations and

omissions.  Pl. Opp. at 50.  Thus, to the extent that Plaintiffs' claims are not predicated on

Defendants' acquisition of SkyTerra, the Court cannot evaluate those claims for the purpose of deciding these motions to dismiss given the summary incorporation of all allegations and the intermingling of various allegations throughout the 93 pages of the 4AC.

Given the circumstances, Defendants urge the Court to dismiss all direct claims as precluded under SLUSA. Harbinger Br. at 11. The Court is tempted to do so for several reasons. For one, it is not the role of the Court to "act like a prospector panning for a few non-precluded theories amid a river of precluded ones." *Instituto De Prevision Militar v. Merrill Lynch*, 546 F. 3d 1340, 1350 (11th Cir. 2008). Moreover, Plaintiffs have already been given an opportunity to amend their complaint in light of Defendants' arguments for dismissal, and typically this Court will not allow re-pleading in this context. Ind. Rules of Prac. 3F. However, unusual circumstances require a deviation from that practice here. First, the Court's SLUSA analysis is heavily reliant on the Second Circuit's decision in *Herald*, which was handed down after Plaintiffs had their opportunity to amend and even after full briefing on the motions to dismiss. Additionally, Plaintiffs have at least identified some allegations that may comprise non-precluded claims. Pl. Opp. at 22. Although these claims may be subject to dismissal based on other arguments Defendants raise in their briefs, Harbinger Br. at 13–19, 23–25; Harbert Br. at 4–23, Defendants' briefing is focused on the larger set of allegations contained in the 4AC, including those allegations which go to precluded claims. In light of these considerations, the Court will allow Plaintiffs a final opportunity to amend and the Defendants an opportunity to refocus their additional dismissal arguments on any non-precluded claims.

Accordingly, to the extent that any of Plaintiffs' claims are predicated on the purchase of SkyTerra, they are precluded under SLUSA and therefore DISMISSED WITH PREJUDICE. Plaintiffs are granted a final opportunity to re-plead their non-precluded claims in a Fifth

Amended Complaint.  If Plaintiffs choose to bring a Fifth Amended Complaint, Defendants may

again move to dismiss, including by re-raising arguments made in their current papers that have

not yet been addressed.  Plaintiffs will be given no further opportunity to re-plead in response to

any such motion to dismiss.

### B. Plaintiffs' Derivative Claims

As discussed above, Defendants challenge Plaintiffs' standing to bring direct claims on

behalf of investors in Fund II and Offshore Fund II.  But Defendants also challenge Plaintiffs'

standing to bring derivative claims on certain Funds' behalf—namely, Offshore Fund I (Count

V), the Master Fund (Count V), the Special Situations Offshore Fund (Count V), Fund I (Count

VI), Fund II (Count VI), and the Special Situations Fund (Count VII).[7]  The Court addresses

these grounds for dismissal below.

### 1. Plaintiffs Have Class Standing to Bring Derivative Claims on Fund II's Behalf

In Defendants' view, Plaintiffs' failure to invest in Fund II means that they cannot bring

derivative claims on its behalf.  Harbinger Br. at 21–22; Harbert Br. at 4; LTD Br. at 1.  As

Defendants point out, Delaware law requires anyone bringing a derivative suit to have invested

in the company or partnership at issue.  *See* 6 Del. C. § 17-1002 ("In a derivative action, the

plaintiff must be a partner or an assignee of a partnership interest at the time of bringing the

action and at the time of the transaction of which the plaintiff complains").

With respect to Fund II, Defendants miss the mark because they attempt to defeat class

standing with an argument about individual standing.  Plaintiffs argue that the claims they bring

---

[7] While Offshore Fund II argues that Plaintiffs may not bring derivative claims on its behalf, *see* LTD Br. at 1, in fact Plaintiffs have brought only direct claims on behalf of investors in Offshore Fund II, not derivative claims.

on behalf of the investors in Fund II implicate the "same set of concerns" as their own claims, and that their putative class should therefore include those investors. *See NECA*, 693 F.3d at 162. As discussed above, the Court agrees that investors in Fund II may be part of Plaintiffs' putative class under *NECA*. The fact that Plaintiffs have standing to represent those investors at this stage suggests that they may also represent them insofar as they are authorized to bring derivative claims brought on Fund II's behalf, because the allegations in the 4AC demonstrate that those derivative claims implicate the "same set of concerns" as Plaintiffs' direct claims. At least at this stage, whether Plaintiffs themselves invested in the Funds is not a dispositive issue in a putative class action like this. None of the cases that Defendants or Nominal Defendants cite discuss class standing, and they all predate *NECA*. *See Druck Corp. v. Macro Fund Ltd.* 290 F. App'x 441 (2d Cir. 2008); *In re Bank of N.Y. Derivative Litig.*, 320 F.3d 291 (2d Cir. 2003); *Butz v. Bliss*, No. 84 Civ. 7030 (JMW), 1987 WL 14634 (S.D.N.Y. July 15, 1987); *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143 (Del Ch. 2003); *Birch v. Sullivan*, [1957] 1 WLR 1247; *Svanstrom v. Jonasson*, [1997] CILR 192. Therefore, the named Plaintiffs' failure to invest in Fund II does not itself require dismissal, at this stage of a putative class action, of those derivative claims brought on behalf of Fund II.

### 2. Plaintiffs May Bring Derivative Claims Under Delaware Law

The parties agree that in a New York federal court sitting in diversity, the law of the company's place of organization governs the question of whether an investor in a company may bring a derivative action on the company's behalf. *See Galef v. Alexander*, 615 F.2d 51, 58 (2d Cir. 1980). Fund I, Fund II, and the Special Situations Fund are organized in Delaware. 4AC ¶¶ 38, 40, 42. Under Delaware law, a limited partner may bring a derivative action on a partnership's behalf only "if general partners with authority to do so have refused to bring the

action or if an effort to cause those general partners to bring the action is not likely to succeed."
6 Del. C. § 17-1001. Plaintiffs concede that they have not "made demand" of the General

Partners for those Funds—Harbinger GP and Special Situations GP—by asking them to bring

claims against Defendants, but they allege that such a request would be futile.

A plaintiff alleging demand futility is subject to a "stringent" pleading standard that

"differ[s] substantially" from the notice-pleading requirements otherwise contemplated by

Delaware law.[8] *In re INFOUSA, Inc., Shareholders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007)

(quoting *Zimmerman ex rel. Priceline.com, Inc. v. Braddock*, 2002 WL 31926608, at *7 (Del.

Ch. Dec. 20, 2002)). Like corporate boards of directors,[9] "general partners are presumed to

exercise business judgment in running the Partnership, and plaintiffs must allege otherwise with

particularity in order to establish demand futility and state a valid derivative claim." *Litman v.

Prudential-Bache Props., Inc.*, No. Civ. A. 18473-NC, 1993 WL 5922, at *5 (Del. Ch. Jan. 4,

2003); *see* 6 Del. C. § 17-1003 ("[T]he complaint shall set forth with particularity the effort, if

any, of the plaintiff to secure initiation of the action by a general partner or the reasons for not

making the effort."). Plaintiffs argue that they have adequately pled demand futility by alleging

facts that create a "reasonable doubt" that "the [General Partners] are disinterested and

independent." Pl. Opp. at 60 (quoting *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984),

*overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)). To rebut the initial

---

[8] Defendants assume that Delaware law regulates the pleading standards applicable to Plaintiffs' demand futility allegations, Harbinger Br. at 21–22, and Plaintiffs do not argue otherwise. In any case, the Federal Rules are in accord with Delaware law that demand futility must be pled "with particularity." Fed. R. Civ. P. 23.1(b)(3).

[9] The requirements for pleading demand futility in cases involving partnerships are "substantially the same" as the applicable standard in the corporate context. *Saltz*, 782 F. Supp. 2d at 80 (quoting *Gotham Partners v. Hallwood Realty Partners, L.P.*, No. Civ. A. 15754-NC, 1998 WL 832631, at *4 (Del. Ch. Nov. 10, 1998)) (internal quotation marks omitted).

presumption of independence, Plaintiffs must raise a reasonable doubt that the General Partners (1) "[are] personally interested in the outcome of the litigation, in that [they] will personally benefit or suffer as a result of the lawsuit," or (2) are "dominated" by or "beholden to" a personally interested party. *INFOUSA*, 953 A.2d at 985.

In the 4AC, Plaintiffs allege that the General Partners were not disinterested for two reasons. First, they "participated in, approved, and/or permitted the wrongs alleged herein and concealed or disguised those wrongs." 4AC ¶ 224. However, Delaware courts have rejected the suggestion that "any board approval of a challenged transaction automatically connotes 'hostile interest' and 'guilty participation' by directors, or some other form of sterilizing influence upon them." *Aronson*, 473 A.2d at 814. Because most derivative suits are predicated on alleged prior wrongdoing by the company, excusing demand based on directors' or general partners' acquiescence in the challenged conduct "would obviate the need for demand in practically every case." *Lewis v. Graves*, 701 F.2d 245, 248 (2d Cir. 1983) (applying Fed. R. Civ. P. 23.1), *cited in Aronson*, 473 A.2d at 818. Indeed, Plaintiffs appear to recognize as much: unlike the 4AC, their brief does not cite the General Partners' approval of the challenged conduct as a basis for excusing demand.

Plaintiffs also argue that the General Partners "are ultimately controlled by Falcone and the related Harbinger entities named as Defendants in this action," and that it would therefore be "futile to make a demand on the General Partners to sue the very people who control and make the decisions for the General Partners." 4AC ¶ 225. In response, Defendants point out that Delaware courts have long rejected the "bootstrap argument" that "demand is excused because the directors otherwise would have to sue themselves." *Aronson*, 473 A.2d at 818; *accord Litman*, 1993 WL 5922, at *4 ("the conclusory allegation that the general partners cannot be

34

expected to sue themselves . . . is insufficient as a matter of law" (citing *Spiegel v. Buntrock*, 571 A.2d 767, 774 n.14 (Del. 1990); and *Pogostin v. Rice*, 480 A.2d 619, 625 (Del. 1984))); *Saltz*, 782 F. Supp. 2d at 81–82; *In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F. Supp. 2d 419, 432–33 (S.D.N.Y. 2010). But Plaintiffs are not arguing that the General Partners cannot be expected to sue themselves—they are arguing that the General Partners cannot be expected to sue Falcone and the other Defendants. This is an argument that the General Partners were "dominated" by or "beholden to" an interested party. *INFOUSA*, 953 A.2d at 985.

The Court concludes that Plaintiffs have adequately pled demand futility on that basis. Plaintiffs assert that they "seek to hold Defendants personally liable" and that "Defendants control the Funds through the general partners." Pl. Opp. at 60. Although Plaintiffs do not cite any cases to this effect, a director's potential for "personal liability" can sometimes call her independence into doubt. *See Am Int'l Grp.*, 700 F. Supp. 2d at 431; *Wood v. Baum*, 953 A.2d 136, 141 & n.11 (Del. 2008); *Aronson*, 473 A.2d at 815. With respect to the corporate Defendants, however, the very concept of "personal liability" is inapposite, and the relevant question is whether the individuals responsible for the General Partners' decisionmaking would themselves face personal liability.

Throughout the 4AC, Plaintiffs allege that Falcone controlled the General Partners, ultimately grounding those allegations on diagrams illustrating the complex structure of the Harbinger Funds' ownership and control. 4AC ¶¶ 46, 48. One diagram shows that Falcone personally owns 50% of the vote in Harbinger GP, the General Partner for Fund I and Fund II, and is the "100% Managing Member" of Holdings, which owns the other 50% of the vote. 4AC ¶ 48. The second diagram shows that Falcone owns 50% of the vote in Harbinger Special Situations GP, the General Partner for the Special Situations Fund, and that Holdings owns the

other 50%. 4AC ¶ 46. By demonstrating Falcone's control over 100% of the vote in the two General Partners, Plaintiffs have sufficiently pled that they were "beholden" to him. *See Dean v. Dick*, No. 16566, 1999 WL 413400, at *3 (Del. Ch. June 10, 1999); *Brinckerhoff v. Enbridge Energy Co., Inc.*, No. 5526-VCN, 2011 WL 4599654, at *7 (Del. Ch. Sept. 30, 2011).

The Court also concludes that Falcone was personally interested in the outcome of this litigation such that the General Partners he controlled cannot be expected to have brought suit against him. Under Delaware law, "the mere threat of personal liability . . . is insufficient to challenge either the independence or disinterestedness of directors," and "a reasonable doubt that a majority of directors is incapable of considering demand should only be found where 'a substantial likelihood of personal liability exists.'" *Wood*, 953 A.2d at 141 n.11 (quoting *Aronson*, 473 A.2d at 814); *accord Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003) ("if the directors face a 'substantial likelihood' of personal liability, their ability to consider a demand impartially is compromised"). Whether such a "substantial likelihood" exists depends on whether the plaintiff has pled a "non-exculpated claim . . . based on particularized facts." *Guttman*, 823 A.3d at 501. In this case, exculpatory provisions in the Funds' governing documents protect Defendants from liability unless it "aris[es] from losses caused by [their] gross negligence, willful misconduct or violation of applicable laws." Harbinger Br. at 19 & n.26 (citing Leffell Decl. Ex. 25 § 3.03(a); Leffell Decl. Ex. 26 § 2.05).

In light of the allegations currently in the 4AC, the Court concludes that Plaintiffs have adequately pled willful misconduct for purposes of a motion to dismiss, meaning that Plaintiffs have also sufficiently pled that Falcone faces a "substantial likelihood" of personal liability. In particular, the allegations involving the personal loan to Falcone, if believed, suggest that Falcone was using his influence with the Funds to benefit himself at investors' expense and to

conceal that conduct from investors. *Cf. Ishimaru v. Fung*, No. Civ. A. 929, 2005 WL 2899680, at *12–13 (Del. Ch. 2005). Because the General Partners of Fund I, Fund II, and the Special Situations Fund were beholden to Falcone, Plaintiffs have standing to bring claims derivatively on behalf of those Funds.

### 3. Plaintiffs May Not Bring Derivative Claims Under Caymans Law

However, the Court concludes that Plaintiffs do not have standing to bring claims on behalf of the Cayman Funds: Offshore Fund I, the Master Fund, and the Special Situations Offshore Fund. As an initial matter, the Special Situations Offshore Fund is a limited partnership,[10] and Caymans law imposes a strict requirement that a limited partner seeking to bring a derivative suit on a limited partnership's behalf must actually make demand of the general partner. Whether demand would be futile is irrelevant. *See* Cay. Is. Exem. Lim. Part. § 13(2) (2011 Revision) ("A limited partner may bring an action on behalf of an exempted limited partnership if any one or more of the general partners with authority to do so have, without good cause, refused to institute such proceedings."); Robinson Decl. ¶¶ 63, 66. Plaintiffs never allege that they asked Special Situations Offshore GP to bring this action or that Special Situations Offshore GP refused to do so without good cause. As a result, their derivative claims on behalf of the Special Situations Offshore Fund must be dismissed.

---

[10] There is arguably a factual debate, never explicitly recognized as such by the parties, regarding whether the Special Situations Offshore Fund actually is a limited partnership. The 4AC states that "Harbinger Capital Partners Special Situations Offshore Fund L.P. . . . is an exempted company organized under the laws of the Cayman Islands." 4AC ¶ 41. Plaintiffs thus recognize that unlike the other Caymans Funds, the Special Situations Offshore Fund bears the designation "L.P."—as opposed to "Ltd."—but they also assert that it is an "exempted company," not an "exempted limited partnership." In their brief, Plaintiffs do not distinguish between the Special Situations Offshore Fund and the other Caymans Funds. However, Nominal Defendants explicitly state that the Special Situations Fund is a limited partnership, LP Br. at 2, and given the 4AC's ambiguity, the Court assumes that they are correct. Nothing ultimately turns on this assumption because, as explained in the text, the derivative claims brought on behalf of the Caymans exempted companies are also dismissed, although for different reasons.

Unlike the Special Situations Offshore Fund, Offshore Fund I and the Master Fund are Caymans exempted companies.  4AC ¶¶ 39, 44.  Plaintiffs concede that they did not invest in the Master Fund, but they argue that they should be able to sue "double derivatively" on its behalf because Caymans law authorizes a plaintiff to bring a "derivative action on behalf of a company in which he is a shareholder, in respect of a wrong done to a subsidiary of that company."[11]  To preclude Plaintiffs from bringing such a suit on the Master Fund's behalf on the ground that the Funds in which Plaintiffs invested do not "wholly own" the Master Fund would, Plaintiffs contend, "elevate[] form over substance."  Pl. Opp. at 16–17.  In response, Nominal Defendants argue that the relationship between the Master Fund and its "feeder funds" is insufficiently analogous to the parent-subsidiary relationship to support Plaintiffs' double-derivative theory of standing.  LTD Reply at 3–4.

The rationale for authorizing double-derivative standing is that an alleged wrongdoer's control over a parent implies that the wrongdoer can prevent the parent's subsidiary from bringing suit.  LTD Reply at 4 (citing *Renova Res. Private Equity Ltd. v. Gilbertson*, [2009] CILR 268, 294–95).  And because injuries inflicted on subsidiaries flow through to a parent's investors, those investors should be able to sue derivatively on the subsidiary's behalf; analogously, Plaintiffs claim that the injuries inflicted on the Master Fund flowed through to the feeder funds in which they invested.  But the rationale for allowing double-derivative suits would seem to apply with equal force whenever the subsidiary is effectively controlled by the alleged

---

[11] The parties agree that Cayman Islands law governs Plaintiffs' right to sue double-derivatively.  Pl. Opp. at 16; LTD Br. at 7.  The Court will assume that they are correct, although the fact that some of the feeder Funds in which Plaintiffs invested are organized in Delaware arguably makes the issue more complicated than the parties indicate. *See Batchelder v. Kawamoto*, 147 F.3d 915, 920 (9th Cir. 1998) ("Batchelder's prerogative to step into the shoes of the parent corporation as derivative plaintiff, or of the subsidiary as double derivative plaintiff, must be determined by the law of the place of incorporation of the company in which he holds an interest.").

wrongdoer such that the wrongdoer could prevent the subsidiary from bringing suit—not just when the subsidiary is wholly owned. *Cf. Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1079 n.10 (Del. 2011) (noting that other jurisdictions do not require 100% ownership of the subsidiary but that Delaware courts have not ruled on the question). Nonetheless, Nominal Defendants cite *Renova Resources Private Equity Ltd. v. Gilbertson*, [2009] CILR 268, for the proposition that Caymans law "limits double-derivative claims to those brought by shareholders of a parent company on behalf of a *wholly-owned* subsidiary." LTD Br. at 7 & n.6. However, while Nominal Defendants are correct that *Renova* authorized a double-derivative suit where the subsidiary happened to be wholly owned, the opinion does not contain language suggesting that double-derivative claims are permissible *only* under those circumstances. *See* [2009] CILR at 271, 295. Fortunately, the Court need not resolve this debate. As discussed below, even assuming *arguendo* that establishing Defendants' control over the Master Fund would suffice to support a double-derivative suit on its behalf, Plaintiffs still would not succeed because their allegations of control are insufficient.

The parties agree that a shareholder's right to bring derivative claims on behalf of Caymans exempted companies is governed by *Foss v. Harbottle*, 2 Hare 461 (Eng. 1843). *Foss* establishes a general rule that "derivative claims are owned and controlled by the company, not its shareholders, and that a shareholder is not permitted to bring a derivative action on behalf of that company." *Winn v. Schaffer*, 499 F. Supp. 2d 390, 396 (S.D.N.Y. 2007); *see also Feiner Family Trust v. VBI Corp.*, No. 07 Civ. 1914 (RPP), 2007 WL 2615448, at *5 (S.D.N.Y. Sept. 11, 2007); *Seghers v. Thompson*, No. 06 Civ. 308 (RMB) (KNF), 2006 WL 2807203, at *4 (S.D.N.Y. Sept. 27, 2006); *Erie Cnty. Ret. Sys. v. Isenberg*, Civ. A. No. H-11-4052, 2012 WL 3100463, at *2 (S.D. Tex. July 30, 2012); *City of Harper Woods Emps.' Ret. Sys. v. Oliver*, 577

F. Supp. 2d 124, 131–32 (D.D.C. 2008); *In re Tyco Int'l Ltd.*, 340 F. Supp. 2d 94, 98 (D.N.H. 2004). However, this general rule contains several exceptions. In this case, Plaintiffs invoke the so-called "fraud-on-the-minority" exception,[12] which has two requirements: "The first is that the alleged wrongdoers must have 'control' over a majority of the stock with voting rights and the second is that the wrongdoers must have committed 'fraud.'" *Tyco*, 349 F. Supp. 2d at 98; *Seghers*, 2006 WL 2807203, at *4.

Plaintiffs have not adequately pled that the "wrongdoers"—the Defendants who allegedly committed the fraud—had control over a majority of the shares with voting rights. In fact, they say nothing at all about the voting rights associated with the Master Fund and Offshore Fund I, resting their argument on other allegations of "control" scattered throughout the 4AC. Pl. Opp. at 58. As relevant to the Master Fund and Offshore Fund I, the 4AC establishes that HCP is the "investment manager and investment advisor" for the two funds, 4AC ¶ 30; Holdings is the managing member of HCP, 4AC ¶ 31; and Falcone is the managing member of Holdings, 4AC ¶ 31. In this way, the 4AC alleges, Falcone has "ultimate control and dispositive power over assets held by" the Master Fund and Offshore Fund I. 4AC ¶ 36.

But the fact that Defendants controlled the Funds' assets and investments is irrelevant. The ultimate question under the fraud-on-the-minority exception is whether the wrongdoers "controlled the company such that a majority of shareholders could not ratify the [challenged] actions," *Erie County*, 2012 WL 3100463, at *6–7, so Plaintiffs must demonstrate that Defendants controlled a majority of the votes by which their alleged wrongdoing might be ratified, *see Winn*, 499 F. Supp. 2d at 398 ("Plaintiff's allegations that the Individual Defendants

---

[12] The 4AC alleges that two exceptions apply: the fraud-on-the-minority exception and the *ultra vires* exception. In their brief, Plaintiffs abandon the *ultra vires* exception, Pl. Opp. at 57–58, so the Court will not address it.

control the Company itself are inapposite"). As Nominal Defendants point out, the diagrams

illustrating the ownership and control structure of the Harbinger Funds show that ownership of

the Master Fund and Offshore Fund I was widely dispersed among the investing public. LTD

Br. at 11; *see* 4AC at 18. Because the Master Fund and Offshore Fund I are investment vehicles,

not ordinary business corporations, it is possible that those widely dispersed shares did not carry

voting rights, but Plaintiffs have not made that claim. *See Shipping Fin. Servs. Corp. v. Drakos*,

140 F.3d 129, 131 (2d Cir. 1998) ("[W]hen the question to be considered is one involving the

jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not

made by drawing from the pleadings inferences favorable to the party asserting it."). The 4AC's

other allegations regarding Defendants' "control" over the two Funds are conclusory and thus

insufficient at this stage. 4AC ¶¶ 44, 48, 212.

Plaintiffs' arguments that they adequately plead control are not persuasive. Presumably

to shift the Court's focus from the importance of voting rights, Plaintiffs claim that control is a

"flexible concept," and that the 4AC's allegations sufficiently plead that Defendants exercised

"*de facto* control" over the Funds—which, they imply, is all that is required. Pl. Opp. 57–58

(quoting *Tyco*, 340 F. Supp. 2d at 99). This argument elides a key question: *de facto* control over

what? As Nominal Defendants point out, *Tyco* is inconsistent with Plaintiffs' position because

the passage Plaintiffs quote concerns *de facto* control over a company's voting shares, not its

assets or investments: the *Tyco* court was simply concluding—and only for the sake of

argument—that a plaintiff must establish wrongdoer control over a majority of votes likely to be

cast, as opposed to a majority of voting shares outstanding. *See* 340 F. Supp. 2d at 99. Nor do

the other cases that Plaintiffs cite offer their argument any support. *See Winn*, 499 F. Supp. 2d at

398 (finding fraud-on-the-minority exception inapplicable because "the Complaint fails to allege

41

that [certain] defendants hold a controlling number of the company's shares or that they exercise *de facto* control over those shares."); *Feiner Family Trust*, 2007 WL 2615448, at *5–6 (finding fraud-on-the-minority exception inapplicable for lack of fraud where "[t]here is no dispute over whether Defendants control Xcelera" because they "own more than 76% of the voting securities"); *Erie County*, 2012 WL 3100463, at *7 ("Plaintiff has not presented a *prima facie* case that the Director-Defendants exercised majority control of the voting shares of the company nor that they employed such control improperly to prevent Plaintiff from bringing this action"). Accordingly, Plaintiffs have failed to adequately plead wrongdoer control, and their derivative claims on behalf of the Master Fund and Offshore Fund I must be dismissed.

## IV. CONCLUSION

Pursuant to the discussion above, the following claims are dismissed:

- Count I: Negligent misrepresentation claims predicated on the purchase of SkyTerra are DISMISSED WITH PREJUDICE.

- Count II: Common law fraud claims predicated on the purchase of SkyTerra are DISMISSED WITH PREJUDICE.

- Count III: Unjust enrichment claims asserted against Falcone, Holdings, HCP, Harbinger GP, and Special Situations GP are DISMISSED WITH PREJUDICE.

- Count IV: Breach of fiduciary duty claims asserted against Falcone, Harbinger GP, and Special Situations GP that (1) do not arise from nondisclosure or differential treatment allegations and/or (2) are predicated on the purchase of SkyTerra are DISMISSED WITH PREJUDICE.

- Count V: Breach of fiduciary duty claims asserted against HCP, Holdings, and Falcone derivatively on behalf of Offshore Fund I, the Master Fund, and the Special Situations Offshore Fund are DISMISSED WITH PREJUDICE.

- Count VIII: Aiding and abetting breach of fiduciary duty claims asserted against Harbert are DISMISSED WITH PREJUDICE to the same extent as the underlying breach of fiduciary duty claims.

42

- Count IX: Aiding and abetting breach of fiduciary duty claims asserted against
  Falcone and Holdings are DISMISSED WITH PREJUDICE to the same extent as the
  underlying breach of fiduciary duty claims.

Plaintiffs are further granted a final opportunity to file an amended complaint and re-plead any remaining claims in a manner consistent with this opinion and that clearly outlines both the claims against each individual Defendant and the particular allegations supporting each claim.  If Plaintiffs choose to file such an amended complaint, they shall do so on or before October 14, 2013.

As previously noted, Special Situations Offshore GP has neither entered an appearance in this matter nor responded to the 4AC.  Accordingly, Plaintiffs are ordered to provide a letter to the Court, on or before October 7, 2013, indicating whether they intend to maintain this action against Special Situations Offshore GP.

This Order resolves Docket Numbers 90, 95, 98, and 101.  Plaintiffs having filed the 4AC, Defendants' and Nominal Defendants' motions to dismiss the Third Amended Complaint—Docket Numbers 62, 65, 70, and 77—are hereby administratively denied as moot.

SO ORDERED.

Dated: September 30, 2013
       New York, New York

ALISON J. NATHAN
United States District Judge

43