**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RECEIVED
NOV - 4 2013
U.S.
CASHIER IN

Case No. 1:12-cv-01244-AJN

In re HARBINGER CAPITAL PARTNERS FUNDS
INVESTOR LITIGATION

**SIXTH VERIFIED AMENDED**
**CLASS ACTION AND**
**DERIVATIVE COMPLAINT**

JURY TRIAL DEMANDED

6401-1

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   SUBJECT MATTER JURISDICTION AND VENUE...................................8

III.   PARTIES ...........................................................................................8

     A.     Plaintiffs.................................................................................8

     B.     Defendants ...........................................................................9

     C.     Nominal Defendants ..........................................................11

     D.     Other Relevant Entities .....................................................12

     E.     The Structure and Organization of the Funds .....................14

IV.   FACTUAL ALLEGATIONS ..................................................................16

     A.     The History of Harbinger and the Funds .............................16

     B.     Harbinger Acquires LightSquared With Money from the Funds ..........................17

     C.     The GPS Interference Problem and the Conditional Waiver from the FCC..........20

     D.     Falcone's Attempt to Improperly Influence the Government...............................23

     E.     The Senate Investigation....................................................26

     F.     LightSquared Filed for Bankruptcy ....................................27

     G.     The SEC Investigation, Civil Actions And Settlements ........31

     H.     The September 2012 Hearings in the House of Representatives...........37

V.    DERIVATIVE CLAIMS: DEFENDANTS' BREACHES OF FIDUCIARY DUTIES TO THE FUNDS .......................................................................37

     A.     The LightSquared Gamble ..................................................38

     B.     The SEC Investigation And Civil Fraud Actions ..................39

     C.     Attempt to Improperly Influence the FCC and a Congressional Investigation .....40

VI.     DERIVATIVE CLAIMS: DEMAND FUTILITY ALLEGATIONS ...................................41

VII.    DIRECT CLAIMS: DEFENDANTS' FALSE AND MISLEADING
        STATEMENTS TO THE INVESTORS ........................................................................44

        1.      General Background of Repeated False and Misleading Statements and
                Omissions Regarding the Viability and Risk of the LightSquared Venture ..........44

        2.      The April 28, 2010 Investor Conference Call ....................................................45

        3.      The June 3 and June 4, 2010 Commentaries ......................................................46

        4.      The June 2010 Investor Presentation ................................................................48

        5.      The July 20, 2010 Press Release ......................................................................51

        6.      The November 11, 2010 Commentary ..............................................................51

        7.      The June 17, 2011 Announcement ....................................................................52

        8.      The August 5, 2011 Commentary .....................................................................53

        9.      The August 19, 2011 Commentary - First Reference
                to GPS Interference Issues ..............................................................................54

        10.     The Monthly Statements and Performance Summaries
                Reporting NAV and AUM ................................................................................56

VIII.   DIRECT CLAIMS: PLAINTIFFS' RELIANCE ...........................................................57

IX.     DIRECT CLAIMS: SPECIAL RELATIONSHIP BETWEEN DEFENDANTS
        AND INVESTORS ....................................................................................................57

X.      ALL CLAIMS: DAMAGES AND LOSS CAUSATION ................................................59

XI.     ALL CLAIMS: TOLLING OR NON-ACCRUAL OF STATUTES OF
        LIMITATIONS ........................................................................................................60

XII.    DIRECT CLAIMS:  CLASS ACTION ALLEGATIONS ..............................................60

XIII.   COUNTS ................................................................................................................62

XIV.    JURY DEMAND ......................................................................................................68

XV.     PRAYER FOR RELIEF ...........................................................................................68

- ii -

## I.      INTRODUCTION

> *"Today's charges read like the final exam in a graduate school*
> *course in how to operate a hedge fund unlawfully"*
>
> *—Robert Khuzami, Director of the SEC's Division of Enforcement*
> *in a June 27, 2012 News Release announcing multiple civil fraud*
> *charges against Defendants Falcone, Harbinger and Harbert*

1.      This is a class and derivative action on behalf of the Harbinger family of hedge funds and their investors and seeks to recover approximately $3 billion of losses sustained as a direct result of Defendants' fraudulent and/or grossly negligent misrepresentations to investors and knowing, reckless and/or grossly negligent breaches of fiduciary duties owed to the funds and to the investors.

2.      Plaintiffs Lili Schad, Anil Bhardwaj, The Edward M. Armfield Sr. Foundation Inc., Dr. Randall Lang, and the Klein Family Partnership LP (together, the "Plaintiffs"), by and through their undersigned counsel, bring this action individually and on behalf of all persons and entities who purchased or otherwise acquired limited partnership interests in Harbinger Capital Partners Fund I, L.P. ("Fund I"), limited partnership interests in Harbinger Capital Partners Fund II, L.P. ("Fund II"), limited partnership interests in Harbinger Capital Partners Special Situations Fund L.P. (the "Special Situations Fund"), (collectively, the "Domestic Funds"), limited partnership interests in Harbinger Capital Partners Special Situations Offshore Fund L.P. (the "Special Situations Offshore Fund"), shares in Harbinger Capital Partners Offshore Fund I, Ltd. ("Offshore Fund I") and/or shares in Harbinger Capital Partners Offshore Fund II, Ltd. ("Offshore Fund II") (collectively, the "Offshore Funds")[1] and purchased their interests prior to December 31, 2011 ("Class Members"), for direct claims sounding in fraud,

---

[1]      The Domestic Funds and the Offshore Funds are referred to collectively as the "Funds."

6401-1

negligent misrepresentation and breach of fiduciary duty. Plaintiffs bring this action against various entities that control the Funds, including Harbinger Capital Partners LLC ("HCP"), Harbinger Holdings, LLC, Harbinger Capital Partners GP, L.L.C., Harbinger Capital Partners Special Situations GP, L.L.C., and Harbinger Capital Partners Special Situations Offshore GP, L.L.C., as well as individual Philip A. Falcone, for fraud, negligent misrepresentation and breach of fiduciary duty. Plaintiffs also bring this action against Harbert Management Corporation, the former owner of the entities that control the Funds ("Harbert"), for aiding and abetting breach of fiduciary duty.

3.      Plaintiffs also assert derivative claims on behalf of the Domestic Funds, which were operated under common control of the Defendants and as a unified enterprise, arising from Defendants' breaches of their fiduciary duties owed to the Funds.

4.      The Harbinger Funds, founded and controlled by famed billionaire hedge-fund manager Defendant Philip A. Falcone, were marketed as primarily distressed-debt funds. The Defendants offered limited partnership interests and shares in a number of funds and represented that they would seek superior absolute returns by continuing to invest primarily in a portfolio of high-yield debt issued by distressed companies.

5.      Defendants reportedly raised as much as $20 billion through the sale of interests in the Funds, and at their peak, the Harbinger Funds had more than $26 billion under management.

6.      In 2006, despite marketing and operating the Funds as primarily distressed-debt and credit-driven funds, Defendants started to implement a very different investment strategy with significantly greater risks. That strategy, which amounted to a material deviation from the Funds' investment objective and investment program, involved ultimately concentrating more

2

than half of the Funds' resources to acquire and operate a single, high-risk company called LightSquared (originally SkyTerra). LightSquared was a development-stage wireless telecommunications company with no profits and its success (if such was ever possible) was dependent on overcoming massive technological and regulatory hurdles. Defendants also made a further substantial investment in a competing company Inmarsat, plc, intended to augment the LightSquared project.

7.      Defendants had no relevant expertise or experience in the telecommunications field, either in operating or building out a multi-billion dollar wireless network that used complex cutting-edge technology or in managing the regulatory issues associated with such unproven wireless technologies.  Defendants did not disclose to investors the nearly impossible technical and regulatory obstacles facing the venture until _after_ media reports and Falcone's entanglement in a series of media controversies and regulatory inquiries brought the extent of the Funds' problems to light.

8.      Defendants invested approximately two-thirds of the Funds into LightSquared, a company that had a singular focus.  LightSquared sought to use a portion of the L-band spectrum reserved for satellite communications to build out a hybrid terrestrial and satellite communications network. Undisclosed to investors, but known by industry insiders and Defendants, LightSquared's plan was materially flawed due to an insurmountable obstacle: the proposed hybrid network it planned to build fatally interfered with existing global positioning systems ("GPS") employed by the military, airlines, and transportation companies. Commercial viability for LightSquared's plan depended on resolving the technical interference issues and convincing the Federal Communications Commission ("FCC") that the GPS interference problem could be resolved.  The FCC had reservations but granted LightSquared a **_conditional_**

3

*waiver*, giving it the opportunity to prove that it could resolve GPS interference problems. Thus, LightSquared was required by the FCC to spend several billion dollars before it could even prove that its technology was viable.  Defendant Falcone, who controlled the Funds, committed billions of dollars of the Funds to a venture-stage project with possibly unworkable technology.

9.    In essence, Defendant Falcone impermissibly used the Funds to gamble on LightSquared to support his "vision" of being the founder of a next-generation 4G satellite-terrestrial wireless broadband company.  By "going all in" on LightSquared, Defendants put the Funds at substantial risk, and ultimately caused the Funds enormous damage, by deviating from the Funds' stated investment strategy of seeking to achieve attractive returns by investing in a credit-driven, risk-controlled, diverse portfolio of distressed debt, special situation equities, and private loans and notes, and of not assuming operational risk.

10.    Moreover, Defendants repeatedly misled investors about LightSquared.  On or about August 19, 2011, years after Defendants already had poured billions of dollars of investors' money into the LightSquared venture, Defendants finally advised Plaintiffs and the other investors that LightSquared's technology interfered with GPS systems, and that it was fatally flawed.  Nothing in any reports or communications from Defendants to investors before August 19, 2011 gave any indication that the Funds' investment in LightSquared might be jeopardized, had material risks, or was unlikely to succeed due to GPS interference or related regulatory issues.

11.    Defendants knew from the outset, or were reckless in failing to know, that LightSquared's technology interfered with GPS systems.  Indeed, Falcone's attorney wrote Senator Charles Grassley on October 19, 2011 and acknowledged that LightSquared's

4

predecessor had attempted to address GPS interference problems as early as 2002. Notwithstanding this knowledge, Defendants led investors in the Funds to believe that they owned extremely valuable "spectrum assets" in LightSquared, that its business plans and viability were approved by the FCC and that LightSquared was signing contracts with customers and close to commercial operation.

12.     Plaintiffs would have refrained from investing in the Funds or immediately sought to withdraw their investments from the Funds had they known that Defendants knew of the regulatory and technical obstacles that LightSquared faced.  Yet, Defendants failed to provide Plaintiffs and other investors with necessary information about these risks and hurdles needed to determine if an investment in the Funds met their objectives.  Defendants also failed to provide investors with candid information concerning the status of the Funds' investment in LightSquared or its risks of failure, depriving them of the ability to determine if they wished to maintain their investments in the Funds.

13.     At the same time, Defendants were engaged in other conduct that constituted gross mismanagement of the Funds and, among other things, violated their fiduciary duties of loyalty and care.  Specifically, as he has since publicly admitted in a settlement with the SEC, Falcone unlawfully caused the Special Situations Fund to pay him $113.2 million in the form of a low interest rate "personal loan" that was not disclosed to investors until months later. Additionally, Defendants, as *quid pro quo* for approval of more stringent redemption restrictions, allowed certain favored institutional investors to redeem their investments at times and on terms unavailable to Plaintiffs and other investors.  Through an undisclosed "side letter" arrangement one institutional investor redeemed $65 million on terms not available to other investors.  This investor apparently was Goldman Sachs, one of the Funds' prime brokers.

6401-1

14.     According to an August 16, 2013 Consent,[2] Falcone and HCP have admitted to scheming to misappropriate $113.2 million from the Special Situations Fund as a low-interest-rate personal loan to pay taxes Falcone owed (and avoid curtailing his lavish spending), failing to obtain investor approval for this loan, misleading outside legal counsel to obtain advice on how to proceed with the loan, and disregarding the legal advice he received.  HCP and Falcone also admitted to granting large investors favorable redemption and liquidity terms as a *quid pro quo* for their vote to approve increased redemption restrictions, and hiding this scheme from the directors who had the sole authority to grant preferences.

15.     Falcone, HCP Offshore Manager L.L.C. and HCP Special Situations GP, L.L.C. also admitted to manipulating a "short squeeze" in high-yield bonds owned by the Funds to force settlement at inflated prices.  Harbert Management Corporation was also separately charged in connection with the illegal "short squeeze" and subsequently settled for a monetary penalty of $1 million.

16.     Owing to their violations of the Securities Act, the Exchange Act, and the Investment Advisers Act with the above conduct, Falcone and HCP were ordered to pay over $18 million in disgorgement, interest and penalties.  They were also barred from working in the securities industry for a minimum of five years.

17.     Separately, the SEC charged HCP in an administrative proceeding with multiple violations of Rule 105 of Regulation M of the Exchange Act by short selling securities during a restricted period and then purchasing the securities in an initial public offering.  HCP settled the administrative proceeding and agreed to accept censure, pay disgorgement of $857,950

---

[2] *Consent of Defendants Philip A. Falcone; Harbinger Capital Partners LLC; Harbinger Capital Partners Offshore Manager, L.L.C.; and Harbinger Capital Partners Special Situations GP, L.L.C.*, 12 Civ. 5027 (PAC); 12 Civ. 5028 (PAC).

6401-1

representing its profits on the trades, prejudgment interest of $91,838.00, and pay an additional monetary penalty of $428,975.

18.     Finally, on February 14, 2012, as predicted by industry insiders, the FCC announced that its conditional waiver granted to LightSquared was indefinitely suspended because Harbinger and LightSquared were unable to resolve the GPS interference problem. Most industry experts believe that LightSquared's proposed network is no longer viable. As a result, on May 14, 2012, Defendant Falcone caused LightSquared to file for bankruptcy, resulting in even greater losses for Class Members. In contrast to the investors who trusted him with their money, however, Falcone has reassured the public that the failure of his quixotic venture will not similarly impact him; in an interview with the *Daily Beast* on April 16, 2012, Falcone said, "If LightSquared went to zero, no, my lifestyle would not change . . . I have enough capital in other assets and in other areas where my lifestyle is not going to change." Falcone even stated to *Bloomberg News* on April 5, "LightSquared, if I have to, I'll put it into bankruptcy, *I don't care.*" (Emphasis added).

19.     Defendants' actions have damaged Plaintiffs, Class Members and the Funds. Defendants falsely represented LightSquared's status and regulatory issues, as well as the true value of the LightSquared investment, to Class Members.

20.     Defendants breached their fiduciary duties to the Funds by pursuing the LightSquared strategy; permitting Defendant Falcone to give himself a $113.2 million low-interest loan for, which violated the Funds' governing documents; giving preferential treatment to Goldman Sachs and other institutions at a time when other investors were barred from withdrawing their investments; and subjecting the management and general partners of the Funds to the SEC's censure, penalties and civil fraud actions. Moreover, by undertaking and

7

failing to disclose these actions, Defendants misled, and breached their fiduciary duties to, Plaintiffs and Class Members.

## II.      SUBJECT MATTER JURISDICTION AND VENUE

21.      This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because at least one member of the class is a citizen of a state different from at least one defendant, the aggregate amount in controversy exceeds $5,000,000.00, the Class contains more than 100 members, and less than two-thirds of all Class members reside in the State of New York. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

22.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the Defendants' conduct giving rise to the causes of actions occurred within this District.

## III.     PARTIES

### A.      Plaintiffs

23.      Plaintiff Lili Schad ("Schad") is a natural person domiciled in the State of New York. She purchased limited partnership interests in Nominal Defendant Harbinger Capital Partners Fund I, L.P. ("Fund I") and suffered damages as a result of Defendants' misconduct described herein. Plaintiff Schad continues to hold her limited partnership interests.

24.      Plaintiff Klein Family Partnership L.P. ("Klein") is a partnership domiciled in Harrison, New York. Klein purchased limited partnership interests in Nominal Defendant Special Situations Fund in June 2007 and suffered damages as a result of Defendants' misconduct described herein. Klein continues to hold limited partnership interests. In addition, Klein purchased limited partnership interests in Fund I in November 2006 and suffered damages

8

as a result of Defendants' misconduct described herein.   Klein continues to hold limited partnership interests in Fund I.

25.   Plaintiff The Edward M. Armfield Sr. Foundation Inc. ("Foundation") is a non-profit corporation domiciled in Greensboro, North Carolina.   In April 2007, the Foundation invested in Class A shares issued by Harbinger Capital Partners Offshore Fund I, Ltd. (the "Offshore Fund") and invested in limited partnership interested in Nominal Defendant Harbinger Capital Partners Special Situations Offshore Fund L.P. (the "Special Situations Offshore Fund").  The Foundation continues to hold shares.

26.   Plaintiff Dr. Randall Lang ("Lang") is a natural person domiciled in Ontario, Canada.   Since 2003, has invested in Class A shares issued by Offshore Fund and suffered damages as a result of Defendants' misconduct described herein.   Plaintiff Lang continues to hold shares.

27.   Plaintiff Anil Bhardwaj ("Bhardwaj") is a natural person domiciled in Dubai, United Arab Emirates.   He purchased Class A shares issued by Harbinger Capital Partners Offshore Fund I, Ltd. (the "Offshore Fund") and suffered damages as a result of Defendants' misconduct described herein.  Plaintiff Bhardwaj continues to hold his shares.

**B.      Defendants**

28.   Defendant Harbinger Capital Partners LLC ("HCP") is a limited liability company organized under the laws of the State of Delaware.  HCP is the managing member of Defendant Harbinger Capital Partners GP, L.L.C. ("Harbinger GP"), which in turn is the general partner of Nominal Defendants Fund I and Fund II.  HCP has served as the investment manager and investment advisor to the Offshore Funds and the Master Fund since March 2009, and as investment advisor to Nominal Defendants Fund I, Fund II and Special Situations Fund.  HCP

9

received management fees in connection with these duties based on the supposed value of total fund assets, as detailed below.   HCP has its principal office at 450 Park Avenue, 30th Floor, New York, New York 10022.   HCP is controlled by Defendants Falcone and Harbinger Holdings, LLC.

29.   Defendant Harbinger Holdings, LLC ("Holdings") is a limited liability company organized under the laws of the State of Delaware.  Holdings is the managing member of HCP, the managing member of Defendant Harbinger Capital Partners GP, L.L.C. ("Harbinger GP"), and the managing member of Defendant Harbinger Capital Partners Special Situations GP, L.L.C. ("Special Situations GP") and has a principal office at 450 Park Avenue, 30th Floor, New York, New York 10022.  Holdings is controlled by its managing member, Defendant Falcone.

30.   Defendant Harbert Management Corporation ("Harbert") is an Alabama corporation headquartered at 2100 Third Avenue North, Suite 600, Birmingham, AL 35203. Harbert maintains an office in this District at 555 Madison Avenue, 16th Floor, New York, NY 10022.   Harbert financed the launch of the Funds in 2000, and with Defendant Falcone controlled the Funds until 2009.

31.   Defendant Harbinger Capital Partners GP, L.L.C. ("Harbinger GP") is a limited liability company organized under the laws of Delaware and headquartered at 450 Park Avenue, 30th Floor, New York, New York 10022.  Harbinger GP is the general partner of Nominal Defendants Fund I and Fund II, and is controlled by Defendants Holdings and Falcone. Harbinger GP paid itself an "incentive allocation" of 20% of the purported "excess profits" of Fund I and Fund II as discussed in more detail below.

32.   Defendant Harbinger Capital Partners Special Situations GP, L.L.C. ("Special Situations GP") is a limited liability company organized under the laws of Delaware and

10

headquartered at 450 Park Avenue, 30th Floor, New York, New York 10022. Special Situations GP is the general partner of the Special Situations Fund, and is controlled by Defendants Holdings and Falcone. Special Situations GP paid itself an "incentive allocation" of 20% of the purported "excess profits" of the Special Situations Fund as discussed in more detail below and invests in the Fund.

33.    Defendant Harbinger Capital Partners Special Situations Offshore GP, L.L.C. ("Special Situations Offshore GP") is a limited liability company organized under the laws of Delaware and headquartered at 450 Park Avenue, 30th Floor, New York, New York 10022. Special Situations Offshore GP is the general partner of the Special Situations Offshore Fund, and is controlled by Defendants Holdings and Falcone. Special Situations Offshore GP paid itself an "incentive allocation" of 20% of the purported "excess profits" of the Special Situations Offshore Fund as discussed in more detail below and invests in the Fund.

34.    Defendant Philip A. Falcone ("Falcone") is an adult domiciled in the State of New York. He is the co-founder, Chief Investment Officer and managing member of Holdings which in turn is the managing member of HCP. Defendant Falcone controls HCP and Holdings, and has ultimate control and dispositive power over assets held by the Master Fund, Fund I, the Offshore Fund, the Special Situations Fund and the Special Situations Offshore Fund. Falcone also invests in the Funds.

35.    Defendants Falcone, HCP, Special Situations GP, Special Situations Offshore GP, Harbinger GP and Holdings are sometimes referred to as "Harbinger" or the "Harbinger Entities" in this Complaint.

C.    **Nominal Defendants**

11

36.     Harbinger Capital Partners Fund I, L.P. ("Fund I") is a limited partnership organized under the laws of the State of Delaware. Fund I is controlled by Defendants Falcone and Holdings, and has its principal office at 450 Park Avenue, 30th Floor, New York, New York 10022. In a 1Q2010 due diligence questionnaire, Defendant HCP disclosed that all activities and functions of Fund I, including trading, research, portfolio management and operations activities, take place in New York. Fund I is a feeder fund and invests solely in the Master Fund.

37.     Harbinger Capital Partners Fund II, L.P. ("Fund II") is a limited partnership organized under the laws of the State of Delaware. Fund I is controlled by Defendants Falcone and Holdings, and has its principal office at 450 Park Avenue, 30th Floor, New York, New York 10022. In a 1Q2010 due diligence questionnaire, Defendant HCP disclosed that all activities and functions of the Fund, including trading, research, portfolio management and operations activities, take place in New York. Fund II is a feeder fund and invests solely in the Master Fund.

38.     Harbinger Capital Partners Special Situations Fund L.P. (the "Special Situations Fund") is a limited partnership organized under the laws of the State of Delaware. The Special Situations Fund is controlled by Defendants Falcone and Holdings, and has its principal office at 450 Park Avenue, 30th Floor, New York, New York 10022.

**D.          Other Relevant Entities**

39.     Harbinger Capital Partners Offshore Fund I, Ltd. ("Offshore Fund I") is an exempted company organized under the laws of the Cayman Islands. Offshore Fund I is controlled by Defendants Falcone and Holdings, and has its principal office address at 450 Park Avenue, 30th Floor, New York, NY 10022. Its custodian (and Cayman counsel) is Ogier

12

Fiduciary Services (Cayman), 89 Nexus Way, Camana Bay, Grand Cayman, Cayman Islands, KY1-9007.   In a 1Q2010 due diligence questionnaire, Defendant HCP disclosed that all activities and functions of the Fund, including trading, research, portfolio management and operations activities, take place in New York.   Offshore Fund I is a feeder fund and invests solely in the Master Fund.

40.    Harbinger Capital Partners Offshore Fund II, Ltd. ("Offshore Fund II") is an exempted company organized under the laws of the Cayman Islands.   Offshore Fund II is controlled by Defendants Falcone and Holdings, and has its principal office address at 450 Park Avenue, 30th Floor, New York, NY 10022.   Its custodian (and Cayman counsel) is Ogier Fiduciary Services (Cayman), 89 Nexus Way, Camana Bay, Grand Cayman, Cayman Islands, KY1-9007.   In a 1Q2010 due diligence questionnaire, Defendant HCP disclosed that all activities and functions of the Fund, including trading, research, portfolio management and operations activities, take place in New York.   Offshore Fund II is a feeder fund and invests solely in the Master Fund.

41.    Harbinger Capital Partners Special Situations Offshore Fund L.P. (the "Special Situations Offshore Fund") is an exempted company organized under the laws of the Cayman Islands. The Special Situations Offshore Fund is controlled by Defendants Falcone and Holdings, and has its principal office at 450 Park Avenue, 30th Floor, New York, New York 10022. The Special Situations Fund and the Special Situations Offshore Fund are organized and managed under a master-feeder structure so that the Special Situations Offshore Fund invests solely in the Special Situations Fund and is a majority limited partner of the Special Situations Fund

42.    Harbinger Capital Partners Master Fund I, Ltd. (the "Master Fund") is an exempted company organized under the laws of the Cayman Islands.  The Master Fund is controlled by Defendants Falcone, HCP and Holdings, and has its principal office address at 450 Park Avenue, 30th Floor, New York, New York 10022.  Its custodian is International Fund Services (Ireland) Limited (a State Street Company), 78 Sir John Rogerson's Quay, Dublin 2, Ireland.  The Master Fund, Nominal Defendant Fund I, Nominal Defendant Fund II, Offshore Fund I and Offshore Fund II are managed under a master-feeder structure so that the Funds (among other funds) are each allocated a portion of the holdings of the Master Fund.

E.        **The Structure and Organization of the Funds**

43.    The relationship among the Special Situations Fund, Special Situations Offshore Fund and Defendants HCP, Holdings, Falcone, Special Situations GP and Special Situations Offshore GP, is illustrated below:

6401-1



Note: All equity percentages are calculated as of January 31, 2012 as provided by Defendant HCP to the Federal Communications Commission. Footnotes omitted.

44. The relationship among Fund I, Fund II, Offshore Fund I, Offshore Fund II, the Master Fund and Defendants HCP, Holdings, Falcone and Harbinger GP is illustrated below.

45. As the chart illustrates, all of the Funds ultimately were controlled by Falcone.

6401-1

MASTER FUND OWNERSHIP DIAGRAM[1]



Note:   All equity percentages are calculated as of January 31, 2012 as provided by Defendant HCP to the Federal Communications Commission.  Footnotes omitted.

## IV.   FACTUAL ALLEGATIONS

### A.   The History of Harbinger and the Funds

46.   Defendant Falcone founded New York based Defendant HCP in 2001 with the assistance of Defendant Harbert, an alternative-investment manager based in Birmingham, Alabama.  Harbert held a majority stake and provided $25 million of seed money for HCP's first hedge fund in 2001.  Falcone bought out Harbert in 2009 for an undisclosed sum, but Harbert's eponymous owner, non-party Raymond Harbert, is still a substantial investor in various Harbinger funds.  Falcone continues to hold a majority interest in HCP and a 100%

16

interest in Defendant Holdings today, and controls all of the Nominal Defendants and Other Relevant Entities.

47.     Falcone came to national prominence in 2007 when five hedge fund managers (including George Soros, Jim Simons, John Paulson, Ken Griffin and Defendant Phil Falcone), paid themselves $12.6 billion in a single year after profiting from the collapse of the credit markets.  Falcone paid himself $1.7 billion in 2007 after his two main funds returned 114% and 176% that year.   From 2005-2007, the funds invested heavily in credit default swaps that offered protection on specific layers of the capital structure of various synthetic CDOs and other less-esoteric mortgage-backed securities that held pools of subprime mortgages.   When the financial markets collapsed in 2007, the swaps paid out handsomely and Falcone's two primary funds recorded multi-billion dollar gains.

**B.      Harbinger Acquires LightSquared With Money from the Funds**

48.     In 2006, the Harbinger funds began to invest in SkyTerra Communications, Inc. ("SkyTerra"), a public Delaware corporation based in Virginia that was the predecessor to the company that is now known as LightSquared Inc. ("LightSquared").

49.     LightSquared is a development-stage wireless broadband company that seeks to build a wholesale, nationwide network to provide 4G wireless access integrated with satellite coverage to end users.

50.     At first, Harbinger invested in SkyTerra's debt, as would be appropriate for a fund marketed primarily as a distressed-debt fund, and small amounts of equity.  For example, the Master Fund purchased $60 million of Senior Secured Notes in a $750 million bond offering in March 2006.

6401-1

51.     On December 15, 2007, Harbinger entered into a securities purchase agreement to purchase $150 million of SkyTerra's 16.5% senior unsecured notes due 2013.  Harbinger also ramped up its equity exposure to SkyTerra by acquiring ten-year warrants to purchase 9,144,038 shares of SkyTerra's capital stock, with an exercise price of $10.00 per share.

52.     On February 4, 2008, Harbinger purchased 14,407,343 shares of non-voting common stock of SkyTerra from another company.  As a result of Harbinger's purchase, SkyTerra was required to offer to repurchase its senior secured notes due to a "change in control," and the majority of note holders agreed to a waiver of this provision on April 2, 2008.

53.     On April 7, 2008, Harbinger purchased 10,224,532 shares of SkyTerra common stock and 6,173,597 shares of non-voting common stock for, in the aggregate, approximately $164 million ($10 per share) from Apollo Funds.  In connection with this stock purchase, Harbinger filed an application with the FCC to acquire control over SkyTerra and 442,825 shares were placed in escrow pending FCC consent.  Harbinger also proposed two directors who were appointed to the SkyTerra board of directors.

54.     Three days later, on April 10, 2008, Harbinger approached SkyTerra management with a proposal for a business combination between SkyTerra and Inmarsat plc ("Inmarsat"), a London-based competitor in which Harbinger already owned a 28% interest. SkyTerra's board of directors approved a transaction for its acquisition of all of the stock of Inmarsat not owned by Harbinger, which was to be funded by Harbinger.  As part of the deal, Harbinger would exchange Inmarsat stock for shares of SkyTerra stock at $10 per share. Harbinger also agreed to provide $500 million of debt financing to fund SkyTerra's business plan through the third quarter of 2010.

55.    On August 22, 2008, SkyTerra's board approved the Inmarsat deal, and changed the terms so that SkyTerra agreed to issue 10.3 million additional shares of common stock to Harbinger if the business combination with Inmarsat was consummated.  On the same date, SkyTerra filed with the FCC for a change of control to Harbinger.

56.    On September 12, 2008, SkyTerra entered into several agreements with another company for the sale of its SkyTerra holdings to Harbinger.  This company sold 23,626,074 shares of non-voting common stock to Harbinger (of which 7,906,737 shares were placed in escrow pending the receipt of the FCC consent for $4.15 per share).  Following the sale, SkyTerra agreed to exchange non-voting stock for voting common stock, and Harbinger exchanged 6,353,915 shares for voting common stock.

57.    During January and February 2009, Harbinger purchased 1,634,708 shares of common stock in open market transactions at purchase prices ranging from $1.43 to $4.69 per share.

58.    In early 2009, SkyTerra's management team learned of increasing uncertainty that Inmarsat's acquisition could be financed before SkyTerra ran out of money.  Thus, SkyTerra authorized a special committee to work with management, Morgan Stanley and outside counsel to analyze funding and restructuring alternatives.

59.    On June 9, 2009, Morgan Stanley advised that SkyTerra may only have sufficient capital to fund business operations through the third quarter of 2010.  Morgan Stanley also advised SkyTerra that finding a strategic investor would be challenging.  Harbinger had appointed two members to the SkyTerra board and was thus aware the company was facing severe financial problems.

60.     SkyTerra and Harbinger filed a Committee on Foreign Investment in the United States notice in connection with a change in control to the Master Fund (a Cayman Islands entity).  The Committee approved the change in control on August 21, 2009.

61.     On September 23, 2009, Harbinger entered into an agreement and plan of merger with SkyTerra to acquire 100% of the company.   At the time, Harbinger already held approximately 69% of the company.  In connection with its acquisition, Harbinger also took SkyTerra private so that it no longer had to file public reports.

62.     With the completion of the merger on March 29, 2010, Defendants took full control of SkyTerra and began to transform it into LightSquared.   The acquisition gave Defendants full responsibility for the management of the company, and managerial execution of its business plans.  Defendants replaced nearly all of LightSquared's officers and directors.  As the owner of LightSquared, rather than an investor in the company, the Funds' options for exiting their position in the company were greatly reduced.

**C.     The GPS Interference Problem and the Conditional Waiver from the FCC**

63.     LightSquared's high-speed network is designed to operate on an "L-band satellite spectrum."  If deployed, the base stations of the LightSquared network would use radio band adjacent to GPS frequencies.  Although each has its own network, the spectrums are so close that GPS systems would likely pick up the stronger LightSquared signal.

64.     LightSquared must obtain FCC approval to operate its proposed network.   In 2005, the FCC granted LightSquared authority to start to build out – but not operate – its network in the L-band spectrum.

65.     On January 26, 2011, the FCC gave LightSquared approval to expand its existing initial satellite bandwidth license, but conditioned the approval on the resolution of interference

20

problems with GPS operators. The GPS community has objected to FCC approval of LightSquared's expanded network. Opposition has come from GPS equipment makers, the Pentagon and military industries, and companies like John Deere, whose farm equipment uses GPS systems. It is now widely understood – but was only known by insiders like SkyTerra at the time – that the industry was aware of the potential for massive GPS interference should the LightSquared network actually deploy and become functional. The FCC thus directed LightSquared to participate in an interference working group, and to submit monthly reports and a final report by June 2011. The FCC also directed the National Telecommunications and Information Administration ("NTIA") to conduct a study into the interference concerns.

66.    As a part of its investigation, the NTIA solicited reports from several government agencies, including the National Aeronautics and Space Administration ("NASA"), the Department of Transportation ("DOT") (which includes the Federal Aviation Administration "FAA")), and the Department of the Interior. Each submitted reports in July 2011, and their findings were devastating. For example, Badri A. Younes, Deputy Associate Administrator for Space Communications & Navigation at NASA, concluded in a July 20, 2011 report that:

> NASA feels that due to the severity of the operational impacts, to both government and commercial users, it is ***conclusive*** that LightSquared's implementation on the upper 10-MHz is not feasible in the near or long-term (emphasis added).

67.    NASA was also concerned because LightSquared had proposed to the FCC that it would only use the lower half of its spectrum to avoid the upper-end interference, but was told "that the upper 10-MHz is needed to provide a viable 4G LTE service."

68.    Joel Szabat, the Deputy Assistant Secretary for Transportation Policy at DOT, wrote to the NTIA the next day and echoed NASA's concern in much stronger language. DOT

concluded that LightSquared's proposed network would interfere with GPS to such a degree and interfere with aviation, maritime, rail and road systems so pervasively that the LightSquared network "likely would result in the loss of life and an economic [impact] to transportation applications of over $100 billion."

69.     DOT's primary concern was with aviation.  In the July 21, 2011 report, DOT concluded:

> The effects of LightSquared deployment would be far-reaching and potentially devastating to aviation.  If LightSquared deploys as planned, all current GPS efficiency and safety benefits would be lost, or at least severely reduced, until all aircraft operating in US airspace could be retrofitted over a period of 10 and possibly up to 15 years.

70.     On September 8, 2011, the FCC issued a request for NTIA to conduct additional testing into LightSquared's GPS interference.

71.     Independent of the NTIA study, the National Space-Based PNT Systems Engineering Forum conducted its own study of the potential for interference with military and civilian GPS applications.  On December 9, 2011, according to Bloomberg, "laboratory testing was performed for the National Space-Based Positioning, Navigation, and Timing (PNT) Systems Engineering Forum, an executive branch body that helps advise policy makers on issues around GPS" and "found that 69 of 92, or 75 percent, of receivers tested 'experienced harmful interference' at the equivalent of 100 meters (109 yards) from a LightSquared base station."

72.     On February 14, 2012, NTIA reported to the FCC that multiple government tests all reached the same inescapable conclusion: LightSquared's network would interfere with navigation equipment used by airlines, trains, boats and other vehicles that depend on GPS navigation tools.  NTIA concluded that "there is no practical way to mitigate the potential interference at this time."

22

73.     On February 15, 2012, the FCC revoked its conditional approval because of the GPS interference problem. Tammy Sun, an FCC spokesperson, said in an e-mailed statement that the agency was preparing to withdraw the preliminary approval it granted last year for the company to build a high-speed network.  Sun said, "[t]he commission clearly stated from the outset that harmful interference to GPS would not be permitted," and that "[t]he commission will not lift the prohibition on LightSquared."

### D.     Falcone's Attempt to Improperly Influence the Government

74.     The fact that the FCC finally relented and was forced to revoke the conditional waiver surprised no one in the industry.  Instead, industry insiders had been scratching their heads wondering why the conditional waiver was granted in the first place, and why the FCC and others in the government appeared to treat LightSquared with suspicious favoritism.

75.     It has since come to light in media reports that Defendant Falcone and other executives at Harbinger may have improperly tried to gain favors from the government.

76.     For example, at a time when the FCC was reviewing LightSquared's proposed network, James Kohlenberger, chief of staff for the White House Office of Science and Technology Policy, met with Falcone and LightSquared CEO Sanjiv Ahuja on September 29, 2009; one week after the meeting, Falcone donated $30,400 to the Democratic Senatorial Campaign Committee. These circumstances were reported by the Center for Public Integrity in · a September 14, 2011 article titled, "Emails Show Wireless Firm's Communications with White House as Campaign Donations Were Made" ("CPI Report").

77.     According to the CPI Report, on September 23, 2010, LightSquared's representative Dave Kumar emailed Aneesh Chopra, the President's Chief Technology Officer, asking for a meeting, and mentioned that he would be at a Presidential fundraiser the following

week.  On the same day, Henry Goldberg, a LightSquared lawyer, wrote to Kohlenberger also asking for a meeting with Chopra, and also noted that he would be at the fundraiser the following week.  According to the CPI Report, Ahuja donated another $30,400 to the DSCC *on the exact same day both emails were sent asking for a meeting with Chopra.*

78.     Other evidence also points to LightSquared's attempts to court government influence.  For example, as reported by the *Daily Caller* on February 21, 2012, according to White House visitor logs, FCC Chairman Julius Genachowski – a friend and classmate of the President, and the man with authority to grant or deny LightSquared's waiver – met with White House Personnel Director Don Gips on February 18, 2009.  At the time, Gips held between $250,000 and $500,000 of LightSquared stock options.  It is unclear what was said at the meeting at the White House, but immediately thereafter, two members of the President's transition team were given jobs at LightSquared – Jeff Carlyle was named LightSquared's VP of regulatory affairs, and Gary Epstein was named executive vice president.  Epstein also worked for a few months at the FCC between leaving the transition team and starting at LightSquared.

79.     According to the February 21, 2012 *Daily Caller* article, these various attempts to gain influence were followed by multiple instances of government officials trying to assist LightSquared.  For example, on July 24, 2009, LightSquared asked the FCC to allow it to delay the launch of a new satellite; the FCC granted the request even though it denied the exact same request by a competitor.  Several other decisions by the FCC favored LightSquared over the same competitor, according to the article.

80.     There have also been reports that the White House attempted to tamper with testimony before a House Armed Services Subcommittee hearing on September 15, 2011.  This

24

incident was reported in a September 15, 2011 *Daily Beast* article by Eli Lake titled, "White House Pressure for Donor?" According to the article, General William Shelton, Commander of Air Force Space Command testified that the LightSquared network "poses significant challenges for almost all GPS users." However, in a classified briefing prior to the hearing, General Shelton said the White House intervened and tried to pressure him to change his testimony to make it more favorable to the company. Then, according to the article, the White House leaked the General's prepared testimony to LightSquared prior to the hearing. General Shelton reportedly "chafed at the intervention."

81.     As reported in the September 15, 2011 *Daily Beast* article, U.S. Representative Mike Turner, chairman of the House Armed Services subcommittee that oversees General Shelton's space command and GPS issues, said that "[t]here was an attempt to influence the text of the testimony and to engage LightSquared in the process in order to bias his testimony. The only people who were involved in the process in preparation for the hearing included the Department of Defense, the White House, and the Office of Management and Budget."

82.     After the press reported the attempt to pressure General Shelton, several members of the House Committee on Space, Science and Technology, including the Chairperson, wrote on September 20, 2011 to the Director of the Office of Management and Budget demanding copies of all communications between Falcone, LightSquared or Harbinger and any OMB employee. The Committee members' letter also referred to White House efforts to pressure General Shelton as "tampering with testimony."

83.     According to a September 19, 2011 *Daily Beast* article titled, "White House's Testimony 'Guidance,'" after the reports concerning General Shelton, a second witness at the Armed Services Subcommittee hearing admitted that he received "guidance" from the White

25

6401-1

House prior to his testimony. Anthony Russo, Director of the National Coordination Office for Space-Based Positioning, Navigation and Timing, admitted that OMB requested that he testify that GPS interference testing could be done in 90 days. This was the timeframe favored by LightSquared. According to the *Daily Beast* article, Russo rejected the "guidance" and said he was aware that other witnesses received identical "guidance."

### E.    The Senate Investigation

84.    After the January 26, 2011 FCC conditional waiver, Falcone and LightSquared became the subject of a Senate Judiciary Committee investigation into whether the FCC's approval was tainted by political contributions. On April 27, 2011, Senator Grassley wrote to the FCC to demand documents related to all communications with Harbinger and LightSquared. In his letter, Senator Grassley pointed to the ongoing SEC investigation of possible securities fraud by Falcone as one of the reasons for concern that the FCC was moving with such haste.

85.    The Senate investigation has become increasingly contentious as the FCC has refused to comply with various requests, or complied but with substantial delays. After news broke in September 2011 of the details of the various connections among the FCC, the White House and LightSquared, the Senate investigation intensified. Immediately thereafter, according to a January 23, 2011 letter from Senator Grassley to Falcone, Falcone personally intervened. According to Senator Grassley's letter, on October 5, 2011, Falcone sent an email to Senator Grassley saying that approval of LightSquared's network could be made a "win" for the Senator since the matter was already in the "political arena" and that "the last thing I want to do is make this more political than it already is."

86.    According to Senator Grassley's letter, Falcone's email was followed up by an email from Todd Ruelle, a consultant for LightSquared, who said that if LightSquared were

6401-1

approved, Grassley's home state of Iowa could get a "call center."  Grassley's office advised Ruelle not to contact the office again and called the Senate Ethics Committee regarding the contact.  Senator Grassley's letter demanded that Falcone explain the "questionable contact" and said that the two emails, when read together, "intimated benefits for Grassley if he softened his inquiry of government approval of the project."

### F.   LightSquared Filed for Bankruptcy

87.    The February 14, 2012 revocation of the conditional waiver was a financial blow from which LightSquared was not able to recover, and resulted in its bankruptcy.  Even prior to the FCC's decision, a number of industry analysts concluded that LightSquared would exhaust its available cash in the near future, perhaps prior to the end of the second quarter of 2012.

88.    Without any plan to generate revenues and increasingly dim hopes of convincing the FCC to reconsider, LightSquared's business began to unravel.  Forty-five percent of the company's staff was laid off, and on February 28, 2012, LightSquared CEO Sanjiv Ahuja stepped down, replaced temporarily by co-COOs Doug Smith and Marc Montagner.  On the same day, the Harbinger Funds (which are controlled by Falcone) named Falcone to the Board. Following the announcement, Tim Farrar at TMF Associates told Bloomberg News: "Ahuja lost his credibility by continually stating his absolute confidence that this will get resolved. . . . As this moves forward, the focus will be more toward litigation and away from building a network."

89.    In addition, customers terminated contracts before service even started.  For example, in June 2011, LightSquared entered into a 15-year, $9 billion spectrum-hosting agreement with Sprint Nextel to deploy and operate the planned 4G network capable of utilizing LightSquared's 1.6GHz spectrum.  LightSquared made $350 million in prepayments to cover

6401-1

costs of the deployment.   On March 16, 2012, Sprint terminated the agreement because LightSquared had not satisfied its conditions related to the GPS interference.   A month earlier, on February 15, FreedomPop (a startup backed by Skype co-founder Niklas Zennstrom) terminated its agreement with LightSquared and instead signed a wholesale agreement with Clearwire Corp.

90.      In addition to burning through cash with no actual profits in sight, loans and other financial obligations were coming due that LightSquared was increasingly desperate to meet.  For example, despite receiving a $190 million loan from Jeffries Group Inc. on January 30, 2012 – a loan with an effective rate of 24%, more than four times what the riskiest corporate borrowers were paying – LightSquared missed a $56.25 million payment due to Inmarsat on February 20, 2012.  LightSquared also missed a second payment of $29.6 million at the end of March.

91.      The $190 million Jeffries loan was used (in part) to pay off the remainder of a $400 million loan from Zurich-based UBS AG.  The deadline was January 30, 2012 at 1 pm; the money from Jeffries was wired six minutes before the deadline after lawyers worked through the night hammering out the deal.

92.      On April 20, 2012, LightSquared reached an agreement with Inmarsat to pay the $56.25 million missed payment in exchange for suspending payments and all other terms of the contract for two years to give LightSquared time to figure out what to do.

93.      Following the FCC's decision to revoke the conditional waiver, Tim Farrar, an independent satellite-industry analyst, said that "[w]ith LightSquared set to run out of money in the near future, it must now consider whether to file for bankruptcy and preserve its resources

6401-1

for the inevitable litigation fights, or continue pretending that all of its problems can be overcome while its cash drains away."

94.     The next day, an unnamed holder of LightSquared's debt echoed Mr. Farrar's sentiment and told Reuters that a "bankruptcy Chapter 11 filing seems inevitable." Defendant Falcone, however, flatly ruled it out, telling investors that bankruptcy "is clearly not on our table." He said there was a plan for dealing with the situation, but declined to offer any details.

95.     On April 5, 2012, Falcone told Reuters and Bloomberg that he was in fact considering putting LightSquared into bankruptcy. Because most of the Funds' investment in LightSquared is in the form of equity, not debt, bankruptcy would further injure Plaintiffs and the Class Members, as the bondholders might convert some of their holdings into equity and possibly even wipe out the equity completely. Falcone and the LightSquared bondholders then negotiated a deal to extend bankruptcy negotiations until May 7, 2012, with the condition that Falcone resign from the Board.

96.     Falcone, however, stated that he did not care. Instead, he stated that "we" would be better off in bankruptcy, apparently forgetting the Harbinger funds investors to whom he owed fiduciary duties, and despite pretending to be aligned with their interests. He told the press on April 5, and investors on April 9, that the goal is to "complete the vision"; there was no mention of protecting the Funds or his investors, to whom Falcone admitted he owed fiduciary duties (going so far as to call himself "your fiduciary" in correspondence to investors), and no mention of the fact that he barred all redemptions, trapping investors in his venture whether they want to stay in or not. Instead, all that mattered to Falcone was pursuing his vision of making LightSquared work, even if it wiped his investors out. Shockingly, Falcone even admitted this to Bloomberg News on April 5, saying, "LightSquared, if I have to, I'll put it into bankruptcy, *I*

29

*don't care*" (emphasis added), adding that he would still personally maintain control over the company even if it were to be reorganized.  And as noted above, Falcone reassured the press that even if LightSquared were to go bankrupt and his investors were to lose the majority of their investment, he will still live well: "If LightSquared went to zero, no, my lifestyle would not change . . . I have enough capital in other assets and in other areas where my lifestyle is not going to change."

97.    On May 14, 2012, Defendant Falcone finally put LightSquared into bankruptcy as LightSquared and all of its related subsidiaries filed a Voluntary Chapter 11 Petition.  In its filings, the Funds are identified as owning 96% of the equity, and LightSquared listed "assets" of $4.48 billion and debt of $2.29 billion as of February 29, 2012.  Thomas Lauria, a lawyer for an ad hoc group of lenders who own a portion of the debt stated in court that "[t]oday it isn't really a business.  There's a vision of a business."  In filings, the ad hoc group of lenders has also described LightSquared's plan as the "mere hope of a positive outcome of FCC discussions or litigation," and stated that it does not believe that there is sufficient cash flow to support LightSquared's existing debt.

98.    Defendant Falcone also told the Wall Street Journal on or about May 4, 2012, that the board of LightSquared needs "telecom and industry veterans, not hedge-fund[] managers" and yet placed himself – a hedge fund manager with no prior experience in the telecom industry – on the board in February, 2012.  This put Falcone in the curious situation of having fiduciary duties to the single largest creditor of a company in bankruptcy to which he had also had fiduciary duties.

99.    On June 13, 2012, counsel for LightSquared told the bankruptcy court that LightSquared reached an agreement to use lenders' cash collateral, giving the company money

to fund operations until September, 2013.  As a part of the deal, LightSquared agreed to pay the lenders $6.25 million a month and let them return to court to file a motion for the use of the cash collateral; LightSquared also agreed to pay the lenders' legal fees, further draining assets from the company.  It was also reported that the lenders are exploring whether they can pursue claims for damages against Defendant Falcone and Harbinger, either directly or derivatively on behalf of the company.

100.    Currently, LightSquared's efforts are focused on trying to modify its ATC authorization from the FCC, seeking approval to use just the upper 10 MHz end of its spectrum, hoping that giving up the lower end provides a buffer to interference.  LightSquared appears to be asking to be subject to the same original conditions of working out issues and testing, which further risks what little value the spectrum has to LightSquared.

**G.    The SEC Investigation, Civil Actions And Settlements**

101.    On June 27, 2012, after many months of investigation, the SEC formally charged Defendants Falcone, HCP, Harbinger Capital Partners Offshore Managers, Harbinger Capital Partners Special Situations GP, and Harbert, in three civil fraud complaints and one administrative proceeding, with multiple violations of the securities laws, including the Securities Act of 1933, the Exchange Act of 1934 and the Investment Advisors Act of 1940, and regulations thereunder.

102.    The Release by the SEC announcing the filings contained the following statement:

> Today's charges read like the final exam in a graduate school course in how to operate a hedge fund unlawfully," said Robert Khuzami, Director of the SEC's Division of Enforcement. "Clients and market participants alike were victimized as Falcone unscrupulously used fund assets to pay his personal taxes, manipulated the market for certain bonds, favored some clients at the expense of others, and violated trading rules intended to prohibit manipulative short sales.

31

103.    The SEC charged Falcone and HCP with fraudulently scheming to misappropriate $113.2 million from the Funds, and putting their own interests above those of the Funds.  Falcone arranged for a personal low interest rate loan in order to pay taxes he owed, rather than sell assets so as to avoid curtailing his lavish spending and lifestyle.  The SEC claimed that Falcone arranged for this loan at a time when investors could not redeem, that he failed to obtain investor approval for the related party loan, and that he concealed the loan from investors for five months.

104.    The SEC also charged that, to give the appearance of legality to the loan, Falcone and HCP engaged an outside law firm to advise on the transaction but failed to disclose material information to the law firm, and failed to act on the law firm's advice.  Falcone ignored the law firm's requirement that the portfolio manager determine that the lender had no need for the cash and that such a loan would have no adverse effect on the lender.  The Loan Agreement provided that Falcone was supposed to pay the higher of either the Applicable Federal Rate (at the time 2.66 percent) plus 1 percent, or 1 percent more than the lender's cost of funds (at the time 7 percent).  Falcone's loan was at an interest rate 3.66 percent instead of the 8 percent interest rate he should have paid – a benefit to him at investors' expense.  Falcone even ignored an email from the general counsel of the Funds' third-party service provider who advised against it.

105.    Further, the SEC charged that Falcone and HCP failed to disclose the loan to investors in the Special Situations Fund.  Falcone's loan was never listed as an "asset" of the Fund, despite the fact that it would have been one of its largest holdings.  Falcone also sent an email to investors misrepresenting that the loan had been "vetted extensively" with outside counsel, as well as other misleading emails. In addition, after the loan was revealed in March

32

2010, Falcone and HCP misled investors by telling them that Falcone's tax liability was unexpected. This was untrue as Falcone and HCP knew at least six months before the loan that he would have a large tax obligation due October 2009, and Falcone had inquired about, but declined, a bank loan.

106. The same SEC fraud action charged HCP and Falcone with scheming to grant large investors favorable redemption and liquidity terms as a *quid pro quo* for their vote to approve increased redemption restrictions at a time when the Funds were losing assets, and hiding this scheme from the directors who were the only ones authorized to grant preferences. In Fall 2008, the Funds experienced a sharp decline in assets due to investor redemptions. In response, Falcone sought to change the redemption restrictions in Fund I from a limit on the total redemptions received by investors of 20%, to a more restrictive 25% limit on each investor's redemption. Effectively, he sought to change from a fund-level "gate" to an investor-level "gate."

107. This change required investor consent. To secure consent, Falcone and HCP made side deals with some of their largest investors giving them preferential liquidity as *quid pro quo* for their affirmative vote for the change. One of these large investors was reportedly Goldman Sachs. In making these arrangements, Falcone and HCP failed to disclose these material terms to the directors and other investors, and failed to honor "most favored nation" provisions with certain other investors.

108. Falcone entered into two side letter agreements with one institutional investor to approve $65 million in preferential redemptions. Another institution obtained a side letter permitting it to treat its affiliated accounts as a single account for purposes of calculating the

investor-level "gate" or the 25% redemption limit.   Another institution received a waiver of prior notice provisions for its customers' redemptions of investments in Harbinger Funds.

109.   Despite these side letters, in March 2010, the directors for Fund I were notified that there were no side letters.   HCP also failed to honor agreements with other investors that required them to be notified and offered any more favorable terms offered in side letters to other investors. Harbinger again failed to disclose the preferences it had granted in response to annual investor questionnaires.

110.   In the second fraud action, the SEC charged Falcone, and HCP Offshore Manager L.L.C. and HCP Special Situations GP, L.L.C. with manipulating a "short squeeze" in a $170 million issuance of high yield bonds by a Canadian company called MAAX Holdings Inc. (now called "MAAX Corp."). Between 2006 and 2008, Harbinger learned that a prime broker it used was shorting MAAX bonds in which it had a position.  In retaliation, Harbinger purchased more than the available supply of these bonds (and more than even had been issued), then transferred the MAAX Corp. bonds away from the prime broker to a custodial bank account so that they could not be used to deliver on short positions.  Harbinger also demanded the return of any MAAX Corp. bonds that were borrowed.

111.   When the firm could find no bids in the market and sought to purchase MAAX Corp. bonds from Harbinger, Harbinger offered the bonds at par, or at a price of $100, although they were selling at a steep discount and were carried on its books at $65.  Harbinger continued to try to induce the firm to buy-in at inflated prices, and even engaged in a trade with a long-time trading partner of Falcone to make it appear as though Harbinger did not own all of the MAAX Corp. bonds.  Falcone continued to try to induce the firm to purchase the MAAX Corp. bonds at a price of $60 or more, even after he had written the position off as worthless.

112.    The SEC also separately charged Defendant Harbert in connection with the illegal "short squeeze" as a control person responsible and liable for Falcone's actions.  During the time period in which the illegal short squeeze occurred, Falcone was a Harbert employee and under its supervision.    Harbert was also responsible for the legal, compliance and supervision of Falcone and his Funds during this time.

113.    On July 3, 2012, Harbert settled with the SEC and agreed to pay a penalty of $1 million.

114.    On August 19, 2013, the SEC announced that it had reached a settlement in which Falcone and HCP admitted to having violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Section 20(a) of the Exchange Act (only as to Falcone), and Sections 206(1), (2) and (4) of the Investment Advisers Act of 1940 and Rule 206(4)-8 thereunder.  Falcone was barred from the securities industry for a minimum of five years.  Falcone and HCP also agreed to pay $18,020,714 in disgorgement, prejudgment interest and penalties.

115.    In the signed Consent that accompanied the announcement of the settlement and a Proposed Final Judgment for approval by the federal court, Falcone and HCP admitted that, "in connection with two funds they advised, Harbinger Capital Partners Special Situation Fund ('SSF') and Harbinger Capital Partners Fund ('HCP Fund I')":

(a)    "Falcone improperly borrowed $113.2 million from SSF, at an interest rate less than SSF was paying to borrow money, to pay his personal tax obligation, at a time when Falcone had barred other investors from making redemptions, and did not disclose the loan to investors for approximately five months"; and

(b)     "Falcone and Harbinger granted favorable redemption and liquidity terms to certain large investors in HCP Fund I who voted in favor of more restrictive redemption terms; and did not disclose certain of these arrangements to the fund's board of directors and the other fund investors."

116.    Falcone also admitted in the Consent to having manipulated the market for MAAX Corp. bonds by engaging in "interference with the normal interplay of supply of demand," because of which "the bonds more than doubled in price" during the period of Falcone's unlawful manipulation.

117.    Falcone and Harbinger further admitted in the Consent that, in connection with all of the above activity, they "acted recklessly."

118.    The SEC also charged HCP in an administrative proceeding with multiple violations of Rule 105 of Regulation M of the Exchange Act by short selling securities during a restricted period and then purchasing the securities in an initial public offering.  HCP settled the administrative proceeding and agreed to accept censure, pay disgorgement of $857,950, representing its profits on the trades, and pay a penalty of $428,975.

119.    Although the SEC investigation that resulted in these actions apparently began in 2008, it was not disclosed to investors until April 29, 2011.  By that time, Harbinger management had already produced documents and witnesses to regulators.

120.    Now that Falcone and HCP have admitted in the Consent to breaking the law, it is clear that the Defendants put personal interests ahead of all others, running the Funds with little regard for the well-being of the majority of investors or the iron-clad rules governing appropriate fiduciary conduct. The conduct and actions described in the Consent are also consistent with Falcone's *modus operandi* concerning LightSquared – gambling investor funds

36

on his ego-driven vision of a satellite-terrestrial wireless company and "breaking rules" to achieve it.

### H.     The September 2012 Hearings in the House of Representatives

121.    On September 21, 2012, the House Energy and Commerce Committee ("HECC") held hearings into the FCC's handling of the LightSquared situation.  Two officials from the FCC were called to testify, Ms. Mindel De La Torre (Chief of the International Bureau) and Mr. Julius Knapp (Chief of the Office of Engineering and Technology).

122.    Although the HECC did not officially assign blame for the fiasco, it did clearly note that as early as 2001, the industry knew that GPS interference was a substantial problem to be overcome should LightSquared's predecessor be granted its requested L-band license.

123.    Indeed, LightSquared's predecessor, Motient, in response to public comments in 2001 about its application for a license, acknowledged the potential GPS interference problem. In its August 17, 2001 Notice of Proposed Rulemaking, the FCC noted that "unwanted emissions from terrestrial stations in the MSS would have to be carefully controlled in order to avoid interfering with GPS receivers."

## V.     DERIVATIVE CLAIMS:  DEFENDANTS' BREACHES
## OF FIDUCIARY DUTIES TO THE FUNDS

124.    Defendants Harbinger GP, Harbert, Holdings and Falcone controlled Fund I and Fund II and as such owed Fund I and Fund II fiduciary duties of loyalty and care under Delaware law.

125.    Defendants Harbinger Special Situations GP, Harbert, Holdings and Falcone controlled the Special Situations Fund and as such owed the Special Situations Fund fiduciary duties of loyalty and care under Delaware law.

37

126.   The Defendants directed that Fund I and Fund II invest solely in the Master Fund.   Fund I and Fund II are ultimately controlled by HCP and Falcone to the exact same extent as HCP and Falcone control the Master Fund.   By investing the assets of these Funds solely in the Master Fund, any actions taken on behalf of the Master Fund that constitute a breach of fiduciary duty therefore must constitute a breach of fiduciary duty owed to Fund I and Fund II.

### A.      The LightSquared Gamble

127.   Falcone's decision to pursue his "vision" of building a satellite-terrestrial wireless 4G network created an impermissible conflict of interest between the Defendants and the Funds.   The Defendants had fiduciary duties to maximize returns for investors consistent with the investment objectives, which should have targeted a diversified portfolio focused primarily on distressed debt and proper risk management.   Defendants, however, materially deviated from this objective and decided to use and/or facilitate Falcone's use of the Funds to pursue a wildly complex "vision" of building a competitor to existing wireless companies from the ground up that used unproven technologies the Defendants knew were interfering with the GPS system.

128.   Falcone's pursuit of his vision with the knowledge and substantial assistance of the other Defendants put his own interests ahead of his investors.   Before LightSquared filed for bankruptcy, Falcone repeatedly told the press that he did not care if it went bankrupt, so long as he maintained control of the company, though this meant of course that his investors' equity position would shrink substantially or be wiped out.   Falcone even continued to pursue his personal vision after investor redemptions were restricted and suspended, and forced his investors to stay in the Funds whether they wanted to or not.

6401-1

129.     In addition to the conflict of interest and self-dealing inherent in Falcone's strategy, Defendants breached their duties to the Funds by concentrating a large portion of the Funds in a single, high-risk venture (made worse by the parallel investment in rival Inmarsat used to augment Falcone's "vision"), by failing to employ adequate internal risk controls, and by taking control of a company when no executive at Harbinger had sufficient experience in running a complex high-technology wireless telecommunications company.

130.     Summing up the consensus in the investor community after the FCC's February 14, 2012 decision, Artemis Wealth Advisors LLC's Peter Rup said, "[t]this has been nothing but a complete mismanagement of the fund." He further added, "[t]here should have been constraints on risk and concentration of the investments."

**B.      The SEC Investigation And Civil Fraud Actions**

131.     Since apparently 2008, the SEC has been investigating Harbinger and Falcone, which led to the civil fraud charges over possible manipulation of the market for MAAX bonds violations of Rule 105, improper loans that Falcone made to himself that he did not disclose to his investors for months (and made at a time when other investors faced restrictions from withdrawing from the Funds), and other improprieties.

132.     It was because of the SEC investigation of these possible instances of securities fraud that the Senate Judiciary Committee launched its investigation in the first place. In an April 27, 2011 letter from the Committee to Chairman Genachowski, Senator Grassley called the FCC's actions following the announcement of the SEC investigation a "curious set of circumstances" and ordered the FCC to provide documents related to communications with Falcone and the other defendants.

6401-1

133. Had it not been for the market manipulations, personal loans, and other violations being investigated by the SEC, Falcone would have likely avoided the Senate investigation and would have had at least a fighting chance in Washington to find a last-minute political solution. Because LightSquared is now viewed as politically toxic, it no longer has the ability to find a political solution, and thus the personal loan constituted a breach of fiduciary duty to the Funds.

134. In addition, even without the SEC investigation, Falcone's $113.2 million personal loan taken from the Funds constituted a breach of fiduciary duty because the Funds at that time had suspended redemptions, which by definition meant that the Funds lacked the liquidity to pay cash redemptions to investors. By taking $113.2 million out of the Funds at the time that liquidity problems were so severe, the Defendants breached their fiduciary duties.

135. Finally, the special treatment given to Goldman Sachs and other institutions was a breach of Defendants' fiduciary duties to the Funds because the Defendants allowed Goldman to withdraw $65 million from the Funds at a time when the Funds were experiencing liquidity problems. Other investors were restricted from redeeming at the time under the same terms.

## C. Attempt to Improperly Influence the FCC and a Congressional Investigation

136. Because LightSquared and Harbinger have been unable to resolve the problems of the L-band GPS interference problem, the only possible way for Falcone's "vision" to work would be to convince the government to swap spectrum with the company. However, Defendants' attempts to improperly influence the FCC and Senator Grassley have made LightSquared a "political hot potato" according to more than one commentator. The *Wall Street Journal* confirmed on April 27, 2012 that LightSquared's lenders "believe Mr. Falcone has

become a lightning rod that has made dealing with Washington regulators too difficult and threatens to upend the company's chances of success."

137.    Precisely when LightSquared "needed friends" in Washington D.C. to help it with a spectrum swap, Defendants made the company toxic, thus making a political resolution impossible. Before filing for bankruptcy, LightSquared recognized that its political situation was desperate, and tripled its lobbying budget in a single quarter, increasing it from $350,000 in the fourth quarter of 2011 to $1 million in the first quarter of 2012, according to the U.S. Senate's Lobbying Disclosure Act database.

## VI.    DERIVATIVE CLAIMS: DEMAND F UTILITY ALLEGATIONS

138.    Fund I, Fund II and the Special Situations Fund (the "Partnerships") are organized under Delaware law.

139.    Plaintiffs Schad, Foundation and Klein incorporate by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

140.    Plaintiffs bring Counts VI and VII derivatively or double-derivatively for the benefit of the Partnerships to redress injuries suffered and injuries that continue to be suffered by the Partnerships as a direct result of the misconduct alleged herein.  The Partnerships are named as nominal defendants solely in a derivative capacity, and not as named defendants, and thus there is no conflict in asserting these derivative claims.

141.    Plaintiffs Schad and Klein bring the derivative claim on behalf of Fund I, which is managed as a single unified enterprise in a master-feeder structure along with Fund II, Offshore Fund I, Offshore Fund II and the Master Fund, to purse a common goal and thus effectively function as a single entity. Defendants invested the entirety of Fund I, Fund II, Offshore Fund I and Offshore Fund II into the Master Fund, which invested in and held the

41

6401-1

assets which were reported to the investors in Fund I, Fund II, Offshore Fund I and Offshore Fund II.

142.   Plaintiffs Foundation and Klein bring a derivative or double-derivative claim on behalf of the Special Situations Fund. The Special Situations Fund and Special Situations Offshore Fund are partnerships which are managed as a single unified enterprise under a master-feeder structure to purse a common goal and thus effectively function as a single entity. The Special Situations Offshore Fund invested solely in the Special Situations Fund which invested in and holds the assets reported to investors in the Special Situations Offshore Fund. Both Funds are under common control.

143.   Plaintiffs will fairly and adequately represent the interests of the respective Partnerships and their limited partners in enforcing and prosecuting their rights.

144.   Plaintiffs have made substantial investments in the Partnerships. Plaintiffs have owned their respective limited partnership interests continuously throughout the period in which Defendants' wrongful acts occurred, and continue to own their limited partnership interests, thus giving them standing to pursue Counts VI and VII pursuant to 6 DEL. C. § 17-1002.

145.   This action is not being used by the Plaintiffs to gain any personal advantage, nor do Plaintiffs maintain any personal agenda other than seeking to remedy the wrong that has been done to the Partnerships.

146.   Plaintiffs did not make a demand on the General Partners of the Partnership to take remedial action on behalf of the Partnerships against the Defendants because such a demand would have been a futile, wasteful, and useless act. The General Partners themselves participated in, approved, and/or permitted the wrongs alleged herein and concealed or

disguised those wrongs, and are therefore not disinterested parties and lack sufficient independence to exercise business judgment as alleged herein.

147.    In addition, as established above and by Falcone's own admissions, the General Partners of the Partnerships are ultimately controlled by Falcone and the related Harbinger entities named as Defendants in this action. It would be futile to make a demand on the General Partners to sue the very people who control and make the decisions for the General Partners. As such, demand is excused under Delaware law.

6401-1

## VII.   DIRECT CLAIMS:  DEFENDANTS' FALSE AND MISLEADING STATEMENTS TO THE INVESTORS

### 1.   General Background of Repeated False and Misleading Statements and Omissions Regarding the Viability and Risk of the LightSquared Venture

148.   LightSquared's predecessor had long known that the GPS interference with its spectrum would be fatal to any plans to build a hybrid terrestrial-satellite wireless network.  In a November 4, 2011 letter to Senator Charles E. Grassley, Harbinger acknowledged that LightSquared's predecessor company knew of the GPS problem for almost 10 years, since 2002. In addition, Falcone himself has recently admitted in interviews that LightSquared (or its predecessor company) has been working with the GPS industry to remedy the problem since it first became known.

149.   It can reasonably be inferred from these facts that in the course of performing due diligence regarding the acquisition of what ultimately became LightSquared, and upon becoming a 100% owner of the entity known as LightSquared as of March 29, 2010, Defendants knew – or were utterly reckless in not knowing – that a resolution of the GPS issue was required to receive the final FCC approval needed to deploy LightSquared's technology, and knew that the entire venture depended on this one critical issue.

150.   Despite knowing of these enormous risks and hurdles, however, Defendants provided the Plaintiffs and Class Members with positive, anodyne general reporting on Harbinger's investment in LightSquared that functioned more as sales pitches than true, honest reports from fiduciary to investor.  No mention was ever made of any GPS interference issue, let alone the full extent of the risk, until August 19, 2011.

151.   Defendants issued monthly performance summaries describing the Funds' asset allocations.   These reports did not give any information specific to the investment in

44

LightSquared and did not offer information sufficient to determine the degree to which investors' money was concentrated in a single investment, a concentration exacerbated by the massive parallel investment in Inmarsat.

152.    Even when Harbinger did finally admit that GPS interference was an issue, the risk was described in only mild terms that did not accurately reflect the depth of the problem. Defendants only advised investors that users of GPS had claimed that LightSquared's network would interfere with satellite signals sent to GPS devices.  Defendants reassured investors that LightSquared had, for years, been diligently working with the GPS industry on the issue and had found a comprehensive solution that would allow LightSquared's plans to proceed. Defendants never disclosed that ultimate FCC approval was contingent on LightSquared finding a solution for the GPS issue until after redemptions were formally suspended – again – at the end of 2011.  These material false and misleading statements are provided in detail below.

153.    Harbinger's misrepresentation and disclosure failures relating to GPS interference issues exacerbated its failures to disclose risks associated with its investment strategies, i.e., its overconcentration into a single investment in LightSquared, its abandonment of a credit-driven strategy for a venture capital strategy, and its adoption of a long-term strategy to execute on business plans rather than an event-driven strategy.  Harbinger changed the fundamental nature of its investment strategy when it acquired LightSquared and it never disclosed this fact or the material related risks to investors.

### 2.    The April 28, 2010 Investor Conference Call

154.    On April 28, 2010, Harbinger hosted an investor conference call for the Fund I investors.  Defendant Falcone told investors that the Funds were equally exposed to long and short positions "to hedge risk."

155. This statement was false and misleading because the Funds at that time owned 100% of the equity of LightSquared (a particularly risky long position) and had other long positions that far outweighed the shorts. This gave investors a false sense of security that risk in the portfolio was mitigated when the truth was exactly the opposite.

156. HCP CEO Ahuja told investors that "we own 50 MHz of spectrum worth $15 billion."

157. This statement was false and misleading because Harbinger did not "own" spectrum, it merely held licenses that had less legal protection than true "ownership." More importantly, this spectrum is and was worth nowhere near $15 billion, a number that is so inflated as to strongly suggest that the value was arrived at and communicated to investors with fraudulent intent. Indeed, such a valuation is not reflected in any audited balance sheet or NAV or AUM calculation.

158. Ahuja further stated on the call that "while there is execution risk [related to the build-out of LightSquared], it's low. Technology is proven. We own the spectrum, so there is base value even without any added value."

159. These statements were false and misleading because the execution risk was extreme, not low, and this was known to Defendants. Also, the technology was unproven by any definition. At the time of this call, Defendants knew that substantial tests would be required to prove the viability of the technology, and that such testing would be expensive. And finally the statement that "we own the spectrum" is false and misleading because Harbinger merely held licenses, it did not "own the spectrum."

3.      The June 3 and June 4, 2010 Commentaries

46

160.   On June 3, 2010, Harbinger provided investors in Fund I, Fund II, Offshore Fund I and Offshore Fund II with a portfolio update, and on June 4, 2010, Harbinger provided investors in the Special Situations Fund and Special Situations Offshore Fund with a portfolio update, which commented on the market environment and the Funds' holdings.   Harbinger reported to investors in the Funds that the FCC had *already approved* the application by LightSquared's predecessor company "for a modification of certain terms of the ancillary terrestrial component … authorization" and that LightSquared's spectrum licenses could therefore "be made commercial for a terrestrial mobile broadband network."   Harbinger furthered told investors that LightSquared had "achieved regulatory support" and "created a valuable spectrum asset at a low cost."

161.   Harbinger's representations about the FCC approval and its impact were materially false and/or materially misleading, because on March 26, 2010, the FCC had issued only a **conditional** approval requested by LightSquared's predecessor for the ATC modification. The FCC's Order and Authorization permitted LightSquared to increase the power of its base station transmissions, but subjected its approval to numerous conditions to address the interference and degradation issues. The FCC's conditional approval did not confer commercial viability to any aspect of its business, and the FCC stated that it likely agreed with NTIA that LightSquared's predecessor (and subsequently LightSquared) would need to make a "hardware demonstration." The FCC's grant was intended only to give LightSquared's predecessor flexibility to attempt to coordinate and resolve the interference issues, and LightSquared's predecessor, and then LightSquared, was required to regularly report to the FCC on its progress.

162.    Furthermore, Harbinger's statement above was materially false and misleading because Harbinger also knew that the venture required significant and expensive additional FCC approvals including further ATC modification (for example, to make handsets available for terrestrial-only service) for its business to come close to being commercially viable.

### 4.    The June 2010 Investor Presentation

163.    On June 11, 2010, Harbinger provided a confidential investor presentation on its website. In the commentary sent to investors in Fund I, Fund II, Offshore Fund I and Offshore Fund II, Harbinger directed Class Members to this presentation which was "aimed to address investors' questions and thoroughly walk through our investment thesis and valuations for [LightSquared]." The presentation contained numerous materially false and misleading statements.

164.    Harbinger stated that it was an early investor in L-band spectrum and that it spent the last four years working with the FCC on modifying the spectrum for consumer broadband usage. Despite its long history as an L-band spectrum investor, and years of working with the FCC, Harbinger failed to even mention to investors the risks presented from GPS interference – the single largest risk to LightSquared's commercial viability.

165.    Instead, Harbinger focused on its thesis – that exploding demand for wireless service provides LightSquared with the opportunity to capitalize on the value of the spectrum it accumulated through investments in several companies. Harbinger compared the value of its assets, the low cost of its acquisition of the assets, and discussed the enormous potential for its operation of a network. However, in doing so, Harbinger made numerous false and misleading statements about LightSquared's progress to date, the true value of its assets, the hurdles ahead, the downside risks associated with its plan, and its prospect for success, as follows:

(a)    **"We believe [LightSquared] has more usable spectrum available for deployment of a next generation network than AT&T and Verizon."** This statement was false and misleading because Verizon's and AT&T's legacy networks (to which spectrum must be allocated) are a huge advantage for them in terms of existing customers and revenue streams, and they have a huge operational head start.

(b)    **"In March 2010, the Harbinger Funds were granted important modifications to their spectrum licenses that enable them to unroll a commercially viable, terrestrial network."** This statement was false and misleading because the ATC modifications granted by the FCC were only conditional and subject to numerous conditions including resolution of interference issues before LightSquared's network could ever achieve commercial viability.  LightSquared also had several regulatory hurdles ahead including additional ATC modifications needed from the FCC before it could ever reach commercial viability for a terrestrial network.

(c)    **"...even with minimal additional build out of a broadband network, [LightSquared] has 59 MHz of spectrum that, based on recent auction metrics, could be worth multiples."** This statement was materially false and misleading because LightSquared's entire 59 MHz of spectrum is not likely commercially usable based on its location on the spectrum proximately adjacent to GPS signals. In fact, LightSquared would later have only 10-20 MHz of usable spectrum.  Because of the interference issues, and the conditional nature of FCC approvals, LightSquared's L-band spectrum also cannot compare on a valuation basis to the spectrums sold at recent auctions, and should be discounted far more severely than the aggressive valuations given in the presentation.

(d)    **"The expected demand growth is driving the FCC to identify other sources of existing spectrum and modify various rules around these spectrum licenses in order to encourage usage in mobile broadband networks."** This statement was materially false and misleading because the FCC approval for ATC modification granted on March 26, 2010 to LightSquared was plainly conditional, with requirements that LightSquared address and resolve interference issues.  This FCC gave no indication that it would modify rules in a way that would allow LightSquared to circumvent the interference issues.

(e)    **"The FCC also approved our business plan for a competitive broadband network, which they view as enhanced by commitments to limit capacity sales to AT&T and Verizon Wireless."** This statement was materially false and misleading because the FCC did not approve either Harbinger's or LightSquared's "business plan" as this term is commonly understood and interpreted by investors, and did not give any "view" on its plans.  The FCC simply issued a conditional grant of a

49

request.  Moreover, LightSquared's decision to limit its wholesales to just Verizon and AT&T, or 40% of its potential market, eliminating the other 60% of its potential market, should not have been presented as a positive to investors, and the FCC did not comment on the business aspect of this decision.

(f)     **"Upon completion of the proposed capital raise, the Company would be capitalized by approximately $5,000MM to $6,000MM."**  This statement was materially false and misleading because this amount represents approximately three-to-four times less capital than would reasonably be needed to develop and build the terrestrial network which LightSquared stated was its goal.  The presentation failed to disclose the full extent of the capital needed or that this capital raise would be largely insufficient for the realization of LightSquared's plans.  Harbinger also misleadingly suggested that the additional capital would come from strategic investors, vendor financing and financial investors, not just the Funds.

166.    The June 2010 presentation by Harbinger did not provide its investors with a balanced discussion of its investment thesis or views, and no discussion at all of the associated investment risks. Harbinger did not describe or discuss the investment risks associated with its investment in spectrum "assets," nor the risks associated with the "assets."  Harbinger also did not describe or discuss the investment risks associated with its large concentration of the Funds' assets into LightSquared (and parallel investment in Inmarsat), including the lack of any reliable hedge that could be employed to manage risk.

167.    Finally, Harbinger's presentation also failed to address the specific and unique material risks to the Funds associated with assuming a *de facto* management and business execution strategy in the highly-regulated telecommunications field.  The Funds' success as an investment became dependent on Harbinger's ability to manage a development-stage telecommunications business, and not simply conduct credit analysis on an investment.  Investors were not given clear disclosure of these risks, nor of the effect the risks had on their investments in the Funds.

6401-1

### 5.   The July 20, 2010 Press Release

168.   On July 20, 2010, LightSquared issued a Press Release announcing a launch of LightSquared entitled "INTRODUCING LIGHTSQUARED: Revolutionizing the U.S. Wireless Industry". Falcone is credited as the "driving force behind LightSquared," and quoted in the Press Release as saying that the launch is a "milestone" for Harbinger.

169.   The Press Release touted LightSquared as the "[f]irst-ever wholesale nationwide 4G-LTE wireless broadband network integrated with satellite coverage [that] allows partners to offer terrestrial-only, satellite-only or integrated satellite-terrestrial services to their end users."

170.   This statement was materially false and misleading because LightSquared had not yet built its broadband network, and the FCC had not yet granted LightSquared an ATC modification permitting it to provide "terrestrial-only" service (and did not until January 2011).

171.   The Press Release also stated that "LightSquared controls valuable high quality spectrum assets of 59 MHz of nationwide spectrum in an advantageous frequency position" and that "[t]he nationwide LightSquared network, consisting of approximately 40,000 cellular base stations, will cover 92 percent of the U.S. population by 2015."   These statements were both materially false and misleading because LightSquared's frequency had significant drawbacks and limitations on its potential usability that made it highly disadvantageous compared to other spectrum, and LightSquared's forecast of the size of its network lacked a basis in reality as it had not yet received approval to even operate its network prior to commencing a multi-billion-dollar deployment.

### 6.   The November 11, 2010 Commentary

172.   On November 11, 2010, Harbinger provided investors in Fund I, Fund II, Offshore Fund I and Offshore Fund II with a confidential portfolio update.   The commentary

51

stated that LightSquared had "secured significant financing to fund its initial capex requirements." Harbinger went on to state that:

> The response to both the debt and equity raise was tremendous and, we believe, underscores the appetite for spectrum assets in the market. As further validation for not just the asset, but also the business plan, Lightsquared signed definitive documents with its first wholesale network customers and continues to actively negotiate with a pipeline of additional customers.

173.    This commentary was materially false and misleading because it reaffirmed Harbinger's prior false statements about its assets and business plans, while omitting any disclosure of risks or qualifications about the worth of the assets or limitations on the plans. Harbinger also failed to disclose specifics on its capital needs, cash burn-rate, and cash position – material information to any investor in a development-stage company.

### 7.     The June 17, 2011 Announcement

174.    On June 17, 2011, Harbinger provided investors in Fund I, Fund II, Offshore Fund I, Offshore Fund II, Special Situations Fund and Special Situations Offshore Fund with a letter announcing that LightSquared had reached a definitive agreement with Sprint Nextel Corporation, and cautioned them about the confidentiality of this "inside" communication. The letter stated:

> The agreement establishes a 15-year strategic partnership between Lightsquared and Sprint that we believe will be transformative for Lightsquared. Under the agreement, Lightsquared and Sprint will jointly develop, deploy and operate Lightsquared's 4GLTE network; Lightsquared will obtain 3G network roaming capacity from Sprint; and Sprint will become a significant customer of Lightsquared's 4G LTE network.

175.    This description of the agreement with Sprint was materially false and misleading. LightSquared failed to disclose that it would pay Sprint $9 billion in cash and $4.5 billion in credits, so that there was significant consideration to be provided. Additionally, and

52

more importantly, LightSquared's "15-year strategic partner" Sprint had the right to cancel the agreement before the end of the year if LightSquared was unable to resolve the interference issues with the FCC, and the agreement had other contingencies and conditions on resolving interference issues. Sprint's right to cancel, and the other conditions, based on interference issues, were not disclosed to Harbinger's investors.

### 8.   The August 5, 2011 Commentary

176.   On August 5, 2011, Harbinger provided investors in Fund I, Fund II, Offshore Fund I and Offshore Fund II with a portfolio update that commented on the market environment and the Funds' holdings.  Harbinger reported:

> Lightsquared is an investment that truly emphasizes our ability to be novel and unique in our approach and active in opportunities where we can be the driver of returns.   Reflecting on the past year, Lightsquared has achieved a number of significant milestones since Harbinger fully acquired Skyterra on March 27, 2010. Coinciding with this acquisition, LightSquared **received approval from the Federal Communications Commission (the "FCC") to pursue Lightsquared's business plan** and to modify certain terms of the ancillary terrestrial component authorization, which <u>enhanced the commercial attractiveness</u> of the terms under which Lightsquared's spectrum licenses may be used to operate the terrestrial portion of Lightsquared's mobile broadband network.  **Early this year, the FCC issued an order further <u>enhancing this commercial attractiveness by endorsing Lightsquared's plans</u> for integrating the satellite and terrestrial portions of its network.** (emphasis added)

177.   These statements to investors were materially false and misleading because Harbinger, again, misled investors into believing that the FCC approved its "business plan" when in fact the FCC merely allowed LightSquared to spend several billions of dollars to attempt to get approval for its business plan.   Likewise, the statement materially misled investors into believing that the ATC modification "enhanced the commercial attractiveness" of LightSquared when in fact the FCC's approval was a conditional approval which placed

numerous significant conditions that had to be met, particularly resolution of interference issues, before LightSquared's spectrum could be commercially viable. The FCC's waiver was in effect permission to burn through $3 billion, which cannot be said to be an order "enhancing" the "commercial attractiveness" of Falcone's vision.

178.    Harbinger also misrepresented the significance of the January 2011 Order from the FCC which, again, did not "endorse" LightSquared's plans. Even while the FCC granted LightSquared a waiver, it noted the GPS-related interference concerns raised by the NTIA and U.S. GPS Industry Council. In fact, the FCC established a working group on GPS interference issues, and required LightSquared to participate in the working group and report on the progress. The FCC also emphasized that this waiver did not change the prior conditions relating to interference placed in the March 2010 ATC modification it granted. The FCC Order was not an endorsement or comment on the commercial attractiveness or viability of LightSquared's business plans.

179.    Despite referencing LightSquared's progress, Harbinger failed to disclose to investors the GPS interference issues related to its proposed plans, or the conditional nature of the FCC approvals. Harbinger's discussion of the FCC approvals without reference to the conditions is a materially false and misleading statement.

### 9.    The August 19, 2011 Commentary – First Reference to GPS Interference Issues

180.    On August 19, 2011, Harbinger provided investors in Fund I, Fund II, Offshore Fund I and Offshore Fund II with a portfolio update that, among other things, commented for the first time on the GPS interference issues. Yet Harbinger misrepresented the seriousness of the interference issue, and the likelihood of LightSquared ever achieving commercial viability.

LightSquared's statement also demonstrated its long-standing knowledge of the GPS interference issues.

181.   Harbinger reported as follows:

Additionally, LightSquared management continues to work diligently with the FCC, NTIA and GPS community on a modified spectrum plan that will serve as a foundation for the construction of their wireless broadband network. Users of GPS receivers have claimed that LightSquared's transmissions will overpower the satellite signals sent to their devices. It is critical to note that the reason for this interference is not because LightSquared would improperly transmit in the GPS band. Results from recent GPS device tests confirm that the interference is a result of the GPS device manufacturer's decision over the past eight years to design products that depend on using spectrum assigned to other FCC licensees. **For years, LightSquared (and/or its predecessor companies) has participated in open, public proceedings to determine its network's technical parameters and has worked with the GPS Industry throughout the process.** Despite LightSquared's continuous efforts to cooperate in order to find solutions to the interference issues, the GPS community has recently launched a rather loud and contentious public relations and lobbying effort outside the scope of the proceedings, which fails to acknowledge any responsibility for having created this situation. (emphasis added)

\* \* \*

In a report filed with the FCC on June 30th, LightSquared outlined a comprehensive solution that allows the company to move forward with its business plan and lay the foundation for future co-existence with the GPS community. LightSquared is committed to working with the FCC, NTIA and others to find solutions that mitigate the interference issues and we look forward to keeping you informed on any developments.

182.   Harbinger's bare identification of the GPS interference issue was a materially false and misleading characterization of the overwhelmingly difficult task ahead for the company. On June 30, 2011 – *several weeks prior to this statement above* – the FCC's Technical Working Group issued a report of its findings from its extensive study and testing of potential GPS interference. The TWC concluded that LightSquared's terrestrial broadband network would cause harmful interference to nearly all 500 million GPS receivers and GPS-dependent applications. Separately, the FAA and National Public Safety Telecommunications

55

Council reached similar conclusions *prior to the August 2011 disclosure to investors*. Thus, Harbinger still failed to disclose the full depth and degree of the seriousness of the fatal GPS interference problems to its investors, as any reasonable possibility of LightSquared's terrestrial use of the L-band spectrum for its network was effectively ended by the TWC's test results. The TWC further found that filters or other technology that would solve the interference problem did not exist.

183.    In reaction to the TWC's report, Harbinger submitted a 318-page proposal to the FCC in a last-ditch effort to "save" LightSquared's business.  Among its proposals were for LightSquared to operate at reduced power and to utilize only its lowest 10 MHz band (out of its total 59 MHz) for its terrestrial network.  Harbinger's commentary to investors failed to disclose these proposed radically scaled-back options, or that it even had been forced to make such proposals.  Harbinger's disclosure to investors was thus grossly false and misleading, as investors were never informed that LightSquared was teetering on the edge of a cliff.

184.    Upon information and belief, Harbinger made the same or substantially similar misrepresentations and/or material omissions to investors in all Funds.

### 10.    The Monthly Statements and Performance Summaries Reporting NAV and AUM

185.    The Defendants follow GAAP in the maintenance and reporting of the Funds' accounts in the calculation of Assets Under Management and each investor's account balance.

186.    After March 2010, the LightSquared stock held by the Funds became Level III assets (or assets whose value cannot be determined by observable measures), and the Funds including the Master Fund adopted the framework set forth in Financial Accounting Standards Board Statement No. 157 ("FASB 157") to calculate "fair value" of assets that do not trade on an active market and lack significant observable inputs.

187.    FASB 157 requires valuation of the Funds' assets "based on the best information available."  From March 29, 2010 through the beginning of 2012, Defendants knew that they had wildly overvalued the LightSquared stock because their valuation did not make appropriate assumptions about risk, and did not include the best information available, including the fact that the business wholly depended on resolving a technical issue that could not be resolved.  In 2011, the Defendants wrote down the LightSquared value by half, but this mark-down should have been done far earlier.  The refusal to provide proper valuations for an asset that constituted the bulk of the Funds' assets resulted in inappropriately reassuring performance figures and thus misrepresented the health of the Funds each month to investors.

## VIII.   DIRECT CLAIMS:  PLAINTIFFS' RELIANCE

188.    Plaintiffs relied on communications from the Defendants related to the Funds, including the reported net asset values ("NAVs"), in deciding whether to continue to hold their investments.  Because the Funds are not publicly traded companies, Plaintiffs justifiably relied on these communications as they were Plaintiffs' primary source of information about the Funds.

189.    Class Members are also presumed to have relied on communications from the Defendants related to the Funds, including the reported NAVs, in deciding whether to continue to hold their investments.  Because the Funds are not publicly traded companies, Class Members justifiably relied on these communications as they were Class Members' primary source of information about the Funds.

## IX.   DIRECT CLAIMS:  SPECIAL RELATIONSHIP BETWEEN DEFENDANTS AND INVESTORS

190.    Defendants had a special relationship with Plaintiffs and Class Members that gave rise to legally recognized duties of care and fiduciary duties.

6401-1

191.   Defendants communicated directly and confidentially with each investor prior to the investment.   Confidential offering documents were provided or made available to each investor, and each investor was instructed to rely solely on the information contained therein when deciding whether to invest.

192.   The shares and limited partnership interests are restricted securities, not traded on any public exchange, and can only be purchased by certain qualified investors.   Almost all information provided by Defendants to the investors is required to be kept confidential.

193.   Defendants provided monthly performance summaries directly to the investors that were not permitted to be made public.

194.   Defendant Falcone wrote letters directly to his investors and hosted conference calls to discuss recent events and answer questions investors might have.

195.   In Offering Materials for each fund, Defendants held themselves out as experts in their field.   For example, the Confidential Offering Memorandum for Fund I touted the "extensive expertise" of the investment team which enabled them to "develop a broad network within the restructuring community."   Biographies for no fewer than 18 key employees at Harbinger and five at Harbert were provided in the OM to give comfort to investors that the Funds would be well-managed.

196.   Defendants were aware that the Plaintiffs and Class Members would use information provided by Defendants for the special purpose of deciding whether to invest and/or redeem.   Not only was the information confidential but Defendants were frequently the only conduit for information to the investors.

197.   Plaintiffs and each and every Class Member are in privity of contract, or in a relationship approaching privity of contract, with the Defendants, because investments can only

58

be made through a subscription agreement executed by at least one Defendant (all of whom are ultimately controlled by or affiliated with Defendant Falcone) and the investor.  No limited partnership agreements or shares can be acquired on the open market without a contract signed by at least one Defendant.

## X.     ALL CLAIMS: DAMAGES AND LOSS CAUSATION

198.    At their peak, the Harbinger Funds managed more than $26 billion.  Of this amount, approximately $3 billion was invested in LightSquared.  Due in part to redemptions, but also due in part to drops in asset values, the Funds now have less than $4 billion under management. Such a drop in only four years constitutes the biggest loss by any family of hedge funds in history.  The $3 billion investment in now-bankrupt LightSquared is now almost completely gone.  The Defendants concealed the risk inherent in this strategy, and when the risk materialized, the Defendants closed the gate and refused to let investors out.

199.    Defendants used assets in the Funds to finance LightSquared. All told, more than $3 billion was diverted from the Funds to LightSquared, which is now bankrupt with only a "vision of a business" left.

200.    In addition, the Defendants' knowing, reckless and/or grossly negligent breaches of their fiduciary duties to the Funds caused substantial harm to the Funds and investors therein, including direct harm as outlined in the SEC cases, and indirect harm because of Defendants' inability to salve a political solution for the LightSquared GPS interference problem.  Because Falcone and the other Defendants put their interests above the Harbinger investors, and because they committed multiple counts of securities fraud, they have become toxic in Washington and substantially diminished their ability to solve the GPS problem.

6401-1

201.    In addition, Defendant Falcone's knowing, reckless and/or grossly negligent breaches of his fiduciary duties to his fellow partners in the Delaware Funds caused substantial harm to the partners.

202.    As a direct result of the Defendants' fraudulent and/or grossly negligent misrepresentations of the investment objectives of the Funds, and of the risks inherent in the LightSquared folly that materialized, investors and the Funds have lost almost all of the $3 billion.

## XI.    ALL CLAIMS:  TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATIONS

203.    Plaintiffs, on behalf of the Class Members and derivatively on behalf of the Domestic Funds, did not discover the facts constituting Defendants' violations until a date within the limitations periods governing this action, and promptly exercised due diligence by filing the original class action complaint and subsequent amended class action and derivative complaint in this action.  Plaintiffs and Class Members could not reasonably have discovered Defendants' conduct before 2011, and therefore any applicable statutes of limitations were tolled until at least the beginning of 2011.

## XII.    DIRECT CLAIMS:  CLASS ACTION ALLEGATIONS

204.    Counts I through V of this action assert direct class claims pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired limited partnership interests in Fund I, Fund II, the Special Situations Fund, the Special Situations Offshore Fund, Offshore Fund I and Offshore Fund II prior to December 31, 2011.  Excluded from the Class are Defendants and their respective officers, directors, employees, affiliates, legal representatives, predecessors,

60

successors and assigns, and any entity in which any of them have a controlling interest or is a parent.

205.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time and can only be obtained through appropriate discovery, Plaintiffs believe that the number of Class Members exceeds 40 and joinder would be impracticable.   Record owners and other members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

206.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.   The questions of law and fact common to the Class include (1) whether Defendants omitted and/or misrepresented material facts in communications with investors about risks associated with their intended investment strategies; (2) whether Defendants knew or recklessly disregarded that their statements were false or misleading; (3) whether Defendants breached fiduciary duties to the Class Members; and (4) the extent to which members of the Class have sustained damages and the proper measure of any such damages.

207.    Plaintiffs' claims are typical of the claims of other Class Members, as all members of the Class were similarly affected by Defendants' wrongful conduct.

208.    Plaintiffs are substantial investors who will fairly and adequately protect the interests of Class Members and have retained counsel that is competent and experienced in class and securities litigation.   Plaintiffs have no interests that are in conflict with, or otherwise antagonistic to the interests of the other Class Members.

6401-1

209.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. There will be no difficulty in management of this action as a class action.

## XIII.   COUNTS

### COUNT I

### Direct Claim:  Negligent Misrepresentation Asserted Against All Defendants Except Harbert

210.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein, except for those averring fraud and those pertaining to Derivative Claims.

211.    Defendants had a special duty of care to investors that arose out of a special relationship.  Defendants, as a result of their special relationship with investors in the Funds, owed Plaintiffs and the Class duties of ordinary and reasonable care that arose from their relationships with the Harbinger entities and the investors, their position and status as issuer of the limited partnership interests in the Funds, and as investment advisors and managers of the Funds.  Defendants owed duties of ordinary and reasonable care applicable to any similar hedge fund, private equity firm or other investment advisor.

212.    Defendants made numerous false and misleading representations about the Funds to Plaintiffs and Class Members concerning, among other things, the Funds' investment strategy, the risk management strategies that would be employed, and the prospects for the Funds' underlying investments.

213.    Defendants were grossly negligent in their failure to exercise reasonable care. Defendants' conduct was an extreme departure from the ordinary standard of care and more than ordinary inadvertence or inattention.

214.    Plaintiffs and the Class justifiably relied on the statements Defendants made in selling limited partnership interests and shares.  Plaintiffs and the Class also justifiably relied on the ongoing statements Defendants made in deciding to continue holding and not redeem.

215.    As a result of Defendants' conduct, Plaintiffs and the members of the Class have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## COUNT II

## Direct Claim:  Common Law Fraud Asserted Against All Defendants Except Harbert

216.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein, except for those pertaining only to Derivative Claims.

217.    Defendants made numerous false representations to Plaintiffs and Class Members with reckless indifference to the truth, and/or with knowledge or belief that the representation was false, or Defendants deliberately concealed some material fact, or Defendants were silent in the face of a duty to provide disclosure to Plaintiffs and Class Members.

218.    Defendants' false representations, concealment or silence induced Plaintiffs to invest in the Funds and/or forbear from redeeming their investments in the Funds.

219.    Plaintiffs and Class members justifiably relied upon Defendants' false representations, concealment or silence, which induced them to invest in the Funds and/or forbear from redeeming their investments in the Funds.

220.    As a direct and proximate result of such reliance, Plaintiffs and the members of the Class have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

63

## COUNT III

### Direct Claim:  Breach of Fiduciary Duty Asserted Against Defendants Falcone, Harbinger GP, Harbinger Special Situations GP and Harbinger Special Situations Offshore GP

221.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein, except for those averring fraud and those pertaining only to Derivative Claims.

222.    Defendants Falcone, Harbinger GP, Harbinger Special Situations GP and Harbinger Special Situations Offshore GP, in addition to fiduciary duties owed to the Funds, owed direct fiduciary duties to the Plaintiffs and Class Members.  Defendant Falcone admitted in communications with investors that he is their fiduciary.

223.    Specifically, these Defendants owed duties of candor and truthful disclosures as well as the duty to avoid disparate treatment of the investors.

224.    Defendants knowingly and/or grossly negligently failed to disclose to investors that Falcone received a low-interest, personal loan for $113.2 million from the Funds at a time when other investors faced redemption restrictions, making his loan one of the largest investments for the Special Situations Fund. Defendants further failed to disclose to investors that the Fund reached side agreements with large institutional investors to receive preferential treatment of redemption requests.

225.    Defendants' actions constituted breaches of fiduciary duties owed directly to the investors.

226.    These breaches induced Plaintiffs and Class Members to forbear from redeeming their investments in the Fund and as a result they incurred damages.

6401-1

## COUNT IV

**Direct Claim:  Aiding and Abetting Breach of Fiduciary Duty Against Defendant Harbert**

227.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein, except for those pertaining only to Derivative Claims.

228.    Defendant Harbert knew that Falcone, Harbinger GP, Harbinger Special Situations GP and Harbinger Special Situations Offshore GP owed Plaintiffs and Class Members a direct fiduciary duty.

229.    Defendant Harbert knew that Falcone, Harbinger GP, Harbinger Special Situations GP and Harbinger Special Situations Offshore GP breached their fiduciary duty as set forth herein.

230.    Defendant Harbert knowingly participated and substantially assisted in these breaches by causing Falcone, Harbinger GP, Harbinger Special Situations GP and Harbinger Special Situations Offshore GP to make false statements to investors and to fail to disclose the $113.2 million loan to Falcone and the selective redemptions of certain investors.

231.    These breaches induced Plaintiffs and Class Members to forbear from redeeming their investments in the Funds and as a result they incurred damages.

## COUNT V

**Direct Claim:  Aiding and Abetting Breach of Fiduciary Duty Against Defendants Falcone and Holdings**

232.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein, except for those pertaining only to Derivative Claims.

233.    Plaintiffs assert this claim in the alternative against Defendant Falcone.

6401-1

234.    Defendants Falcone and Holdings knew that Harbinger GP, Harbinger Special Situations GP and Harbinger Special Situations Offshore GP owed Plaintiffs and Class Members a direct fiduciary duty.

235.    Defendants Falcone and Holdings knew that Harbinger GP, Harbinger Special Situations GP and Harbinger Special Situations Offshore GP breached their fiduciary duty as set forth herein.

236.    Defendants Falcone and Holdings knowingly participated and substantially assisted in these breaches by causing Harbinger GP, Harbinger Special Situations GP and Harbinger Special Situations Offshore GP to make false statements to investors and to fail to disclose the $113.2 million loan to Falcone and the selective redemptions of certain investors.

237.    These breaches induced Plaintiffs and Class Members to forbear from redeeming their investments in the Funds and as a result they incurred damages.

## COUNT VI

### Derivative Claim:  Breach of Fiduciary Duty Against Defendants Harbinger GP, Holdings and Falcone Derivatively On Behalf of Fund I and Fund II Under Delaware Law

238.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein, except for those pertaining only to Direct Claims.

239.    Defendants Harbinger GP, Holdings and Falcone controlled Fund I and as such owed the Fund fiduciary duties of loyalty and care under Delaware law.

240.    Defendants breached their fiduciary duties by, *inter alia*, violating the investment objectives of the Fund and investing a majority of the Fund's assets in a single, high-risk equity investment, subjecting the Fund to SEC civil fraud actions, granting preferential treatment in side agreements with large institutional investors, reporting inflated asset values thus resulting

in inappropriately high fees being paid to Defendants, and otherwise acting in their own interests and not in the best interests of the Funds.

241.   Plaintiffs did not make demand on the Funds because such demand would be futile. The general partner of the Fund and those in control of the general partner and the Funds are the primary wrongdoers that engaged in the breaches of fiduciary duty.

242.   As a direct and proximate result of these breaches, the Funds have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## COUNT VII

### Derivative Claim:  Breach of Fiduciary Duty Against Defendants Holdings, Harbinger Special Situations GP, and Falcone Derivatively On Behalf of the Special Situations Fund

243.   Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein, except for those pertaining only to Direct Claims.

244.   Defendants Harbinger Special Situations GP, Holdings and Falcone controlled the Special Situations Fund and as such owed the Fund fiduciary duties of loyalty and care under Delaware law.

245.   Defendants breached their fiduciary duties by, inter alia, violating the investment objectives of the Fund and investing a majority of the Fund's assets in a single, high-risk equity investment, making a personal $113.2 million loan to Defendant Falcone, subjecting the Fund to SEC civil fraud actions, reporting inflated asset values thus resulting in inappropriately high fees being paid to Defendants, and otherwise acting in their own interests and not in the best interests of the Fund.

6401-1

246.    Plaintiffs did not make demand on the Fund because such demand would be futile. The general partner of the Fund and those in control of the general partner and the Fund are the primary wrongdoers that engaged in the breaches of fiduciary duty.

247.    As a direct and proximate result of these breaches, the Fund has suffered and continues to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## XIV.   JURY DEMAND

Plaintiffs demand trial by a jury on all triable issues.

## XV.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and Class members pray for a judgment in their favor:

(1)      for an order determining that Counts I through V of this action constitute a proper class action, and certifying the Class as defined herein and appointing Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

(2)      for compensatory, special and general damages according to proof;

(3)      for prejudgment interest;

(4)      for appropriate equitable relief;

(5)      for disgorgement of all management and performance fees paid by the Funds directly or indirectly to any Defendant;

(6)      for an accounting of all damages caused by Defendants to the funds and class members;

(7)      for reasonable attorneys' fees and costs of investigation and litigation; and

(8)      for such other and further relief as the interests of law or equity may require.

6401-1

Dated:   October 29, 2013        Respectfully submitted,

**ZAMANSKY & ASSOCIATES LLC**

By: _____

Jacob H. Zamansky
Edward H. Glenn, Jr.
Samuel E. Bonderoff
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
*jake@zamansky.com*

*Interim Class Counsel*

**GIRARD GIBBS LLP**
Daniel C. Girard
Amanda M. Steiner
711 Third Avenue, 20th Floor
New York, NY 10017
Telephone: (212) 867-1721
Facsimile: (212) 867-1767
*dcg@girardgibbs.com*

**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
Steven E. Fineman
Nicholas Diamand
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592
*sfineman@lchb.com*

*Additional Counsel for Plaintiffs*

6401-1

**RULE 23.1 VERIFICATION OF JACOB H. ZAMANSKY, ESQ.**
**ON BEHALF OF PLAINTIFF ANIL BHARDWAJ**

1.  I am Jacob H. Zamansky, counsel for plaintiff Anil Bhardwaj (Bhardwaj).

2.  I am authorized to make this verification on behalf of Bhardwaj.

3.  I have provided a copy of the sixth amended complaint to Bhardwaj and he confirms that he knows the contents thereof and that, based upon personal knowledge and information provided to me, the facts provided therein are true and correct to the best of my information and belief.

4.  Plaintiff Bhardwaj is out of the country and getting him to execute a Rule 23.1 verification at this time would prove to be impractical.


_____

Jacob H. Zamansky as agent for Anil Bhardwaj

**RULE 23.1 VERIFICATION OF JACOB H. ZAMANSKY, ESQ.
ON BEHALF OF PLAINTIFF THE EWARD N. ARMFIELD SR. FOUNDATION**

1. I am Jacob H. Zamansky, counsel for plaintiff The Edward M. Armfield Sr. Foundation (the "Foundation).

2. I am authorized to make this verification on behalf of the Foundation.

3. I have provided a copy of the sixth amended complaint to Foundation which has confirmed that it knows the contents thereof and that, based upon personal knowledge and information provided to me, the facts provided therein are true and correct to the best of my information and belief.

4. Plaintiff Foundation is located in another state and obtaining a Rule 23.1 verification at this time would prove to be impractical.


_____
Jacob H. Zamansky as agent for The Edward
M. Armfield Sr. Foundation

### RULE 23.1 VERIFICATION OF JACOB H. ZAMANSKY, ESQ.
### ON BEHALF OF PLAINTIFF KLEIN FAMILY PARTNERSHIP LP

1.  I am Jacob H. Zamansky, counsel for plaintiff Klein Family Partnership LP (Klein).

2.  I am authorized to make this verification on behalf of Klein.

3.  I  have provided a copy of the sixth amended complaint to Klein and confirms that it knows

    the contents thereof and that, based upon personal knowledge and information provided to me, the

    facts provided therein are true and correct to the best of my information and belief.

4.  Plaintiff Klein is out of town and getting Klein to execute a Rule 23.1 verification at this

    time would prove to be impractical.


    _____

    Jacob H. Zamansky as agent for
    Klein Family Partnership LP

## RULE 23.1 VERIFICATION OF JACOB H. ZAMANSKY, ESQ.
## ON BEHALF OF PLAINTIFF DR. RANDALL LANG

1. I am Jacob H. Zamansky, counsel for plaintiff Dr. Randall Lang (Lang).

2. I am authorized to make this verification on behalf of Lang.

3. I  have provided a copy of the sixth amended complaint to Lang and he confirms that he knows the contents thereof and that, based upon personal knowledge and information provided to me, the facts provided therein are true and correct to the best of my information and belief.

4. Plaintiff Lang is out of the country and getting him to execute a Rule 23.1 verification at this time would prove to be impractical.

_____

Jacob H. Zamansky as agent for Dr. Randall Lang

**RULE 23.1 VERIFICATION OF JACOB H. ZAMANSKY, ESQ.
ON BEHALF OF PLAINTIFF LILI SCHAD**

1. I am Jacob H. Zamansky, counsel for plaintiff Lili Schad ("Schad").

2. I am authorized to make this verification on behalf of Schad.

3. I have provided a copy of the sixth amended complaint to Schad and she confirms that she knows the contents thereof and that, based upon personal knowledge and information provided to me, the facts provided therein are true and correct to the best of my information and belief.

4. Plaintiff Schad is out of town and getting her to execute a Rule 23.1 verification at this time would prove to be impractical.

_____
Jacob H. Zamansky as agent for Lili Schad

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re HARBINGER CAPITAL PARTNERS
FUNDS INVESTOR LITIGATION

Case No. 1:12-cv-01244-AJN

**CERTIFICATE OF SERVICE**

I, Jacob H. Zamansky, hereby certify in accordance with this Court's Individual Practices that on November 4, 2013, plaintiffs' counsel served the following document:

## SIXTH VERIFIED AMENDED CLASS ACTION
## AND DERIVATIVE COMPLAINT

on counsel for defendants:

David J. Leffell
Leslie Gordon Fagen
Steven Craig Herzog
**Paul, Weiss, Rifkind, Wharton & Garrison, LLP**
1285 Avenue of the Americas
New York, NY 10019
dleffell@paulweiss.com
lfagen@paulweiss.com
sherzog@paulweiss.com

Gregory P. Joseph
Pamela Jarvis
Rachel Mead Cherington
**JOSEPH HAGE AARONSON LLC**
485 Lexington Avenue, 30th Floor
New York, NY 10017
gjoseph@jhany.com
pjarvis@jhany.com
rcherington@jhany.com

Gregory A. Clarick
Isaac Berkman Zaur
Nicole L. Gueron
**CLARICK GUERON REISBAUM LLP**
40 West 25th Street
New York, NY 10010
gclarick@cgr-law.com
izaur@cgr-law.com
ngueron@cgr-law.com

Nina Minard Beattie
Jessica Renee Holloway
**BRUNE & RICHARD LLP**
One Battery Park Plaza
New York, NY 10004
nbeattie@bruneandrichard.com
jholloway@bruneandrichard.com

  XX   by electronically transmitting via email the above listed documents to the email addresses

set forth above.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

November 4, 2013 at New York, New York.


By: /s/ *Jacob H. Zamansky*

Jacob H. Zamansky
Edward H. Glenn, Jr.
Samuel E. Bonderoff
**ZAMANSKY & ASSOCIATES LLC**
50 Broadway, 32nd Floor
New York, New York 10004
Telephone: (212) 743-1414
Facsimile:  (212) 742-1177

*Interim Class Counsel*

Daniel C. Girard
Amanda M. Steiner
Christina H. C. Sharp
Gabriel T. Bluestone
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA  94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Steven E. Fineman
Nicholas Diamand
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

*Additional Counsel for Plaintiffs*