UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Harbinger Capital Partners Funds Investor
Litigation

12-cv-1244 (AJN)

OPINION &
ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 3 0 2015

ALISON J. NATHAN, District Judge:

This is a putative class action arising out of Plaintiffs' investments in a family of hedge

funds managed by Defendants Philip A. Falcone and Harbinger Capital Partners, LLC, and

affiliated entities.  Plaintiffs' allegations center on Defendants' investment in the wireless

broadband company SkyTerra Communications, Inc. ("SkyTerra"), which Defendants renamed

LightSquared Inc. ("LightSquared").  Despite investing in what were marketed as diversified,

distressed-debt hedge funds, Plaintiffs claim that Defendants used the funds to take a majority

ownership interest in LightSquared without disclosing the changed strategy or risks involved.

Plaintiffs also raise claims involving a large, low-interest personal loan to Falcone from the

funds, "side agreements" with large investors granting them more favorable redemption terms

than Plaintiffs, and derivative claims on behalf of certain funds alleging breaches of fiduciary

duty.

On September 30, 2013, the Court granted in part and denied in part Defendants' motion

to dismiss the Fourth Amendment Complaint ("4AC"), and dismissed with prejudice all claims

predicated on the funds' purchase of SkyTerra, as well as certain direct and derivative claims for

breach of fiduciary duty.  *See* Dkt. No. 125 at 42-43; *In re Harbinger Capital Partners Funds

Investor Litig.*, No. 12-cv-1244 (AJN), 2013 WL 5441754 (S.D.N.Y. Sept. 30, 2013).  At the

same time, the Court granted Plaintiffs leave to amend their complaint and re-plead their

remaining claims in light of the September 30, 2013 order.  On December 16, 2013, the Court

1

granted Defendants' motion for reconsideration of a portion of its September 30 order, and dismissed Plaintiffs' derivative claims brought on behalf of Harbinger Capital Partners Fund II, L.P.  Dkt. No. 160.  On July 7, 2014, the Court denied Plaintiffs' motion for reconsideration of the September 30 order.  Dkt. No. 191.

Plaintiffs filed the Sixth Amended Complaint ("6AC") on November 4, 2013,[1] and now before the Court is Defendants' motion to dismiss for failure to state a claim on which relief can be granted.  For the reasons that follow, Defendants' motion is GRANTED as to Counts I through V,[2] and the Court declines to exercise supplemental jurisdiction over the remaining claims.

## I.      Background

For the purpose of evaluating the motion to dismiss, all well-pleaded facts in the Sixth Amended Complaint are accepted as true, and all reasonable inferences drawn in Plaintiffs' favor.  *See Kassner v. 2d Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

### A. Parties

Each named Plaintiff is an investor in one of four Harbinger-managed funds.  Lili Schad purchased limited partnership interests in Harbinger Capital Partners Fund I, L.P. ("Fund I"). Klein Family Partnership L.P. purchased limited partnership interests in Harbinger Capital Partners Special Situations Fund L.P. ("Special Situations Fund").  Anil Bhardwaj, Dr. Randall Lang, and The Edward M. Armfield Sr. Foundation Inc. all bought Class A shares issued by Harbinger Capital Partners Offshore Fund I, Ltd. ("Offshore Fund I"), and the Armfield Foundation also purchased a limited partnership interest in Harbinger Capital Partners Special Situations Offshore Fund L.P. ("Special Situations Offshore Fund").  6AC ¶¶ 23-27.

---

[1] Plaintiffs amended the Fifth Amended Complaint, filed October 15, 2013, Dkt. No. 131, to correct typographical errors.  *See* Dkt. No. 142.

[2] Count IV of the Sixth Amended Complaint is asserted against only Harbert Management Corporation. Plaintiff voluntarily dismissed its claims against Harbert shortly after it filed the Sixth Amendment Complaint.  *See* Dkt. No. 151.  Count IV is therefore DISMISSED with prejudice and considered no further.

Two of these funds—Fund I and Offshore Fund I—are "feeder funds" that invest only in Harbinger Capital Partners Master Fund I, Ltd. ("Master Fund"). Harbinger Capital Partners Fund II, L.P. ("Fund II") and Harbinger Capital Partners Offshore Fund II, Ltd. ("Offshore Fund II") are also feeder funds of the Master Fund. Each of the four feeder funds is allocated a portion of the Master Fund's holdings. 6AC ¶¶ 36-42.

Defendants are the individual and the entities responsible for managing the funds' investments. Harbinger Capital Partners LLC ("HCP") is the managing member of Harbinger Capital Partners GP, L.L.C. ("Harbinger GP"), which is the general partner of Fund I and Fund II. HCP has also been investment manager and investment adviser to Offshore Funds I and II and the Master Fund since March 2009, and an investment advisor to the Special Situations Fund. Harbinger Capital Partners Special Situations GP, L.L.C. ("Special Situations GP") is the general partner of the Special Situations Fund. Harbinger Capital Partners Special Situations Offshore GP, L.L.C. ("Special Situations Offshore GP") is the general partner of the Special Situations Offshore Fund. Harbinger Holdings, LLC ("Holdings") is the managing member of HCP, Harbinger GP, Special Situations GP, and Special Situations Offshore Fund GP. Philip A. Falcone ("Falcone") is the co-founder, Chief Investment Officer, and managing member of Holdings, and thus has ultimate control over all of the funds. References to the "Harbinger Defendants" refer to all of the Defendants identified in this paragraph. 6AC ¶¶ 28-35.

Fund I, Fund II, and the Special Situations Fund are also identified as nominal defendants in this action, and Plaintiffs bring derivative claims on their behalf. 6AC ¶¶ 36-38.

**B. Factual Background**

The Court assumes familiarity with its order dismissing the Fourth Amended Complaint, from which the basic factual allegations are largely unchanged. *See* Dkt. No. 125; *In re Harbinger Capital Partners Funds Investor Litig.*, No. 12-cv-1244 (AJN), 2013 WL 5441754 (S.D.N.Y. Sept. 30, 2013). The Harbinger Funds first invested in SkyTerra in 2006, when they purchased some of the company's debt, along with small amounts of equity. 6AC ¶¶ 48-50. Over the next few years, the Harbinger-affiliated funds acquired an increasing amount of

3

SkyTerra's debt and equity.  In 2009, Defendants entered into an agreement and plan of merger with the company, pursuant to which they would acquire full ownership of SkyTerra and take the company private.  The merger was completed in March 2010, and Defendants then replaced nearly all of the company's officers and directors, and renamed it LightSquared.  6AC ¶¶ 48-62.

LightSquared was a high-speed wireless broadband company that intended to operate on the L-band satellite network, on frequencies neighboring those used by Global Positioning System (GPS) technology.  6AC ¶ 63.  In order to operate on the L-band spectrum, LightSquared needed approval from the Federal Communications Commission ("FCC"), and in 2005 the company (then still SkyTerra) was granted permission to build out but not to operate its network. In January 2011, the FCC conditionally approved LightSquared's plans to expand its initial bandwith license, subject to resolving interference problems with GPS operators, and despite opposition from GPS and military equipment producers, the Pentagon, NASA, and the Department of Transportation.  6AC ¶¶ 63-69.  After a February 14, 2012 National Telecommunications Information Administration report to the FCC concluded that multiple tests showed that LightSquared's technology could not operate without interfering with the GPS network, the FCC revoked its conditional approval of LightSquared's network the next day. 6AC ¶¶ 72-73.  It was in the interim period between initial approval to build the network in 2005 and the ultimate revocation of the conditional license in 2012 that Defendants made their investment in LightSquared.

Plaintiffs also allege that some of LightSquared's favorable treatment was due to dubious attempts to curry favor, such as donations to campaign committees, job offers to members of the presidential transition team in 2009, and pressure on witnesses testifying before Congress.  6AC ¶¶ 75-83.  After LightSquared was granted the conditional waiver in January 2011, Defendant Falcone and the company became the subjects of an investigation by the Senate Judiciary Committee into whether the approval was the result of political contributions.  6AC ¶¶ 84-86. Plaintiff allege that this scrutiny has made LightSquared a "political hot potato," too controversial for lawmakers and regulators to touch.  6AC ¶ 136.

The FCC's revocation of the conditional license put LightSquared on an inevitable path toward bankruptcy. Customers terminated contracts because of LightSquared's failure to gain FCC approval, 6AC ¶ 89, and the company began to take on more debt to pay its existing obligations, 6AC ¶¶ 90-92. Despite initially suggesting that he would not consider bankruptcy, 6AC ¶ 94, Falcone later changed course and placed the company into bankruptcy on May 14, 2012. 6AC ¶ 97. Shortly before doing so, he expressed what Plaintiffs allege is an apparent lack of concern about whether LightSquared would go bankrupt, making statements that he would retain control of the company either way, and that his "lifestyle" would not change. 6AC ¶ 96.

Not long after the bankruptcy filing, the SEC completed an investigation of Falcone and the Harbinger family of funds, partnerships, and holding companies. 6AC ¶ 101. Falcone, HCP, and the Special Situations GP were charged in three civil fraud complaints and one administrative proceeding with multiple securities laws violations. 6AC ¶ 101. The SEC alleged, among other things, that Falcone and HCP fraudulently gave Falcone a $113.2 million personal loan from the Special Situations Fund, at an interest rate well below the market rate, without revealing their actions to investors. 6AC ¶¶ 103-05. Furthermore, the SEC indicated that Falcone and HCP reached side deals with some of their largest investors to give them preferential redemption terms for their investments, as a *quid pro quo* for voting in favor of more restrictive terms for other investors. 6AC ¶¶ 107-09. Falcone and HCP eventually reached a settlement with the SEC, and signed a Proposed Final Judgment admitting that they made the personal loan to Falcone without disclosing it for five months, and granted favorable redemption terms to investors in Fund I exchange for investors' votes to impose more restrictive terms without informing Fund I's board of directors or other investors. 6AC ¶ 115.

### C. Procedural History

The Court granted in part and denied in part Defendants' motion to dismiss the Fourth Amended Complaint on September 30, 2013. In relevant part, the Court dismissed with prejudice all of Plaintiffs' claims predicated on Defendants' purchase of SkyTerra. Dkt. No. 125 at 42. Such dismissal was compelled by the Securities Litigation Uniform Standards Act of 1998

("SLUSA"), 15 U.S.C. § 78bb(f), because Plaintiffs' claims involved allegations of
"misrepresentation or omission of a material fact in connection with the purchase or sale of a
covered security." 15 U.S.C. § 78bb(f)(1)(A). As explained in the September 30, 2013 order, a
suit is precluded by SLUSA when 1) it is a "covered class action" with a class size of 50 or more
people; 2) it is based on state or local law 3) it concerns a "covered security"; and 4) the
defendant misrepresented or omitted a material fact "in connection with the purchase or sale" of
that security. Dkt. No. 125 at 22 (citing *Newman v. Family Mgmt. Corp.*, 748 F. Supp. 2d 299,
311-12 (S.D.N.Y. 2010)). The parties agreed that the first three requirements were met, so only
the "in connection with a covered security" requirement was at issue in the previous motion to
dismiss. A security "covered" under SLUSA is "one traded nationally and listed on a national
exchange." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 83 (2006); 15
U.S.C. § 78bb(f)(5)(E). The Court rejected Plaintiffs' argument that their claims were not
precluded by SLUSA because they invested only in the Harbinger Funds, which are uncovered
securities. The Court relied on the Second Circuit's decision in *In re Herald (Herald I)*, 730
F.3d 112 (2d Cir. 2013), which held that SLUSA precluded claims brought by investors in
uncovered feeder funds when those funds, in turn, had an investment strategy involving the
purchase of covered securities, and the investors' claims arose in connection with the funds'
security fraud. *Id.* at 118. Recognizing that Plaintiffs had also alleged claims that were not
related to the SkyTerra acquisition, such as those premised on Falcone's personal loan from the
Special Situations Fund and the undisclosed preferential redemption terms for certain
institutional investors, the Court granted Plaintiffs an opportunity to amend the complaint and re-
plead those claims in a way that clearly separated them from allegations based on the acquisition
of SkyTerra.

Subsequent to the Court's order, the Supreme Court issued its decision in *Chadbourne &
Parke LLP v. Troice*, 134 S. Ct. 1058 (2014), on February 26, 2014. *Troice* held that "[a]
fraudulent misrepresentation or omission is not made 'in connection with' ... a 'purchase or sale
of a covered security' unless it is material to a decision by one or more individuals (other than

6

the fraudster) to buy or to sell a 'covered security.'" *Id.* at 1066.  That case involved investors in certificates of deposit offered by Stanford Bank as part of Allen Stanford's Ponzi scheme, and the Court held that claims alleging fraud related to that investment were not precluded by SLUSA because they were not made "in connection with" covered securities. *Id.* at 1064, 1071. The only potential connection between the fraud on investors and covered securities in *Troice* was the bank's purported use of the deposited funds to purchase covered securities; the investors themselves had no purported ownership interest in those securities. *Id.* at 1071.  Plaintiffs here moved for reconsideration of the Court's September 30, 2013 order in light of *Troice*, arguing that *Troice* overruled *Herald I*'s conclusion that claims of fraud causing an investor to take an ownership interest in uncovered hedge fund securities could be considered "in connection with" the underlying covered securities purchased by the feeder fund. *See* Dkt. No. 189.  The Court heard oral arguments, but delayed deciding Plaintiffs' motion until further guidance issued from the Second Circuit, which came shortly thereafter in the form of *In re Herald (Herald II)*, 753 F.3d 110 (2d Cir. 2014), *cert. denied sub nom. Davis v. Kohn*, No. 14-730 (U.S. Mar 30, 3015). In *Herald II*, the Second Circuit denied a petition for panel rehearing in light of *Troice*, explaining that *Troice* concerned investors who were not seeking "directly or indirectly" to purchase covered securities. *Id.* at 113.  They distinguished the funds in *Herald* from the certificates of deposit in *Troice* because the *Herald* investors did, in fact, take a purported ownership interest in covered securities, even though it was through feeder funds as an intermediary. *Id.*

After the Second Circuit decided *Herald II*, the Court denied Plaintiffs' motion for reconsideration on July 7, 2014.  Dkt. No. 191.  Recognizing that the Second Circuit had reaffirmed that claims based on both indirect and direct investments in covered securities are precluded, the Court found Plaintiffs' other attempts to distinguish *Herald II* unpersuasive. Defendants filed the instant motion to dismiss the Sixth Amended Complaint shortly after the Court issued the order denying reconsideration.

## II.    Motion to Dismiss Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual allegations, accepted as true to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570) (internal quotation marks omitted). At this stage, a court must accept as true all well-pleaded facts and draw all reasonable inferences in the light most favorable to Plaintiffs. *See Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir. 2007). Although factual allegations are therefore afforded a presumption of truth, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). In addition to the allegations in the Complaint, the Court may also consider "documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks and alterations omitted) (quoting *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993)).

### III.    SLUSA (Counts I & II)

Defendants first argue that Counts I and II of the Sixth Amended Complaint, which assert state-law negligent misrepresentation and fraud claims against all Defendants, are precluded under SLUSA even in their amended form. Their argument, in short, is that their allegations of fraud and misrepresentations arising while LightSquared was a private, uncovered security are inevitably intertwined with their allegations regarding the Funds' purchase of SkyTerra—and thus that the alleged fraud was perpetrated "in connection with" with the purchase of covered SkyTerra securities.

Following the Court's dismissal of claims based on Defendants' purchase of SkyTerra in the September 30, 2013 Memorandum & Order, Dkt. No. 125, and the Court's subsequent denial of their motion for reconsideration, Dkt. No. 191, Plaintiffs have re-pleaded their allegations to allege only misrepresentations and fraudulent statements made by Defendants after LightSquared went private. These misrepresentations, Plaintiffs claim, caused them to purchase or hold limited

8

partnership interests in Harbinger Funds that they either would have foregone or divested from, had they known the truth.  The Sixth Amended Complaint does not contain explicit allegations that misrepresentations were made before or during Harbinger's purchase of SkyTerra.  Instead, its allegations in the section entitled "Direct Claims" are largely limited to misrepresentations and failures to disclose in the time period after LightSquared went private in March 2010, including: (1) an investor conference call on April 28, 2010; (2) portfolio updates on June 3 and 4, 2010; (3) an investor presentation in June 2010; (4) a press release dated July 20, 2010; (5) an investor update on November 11, 2010; (6) an announcement that LightSqaured had reached an agreement with Sprint Nextel on June 17, 2011; (7) an investor update on August 5, 2011; (8) an investor update on August 19, 2011, which was the first to mention GPS interference issues; and (9) monthly statements about the funds' performance that did not reflect LightSquared's correct value.  6AC ¶¶ 154-87.

The questions is whether Plaintiffs' more limited allegations involving LightSquared are unrelated to Defendants' acquisition of covered SkyTerra securities in a meaningful way, or just a superficial one.  Background allegations that are not factual predicates of a defendant's liability do not themselves trigger SLUSA preclusion.  *See LaSala v. Border et Cie*, 519 F.3d 125, 141 (3d Cir. 2008); *accord In re Herald (Herald I)*, 730 F.3d 112, 119 (2d Cir. 2013).  In other words, allegations of misrepresentations and omissions related to covered securities will not trigger SLUSA preclusion if they are extraneous to the bases for liability alleged in the complaint.  *LaSala*, 519 F.3d at 141.  However, Plaintiffs cannot avoid preclusion by artfully pleading their claims so as to seemingly disconnect them from the purchase or sale of a covered security if the distinction drawn is superficial.  Courts are required to "look beyond the face of the complaint to analyze the substance of the allegations made."  *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 34 (2d Cir. 2005), *rev'd on other grounds*, 547 U.S. 71 (2006).  Accordingly, if any sufficient connection between Plaintiffs' claims and the sale of a covered security exists based on the substance of the allegations, the claims are precluded even if

Plaintiffs do not plead that connection explicitly. *See Herald I*, 730 F.3d at 119 (connection can be "implicit or explicit") (citing *LaSala*, 519 F.3d at 141).

Unlike *Troice* and *Herald II*, the question here is not whether investments made through an intermediary still involve the purchase or sale of a covered security, but whether the entirety of a fraud involving a security that transitions from "covered" to "uncovered" status *in medias res* is precluded by SLUSA. If LightSquared had been a publicly traded company throughout the entirety of the period covered by Plaintiff's allegations, it would be self-evident that they were precluded under *Herald II* and *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 88-89 (2006) (holding that claims of individuals defrauded into holding covered securities precluded under SLUSA). But while the parties agree that shares of SkyTerra were a "covered security" at the time Harbinger acquired them, LightSquared equity shares would not, considered in isolation, be considered "covered securities" once the merger was complete and the company was taken private, because they were not traded on a national exchange. *Id.* at 83.

Though neither *Troice* nor *Herald II* dealt with the temporal question at issue here, those cases did set forth principles that guide this inquiry. *Troice* held that, for SLUSA purposes, a fraudulent misrepresentation or omission is not made in connection with the purchase or sale of a covered security "unless it is material to a decision by one or more individuals (other than the fraudster) to buy or sell a covered security." 134 S. Ct. at 1066 (internal quotation marks omitted). Inasmuch as *Troice* emphasized the narrowness of SLUSA's definition of "covered security," however, it also did not disturb the Supreme Court's prior holding in *Dabit*, which read SLUSA broadly to hold that preclusion does not depend on the plaintiffs being the direct purchasers of the covered security, or the plaintiffs and the defendant being in a buyer-seller relationship. *Dabit*, 547 U.S. at 85. The alleged fraud need only "*coincide* with a securities transaction—whether by the plaintiff or by someone else." *Id.* (emphasis added and internal quotation marks omitted). Between *Troice* and *Dabit*, then, the "in connection with" requirement can fairly be said to have both a narrow and a broad dimension. It is narrow insofar as allegedly fraudulent statements must be of the type that would induce someone to buy or sell

(or hold) a covered security.  Fraud that depends in no way on a purchase of covered securities will not suffice, even if the fraudster purports to undertake independent transactions in covered securities on his own.  But once it is shown that the alleged fraud is comprised of statements or omissions that would lead an investor to make a decision about whether to buy or purchase covered securities, the scope of what is precluded is broad, and includes far more than claims that the plaintiffs themselves were induced to take a position in the covered security.  So long as someone was induced to buy, sell, or hold a covered security, any fraud claim involving those transactions (or foregone transactions) is precluded under *Dabit*.

In light of these principles, and after considering not just the face of the Sixth Amended Complaint but also the substance of its allegations, as is required, the Court agrees with Defendants that SLUSA precludes Counts I and II.  The *sine qua non* of Plaintiffs' allegations is that, but for Defendants' misrepresentations and omissions, Plaintiffs would have divested themselves of SkyTerra/LightSquared by divesting from the Funds.  On that score, they plead a single fraud that caused them to purchase or hold their investments—a fraud that began with material misstatements and omissions made in connection with the purchase of a covered security, SkyTerra, and continued with the *same misrepresentations and omissions* after SkyTerra became the privately held company LightSquared.  To carefully excise the allegations involving purchase and holding of interests in the Harbinger Funds during the acquisition of SkyTerra is artful pleading, and does not mask Plaintiffs' effective allegations of a single fraud with the requisite connection to covered securities.

Despite Plaintiffs' attempts to cabin their fraud allegations to events occurring after Defendants took LightSquared private, the Sixth Amended Complaint is still replete with allegations concerning the acquisition of SkyTerra.  *See* 6AC ¶¶ 48-62.  Beginning with the initial investment in SkyTerra, Plaintiffs allege that Defendants first invested in SkyTerra's debt, "as would be appropriate for a fund marketed primarily as a distressed-debt fund," 6AC ¶ 50— implying that the acquisition of SkyTerra equity was Defendants' first "inappropriate" move, as it deviated from representations made to investors.  Plaintiffs further allege that, because

11

Harbinger[3] appointed two members to SkyTerra's board after an initial round of equity investments, Defendants knew about SkyTerra's "severe financial problems" before they acquired the company in full.  6AC ¶ 59.  These allegations match Plaintiffs' assertions under the heading "Direct Claims: Defendants' False and Misleading Statements to the Investors," wherein they explain that LightSquared's predecessors knew of the GPS problems since 2002, well before Defendants' take-private acquisition of SkyTerra.  6AC ¶ 148.  Putting a finer point on the matter, Plaintiffs allege that it can "reasonably be inferred" that Defendants would have become aware of the GPS issue, and the hurdles to obtaining FCC approval of the company's technology, while performing due diligence in anticipation of their acquisition of the company.  6AC ¶ 149. Plaintiffs then go on to state that, "[d]espite knowing of these enormous risks and hurdles, … Defendants provided Plaintiffs and Class Members with positive, anodyne general reporting on Harbinger's investment in LightSquared … ."  6AC ¶ 150.

Based on Plaintiffs' own allegations, then, Defendants knew and did not disclose to Plaintiffs and other investors even before they took SkyTerra private: 1) that they had taken a large position in what became LightSquared despite contrary representations about the Funds' investment strategies; 2) that SkyTerra/LightSquared faced serious technological and regulatory challenges that were likely to hinder its development and make the success of the venture speculative at best; and 3) that Defendants would be in a management role over SkyTerra/LightSquared.  These same general misstatements and omissions form the foundation of Plaintiffs' allegations from the period after Defendants took LightSquared private.  *See* 6AC ¶¶ 154-59 (misleading investors about LightSquared's risks and compatibility with Defendants' investment strategy); 6AC ¶¶ 160-62 (misleading investors about regulatory risks); 6AC ¶¶ 163-67 (misleading investors about technological, regulatory, and management risks); 6AC ¶¶ 168-71 (misleading investors about technology and risks); 6AC ¶¶ 172-73 (misleading statements "reaffirmed" prior false statements about assets and business plans); 6AC ¶¶ 176-79 (misleading

---

[3] Plaintiffs do not specify which specific Harbinger entity they are referring to in this portion of the Sixth Amended Complaint.

statements and omissions regarding regulatory risk); 6AC ¶¶ 180-83 (misrepresentations regarding seriousness of regulatory/technological issue).  Even matters that could not have underlain allegations from before the company went private, such as omissions in an announcement about a contract with Sprint Nextel, 6AC ¶¶ 174-75, and Defendants' failure to properly mark down LightSquared's value when reporting it to investors, 6AC ¶¶ 186-87, are simply the other side of the same coin: they are misrepresentations about the value and risk involved in the overall investment in SkyTerra/LightSquared, and are part of Defendants' alleged continuing efforts to keep Plaintiffs in the dark about that investment.

It is telling that the Sixth Amended Complaint alleges not a series of smaller frauds, but a single fraudulent course of conduct that encompasses all of the misstatements and omissions that Plaintiffs have alleged.  *See* 6AC ¶¶ 210-12 (describing Count I, and alleging that Defendants made "numerous false and misleading representations about the Funds to Plaintiffs and Class Members concerning, among other things, the Funds' investment strategy, the risk management strategies that would be employed, and the prospects for the Funds' underlying investments"); ¶¶ 216-18 (Count II, also alleging "numerous false representations").  The substance of the Sixth Amended Complaint makes clear that it is arbitrary, from the standpoint of evaluating the entire scheme, to begin the allegations of fraud and misrepresentations at the moment LightSquared became private, and that the only purpose for doing is to avoid SLUSA's reach.  This is artful pleading, and even the Sixth Amended Complaint itself occasionally undermines it: at one point in the Complaint, Plaintiffs suggest that taking the company private was *part* of the overall fraudulent scheme.  *See* 6AC ¶ 61 ("In connection with its acquisition, Harbinger also took SkyTerra private so that it no longer had to file public reports.").  All of the same misconduct that Plaintiffs allege occurred after the company went private was also occurring when it was still publicly traded, and Plaintiffs cannot avoid that fact by deleting certain facts from the complaint or labeling others "background."  The substance of the complaint reveals that Defendants' activities while SkyTerra was still public were factual predicates of the same fraud that Plaintiffs have pleaded.

Further evidence of artful pleading is found in the differences between Plaintiffs' direct and derivative claims. Though Counts I and II disclaim including any allegations "related to derivative claims," the Court is required look at the substance of Plaintiffs' allegations, and the derivative-claim allegations shed light on the overall nature of Defendants' scheme. In those allegations, Plaintiffs discuss the "LightSquared gamble," and explain that Defendant Falcone was pursuing a "vision" of building a 4G wireless network. 6AC ¶ 127. They claim that this "vision" involved deviating from the Funds' objective, which is also an allegation underlying their direct claims. 6AC ¶ 127. And throughout the Sixth Amended Complaint, Plaintiffs refer to the acquisition of SkyTerra/LightSquared as a "strategy" undertaken by the Funds, with the implicit understanding that Defendants became set on their course of conduct from the time they began acquiring SkyTerra equity. *See* 6AC ¶ 6 ("In 2006 … Defendants started to implement a very different investment strategy … ."); ¶ 20 (referring to the "LightSquared strategy"); 129 (referring to "Falcone's strategy"); ¶ 153 ("Harbinger's misrepresentation and disclosure failures related to GPS interference issues exacerbated its failures to disclose risks … [including] its adoption of a long-term strategy to execute on business plans rather than an event-driven strategy."); ¶ 198 ("Defendants concealed the risk inherent in this strategy … ."). As *Herald I* and other cases discussing "artful pleading" have made clear, the Court cannot turn a blind eye to allegations that would connect Defendants' fraud to a covered security, and the substance of the facts related to those allegations, simply because Plaintiffs ask the Court to do so. *See Herald I*, 730 F.3d at 119.

Accordingly, because Plaintiffs have not pleaded fraud and negligent misrepresentation claims that are unrelated to the purchase of covered SkyTerra securities, their claims in Counts I and II of the Sixth Amended Complaint are precluded under SLUSA, and DISMISSED with prejudice.

IV.   **Direct Breach of Fiduciary Duty & Aiding and Abetting Breach of Fiduciary Duty (Counts III & V)**

Count Three of the Sixth Amended Complaint alleges that Falcone, Harbinger GP, Harbinger Special Situations GP, and Harbinger Special Situations Offshore GP breached fiduciary duties owed directly to Plaintiffs as investors. 6AC ¶ 222. Specifically, this claim is based on low-interest $113.2 million loan Defendant Falcone received from the Special Situations Fund, as well as on undisclosed "side letters" signed with large institutional investors to allowed them to redeem their investments, both at times when others were not permitted to make redemptions, and on terms more favorable than those offered to other investors. 6AC ¶¶ 13, 224. Defendants argue that Plaintiffs have failed to state a claim on this count because the personal loan was disclosed to Plaintiffs, and because the possibility of investment terms being waived or modified for "large or strategic investors" was disclosed as part of the Funds' governing agreements, which Plaintiffs received prior to investing in the Funds. They further argue that Falcone is not liable on this claim because he did not owe a fiduciary duty directly to investors.

Though Plaintiff's claim with regard to Falcone's $113.2 million loan is pleaded solely in terms of violating the fiduciary duty of disclosure, their moving papers also indicate a theory that Defendants violated the duty of loyalty. However, any theory Plaintiffs advance that their direct claims for breach of fiduciary may go forward based on an alleged breach of the duty of loyalty must be put aside, because such claims must be derivative, not direct. As the Court explained in its Memorandum & Order on the motion to dismiss the Fourth Amended Complaint, claims alleging fund mismanagement are indisputably derivative under Delaware law. Dkt. No. 125 at 15. Thus, though Defendants do not contest Plaintiff's proposition that "[i]t is an act of disloyalty for a fiduciary to profit personally" from use of partnership property, *Oberly v. Kirby*, 592 A.2d 446, 463 (Del. 1991) (discussing use of information secured in a confidential relationship), this claim is derivative because it alleges that Falcone profited from use of the *partnership*'s property. The allegation is that Falcone received the loan at an interest rate lower than what the Special Situations Fund was paying to borrow money—meaning the Special Situations Fund was taking a loss on the loan. 6AC ¶¶ 115(a), 134. For the same reasons as

15

were discussed in the Court's September 30, 2013 Memorandum & Order, a direct claim premised on this theory cannot stand.

That said, the September 30, 2013 Memorandum & Order also explained that Plaintiffs could raise a direct breach of fiduciary duty claim alleging nondisclosure of information. *See* Dkt. No. 125 at 17. The Sixth Amended Complaint states that Defendants "owed duties of candor and truthful disclosure... ." 6AC ¶ 223. It goes on to state, "Defendants knowingly and/or grossly negligently *failed to disclose to investors* that Falcone received a low-interest, personal loan ... ." 6AC ¶ 224 (emphasis added). Because these claims are facially premised on the duty of disclosure, they are appropriately raised as direct claims, and the Court will consider them now.

As a threshold matter, Defendants argue that Defendant Falcone did not owe fiduciary duties directly to Plaintiffs and other investors. Recall that Special Situations Fund, which was the source of the loan, has Special Situations GP as its general partner. Special Situations GP, in turn, is managed by Harbinger Capital Holdings. Falcone is the managing member of Holdings, meaning that although he has operating control over the Special Situations Fund, his relationship to it is twice removed: he is the managing partner of the managing partner of the general partner of the Special Situations Fund. *See discussion, supra* at 3. Defendants' argument that Falcone did not owe fiduciary duties to the limited partners of (*i.e.*, investors in) the Special Situations Fund is premised on the proposition that, "as a matter of Delaware law, the person or entity who controls the general partner of a limited partnership does not owe fiduciary duties to the partnership or its individual partners." Defs.' Mem. in Support at 23. This assertion plainly fails in light of *In re USACafes, L.P. Litigation*, 600 A.2d 43 (Del. Ch. 1991), which held that directors of a corporate general partner owe fiduciary duties directly to limited partners. *Id.* at 48. Without delineating the entire extent of the duty owed by a directors of a general partner who are in control of the partnership's property, the Court of Chancery explained that "it surely entails the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership." *Id.* at 49. This holding squarely covers Plaintiffs'

allegations concerning Falcone's loan from the Special Situations Fund, as he was the director in control of the partnership's property, even if his control was formally mediated by a corporate general partner.

Defendants acknowledge *USACafes*, but argue that Delaware law on the issue has changed, even though *USACafes* has never been directly overruled. Even in the authority cited by Defendants, however, the Court of Chancery notes that it has faithfully applied the holding of *USACafes* since it came down, and that the case and its progeny are *stare decisis*. *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 670-71 (Del. Ch. 2012). The Court must apply Delaware law, and under Delaware law Falcone has fiduciary duties to limited partners in the Special Situations Fund.

Even so, Plaintiffs must adequately plead allegations that Defendants breached their fiduciary duties to Plaintiffs by failing to disclose information regarding the personal loan to Falcone and the side letters to institutional investors. Defendants argue that the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies to these allegations, and the Court agrees. Rule 9(b)'s standards must be met not only for claims directly alleging fraud, but for "all averments of fraud or mistake, whatever may be the theory of legal duty—statutory, common law, tort, contractual, or fiduciary." *Frota v. Prudential-Bache Sec., Inc.*, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986); *see also Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (applying Rule 9(b) when "wording and imputations of the complaint are classically associated with fraud"); *Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*, No. 04-cv-3318 (LAP), 2005 WL 736217, at *2 (S.D.N.Y. Mar. 30, 2005). A claim is based on allegations of fraud, regardless of how it is titled, when it involves allegations of "misrepresentations and omissions made with intent to defraud." *DeBlasio v. Merrill Lynch & Co.*, No. 07-cv-318 (RJS), 2009 WL 2242605, at *10 (S.D.N.Y. July 27, 2009) (quoting *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 691 (S.D.N.Y. 2000)). Counts III and V of the Sixth Amended Complaint fit that bill. They allege that Defendants breached their fiduciary duties owed directly to Plaintiffs by failing to disclose information regarding Falcone's personal loan from the Special Situations Fund and

17

the side arrangements with large institutional investors giving them preferential redemption terms, and that Plaintiffs were induced to hold their investments based on these omissions. Essentially, Defendants are alleged to have omitted giving this information to Plaintiffs and thus defrauded them into remaining invested in the Funds.

Rule 9(b) requires that, when alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  In the securities fraud context, this standard requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).  The requirements for alleging omissions are substantially the same; plaintiffs must specify the omissions that they contend were fraudulent, identify the person responsible for not disclosing the omissions, state where and when the omissions occurred, and explain why the omissions were fraudulent. *See In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 213 n.19 (S.D.N.Y. 2004).

Plaintiffs' response fails to adequately address Defendants' argument that the fraud is not alleged with sufficient particularity.  Plaintiffs point the Court to paragraphs 154 through 182 of the Sixth Amended Complaint, which they say contain the particular misstatements Defendants have made.  All of these paragraphs relate to allegations involving the LightSquared investment, and none touch on the personal loan or side arrangements.   However, the Court has considered the broader allegations in the Sixth Amended Complaint for the purpose of evaluating whether they comply with Rule 9(b).  Plaintiffs allege that the SEC charged Falcone with "fraudulently scheming to misappropriate $113.2 million from the Funds" by arranging for the personal loan, and by concealing the loan from investors for five months. 6AC ¶ 103.  The Complaint contains further allegations stating that Falcone and Harbinger engaged outside counsel to advise on the loan, but withheld information from them, and ignored a warning from the general counsel of the Funds' third-party service provider advising against the loan. 6AC ¶ 104.  Plaintiffs state that

Falcone and HCP never disclosed the loan to investors in the Special Situations Fund, and it was not listed as an asset despite being one of the Funds' largest holdings. 6AC ¶ 105. They also allege that Falcone sent an email to investors stating the loan had been "vetted extensively," as well as "other misleading emails." 6AC ¶ 105. Finally, after the loan was revealed in March 2010, Falcone and HCP told investors that Falcone's tax liability (which is ostensibly why he took the loan) was unexpected, which Plaintiffs claim was untrue. 6AC ¶ 105. Although the allegations that 1) Falcone did not disclose the loan and 2) that he emailed investors to tell them it had been "extensively vetted" appear contradictory, the Court must construe the Complaint in the light most favorable to Plaintiffs, and thus assume that the email was sent after the five months that Defendants allegedly did not disclose the loan had passed.

These allegations fall short of Rule 9(b) standards. As far as Falcone's and HCP's affirmative statements go, there is no indication of "where and when" any of the statements attributed to Defendants were made. *See ATSI Commc'ns*, 493 F.3d at 99. The Sixth Amended Complaint refers only to a representation that the loan was "vetted extensively" in an email that was sent at an unspecified time and under unspecified circumstances, and refers to "other misleading emails." 6AC ¶ 105. These basic allegations are not sufficient. *See Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986) (allegations lacking information regarding time, place, speaker, and content of misrepresentations insufficient under Rule 9(b)). It also alleges that Falcone and HCP told investors that Falcone's tax liability was unexpected, but there is no explanation as to "why the statement[] [was] fraudulent," *ATSI Commc'ns*, 493 F.3d at 99.

As for the alleged omissions, Plaintiffs allege broadly that Defendant failed to disclose the loan to them for five months. 6AC ¶ 103. Their other allegations of malfeasance regarding the loan are not couched in terms of nondisclosure: they allege that the loan was taken out at well below the interest rate Falcone should have paid, that Falcone ignored counsel's advice in taking the loan, and that Falcone failed to disclose matters to the law firm advising him on the loan, 6AC ¶ 104, but do not allege that failing to disclose any of these matters was fraudulent. They instead state that these allegations conferred a benefit to Falcone at investors' expense, but the

allegations cannot plausibly be understood to suggest that this was because Plaintiffs were misled as to any of these matters. 6AC ¶ 104. Plaintiffs do not state whether Falcone, Harbinger, or some other entity were responsible for informing them about the loan, or exactly "when" the omissions occurred. *See In re Initial Pub. Offering*, 358 F. Supp. 2d at 213 n.19. Indeed, it is unclear from the Sixth Amended Complaint the regularity with which statements about new investments or loans would or should have been made, and thus there is no statement as to *why* failure to disclose for five months was fraudulent as to Plaintiffs. *See id.* Accordingly, Plaintiffs have failed to set out sufficient allegations to meet the requirements of Rule 9(b) with regard to the personal loan.

Plaintiffs' allegations regarding the "side arrangements" with certain investors are found in paragraphs 106 through 109 of the Sixth Amended Complaint. There, Plaintiffs allege that Falcone entered into four specific side letter arrangements (two with one investor), permitting alternatively $65 million in preferential redemptions, consolidation of an investor's affiliated accounts to permit it to redeem at a higher rate, and a waiver of prior notice provisions for redemption. 6AC ¶ 108. The terms were not disclosed to "directors and other investors." 6AC ¶ 107. However, the directors of Fund I "were notified" in March 2010 that there were "no side letters." 6AC ¶ 109. Defendants also did not disclose the side letters when it responded to annual investor questionnaires. 6AC ¶ 109.

These allegations, too, are not pleaded with sufficient particularity under Rule 9(b). Plaintiffs allege specifics regarding the side deals, and that their very existence as well as their terms were hidden from investors. However, their allegation that directors "were notified" that no side letters existed in March 2010 fails to identify a speaker, and does not demonstrate that a fraudulent statement was made to *investors*. Moreover, the allegation that "Harbinger" specifically did not disclose the side letters in response to annual investor questionnaires, *see* 6AC ¶ 109, does not explain how or why these answers to investor questionnaires were

fraudulent, and does not specifically identify a speaker.[4]  *See Zerman v. Ball*, 735 F.2d 15, 22 (2d Cir. 1984) (dismissing for failure to allege statements specifically from a defendant to plaintiff). Plaintiffs also do not allege any fraudulent statement specifically by Falcone related to the side letters.  Accordingly, because Plaintiff's allegations do not specifically allege any misstatements or omissions by Falcone, Harbinger GP, Harbinger Special Situations GP, or Harbinger Special Situations Offshore GP with the particularity required under Rule 9(b), Count III of the Sixth Amended Complaint must be dismissed.

Count V of the Sixth Amended Complaint alleges that Holdings and Falcone[5] aided and abetted the breaches of fiduciary duty alleged in Count III.  However, one of the elements of aiding and abetting breach of fiduciary duty is knowing participation in another's breach. *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).  Because Plaintiffs' underlying breach claims must be dismissed, their aiding and abetting claims must be dismissed as well.  These claims would suffer from the same pleading deficiencies under Rule 9(b) regardless, as an independent grounds for dismissal.

Accordingly, Counts III and V of the Sixth Amended Complaint are DISMISSED because, although they are premised on allegations of fraud, they do not plead fraud with the particularity required under Rule 9(b).

## V.    Derivative Claims (Counts VI and VII)

Subject-matter jurisdiction in this Court is based on the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), which gives the district courts original jurisdiction over class actions that are, among other requirements, minimally diverse.  Counts VI and VII, which are state-law derivative claims, are before the Court based on supplemental jurisdiction under 28 U.S.C. § 1367, as the parties do not otherwise meet the requirement of complete diversity for the Court to exercise jurisdiction under 28 U.S.C. § 1332(a).  *See Owen Equip. & Erection Co. v. Kroger*,

---

[4] Though Plaintiffs identify the speaker as "Harbinger," this could refer to any Defendant other than Falcone.  Plaintiffs did not give any of these entities a shorthand title of merely "Harbinger" for the purposes of the Sixth Amended Complaint, *See* 6AC ¶ 2.

[5] Plaintiffs pleaded this claim against Falcone in the alternative to their claim in Count III.

437 U.S. 365, 373-74 (1978) (§ 1332(a) requires all plaintiffs to be diverse from all defendants);
6AC ¶ 23 (Plaintiff Schad domiciled in New York); ¶ 34 (Defendant Falcone domiciled in New
York).  Section 1367 also provides that a district court may decline to exercise supplemental
jurisdiction if it has dismissed all claims over which it has original jurisdiction, *see* 28 U.S.C.
§ 1367(c)(3), and that is the case here with the dismissal of all of Plaintiffs' class claims in
Counts I through V.

 The Second Circuit has held that, generally, "if all federal claims are dismissed before
trial, the state claims should be dismissed as well." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39,
56 (2d Cir. 2004) (quoting *Castellano v. Bd. of Trs.,* 937 F.2d 752, 758 (2d Cir. 1991))
(alterations and internal quotation marks omitted).  This rule admits of some exceptions if it is
late in the action and dismissing the state claims would be exceptionally wasteful, *id.* at 56, but
Plaintiffs raise no argument that the Court should exercise supplemental jurisdiction if all class
claims are dismissed, and the Court does not find that the circumstances warrant doing so.
Though the Complaint has gone through several iterations, the case is still at the Rule 12(b)(6)
stage, and the vast majority of the Court's work on the merits has involved SLUSA preclusion
rather than the state-law derivative claims.  Thus, the Court finds that convenience and comity
weigh in favor of the remaining state-law claims being heard in state court, and that judicial
economy is not served by this case remaining in federal court.  *See Dispute Resolution Mgmt.,
Inc. v. Greenberg Traurig, LLP*, No. 03-cv-3501 (SHS), 2005 WL 551030, at *2 (S.D.N.Y. Mar.
9, 2005).

 Given the early stage at which this lawsuit remains and the fact that there are no special
considerations of efficiency or special knowledge that make it sensible for the state-law claims to
remain in federal court, the Court declines to exercise supplemental jurisdiction over the
remaining state law claims—Counts VI and VII—and therefore dismisses the remainder of the
Sixth Amended Complaint.

 **VI. Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED as to all of Counts I, II, III, IV, and V, and these counts are dismissed with prejudice.  The Court declines to exercise supplemental jurisdiction over Counts VI and VII, and those claims are therefore dismissed without prejudice.

This resolves Docket Nos. 192 & 199.  The Clerk is requested to terminate the case.

Dated: March ___30___, 2015
          New York, New York

_____
          ALISON J. NATHAN
     United States District Judge

23